# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **DINAH YUKICH,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | **NO. 2:25-cv-18011-KSH-AME** |
| **PREMIER FENCING CLUB,** *et al.*, | |
| **Defendants.** | |

### BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANTS UNITED STATES OLYMPIC AND PARALYMPIC COMMITTEE AND MAC BROWN'S MOTION TO DISMISS

**SPECTOR GADON ROSEN VINCI, P.C.**
Susan M. Cirilli, Esquire
Attorney I.D. No.: 017972012
One Logan Square, 18th Floor
130 N. 18th Street
Philadelphia, PA 19103
(215) 241-8887
SCirilli@sgrvlaw.com
*Attorney for Plaintiff Dinah Yukich*

**Dated:  March 5, 2026**

4140442-1

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES........................................................................................ ii

I.      INTRODUCTION ...........................................................................................1

II.     FACTUAL BACKGROUND ...........................................................................1

    A.    DINAH'S INITIAL RELATIONSHIP WITH USA FENCING ............................1

    B.    USOPC UPDATES ITS NGB & USOP ATHLETE SAFETY POLICY................2

    C.    THE EXECUTIVE ORDER...................................................................3

    D.    USAF UPDATED THEIR POLICY TO PROHIBIT DINAH FROM
        PARTICIPATING IN WOMEN'S EVENTS ...........................................4

    E.    USOPC & MAC BROWN COLLABORATED WITH USA FENCING ..............4

    F.    USOPC & USAF DEFENDANTS BLOCK DINAH FROM
        PARTICIPATING IN WOMEN'S EVENTS ...........................................4

III.    LEGAL ARGUMENT ....................................................................................6

    A.    THIS COURT HAS JURISDICTION OVER THE USOPC AND BROWN .........6

    B.    USOPC IS SUBJECT TO GENERAL JURISDICTION IN NEW JERSEY .........7

    C.    USOPC IS SUBJECT TO SPECIFIC JURISDICTION IN NEW JERSEY ..........8

    D.    PLALINTIFF'S CLAIMS ARE NOT PREEMPTED BY THE SPORTS ACT ....22

    E.    EXECUTIVE ORDER 14201 IS NOT LAW .......................................31

    F.    THE USOPC'S MANDATE, AS COMMUNICATED BY BROWN, THAT
        THE USAF BAN TRANSGENDER  WOMEN FROM COMPETING IN
        PREMIER FENCING EVENTS CONSTITUTES THEIR AIDING AND
        ABETTING OF PREMIER FENCING'S DISCRIMINATION AGAINST
        PLAINTIFF....................................................................................34

    G.    PLAINTIFF HAS PLED SUFFICIENT FACTS TO SUPPORT HER
        CLAIMS FOR INENTIONAL INFLICTION OF EMOTIONAL
        DISTRESS AND CIVIL CONSPIRACY ...........................................36

IV.     CONCLUSION............................................................................................41

**TABLE OF AUTHORITIES**

<u>CASES</u>

*Acteon, Inc. v. Vista Dental Products*, 2006 WL 12079999,
    at *4 (May 3, 2006) ................................................................................. 18, 19, 20

*Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 178, 876 A.2d 253, 263 (2005) ......................... 40

*Bennett v. Progressive Corp.*, 225 F. Supp. 2d 190, 213 (N.D.N.Y. 2002) .................................. 34

*Bishop v. Okidata, Inc.,* 864 F.Supp. 416, 427 (D.N.J.1994) ......................................................... 37

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.* 582 U.S. 255, 262 (2017) ........... 10, 14

*Buckley v. Trenton Saving Fund Society,* 111 *N.J.* 355, 544 *A.*2d 857 (1988) ............................. 37

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985) .................................................... 9, 16

*California v. Environmental Protection Agency*, 72 F.4th 308, 318 (D.C. Circuit 2023) .............. 32

*Calkins v. Dollarland, Inc.,* 117 F.Supp.2d 421, 432 (D.N.J.2000) .............................................. 37

*Cantrell v. U.S. Soccer Fed'n (USSF),* 924 P.2d 789 (Okla. Civ. App. 1996) .............................. 30

*Chanval Pellier v. Brit. Airways, Plc.*, No. CIV.A. 02-CV-4195, 2006 WL 132073, at *12
    (E.D.N.Y. Jan. 17, 2006) .......................................................................................... 35

*Chen v. D.C.*, 256 F.R.D. 267, 273 n.5 (D.D.C. 2009) .................................................................. 40

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 374 (2000) .............................................. 27

*D'Jamoos ex. Rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.,* 566 F.3d 94, 108
    (3d Cir. 2009) ...................................................................................................... 16, 17

*Devlin by Devlin v. Arizona Youth Soccer Association*, 5 A.D.Cases 321,
    1996 WL 118445 (No. Civ. 95-745 TUC ACM) (D. Ariz. 1996) ...................................... 28, 29

*Dutch Run-Mays Draft, LLC v. Wolf Block, LLP*, 450 N.J. Super. 590, 599,
    164 A.3d. 435, 440 (N.J. App. 2017) ............................................................................. 7

*Elmowitz v. Exec. Towers at Lido, LLC*, 571 F. Supp. 2d 370, 377 (E.D.N.Y. 2008) ............. 35, 36

*Farina v. Nokia, Inc.*, 625 F.3d 97, 115 (3d. Cir. 2010) ................................................................ 28

*Farmer v. Philadelphia Electric Company*, 329 F.2d. 3, 7 (3d. Cir. 1964) ................................... 32

*Ford Motor Company v. Montana Eighth Judicial District Court*,
592 U.S. 351 (2021)..................................................................................................... 8, 13, 14

*Gade v. National Wastes Management Asson.*, 505 U.S. 88, 107 (1992) ..................................... 29

*Geier v. American Honda Motor Co.*, 529 U.S. 861, 873 (2000) .................................................. 31

*Gonzalez v. City of Newark*, No. A-4524-17T3, 2020 WL 4811568,
at *14 (N.J. Super. Ct. App. Div. Aug. 19, 2020)...................................................................... 40

*Gross-Quatrone v. Mizdol*, 811 Fed.Appx. 95, 100 (3d Cir. 2020)................................................ 40

*Hasson v. FullStory, Inc.*, 114 F. 4th 181, 187 (3d. Cir. 2024)...................................................... 21

*Hertz Corp. v. Friend*, 559 U.S. 77, 93 (2010) ............................................................................... 7

*Hillsborough Cty. Fla. V. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 712 (1985) ................... 25

*IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 260 (3d Cir. 1998) ......................................... 20, 21

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs.,
& Prods. Liab. Litig.*, 553 F. Supp. 3d 211, 233 (D.N.J. 2021) ................................................ 40

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*,
725 F.3d 65, 97 (2d Cir. 2013) ............................................................................................ 25, 31

*Independent Meat Packers*, 526 F.2d 228, 235 (8th Cir. 1975) .................................................... 31

*Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 351 (3d Cir. 2013)..................................... 8

*Jovanovic v. USOPC*, 2025 WL 1218155 at *6 (April 28, 2025)...................................................11

*Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 294, n.15 (3d Cir. 2018) ...................................... 40

*Juzwiak v. Doe*, 415 N.J. Super. 442, 451, 2 A.3d 428, 433 (App. Div. 2010) ............................ 37

*K.J. v. J.P.D.*, 659 F. Supp. 3d 471, 482 (D.N.J. 2023).................................................................. 40

*Kwiatkowski v. Merrill Lynch,* No. A-2270-06T1, 2008 WL 3875417,
at *18 (N.J. Super. Ct. App. Div. Aug. 13, 2008)...................................................................... 38

*Lankford v. City of Clifton Police Dep't*, 546 F. Supp. 3d 296, 325 (D.N.J. 2021)...................... 38

*Leang v. Jersey City Bd. of Educ.*, 198 N.J. 557, 588, 969 A.2d 1097, 1115 (2009) ................... 38

*Lee v. U.S. Taekwondo Union,* 331 F. Supp. 2d 1252 (D. Haw. 2004) ......................................... 30

*Linus Holding Corp. v. Mark Line Industries*, 376 F.Supp.3d 417, 423 (D. N.J. 2019) .............. 17

*Marten v. Godwin*, 499 F.3d 290, 297 (3d Cir. 2007) ................................. 21

*Migliore by Migliore v. Vision Solar, LLC*, 160 F.4th 79, 87 (3d. Cir. 2025)................................. 17

*Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 96 (2004) .......................................... 6, 9

*Morganroth & Morganroth v. Norris, McLaughlin & Marcus P.C.*,
331 F.3d 406, 414 (3d Cir. 2003) ......................................................... 40

*Myers v. American Dental Ass'n*, 695 F.2d 716, 722 (3d. Cir. 1982) ..................................... 19, 20

*National Organization for Women, Essex County Chapter v. Little League Baseball*,
127 N.J. Super. 127 N.J. Super 522 (1974)................................................. 23, 24, 28

*Nelligan v. Zaio Corp.*, No. 10-CV-1408 FLW, 2011 WL 1085525,
at *8 (D.N.J. Mar. 21, 2011) ............................................................. 18, 19

*O'Connor v. Sandy Lane Hotel Co. Ltd.*, 496 F.3d 312, 317 (3d Cir. 2007) ..................... 8, 9, 15

*Ontel Products Corp. v. Mindscape Products*, 220 F.Supp.3d 555, 560 (D.N.J. 2016)................ 7

*Otsuka Pharmaceutical Co., Ltd. v. Mylan Inc.*, 106 F.Supp. 3d 456, 463 (D. N.J. 2015)............ 7

*Pension Benefits Guarantee Corporation v. White Consol. Industries*,
998 V.2d 1192, 1197 (3d. Cir. 1993) ................................................... 7

*Pliuskaitis v. USA Swimming, Inc.*, 243 F. Supp. 3d 1217 (D. Utah 2017),
*aff'd sub nom.*, 720 F. App'x 481 (10th Cir. 2018).................................... 30

*Proteonomix, Inc. v. Crompton 2009 WL 10728610 at *3* (November 10, 2009) ...................... 13

*Quaker State Dyeing & Finishing Co. v. ITT Terryphone Corp.*,
461 F.2d 1140, 1142 (3d Cir.1972) ............................................... 8

*Richland/Willkin Joint Powers Authority v. United States Army Corps of Engineers*,
176 F.Supp.3d 839, 848 (D. Minn. 2016) ............................................ 33

*Rivera v. Cracker Barrel Old Country Store Inc.*, No. 02-4160(JBS),
2003 WL 21077965, at *6 (D.N.J. Mar. 3, 2003) ........................................ 37,  39

*San Francisco Arts & Athletics, Inc. v. United States Olympic Committee*,
483 U.S. 522, 542–43 (1987)................................................... 28, 29

*Seltzer v. IC Optics, Ltd.*, 339 F.Supp.2d 601,609 (D.N.J. 2004) ................................................. 17

*Shulman v. Weston*, 2025 WL 3754159 at *3 (December 29, 2025).............................................. 7

*Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580 (7th Cir. 2001) .................................. 29, 30

*Taylor v. Metzger*, 152 N.J. 490, 513, 706 A.2d 685, 696 (1998)................................................. 38

*United States Department of Health and Human Services v. Federal Labor Relations Authority*, 844 F.2d. 1087, 1095-96 (4th Cir. 1987) ........................................... 31, 32

*Walden v. Fiore*, 571 U.S. 277, 285 (2014)................................................................................ 14

*Walton-Floyd v. U.S. Olympic Comm.*, 965 S.W.2d 35 (Tex. App.1998) .................................... 30

*Wigginton v. Servidio*, 324 N.J. Super. 114, 131, 734 A.2d 798, 807 (App. Div. 1999).............. 38

*Worldwide Volkeswagen v. Woodson*, 444 U.S. 286, 297 (1980)............................................ 9, 15

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 US 579, 585 (1952) ........................................... 31

## STATUTES AND OTHER AUTHORITIES

36 U.S.C.A. §220503 ................................................................................................................ 27

36 USCA §220505(b)(3) ....................................................................................................... 22, 24

36 U.S.C.A. §220521 ................................................................................................................ 10

36 U.S.C.A. §220521(a) ......................................................................................................... 8, 10

36 U.S.C.A. §220524 ................................................................................................................ 10

36 U.S.C.A. §220524(b) ........................................................................................................ 22, 24

36 U.S.C.A. §220525 ........................................................................................................... 10, 36

*Executive Order 14201* ...................................................................................................... passim

N.Y. Exec. §290(2)................................................................................................................... 28

N.Y. Exec. Law § 296(6) .......................................................................................................... 34

New Jersey Court Rule 4:4-4 ..................................................................................................... 6

*Ted Stevens Olympic & Amateur Sports Act, 36 U.S.C. §22501, et. Seq* .............................. *Passim*

I.      INTRODUCTION

Plaintiff, Dinah Yukich ("Dinah" or "Plaintiff") opposes the motion of Defendants United States Olympic and Paralympic Committee ("USOPC") and Mac Brown ("Brown") on the bases that their (1) active enforcement of discriminating against transgender women competing in women's fencing events, (2) their compelling of Defendants USA Fencing, Shannon Daugherty, Abdel Aziz and Premier Fencing Club discriminate against transgender women, (3) their requiring Defendant USA Fencing to change Dinah's sex marker from F to M and (4) their refusal to permit Defendant USA Fencing to change Dinah's sex marker back to F were sufficient actions to subject both the USOPC and Brown to personal jurisdiction in New Jersey; Plaintiff's state law discrimination claim is not preempted by the Olympic and Amateur Sports Act (the "Sports Act"); Plaintiff has stated a viable claim of aiding and abetting under the New York States Human Rights Law ("NYSHRL") against both the USOPC and Brown; Brown, as well as the Chairman of the Board of the USOPC admitted that their enforcement of the unlawfully discriminatory Trans Ban to prevent Plaintiff from competing in women's fencing events was "painful and distressing" to her; and Plaintiff's civil conspiracy claim is based on the Defendants' violations of the NYSHRL, unlawful acts that are considered to be "torts" for purposes of a civil conspiracy claim.

As discussed at length below, Plaintiff Dinah Yukich respectfully suggests that Defendant USOPC's and Brown's motion to dismiss must be denied.

II.     FACTUAL BACKGROUND

A.  Dinah's Initial Relationship With USA Fencing

Plaintiff Dinah Yukich is a woman who loves to fence. *See* Plaintiff's Verified Complaint at ¶ 1, a true and correct copy of which is attached to Defendants' Notice of Removal (Document 1). Dinah has fenced since her junior year of high school. *Id.* at ¶ 2.  Dinah first became a USA

Fencing ("USAF") member in 2009 but took time off from fencing from 2009 to 2024. *Id*. at ¶ 39.

In July 2023, Dinah re-activated her USA Fencing membership to resume fencing. *Id*. at ¶ 5.

At Dinah's request, USAF changed her gender marker from "M" to "F" and she was

marked eligible for women's events. *Id*. at ¶ 6. Most competitions are USAF sanctioned events,

requiring USA Fencing Membership. *Id*. at ¶ 7. While technically eligible to compete, Dinah had

not done so in 2023 and 2024, due to being away from fencing for fifteen years, as well as initiating

gender-affirming care in 2024. *Id*. at ¶ 42. She had facial feminization surgery during summer

2024, and later that year was presented for vaginoplasty. *Id*. Dinah once again re-activated her

USAF membership on April 9, 2025, intending to compete once again. *Id*. at ¶ 43. She informed

USAF that she had legally changed her name to "Dinah." *Id*.

### B.  USOPC Updates Its NGB & USOP Athlete Safety Policy

By way of brief background, effective July 21, 2025, the USOPC updated its Athlete Safety

Policy and the NGB Athlete Safety Policy.  *See* Def. Mot. Ex. A. It must be noted that the updated

policies **do not ban transgender women from participating in women's events**.  The new

section, Section 3.3, of USOPC Athlete Policy reads as follows:

> *The USOPC will continue to collaborate with various stakeholders
> with oversight responsibilities, e.g., IOC, IPC, NGB's, to ensure that
> women have a fair and safe competition environment consistent with
> Executive Order 14201 and the Ted Stevens Olympic & Amateur
> Sports Act...*

Def. Mot. Ex. B.  The new Section 4.4 of the NGB Athlete Safety Policy reads as follows:

> *NGB's are committed to protecting opportunities for athletes
> participating in sport.  NGB's will continue to collaborate with
> various stakeholders with oversight responsibilities, e.g. IOC, IPC,
> international federations, to ensure that women have a fair and safe
> competition environment consistent with Executive Order 14201
> and the Ted Stevens Olympic & Amateur Sports Act, 36 U.S.C.
> §22501, et. Seq.*

Def. Mot. Ex. B.

### C.  The Executive Order

The Executive Order 14201 ("EO 14201") that is mentioned in both of the Athlete Safety Policies does not ban transgender women from participating in sports.[1]  Def. Mot. Ex. A.  EO 14201 merely calls for action for discussion on the topic of transgender women participating in sports and announces where the administration will be focusing its support.   Section 4(a) of the Executive Order directed that the Assistant to the President for Domestic Policy shall:

> (i)     convene representatives of major athletic organizations and governing bodies, and female athletes harmed by such policies, to promote policies that are fair and safe, in the best interests of female athletes, and consistent with the requirements of Title IX, as applicable; and

> (ii)    convene State Attorneys General to identify best practices in defining and enforcing equal opportunities for women to participate in sports and educate them about stories of women and girls who have been harmed by male participation in women's sports.

Section 4(a) merely directed the Assistant to the President for Domestic Policy to "convene" on the issue of transgender women participating in sports.  Def. Mot. Ex. A, Sec. 4(a).

Next, Section 4(b) of EO 14201 merely directed the Secretary of State, to:

> (i)     rescind support for and participation in people-to-people sports exchanges or other sports programs within which the relevant female sports category is based on identity and not sex; and

> (ii)    promote, including at the United Nations, international rules and norms governing sports competition to protect a sex-based female sports category, and, at the discretion of the Secretary of State, convene international athletic organizations and governing bodies, and female athletes harmed by policies that allow male participation in women's

---

[1] Section 3 of the EO addresses education.  This lawsuit does not touch on the issue of education.

3

> sports, to promote sporting policies that are fair, safe, and in furtherance of the best interests of female athletes.

Def. Mot. Ex. A, Sec. 4(b). EO 14201 is nothing more than a notice (1) directing people to convene (Sec. 4(a)); and (2) announcing where the administration would be focusing its support and promotion (Sec. 4(b)). The Executive Order does not "prohibit" any activity, nor does it state that transgender women participating in sports is unlawful. *See* Def. Mot. Ex. A.

### D. USAF Updated Their Policy to Prohibit Dinah From Participating in Women's Events

USAF explicitly admitted that there may be state laws contrary to the anti-transgender policy. *Id*. at ¶ 45. At Defendant USOPC's insistence, USAF unilaterally changed Dinah's gender marker from "F" to "M" and later blocked her from registering for any women's competitions on or about August 1, 2025. *Id*. at ¶ 11. It is believed that USOPC and USAF worked together and conspired to ensure that transgender women were excluded from the women's competitions. *Id*, at ¶¶ 12, 44.

### E. USOPC & Mac Brown Collaborated With USA Fencing

Mac Brown, a psychologist with the USOPC, consulted with USAF on implementing the anti-transgender policy. *Id*. Dinah contacted USAF through CEO Phil Andrews and Mac Brown stating that she did not consent to changing her gender marker, and that the change was "demeaning and offensive." *Id*. at ¶ 46. On July 23, 2025, Mac Brown admitted to Dinah that the policy caused great emotional distress. *Id*. at ¶ 47. Despite this acknowledgment, USOPC compelled USAF to implement and enforce the anti-transgender policy. *Id*. at ¶ 48.

### F. USOPC & USAF Defendants Block Dinah From Participating in Women's Events

Dinah's participation in USAF fencing ended when, in July 2025, USAF implemented anti-transgender policies that banned transgender women from competing in women's events, stating

that they were forced to do so by Defendant USOPC.  Pl. Verified Compl. at ¶¶ 10, 12, 44.  On July 26, 2025, Dinah submitted a formal complaint to USA Fencing to dispute the anti-transgender policy, but the USAF closed the complaint without providing a finding. *Id*. at ¶¶ 49-50. On August 3, 2025, Phil Andrews also admitted to Dinah that the anti-transgender policy has a negative effect on her and explicitly stated that USOPC compelled USAF to implement the policy. *Id*. at ¶ 53. Upon information and belief, the USOPC's Board of Directors were aware of the emotional distress the anti-transgender policy would cause to transgender members; Damien Lehfeldt, the Chairman of the Board, admitted this much to Dinah, stating "I am writing to express my deep sympathy regarding the recent shift in policy from the USOPC and its impact on you and other transgender fencers within our community."  *Id*. at ¶ 54.

Dinah attempted to register for the Premier Challenge ROC, set for late September 2025 in Suffern, New York, and hosted by Premier Fencing Club of Metuchen, New Jersey. *Id*. at ¶ 13. The Premier Challenge ROC is organized and run by Premier Fencing Club. *Id*. at ¶ 55. To register for the events, an individual must make a USAF account and become a member, then register for the events through the USAF website. *Id*. at ¶ 56. Dinah was denied registration as a woman competitor and was only permitted to register for men's events. *Id*. at ¶ 13. On August 15, 2025, Dinah requested that USAF assist her to register for the women's events, to which USAF, through Shannon Daugherty, stated that USAF was required to update their transgender policy to comport with USOPC's updated policy. *Id*. at ¶¶ 58-59. Dinah also contacted Abdel Aziz, the tournament organizer, regarding her inability to register for women's events. *Id*. at ¶ 60. Azziz stated he did not have the option to register her for women's events and further directed Dinah to Shannon Daugherty. *Id*. at ¶ 61.

After contacting Daugherty again, Daugherty stated to Dinah that USAF prohibited Dinah from competing in women's events, and that USAF compelled Premier Fencing to discriminate against Dinah for being a transgender woman. *Id*. at ¶ 62. Dinah again contacted Aziz, as the manager and organizer of the event, seeking his assistance in registering for the event, noting that the anti-transgender policy violates state law. *Id*. at ¶ 63. Aziz responded that Premier Fencing is required to comply with USAF policies. *Id*. at ¶ 64.

Dinah Yukich has suffered great emotional distress as a result of the unlawful actions of Premier Fencing, aided and abetted by Shannon Daugherty, Abdel Azziz, and USAF, all of which were compelled by the Mac Brown's and USOPC's unlawful insistence that they ban transgender women from competing in women's events. As a result, Dinah has raised claims against all of those parties. *Id*. at ¶¶ 66-126.

## III.     LEGAL ARGUMENT

### A.     This Court Has Jurisdiction Over The USOPC And Brown

New Jersey Court Rule 4:4-4, along with a litany of case law, provides for jurisdiction over the out of state defendants when there are sufficient minimum contacts. *See, Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 96 (2004). As explained in detail below, Defendant USOPC and Defendant Brown have sufficient minimum contacts that warrant jurisdiction in the state of New Jersey.

Absent an evidentiary hearing, a party need only plead a *prima facie* case for jurisdiction. *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (2004). Dinah sufficiently pled a *prima facie* case for jurisdiction over Defendant USOPC and Defendant Brown. At the motion to dismiss stage, "the court is required to accept the plaintiff's allegations as true and is to construe disputed facts in favor of plaintiff." *Id., see also, Miller Yacht Sales, Inc. v. Smith,* 384 F.3d 93, 97 (3d Cir.

2004) ("[T]he plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have [her] allegations taken as true, and all factual disputes drawn in its favor.")  As explained below, Dinah sufficiently plead jurisdiction over all defendants.

### B.  USOPC Is Subject To General Jurisdiction In New Jersey

Defendant USOPC is subject to general jurisdiction in New Jersey because there are two NGB's headquartered in New Jersey.  In order to demonstrate general jurisdiction, plaintiff must allege that the out-of-state defendant is in fact "at home" in the forum.  *Otsuka Pharmaceutical Co., Ltd. v. Mylan Inc.*, 106 F.Supp. 3d 456, 463 (D. N.J. 2015).  Plaintiff must plead sufficient facts that demonstrate that the defendant's activities and operations in the state are "so substantial and of such nature as to render the corporation at home in the state."  *Ontel Products Corp. v. Mindscape Products*, 220 F.Supp.3d 555, 560 (D.N.J. 2016).  For general jurisdiction, the suit is, "not related directly to the defendant's contacts with the forum . . ."  *Dutch Run-Mays Draft, LLC v. Wolf Block, LLP*, 450 N.J. Super. 590, 599, 164 A.3d. 435, 440 (N.J. App. 2017).

Defendant USOPC has thirteen different headquarters (nerve centers) because of the locations of its NGBs in those states, two of which are in New Jersey.[2]

These states function as "nerve centers" for USOPC.  *See Hertz Corp. v. Friend*, 559 U.S. 77, 93 (2010) (a nerve center is "normally be the place where the corporation maintains its headquarters—provided that the headquarters is the actual center of direction, control, and coordination … and not simply an office where the corporation holds its board meetings…").  The NGBs are very clearly nerve centers for USOPC, as USOPC certifies the NGBs of sports. *See* 36

---

[2] US Rowing and USGA are headquartered in New Jersey.  At the 12(b)(6) stage, courts can consider: (1) the complaint, (2) exhibits attached to the complaint, (3) matters of public record.  *Shulman v. Weston*, 2025 WL 3754159 at *3 (December 29, 2025).  Information and reports from the USOPC constitute public record that can be considered at the 12(b)(6) stage. *See Pension Benefits Guarantee Corporation v. White Consol. Industries*, 998 V.2d 1192, 1197 (3d. Cir. 1993)(Matters of public record include published reports of administrative bodies and decisions of agencies.)

U.S.C.A. 220521(a).  USOPC can only certify one NGB per sport.  *See* 36 U.S.C.A. 220521(b).  Furthermore, there are fifty NGBs located among thirteen states.  The present case is not like that in *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351 (2021), where Ford was at home in Michigan but, "does business everywhere." *Id.* at 355.  That is simply not the case here.  Rather, the NGBs are so tightly controlled by USOPC, that they are hardly at all autonomous from it.  *See Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 351 (3d Cir. 2013) (acknowledging the "well-established rule that a parent corporation maintains separate citizenship from a subsidiary unless it has exerted such an overwhelming level of control over the subsidiary that the two companies do not retain separate corporate identities.") (citing *Quaker State Dyeing & Finishing Co. v. ITT Terryphone Corp.,* 461 F.2d 1140, 1142 (3d Cir.1972)).

Here, USOPC mandates the standards for athlete eligibility and forces USA Fencing, and in turn, Premier Fencing, to abide by those standards, including the Trans Ban. Pl. Verified Compl at ¶¶ 44, 53.  Likewise, both the headquarters for US Rowing and the headquarters for US Golf are located in New Jersey.  This is sufficiently overwhelming control over those NGBs to satisfy general jurisdiction.  These NGB headquarters establish "nerve centers" that place USOPC "at home" in each state.  Therefore, USOPC is "at home" in New Jersey.

### C.  USOCP Is Subject To Specific Jurisdiction In New Jersey

Even if the USOCP were not subject to this Court's general jurisdiction, its involvement in the actions that gave rise to Plaintiff's claims give this Court specific jurisdiction over the USOPC.  In order to plead a prima face case for specific jurisdiction, plaintiff must demonstrate the following: (1) defendants purposefully availed themselves to the forum, (2) the litigation arises out of or relates to at least one of the contacts, and (3) the jurisdiction in the forum comports with traditional notions of fair play and substantial justice.  *O'Connor v. Sandy Lane Hotel, Co. Ltd.*,

496 F.3d 312, 317 (3d. Cir. 2007). A court looks that the "relationship of the [parties], the forum, and the litigation." *Miller Yacht Sales v. Smith*, 384 F.3d. at 96 (3d. Cir. 2004). The Third Circuit explicitly laid out that, "specific jurisdiction over a defendant exists when that defendant has 'purposefully directed [their] activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." *Id.*

### 1. *USOPC Purposefully Availed Itself to New Jersey When it Directed USA Fencing and Other NGB's to Update Their Policies on Transgender Women Athletes*

Dinah satisfied the first prong of the specific jurisdiction analysis when she adequately plead that Defendant USOPC availed itself to the forum of New Jersey when it (1) directed USA Fencing to implement the Trans Ban, (2) approved USAF's Trans Ban, (3) worked with USAF to implement the Trans Ban knowing full well that a contemplated future consequence of this collaboration and unlawful exclusion at local fencing competitions, like Premier Challenge ROC. Pl. Verified Compl. ¶ 12, 14, 17, 31-34, 44, 45, 46, 48, 50, 53, 54; Def. Mot. Ex. C, Sec. 3.3.

The first prong for specific jurisdiction is that a defendant must avail itself to the forum. *O'Connor v. Sandy Lane Hotel Co. Ltd.*, 496 F.3d 312, 317 (3d. Cir. 2007). The defendant must have sufficient minimum contacts. *Worldwide Volkswagen v. Woodson*, 444 U.S. 286, 291 (1980). These contacts cannot be random, fortuitous, or attenuated, and the litigation must "arise out of or relate" to at least one of the contacts. *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d at 317 (3d. Cir. 2007). When looking at the minimum contacts, courts look to the actual course of dealing with the parties. *See Burger King v. Rudzewicz*, 471 U.S. 462, 479 (1985) ("It is these factors – prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing- that must be evaluated in determining whether the defendant purposefully established minimum contacts with the forum.").

Defendant USOPC and Defendant USA Fencing's formal structured relationship coupled with their course of dealing resulted in sufficient minimum contacts with New Jersey. Plf. Verified Compl. ¶ 12, 14, 17, 31-34, 44-46, 48, 50, 53, 54. First, USAF is the National Governing Body ("NGB") for the sport of fencing. *Id*. at ¶ 26-28. Defendant USOPC maintains the statutory authority to certify one NGB per sport. *See* 36 U.S.C.A. § 220521(a). USOPC certified USAF as the sole NGB for the sport of fencing. Plf. Verified Compl. at ¶ 26-28. The Ted Stevens Act ("Sports Act") memorializes the formal structure of the relationship between Defendant USAF (the NGB) and USOP. *See* 36 U.S.C.A. § 220521-220530. Defendant USAF had to comply with the requirements set forth in the Sports Act in order to maintain its status as the NGB for the sport of fencing. The Sports Act sets forth the duties of the NGB (36 U.S.C.A. § 220524) and criteria for when the NGB should sanction an event, such as the Premier Challenge ROC. 26 U.S.C.A. 220525. The formal relationship between Defendant USOPC and Defendant USAF absolutely avails both defendants to New Jersey. Defendant USOPC knew very well that Defendant USAF had to follow the parameters set forth in Section 220525 when deciding whether to make the Premier Challenge ROC a USAF sanctioned event.

The Supreme Court held in *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*, that it is not enough to simply show that there is a contractual relationship between the parties, there needs to be "relevant acts.". 582 U.S. 255, 268 (2017). In that case, plaintiff attempted to establish specific jurisdiction in California based on the fact that the manufacturer defendant had a contract with a distributor in California. *Id.* The Supreme Court found that the plaintiff never alleged that the out of state manufacturer engaged in "relevant acts together" with the distributor in California. *Id.* Even further, the Court went on to say that the plaintiff never alleged that the defendant manufacturer was "derivatively liable for in-state

conduct" of it.  *Id.*  In order to establish specific jurisdiction, it is not enough to simply say that there was a transaction or a contractual relationship.  *See also, Jovanovic v. USOPC*, 2025 WL 1218155 at *6 (April 28, 2025).  Relatedly, in *Jovanovic,* the Court found that the USOPC's award of a monetary grant to a recipient living in New Jersey was insufficient to establish specific jurisdiction.  *Id.*  The Court found that plaintiff needed to show "additional contacts" or "something more."  *Id.*  Dinah has plead that "something more."  Compl. ¶ 12, 14, 17, 31-34, 44-46, 48, 50, 53-54; Def. Mot. Ex. C, Section 3.3.

Here, as explained above, Defendant USOPC and USA Fencing had a contractual formal relationship.  And also, Dinah sufficiently plead the relevant acts that were committed together by Defendant USOPC and USAF to effectuate the discrimination against Dinah.  *Id.*  Beginning with the formal relationship between Defendants USAF and USOPC.  Defendant USAF is an NGB that must abide by the parameters set forth in the USOPC Bylaws, and the Ted Stevens Sports Act in order to maintain its NGB status.

Defendant USOPC and Defendant USAF maintained a regular course of dealing in general and specifically as it relates to the issue of transgender women participation in women's events.  In fact, Defendant USOPC's updated Athlete Safety Policy admitted to the ongoing course of dealing.  *See* Def. Mot. Ex. C, Sec. 3.3.  Section 3.3 of the Athlete Policy states that Defendant USOPC will, "continue to collaborate with various stakeholders with oversight responsibilities…[ie] NGB's, to ensure that women have a fair and safe competition environment consistent with Executive Order 14201 and the Ted Stevens Olympic & Amateur Sports Act…" Def. Mot. Ex. C. Clearly, Defendant USOPC had been collaborating with Defendant USAF on implementing the Trans Bans.

Even more, Defendant USOPC approved the USAF Trans Ban that explicitly acknowledged the existence of state laws that would be contrary to the Trans Ban. Plf. Verified Compl., ¶ 45, 50. The USAF Trans Ban states in part, "…there may be existent laws per state… that have implications on the adherence to the [policy]." Plf. Compl. at ¶ 45. According to Defendant USAF, Defendant USOPC approved the USAF Trans Ban, inclusive of the above-referenced state law precaution. Plf. Verified Compl., ¶ 50 ("…this policy has been approved by the USOPC."). It follows that Defendant USOPC was aware that the Trans Ban would bring them into lawsuits where state law protects against sex or gender-based discrimination. Defendant USOPC cannot be surprised by the nature of the lawsuit nor the venue of the lawsuit, for this is precisely the contemplated future consequence that is in fact memorialized in the USAF Trans Ban as approved by Defendant USOPC.

On July 18, 2025, the USOPC directed every NGB to update their policies relating to transgender women athletes participating in women's events. Compl. ¶44. As a direct result of this directive from Defendant USOPC, Defendant USAF implemented the discriminatory ban. Even more, Defendant USAF issued a policy that had been drafted and circulated in or around April 15, 2025. *Id.* Section 3.3 admitted that Defendant USOPC was already collaborating and working with Defendant USAF as it relates to transgender women participation in women's events. Def. Exh. C, Doc. 16-2, p. 17. ("…the USOPC will continue to collaborate…"). Even more, Defendant Mac Brown actively consulted with Defendant USAF in real time on how best to implement this Trans ban. Compl. ¶12. Defendant Mac Brown directly communicated with Dinah about USAF's policy. Comp. ¶12, 17, 47. Defendant Mac Brown defended USAF's Trans Ban. *Id.* Defendants USOPC and USAF clearly knew that the "place and character" of their prior collaborations and discussions and must have been keenly aware that "contemplated future

consequences" would be that Trans Ban would affect every fencing event that was sanctioned by USAF. *See Proteonomix, Inc. v. Crompton 2009 WL 10728610 at *3* (November 10, 2009). The following month, Dinah contacted USAF and Premier Fencing regarding signing up for the event in September. Comp. ¶58.

Defendant USOPC very well knew that by actively collaborating and even deploying Mac Brown to be working in the trenches with USAF to coax Dinah to abide by the policy that it would be drawn into litigation involving an exclusion of Dinah from a women's event because she is a transgender woman.

This matter is akin to *Ford Motor Company v. Montana Eighth Judicial District Court*, 592 U.S. 351 (2021). That case involved two lawsuits with an identical issue and fact-pattern: (1) Ford cars were involved in accidents that occurred in the forum states (Minnesota and Montana), (2) the cars in each of the accidents were manufactured outside of the forum states, (3) the cars were not sold in the forum states, (4) the cars were not designed in the forum states, (5) Ford was not incorporated in the forum states and (6) Ford was not headquartered in either of the forum states. *Id.* The Supreme Court found that Minnesota and Montana had specific jurisdiction over Ford as the company "systemically served a market [Minnesota and Montana]…for the very vehicles that the plaintiffs allege malfunctioned and injured them in those states." *Id.* at 365.

Here, the USOPC and Defendant USAF sat in Colorado and manufactured the Trans Ban, and then actively serviced it and marketed it to the various forums. Instead of dealerships, here these are fencing clubs who are hosting events. Just like Ford was servicing the market with the very product that injured the plaintiffs, the USOPC was servicing the market with the very policy that discriminated against Dinah in the forum and injured her in the forum.

13

In order for personal jurisdiction to stand, the contacts with the forum must be defendants' own choice. *Ford v. Montana*, 592 U.S. 359 (2021). There needs to be some contact where the defendant "reached out beyond its home." *See Walden v. Fiore*, 571 U.S. 277, 285 (2014). For specific jurisdiction, it is not enough to simply have contacts with the state, the claims must arise out of or relate to the contacts. *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.* 582 U.S. 255, 262 (2017)("Specific jurisdiction is confided to the adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction.") Here, the USOPC reached out of its Colorado home and made direct contact with Dinah Yukich herself to make sure she was aware of the Trans Ban. Defendant USOPC reached out of its Colorado home and into New Jersey when it directed the New Jersey based NGB's in the forum to change their policy through the Athlete Safety Manual.[3] Def. Mot. Ex. B, Sec. 4.4. These policies address transgender women participating in women's events in a sport governed by an NGB. *See* Complaint. At issue in this litigation is transgender women participation in women's sports. *See* complaint. The issues in the instant case derive from the USOPC's contact with New Jersey. The issues in the instant case are connected with the USOPC's contact with New Jersey.

---

[3] There are two (2) NGB's located in New Jersey: (1) US Rowing and (2) the United States Golf Association ("USGA"). Defendant USOPC deliberately directed US Rowing and the United States Golf Association ("USGA"), two NGB's to update their participation policies as it relates to transgender athletes. *See* Athlete Manual Sec. 3.3.

On December 4, 2025, the USGA announced their updated "Competitive Fairness Gender Policy." True and correct copies of UGA's Press Release and the Policy are attached hereto as Exhibit "B". On December 5, 2025, US Rowing updated their policy relating to transgender women participating in women's events as a response to the directive that came from the USOPC directly into the state of New Jersey to US Rowing. A true and correct copy of the US Rowing "Competition Category Policy" is attached hereto as Exhibit "C". ("In response to policy changes and mandates from the U.S. Olympic & Paralympic Committee, US Rowing will be implementing changes…").

The issues being adjudicated in the instant lawsuit derive from and are connected with the policy on transgender women participating in women's events. *See Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 262 (2017) ("Specific jurisdiction is confined to the adjudication of issues deriving from, or connected with the very controversy that establishes jurisdiction."). The fact that the USOPC is getting sued in New Jersey for claims based in discrimination against transgender women, after it directly demanded, two New Jersey-based NGB's to change their policy relating to transgender women participation in sports, should come as no surprise to the USOPC. This is not random. This is not fortuitous. This is not attenuated.

Lastly, specific jurisdiction has been categorized as a "quid pro quo" dynamic with the out-of-state party. See O'Connor v. Sandy Lane Hotel Co., Ltd., 496 F.3d 312, 323 (3d. Cir. 2007). The idea is that when an entity conducts business in a state, it should be aware that engaging in activities in the state would in fact "extend certain benefits and impose certain obligations." O'Connor v. Sandy Lane Hotel Co., Ltd., 496 F.3d 312, 323 (3d. Cir. 2007). The Supreme Court addressed this in *Worldwide Volkswagen*, when it found that Worldwide Volkswagen could be hailed into a forum where the occurrence arises from the parties' service into the forum. *Worldwide Volkeswagen v. Woodson*, 444 U.S. 286, 297 (1980). The Supreme Court found jurisdiction proper, "[w]hen a transaction is not 'simply an isolated occurrence, but arises from the efforts of the [entity] to serve, directly or indirectly, the market for its product in [several or all] other states…" *Id.* The Supreme Court justified this explaining that when an entity avails itself to the forum, it has notice that it could be exposed to litigation in the state. *Id.* It follows that when the company has such notice, then it can, "do something about that exposure: It could 'act to alleviate the risk of burdensome litigation… or if the risks are [still] too great, severing its connection with the state." *Id.*

Here, Defendant USOPC took extraordinary measures to ensure that the transgender policy would be effectuated and implemented. This lawsuit is not an isolated occurrence that came out of nowhere. This lawsuit arises from the efforts of Defendant USOPC to serve directly into the state of New Jersey and indirectly through Defendant USAF the trans ban. Surely the USOPC had notice that it would be exposed.

**2.  *Jurisdiction in New Jersey Comports with Fair Play and Substantial Justice***

Third, the jurisdiction in the forum is fair and reasonable.  When assessing whether the jurisdiction is fair, courts review the following factors: (1) the burden on the defendant to be in the forum, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interests in obtaining the most efficient resolution and (4) the shared interests of several states in furthering fundamental substantive social policies.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).

The USOPC already interacts with New Jersey based on the two New Jersey-based NGBs. New Jersey has an interest in this as it involved an in-state entity being compelled to break the law in the state of New Jersey and also break the law of neighboring state (New York) from New Jersey. The state has an interest in protecting itself from an out of state entity forcing others to break the law and claiming they are above New Jersey state laws.

### 3. *Defendants Premier Fencing, Abdel Aziz, USAF, and Shannon Dougherty Were Agents of the USOPC*

This Court has specific jurisdiction over the USOPC Defendants because they ultimately controlled and directed Premier Fencing Club, a New Jersey entity, to exclude and discriminate again Dinah Yukich.  The agency relationship is as follows:  First, Defendant USOPC, through Mac Brown, controlled and directed Defendant USAF and Shannon Dougherty, to implement and effectuate the Trans Ban.  Second, Shannon Dougherty who was ultimately controlled and directed by Defendant USOPC controlled and directed Abdel Aziz and Premier Fencing to exclude Dinah Yukich based on the Trans Ban.  Put in different way, the USOPC was the mastermind of this insidious web of discrimination.  Defendant USOPC controlled and directed USAF to ensure that Premier Fencing and Abdel Aziz followed their orders in New Jersey.

In order to defeat a motion to dismiss based on jurisdiction, plaintiff needs to make a *prima facie* showing of the actions between the agent and the principle.  *D'Jamoos ex. Rel. Estate of*

*Weingeroff v. Pilatus Aircraft Ltd.,* 566 F.3d 94, 108 (3d Cir. 2009) ("[W]e recognize that for a plaintiff to defeat a motion to dismiss for lack of personal jurisdiction when the plaintiff relies on agency theory, "it need only make a prima facie showing of the connection between the actions of the agent and the principal."). "An agency relationship arises 'when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent.'" *Seltzer v. IC Optics, Ltd.*, 339 F.Supp.2d 601,609 (D.N.J. 2004), *see also, Migliore by Migliore v. Vision Solar, LLC*, 160 F.4th 79, 87 (3d. Cir. 2025).[4]

First, Dinah plead sufficient facts to demonstrate that Premier Fencing and Defendant Aziz were acting act agents of USA Fencing Defendants. Ex. A at ¶¶27, 23-25, 55-65. USAF Defendants had total control over Defendant Aziz and Premier Fencing. *Id.* at ¶¶55-64. Defendant Aziz was the event organizer acting on behalf of Premier Fencing Club. Ex. A at ¶24. Defendant USAF "sanctioned the Premier Challenge ROC, meaning the event was authorized by a USA Fencing representative, and conducted in accordance with the USA Fencing "Rules of Competition" and the related "USA Fencing Operations Manual." *Id.* at ¶ 27. Defendant Dougherty was the enforcement arm of USAF in ensuring compliance. *Id.* at ¶¶ 29-30, 59, 62. Defendant Aziz, as the agent of Defendant Premier Fencing, admits that they have no control over the Premier Challenge ROC. *Id.* at ¶ 64. Defendant Aziz explicitly told Dinah, "…this remains a USA Fencing-sanctioned event. Accordingly, we are required to comply fully with USA Fencing policies." *Id.* Defendant Premier Fencing was compelled by USAF Defendants and Defendant

---

[4] While this is not a formal parent-subsidiary relationship, the analysis is helpful in this case. *See Linus Holding Corp. v. Mark Line Industries*, 376 F.Supp.3d 417, 423 (D. N.J. 2019)("[A] court may impute the contacts of a subsidiary corporation to a foreign parent corporation for the purposes of exercising specific jurisdiction, if the subsidiary corporation is merely operating as the parent corporation's alter ego, such that the 'independence of the separate corporate entities [may be] disregarded.").

Aziz to discriminate.  Premier Fencing was acting on behalf of USA Fencing.  USAF Defendants controlled and directed the acts of Defendant Premier Fencing.

Next, Dinah plead sufficient facts to demonstrate that Defendant USOPC controlled and directed Defendants Premier Fencing, Abdel Aziz, Shannon Dougherty, and USAF.  *See* Plf. Verified Compl. ¶¶ 14, 23, 47, 62.    The New Jersey domiciled defendant, Premier Fencing, was ultimately controlled and directed by Defendant USOPC.  USAF acted as an agent of USOPC when it cooperated to implement the Trans Ban, all while knowing that a contemplated future consequence of this cooperation and collaboration would be the discriminatory and unlawful exclusion from local fencing competitions, such as the Premier Challenge ROC.  Plf. Verified Compl. ¶ 12, 14, 17, 31-34, 44-46, 48, 50, 53, 54.

### 4. *Defendant Mac Brown Was An Agent for the USOPC And He Is Subject to Specific Jurisdiction in New Jersey*

Defendant Mac Brown's actions violate New York Law, and the actions took place in New Jersey when he controlled USAF to implement the ban in New Jersey.  As discussed in Plaintiff's Opposition to USAF's Motion to Dismiss, Defendant Dougherty very much availed herself to the forum of New Jersey.  Plf. Opp. to USAF Mot., Doc. 12.  Defendant Shannon Dougherty reached into the forum of New Jersey because she was controlled by the USOPC and Mac Brown.  Defendants contend that Defendant Dougherty was acting in her capacity as an employee of USAF.  Doc. 10 at p. 7.  Defendant Dougherty's actions as an employee do not render her immune from liability.  *See Acteon, Inc. v. Vista Dental Products*, 2006 WL 12079999, at *4 (May 3, 2006)[5], *see also Nelligan v. Zaio Corp.*, No. 10-CV-1408 FLW, 2011 WL 1085525, at *8 (D.N.J. Mar. 21,

---

[5] A copy of this unreported decision is attached as Exhibit "D" for the Court's convenience.

2011)[6].   Defendant Mac Brown reached into the forum of New Jersey when he defended and enforced the Trans Ban.

An individual employee's actions most certainly exposes the individual to liability when the individual employee was involved in the discriminatory conduct.  *Id.* at 31.  The Court in *Nelligan* explicitly states that when a plaintiff's case is based in discrimination, then certain communication can support specific jurisdiction.  *Id.* at 10 ("Here…Plaintiff's claims sound in discrimination.  So, while the court agrees that mail and telephone communication may support specific jurisdiction in some instances, it is only where the Plaintiff's claims arise out of these communications.")  This District Court held in *Acteon, Inc. v. Vista Dental Products*, individual defendants were (1) directly involved in directing the entity to take the actions at issue, and (2) themselves contributed to the unlawful activity by "taking an active part" in the unlawful activity.  2006 WL 1207999, slip op *4 (May 3, 2006).

Here, Plaintiff's claims are based in discrimination.  Dinah Yukich has adequately alleged that Defendant Mac Brown aided and abetted Defendant Premier Fencing Club to break New York State Law.  Compl, ¶¶93-100.  Dinah Yukich has adequately alleged that Defendant Mac Brown communicated directly with Dinah explaining the implications of the Trans Ban. Dinah Yukich sufficiently pleaded that Defendant Mac Brown took an active part in the discrimination by communicating directly with Dinah regarding the purported effect of the Trans Ban.  Compl. at ¶47.  Even more, Defendant Dougherty's reliance on the USOPC and Mac Brown to address Dinah's concerns, demonstrated Defendant Mac Brown's active participation.  Compl. at ¶61.

This Court also has cited to *Myers v. American Dental Association*, which stands for the principle that an individual can be liable in their individual capacity "based on [her] contacts within

---

[6] A copy of this unreported decision is attached as Exhibit "E" for the Court's convenience.

the forum state while 'advanc[ing] the interests of' and 'endeavor[ing] to carry out [employer] policy' within the forum" *Acteon, Inc. v. Vista Dental Products*, at 4 (May 3, 2006). In that case, the court found that the individual defendant had sufficient contacts with the Virgin Islands to render personal jurisdiction where the individual attended annual meetings to carry out the policy of the employer, and went to the Virgin Islands to lobby for the adoption of a Code of Ethics, which was at the center of the issue of the litigation. *Myers v. American Dental Ass'n*, 695 F.2d 716, 722 (3d. Cir. 1982).

> …it is alleged that [individual employee defendant] came to the Virgin Islands to urge adoption of the Code of Ethics which is at the center of this dispute underlying this action. Having purposefully entered the district to advance the interests of the [employer] in the Virgin Islands, [individual defendant] rendered himself subject to the jurisdiction of the Virgin Islands' courts as least with respect to dispute related to his presence there.

*Id. Myers* is simply very much on point. Just as the individual employee in *Myers* was advancing the interests of his employer and urging the adoption of the Code of Ethics*,* Defendant Dougherty, at the direction of Mac Brown, entered the forum of New Jersey to advance the interests of USAF. Ex. A at ¶58-65. Except Defendant Daugherty did not just "urge the adoption" of the Trans Ban, she enforced and implemented the Trans Ban. *Id*. at ¶¶ 14-15, 59-63. Defendant USOPC controlled Defendant Dougherty through Mac Brown. Plf. Compl. at ¶¶ 12, 30, 47-49. Additionally, Defendant Mac Brown's actions were the basis for the discrimination claim. *See Acteon*, 2006 WL 12079999. Mac Brown took an active part in ensuring that the Trans Ban was implemented in New Jersey.

### 5. *Jurisdiction is Proper in New Jersey Because New Jersey is the Focus of the Tortious Conduct and Therefore Satisfies the Effects Test*

Jurisdiction is also proper as New Jersey is the focus of the tortious conduct. *See Imo Industries, Inc. v. Kiekert AG*, 155 F.3d 254, 265 (3d Cir. 1998). Dinah Yukich alleged that USOPC

and Mac Brown committed torts in New Jersey and conspired to break New York law.  Ex. A.  The New Jersey state law claims are torts.  It follows that the Effects Test applies to this matter.[1]  Per the Effects Tests (1) the defendant committed the intentional tort, (2) the plaintiff felt the brunt of the harm in the forum; and (3) the defendant expressly aimed [the] tortious conduct at the forum.  *Hasson v. FullStory, Inc.*, 114 F. 4th 181, 187 (3d. Cir. 2024).

As recited in Plaintiff's Complaint, the USOPC both controlled USAF and condoned and approved USAF's Trans Ban.  USAF implemented the Trans Ban and unilaterally changed Dinah's gender marker from "F" to "M", blocking her from women's events.  Plf. Verified Compl. at ¶¶ 10, 11.  USOPC and USAF worked together to bar transgender women from women's competitions.  *Id.* at ¶ 12.  Mac Brown actually consulted with the USAF on the implementation of the Trans Ban. *Id.*  Mac Brown even told Dinah that changing her gender marker was "to align with policy is a logistical and systems move…" *Id.* at ¶ 17.  USAF's CEO also stated that USAF had to comply with the USOPC's requirements. *Id.* at ¶ 16.  Despite knowing the emotional distress, USOPC compelled USAF to implement and enforce the Trans Ban.  *Id.* at ¶ 48.

Furthermore, Mac Brown controlled Shannon and USAF to effectuate discrimination.  Acting on behalf of the USOPC, Mac Brown aided, abetted and compelled barring Plaintiff from competing  *Id.* at ¶ 34.  As stated above, Mac Brown consulted with the USAF on implementing the Trans Ban. *Id.* at ¶ 12.  On August 23, 2025, Dinah contacted Shannon Daugherty requesting

---

[1] The Effects Test has often been applied to assess personal jurisdiction over intentional tortfeasors. *Hasson v. FullStory, Inc.*, 114 F.4th 181, 189 (3d. Cir. 2024).  Furthermore, the Effects Test has often been applied where the alleged tortfeasor has de minimis contacts with the forum.  *Id.*  citing *Marten v. Godwin*, 499 F.3d 290, 297 (3d Cir. 2007).  The Test has also been applied where "the tortious conduct occurs primarily 'outside the forum' but has an 'effect ... within the forum,'"  *Id.*  quoting *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 260 (3d Cir. 1998).  As mentioned within this Opposition, Defendants have had *more* than de minimis contacts with the forum.

assistance in registering for the women's events. *Id*. at ¶ 62. Shannon, as an employee and agent of USA Fencing communicated to Dinah that USA Fencing prohibited Dinah from competing in women's events. *Id*. USAF in turn compelled Premier Fencing to discriminate against Dinah because she is a transgender woman. *Id*.

The USOPC Defendants committed the misconduct within the state of New Jersey. Dinah felt the harm in New Jersey because that is where the acts were committed. Dinah was not even allowed to travel to New York and compete. She was never allowed to even get out of the State of New Jersey and get to New York to compete. Lastly, the tortious conduct was explicitly aimed at New Jersey. Defendant USAF and Defendant Dougherty made it their mission to ensure that Defendant Abdel Aziz and Premier Fencing Club prohibited transgender women from competing in women's events. USAF Defendants and Abdel Aziz worked together to make sure Dinah never left New Jersey to go to the state of New York to compete. Thus, Plaintiff's claims clearly satisfy the Effects Test elements.

### D. Plaintiff's Claims Are Not Preempted By The Sports Act

#### 1. *The Sports Act Itself Declares it is Not Preempted by State Law*

The Sports Act explicitly indicates that NGB's must abide by state law and that state law is not preempted by the Sports Act. *See* 26 U.S.C.A. 220524(b)("Nothing in this section hall be construed to preempt or otherwise abrogate the duty of care of a national governing body under State law or the common law."). Furthermore, the Sports Act explicitly indicates that the USOPC is also not preempted by the Sports Act. *See* 36 USCA 220505(b)(3) ("Nothing in this subsection shall be construed to preempt or otherwise abrogate the duty of care of the corporation [USOPC] under State law or the common law."). It follows that USOPC's preemption arguments *very clearly* fail, as the very Act that it relies on expressly provides to the contrary.

In fact, New Jersey caselaw supports Plaintiff's position; a court addressed this precise argument in *National Organization for Women, Essex County Chapter v. Little League Baseball*, 318 A.2d 33 (N.J. Super 1974). In that case, the Division of Civil Rights recommended an order to require Little League Baseball, Inc. ("Little League") to admit girls ages 8-12 to participate in Little League baseball. *Id.* at 527. In response, Little League made the same arguments that Defendant USOPC makes here. Little League claimed that the Supremacy Clause, based on Little League's federal charter, preempted application of NJLAD. *Id.* The Appellate Division found that Little Leagues federal charter lacked the power to preempt state law:

> Since it is difficult to conceive of any express power underlying the congressional charter of incorporation for Little League Baseball, the charter is itself a tenuous exercise of federal power. Moreover, there being no underlying express power, the charter cannot be deemed intended to effectuate any substantive policy or purpose.

*Id.* at fn. 4. The Appellate Division further found that the Sports Act did not preempt the NJLAD's application:

> When the federal statute is seen as simply bestowing a national charter and not as embodying any substantive policy the asserted conflict becomes illusory. The New Jersey statute as applied does not vitiate the charter of incorporation; it merely regulates how Little League shall conduct its activities in the State of New Jersey in respect to exclusion of participants on the basis of sex. In this regard it may be noted that the charter's objects are required to be pursued **in lawful ways**.

*Id.* at 537 (emphasis added).

The *Little League* court found that the Order to include girls in Little League was not preempted by the Supremacy Clause. *Id.* at 537-38. Significantly, the court noted that "Neither Little League nor its chartered leagues in New Jersey **need** conduct baseball in this State. But if they do, **on an invitation to the general public to participate, girls in the mentioned age bracket must be invited and admitted as freely and as unreservedly as are boys**." *Id.* at 538

(emphasis added).  The *Little League* case is directly on-point to the instant action.  Just like the Little League Charter, the Sports Act requires NGB's to act within the bounds of state law.  *See* 26 U.S.C.A. 220524(b)("Nothing in this section hall be construed to preempt or otherwise abrogate the duty of care of a national governing body under State law or the common law.").  Nor can USOPC's federal charter preempt application of state human rights laws.  *See Little League, supra.*

Defendants USOPC and Brown contend that Plaintiff's state law claims must be dismissed because they are preempted by the Sports Act.  They claim that the New York State Human Relations Law (NYSHRL) stands as an obstacle to the accomplishment and execution of the Sports Act, and (2) it is legally impossible for the USOPC to abide by the NYSRHL and the Executive Order.[7]  However, as discussed above, Defendants are clearly wrong, because not only does the sports Act itself **expressly** provide that state laws are not preempted (*see* 26 U.S.C.A. 220524(b); 36 USCA 220505(b)(3)), the *Little League* decision also **expressly** bars preemption.  Defendants are blocked both statute and judicial precedent from succeeding in their arguments.  Defendants were required to comply with the NYHRSL, yet they violated it.  Thus, their arguments must be disregarded.

### 2.   *The USOPC Updated Athlete Safety Policies Are Not Law*

The USOPC claimed that the NYSHRL is preempted by the NGB Athlete Safety Policy.  Def. Mot. p. 24 ("…[E]nforcement of New York's law in a way that conflicts with the USOPC's NGB Athlete Safety Policy would frustrate the central purpose of the Sports Act…")  Def. Mot. p. 24.  The USOPC correctly explained the two (2) principles of conflict-based preemption, one based in obstacle and the other based on impossibility.  Def. Mot. p. 22-23.  However, Defendants become gravely mistaken in that they forget that preemption applies ***when a state law***, conflicts with a

---

[7] Defendant USOPC concedes that the principle of field preemption does not apply to the instant action.  Def. Mot. at p. 22.

**_federal law or regulation_**.  *See In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*, 725 F.3d 65, 97 (2d Cir. 2013).    Section 4.4 of the NGB Athlete Safety Policy is not the law.  It is a policy of a private entity.  Even if we were to assume it was a law, it does not run contrary to the NYSHRL.  Section 4.4 reads as follows:

> *NGB's are committed to protecting opportunities for athletes participating in sport.  NGB's will continue to collaborate with various stakeholders with oversight responsibilities, e.g. IOC, IPC, international federations, to ensure that women have a fair and safe competition environment consistent with Executive Order 14201 and the Ted Stevens Olympic & Amateur Sports Act, 36 U.S.C. §22501, et. Seq.*

Def Ex. B.  This policy does not direct any entity to exclude transgender women from public accommodations.

### 3.   *The NYSHRL Is Not Preempted Under the Obstacle Preemption Theory*

Defendant USPOC seems to believe that the NYSHRL public accommodation law "stands as an obstacle to the accomplishment and executive of the full purposes and objectives" of the Ted Stevens Act. *See Hillsborough Cty. Fla. V. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 712 (1985). This is simply not the case.  The USOPC mistakenly identifies that the Ted Stevens Act as congress's authorization for the USOPC to "set a policy to ensure a fair and safe competition environment for women's sports events." Def. Mot. at 26.  Defendant USOPC disregards the plain reading of the statute.  The Ted Stevens Act explicitly sets out it purpose in Section 220503:

> **(1)**    to establish national goals for amateur athletic activities and encourage the attainment of those goals;
>
> **(2)**    to coordinate and develop amateur athletic activity in the United States, directly related to international amateur athletic competition, to foster productive working relationships among sports-related organizations;
>
> **(3)**    to exercise exclusive jurisdiction, directly or through constituent members of committees, over—

**(A)** all matters pertaining to United States participation in the Olympic Games, the Paralympic Games, the Pan-American Games, and the Parapan American Games, including representation of the United States in the games; and

**(B)** the organization of the Olympic Games, the Paralympic Games, the Pan-American Games, and the Parapan American Games when held in the United States;

**(4)** to obtain for the United States, directly or by delegation to the appropriate national governing body, the most competent amateur representation possible in each event of the Olympic Games, the Paralympic Games, the Pan-American Games, and the Parapan American Games;

**(5)** to promote and support amateur athletic activities involving the United States and foreign nations;

**(6)** to promote and encourage physical fitness and public participation in amateur athletic activities;

**(7)** to assist organizations and persons concerned with sports in the development of amateur athletic programs for amateur athletes;

**(8)** to provide swift resolution of conflicts and disputes involving amateur athletes, national governing bodies, and amateur sports organizations, and protect the opportunity of any amateur athlete, coach, trainer, manager, administrator, or official to participate in amateur athletic competition;

**(9)** to foster the development of and access to amateur athletic facilities for use by amateur athletes and assist in making existing amateur athletic facilities available for use by amateur athletes;

**(10)** to provide and coordinate technical information on physical training, equipment design, coaching, and performance analysis;

**(11)** to encourage and support research, development, and dissemination of information in the areas of sports medicine and sports safety;

**(12)** to encourage and provide assistance to amateur athletic activities for women;

**(13)** to encourage and provide assistance to amateur athletic programs and competition for amateur athletes with disabilities, including, where feasible, the expansion of opportunities for meaningful participation by such amateur athletes in programs of athletic competition for able-bodied amateur athletes;

**(14)** to encourage and provide assistance to amateur athletes of racial and ethnic minorities for the purpose of eliciting the participation of those minorities in amateur athletic activities in which they are underrepresented;

**(15)** to promote a safe environment in sports that is free from abuse, including emotional, physical, and sexual abuse, of any amateur athlete; and

26

> **(16)**  to effectively oversee the national governing bodies with respect to compliance with and implementation of the policies and procedures of the corporation, including policies and procedures on the establishment of a safe environment in sports as described in paragraph (15).

36 U.S.C.A. §220503.  The only subsection of this provision that gives the USOPC exclusive jurisdiction is subsection 3, that regulates the United States' participation in four specific sets of Games and the organization of those four specific games when they are held in the United States. Defendants did not and cannot show that the Premier ROC Challenge was part of the Olympic or Paralympic Games, or the Pan-American Games or Parapan American Games, or qualifying events for any of those four events.[8]  Therefore, Defendants' argument that the Sports Act provides exclusive jurisdiction over Plaintiff's claims is unavailing.

When assessing conflict preemption based on the "obstacle" theory, the analysis is that courts must look to the entire scheme of the federal statute at issue and evaluate whether the purpose of that statute has been frustrated.  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 374 (2000).

> For when the question is whether a Federal act overrides a state law, the entire scheme of the statute must of course be considered and that which needs must be implied is of no less force than that which is expressed.  If the purpose of the act cannot otherwise be accomplished – if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect – the state law must yield to the regulation of Congress within the sphere of its delegated power.

*Id.*  The NYSHRL public accommodation law does not frustrate the purposes outlined in the Sports Act. The aforementioned purposes of the Sports act can be accomplished while adhering to the NYSHRL.

---

[8] While points earned at an ROC can be counted towards rankings to progress through the sport and ultimately to the Olympics, at issue here is access and participation at the event.  Dinah was not even able to get on the strip to fence let alone assess the impact of her results of the competition.

It must be reiterated that there is a strong presumption *against preemption*. *Farina v. Nokia, Inc.*, 625 F.3d 97, 115 (3d. Cir. 2010), *see also National Organization for Women, Essex County Chapter v. Little League Baseball*, 127 N.J. Super. 127 N.J. Super 522 (1974). This presumption is especially strong in fields of law that are the police power of the state. *Id.* at 116. This presumption against preemption does "not apply where regulation has traditionally been absent." *Id.* Discrimination in places of public accommodation is a police power of the state of New York. N.Y. Exec. §290(2)("It shall be deemed an exercise of the police power of the state for the protection of the public welfare, health and peace of the people of this state, and in fulfillment of the provisions of the constitution of this state concerning civil rights.").

The USOPC seems to believe that it is an agent of the government. First, it is well established that the actions of the USOPC are not actions of the government. While the USOPC is a federally chartered entity, it is absolutely a private organization. *See San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee*, 483 U.S. 522, 543 (1987)("The fact that Congress granted it a corporate charter does not render the [USOPC] a Government agent.")

Nor are Defendants correct that courts have uniformly found that state claims are preempted. In all of the cases Defendants cite, the claims asserted arose out of the plaintiff's desire to participle in the Olympic Games, either as an athlete or a coach. When the Olympic Games were not involved, at least one court has found that a plaintiff's state law claims are not preempted.

In *Devlin by Devlin v. Arizona Youth Soccer Association*, 5 A.D.Cases 321, 1996 WL 118445 (No. Civ. 95-745 TUC ACM) (D. Ariz. 1996),[9] the plaintiff brought an action against the Arizona Youth Soccer Association alleging violations of the Americans With Disabilities Act and the Arizonans With Disability Act ("AzWDA"), breach of contract and equitable estoppel. The

---

[9] A copy of this unreported case is attached as Exhibit "F".

defendant sought to have the plaintiff's AzWDA claims dismissed arguing they were preempted by the Sports Act.  The Court rejected this argument, finding:

> There is no express provision in the Amateur Sports Act preempting state law. Furthermore, the Supreme Court made it clear that the United States Olympic Committee is not a federal agency, but a corporation established pursuant to federal law. *San Francisco Arts & Athletics, Inc. v. United States Olympic Committee,* 483 U.S. 522, 542–43 (1987). The Act merely authorizes the coordination by the United States Olympic Committee of activities "which have always been performed by private entities. Neither the conduct nor the coordination of amateur sports has been a traditional governmental function." *Id.* at 544–45. "The Commission that recommended the current USOC powers 'made it clear that it did not want the Federal Government directing amateur athletics in this country.'" *Id.* at Fn. 26 (quoting House Report, at 9, U.S.Code Cong. & Admin.News 1978, 7482.) It is clear that in passing the Amateur Sports Act, Congress did not intend federal law to occupy the field of amateur athletics exclusively.

*Devlin*, *Id.*, at *3 (D. Ariz. Feb. 8, 1996).  The Court also found that, because the AzWDA is a law of general applicability rather than a direct regulation of amateur athletics, it is not preempted.  *Id.*, citing *Gade v. National Wastes Management Asson.*, 505 U.S. 88, 107 (1992).

Defendants erroneously rely on *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580 (7th Cir. 2001) to support their argument that Plaintiff's state law claims are preempted by the Sports Act.  However, the case is inapplicable because, not only is it a Seventh Circuit opinion and bears no binding authority on this court, substantively it dealt with USOPC's eligibility determination of plaintiff-athlete's doping violation. *Id.*  In fact, the Court of Appeals held that "There is no disagreement that state-law causes of action can be brought against the USOC." *Id.* at 595.  The court determined that the claims alleged must be examined to determine preemption. *Id.*  Ultimately, the court determined that Plaintiff's state law claims were preempted based on the USOPC's ability to determine athletes' eligibility. *Id.* at 596.  However, none of the plaintiff's claims arose out of human rights law violations; there is a clear distinction in the present

29

case.  Here, Defendants collectively discriminated against Dinah.  Her "ineligibility" was based on purely unlawful and discriminatory bases.  The *Slaney* plaintiff's claims were based on her ineligibility based on her doping violations.  Thus, this case is clearly inapposite because the Premier ROC Challenge was completely unrelated to any Olympic or Paralympic Game or trial, the USOPC does not have exclusive jurisdiction and Plaintiff's state law discrimination claim is not preempted.

Defendants also cite to *Walton-Floyd v. U.S. Olympic Comm.,* 965 S.W.2d 35 (Tex. App.1998), a non-binding case.  This case also dealt with an athlete's use of a banned substance, not human rights laws violations. *Id*.  For that reason alone, the case is inapplicable to the one at hand.  Dinah Yukich was not disqualified from participating in any women's athletic events because she used banned substances or drugs; she was barred because she is transgender—in clear violation of state human rights laws.  Thus, doping cases hold no weight here.

Defendants cite to three cases involving coaches who had been determined ineligible by sporting bodies. *See Pliuskaitis v. USA Swimming, Inc.,* 243 F. Supp. 3d 1217 (D. Utah 2017), *aff'd sub nom.,* 720 F. App'x 481 (10th Cir. 2018) ; *Lee v. U.S. Taekwondo Union,* 331 F. Supp. 2d 1252 (D. Haw. 2004) ; *Cantrell v. U.S. Soccer Fed'n (USSF),* 924 P.2d 789 (Okla. Civ. App. 1996).  Similar to Plaintiff's argument directly above, these cases are irrelevant to the present case.  Dinah Yukich is not and was never a coach, nor does the gravamen of her claims in this action arise out of her disqualification from being a coach.  Plaintiff's state law claims are grounded in Defendants' unlawful discrimination against her based on protected characteristics; Defendants cite to no caselaw in their preemption argument that preempted state law claims on that basis—just doping and actions involving coaches.  Thus, Defendants' reliance on the above cases is futile.

### E.    Executive Order 14201 Is Not Law

Defendant USOPC attempted to argue that NYSHRL is preempted by EO 14201, as it is impossible to adhere to both.  *In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*, 725 F.3d 65, 97 (2d Cir. 2013).   In order to demonstrate conflict preemption based on impossibility, Defendant must show that "compliance with both federal and state regulations is a physical impossibility."  *Id.* at 97.  Even more, the Supreme Court expanded upon this to say that preemption based on impossibility involves a scenario where, "state law penalizes what federal law requires."  *Geier v. American Honda Motor Co.*, 529 U.S. 861, 873 (2000).   Plaintiff's complaint is based in public accommodation under the NYSHRL.  Plf. Comp.

First, EO 14201 is not a law.  Defendant RPI makes the dangerous argument that Executive Order 14201 ("EO 14201") is federal law.  This is incorrect for three reasons: (1) the President does not have the power to create law relating to Title IX, (2) the EO is merely an internal directive for the management of the President's cabinet, and (3) the EO explicitly states that it is not a law. A true and correct copy of Executive Order 14201 is attached hereto as Exhibit "A".

### 1.    *The President Does Dot Have the Power to Write Law*

 Executive Order 14201 does not have the effect of a law.  The President does not have the authority to issue a law or regulation relating to the Sports Act.  An Executive Order has the effect of a law when the Executive (President) has a "delegation of authority or mandate from congress." *Independent Meat Packers*, 526 F.2d 228, 235 (8th Cir. 1975); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 US 579, 585 (1952)("The President's power, if any, to issue the order must stem from either an act of congress or from the Constitution itself."); *United States Department of Health and Human Services v. Federal Labor Relations Authority*, 844 F.2d. 1087, 1095-96 (4th

Cir. 1987)("The Executive Branch…simply has no power to make the law; that power resets exclusively with congress.").[10]

 The mandate from congress is outlined in the statutes that explicitly provide the Executive with the power to draft regulations relating to the statute.  These regulations have the same effect as a law.  *See Farmer v. Philadelphia Electric Company*, 329 F.2d. 3, 7 (3d. Cir. 1964).  In *Farm v. Philadelphia Electric,* at issue was an Executive Order that was issued in accordance with the Federal Property and Administrative Services Act ("FPASA" or "Act").  *Id.*  The Act itself specified "[t]he President may proscribe such policies and directives, not inconsistent with the provisions of this chapter."  *Id.* at *7. The Court found that since the FPASA explicitly allowed the President to issue policies and directives relating to the Act, then the Executive Order carried the force and effect of a law.  *Id.* at *8. The Court in that case said, "[t]here are instances when the President issues proclamations and orders…pursuant to a mandate or a delegation of authority from Congress.  In such instances the proclamation [and] orders have the force and effect of laws." *Id.* at *7.

 Here, there is no mandate from Congress or the Constitution that affords the President the power to write a regulations or law under the Ted Stevens Act (Sports Act).  It follows that the Executive Order does not have the effect or force of a law.

### 2.  *The EO is Merely an Internal Directive*

 Executive Order 14201 is nothing more than a notice relating to the "internal management of the executive branch."  *See California v. Environmental Protection Agency*, 72 F.4th 308, 318 (D.C. Circuit 2023).  As outlined above, the Executive Order merely directs (1) the Executive Branch to coordinate with the Attorney General to comply with the vacatur of the 2020 regulations,

---

[10] Because EO 14201 does not have the force and effect of law, it follows that the *Letter from Attorney General Bondi to the State of Minnesota*, or any other DOJ pronouncements do not carry the effect of a law.

(2) people to convene to discuss transgender participation in sports, and (3) announces where the administration would be focusing its support and promotion.[11]

### 3. *The EO Explicitly States That it is Not a Law*

Lastly, yet most importantly, Section 5(c) of the Executive Order explicitly states that it is not a law:

> This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

*See Richland/Willkin Joint Powers Authority v. United States Army Corps of Engineers*, 176 F.Supp.3d 839, 848 (D. Minn. 2016).

> Second and perhaps more importantly, President Obama amended the [Executive Order], adding the following text: "*This order is not intended to and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees or agents, or any other person.*" **The President could not have been more explicit that he did not intend for [the Executive Order] to create an enforceable legal framework.**

*Id.* Here, President Trump – just like President Obama – included the above quoted language in EO 14201 to ensure that it is not mistaken for a law. President Trump could not have been more explicit that he did not intend for Executive Order 14201 to create an enforceable legal framework.

Even if the Executive Order were to be treated like a law, which it most certainly should not, Defendants USOPC and Brown's position is based on an unduly broad reading of EO 14201. That Executive Order does not contain a complete prohibition against transgender women competing in amateur women's sports. It merely states a policy that opposes that participation and

---

[11] Section 4 of the EO 14201 merely calls for action for discussion on the topic of transgender women participating in sports and announces where the administration will be focusing its support. Section 4 EO 14201 is nothing more than a notice (1) directing people to convene (Sec. 4(a)); and (2) announcing where the Administration would be focusing its support and promotion (Sec. 4(b)).

threatens to withhold federal funding from academic institutions that permit transgender women to compete in women's events.  In fact, as alleged in Plaintiff's Complaint, the Trans Ban enforced by the USAF specifically states:

> It is important to note that there may be existent laws per state, and an evolving federal legal landscape that have implications on the adherence to the proposed policy.  In such cases, it is the responsibility of that event host(s) or individual(s) to make USA Fencing aware.

Complaint, ¶¶ 44-45.  Because EO 14201 does not completely prohibit transgender women from participating in women's amateur sporting events, it is not impossible to comply with that Executive Order and the NYSHRL.  Therefore, it is respectfully suggested that the USOPC's and Brown's motion to dismiss Plaintiff's Complaint must be denied.

**F.      The USOPC's Mandate, As Communicated By Brown, That The USAF Ban Transgender Women From Competing In Premier Fencing Events Constitutes Their Aiding And Abetting Of Premier Fencing's Discrimination Against Plaintiff**

Plaintiff sufficiently pled aiding and abetting under New York Executive Law §296(6) ("NYSHRL").  Defendants USOPC and Brown also argue that Plaintiff's Complaint fails to state a claim against them because there is no allegation that either the USOPC or Brown played any role in hosting the Premier ROC Challenge.  This argument ignores the well-pled allegations that Dinah was denied the ability to register for or compete in the Premier ROC Challenge because the USOPC mandated that USAF and its member organizations abide by the unlawful Trans Ban.

The NYHRL provides that "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."  N.Y. Exec. Law § 296(6) (McKinney); *Bennett v. Progressive Corp.*, 225 F. Supp. 2d 190, 213 (N.D.N.Y. 2002).  This section establishes aiding and abetting liability when a party "'actually participates in the conduct giving rise to a discrimination claim.'"  *Elmowitz v.*

34

*Exec. Towers at Lido, LLC*, 571 F. Supp. 2d 370, 377 (E.D.N.Y. 2008) (quoting *Chanval Pellier v. Brit. Airways, Plc.*, No. CIV.A. 02-CV-4195, 2006 WL 132073, at \*12 (E.D.N.Y. Jan. 17, 2006)).

As stated above, Defendants' argument ignores the well-pled allegations of Dinah's denial from registering for the Premier ROC Challenge because USOPC mandated USAF and its member organizations to abide by the Trans Ban.  In fact, when Dinah complained to USAF that they incorrectly modified her gender from F to M, the CEO of USAF responded, "Unfortunately, USA Fencing has no choice but to adhere to their requirements of the USOPC at this time."  Complaint, ¶¶ 12, 16, 52-53.

In addition, when Dinah contacted USAF because she was unable to register to compete in the Premier ROC Challenge, USAF's representative responded that they were required to block her registration to compete in women's events due to the USOPC's insistence that they comply with the Trans Ban.  Complaint, ¶¶ 58-59.  The manager and organizer of the Premier ROC Challenge similarly stated that he was unable to register Dinah for women's events in the Challenge because they were required to comply with USAF policy that was, in turn, mandated by the USOPC. Complaint, ¶¶ 12, 15, 60-64.  Plaintiff's Complaint also specifically alleges that the USOPC and USAF worked together and conspired to ensure that transgender women were excluded from the women's competition of the Premier ROC Challenge and that Defendant Brown consulted with the USAF regarding its implementation of the unlawful Trans Ban.  Complaint, ¶ 12.

While Plaintiff's Complaint does not allege that Defendants USOPC and Brown were directly involved in the planning of the Premier ROC Challenge, it does allege sufficient facts to show that Defendant USOPC's mandate, communicated and enforced by Brown, that all USAF sponsored events, including the Premier ROC Challenge, abide by its unlawful Trans Ban, is what

35

prevented Dinah from registering for and competing in women's events at Premier ROC Challenge. Indeed, the USOPC provides the "playbook" through 36 U.S.C.A. Section 220525 ("Ted Stevens Act") for USAF to discriminate against Dinah. Section 220525 sets out requirements that USAF must follow to sanction an event. *See* 36 U.S.C.A. Section 220525. The USOPC compelled USAF to break the law through the requirements in the Ted Stevens Act. Therefore, Plaintiff's Complaint does allege that the USOPC and Brown actually participated in the conduct giving rise to Plaintiff's claim and not only shared, but dictated the discriminatory intent of the primary actors, the USAF and Premier Fencing. *See Elmowitz v. Exec. Towers at Lido, LLC*, 571 F. Supp. 2d 370, 377 (E.D.N.Y. 2008) (Plaintiff sufficiently alleged aiding and abetting against two defendants both actually participated in the events giving rise to the claim of discrimination). For that reason, it is respectfully suggested that Defendants USOPC's and Brown's motion to dismiss must be denied.

### E. Plaintiff Has Pled Sufficient Facts To Support Her Claims For Intentional Infliction Of Emotional Distress And Civil Conspiracy

Defendants USOPC and Brown also assert that Plaintiff's Complaint fails to state a claim for intentional infliction of emotional distress ("IIED"), even though Brown and USAF's Board Chair admitted that they knew their conduct would cause Plaintiff extreme emotional distress. They also falsely contend that Plaintiff's civil conspiracy claim fails because it can only be based on Plaintiff's IIED claim, even though New Jersey law clearly provides that any unlawful act is sufficient for purposes of civil conspiracy. For the reasons set forth below, Defendants are clearly wrong on both arguments.

#### 1. Defendants Admitted That They Knew Their Conduct Would Cause Plaintiff Extreme Emotional Distress, Precluding Dismissal Of That Claim

Defendants contend that Plaintiff has failed to plead sufficient facts to support her common law claim for intentional infliction of emotional distress.  Specifically, Defendants argue that Plaintiff fails to sufficiently plead that their conduct was extreme and outrageous.  In New Jersey, the four required elements of a claim for intentional infliction of emotional distress as set forth in *Buckley v. Trenton Saving Fund Society,* 111 *N.J.* 355, 544 *A.*2d 857 (1988) are: (1) the defendant acted either intentionally or recklessly; (2) the defendant engaged in conduct that is so "extreme and outrageous ... as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community;" (3) the defendant's intentional or reckless conduct was the proximate cause of the plaintiff's emotional distress; and (4) the defendant's conduct resulted in distress that is "so severe that no reasonable man could be expected to endure it."  *Juzwiak v. Doe*, 415 N.J. Super. 442, 451, 2 A.3d 428, 433 (App. Div. 2010).  Plaintiff has sufficiently pled such extreme and outrageous conduct.

New Jersey courts will rarely dismiss an intentional infliction of emotional distress claim on a motion to dismiss.  *See Calkins v. Dollarland, Inc.,* 117 F.Supp.2d 421, 432 (D.N.J.2000) (citing *Bishop v. Okidata, Inc.,* 864 F.Supp. 416, 427 (D.N.J.1994)).  In fact, courts have upheld IIED claims for pleading sufficiently outrageous and extreme conduct in similar situations.  Plaintiff's allegations are similar to those in *Rivera v. Cracker Barrel Old Country Store Inc.*, No. 02-4160(JBS), 2003 WL 21077965, at *6 (D.N.J. Mar. 3, 2003).[12]  In *Rivera*, the plaintiff alleged that the defendant knew of her disability and purposefully harassed her because of her disability, thereby causing her severe emotional distress.  The Court refused to dismiss the plaintiff's claim for intentional infliction of emotional distress finding that the facts alleged, if taken as true, and if

---

[12] A copy of this unreported decision is attached as Exhibit "G" for the Court's convenience.

rising to the aggravated level required by New Jersey law, may sustain a claim for intentional infliction of emotional distress.

New Jersey caselaw supports finding that Defendants' conduct was sufficiently outrageous and extreme. For instance: at the <u>summary judgment stage</u>, the court found that, given the power balance where a sheriff's used a racial slur regarding an African American employee, a jury could reasonably determine there was sufficiently extreme and outrageous conduct. *See Taylor v. Metzger*, 152 N.J. 490, 513, 706 A.2d 685, 696 (1998). *See also Lankford v. City of Clifton Police Dep't*, 546 F. Supp. 3d 296, 325 (D.N.J. 2021) (finding a police officer's use of racial slurs against a suspect in custody was outrageous and shocking, sufficient to support an IIED claim).

Moreover, in *Leang v. Jersey City Bd. of Educ.,* the court found at the <u>summary judgment stage</u> that a defendant's conduct was sufficiently outrageous, where defendant had made a false report that the plaintiff teacher, a practicing non-violent Buddhist, had threatened to kill students, and defendant had refused defendant's sexual advances. *See Leang v. Jersey City Bd. of Educ.*, 198 N.J. 557, 588, 969 A.2d 1097, 1115 (2009). In *Wigginton v. Servidio,* the court reversed dismissal of plaintiff's IIED claim where he pled sufficiently outrageous conduct where a supervisor and two co-workers who made lewd comments and sexual gestures to plaintiff while the others watched, as well as threatening mafia intervention if the plaintiff sought an investigation. *Wigginton v. Servidio*, 324 N.J. Super. 114, 131, 734 A.2d 798, 807 (App. Div. 1999). *See Kwiatkowski v. Merrill Lynch,* No. A-2270-06T1, 2008 WL 3875417, at *18 (N.J. Super. Ct. App. Div. Aug. 13, 2008)[13] (reversing lower court's dismissal of plaintiff's IIED claim where plaintiff's supervisor's calling plaintiff a "fag" at work, "Although admittedly the comment was made under

---

[13] A copy of this unreported decision is attached as Exhibit "H" for the Court's convenience.

plaintiff's supervisor's breath, and not in the presence of anyone else, it was said in anger and was entirely offensive.").

In the present matter, the Defendants' conduct is sufficiently outrageous for more than one reason. First, Defendants admitted that they actually knew that their conduct in forcing Plaintiff to be labeled in a manner that does not align with her identity would cause Plaintiff great emotional distress. *See*, Complaint, ¶¶ 47, 53-54. Further, Defendants' conduct is even more intolerable beyond Defendants' admissions. Barring a transgender woman from participating in women's sports and unilaterally changing her gender marker without her consent is not simply a "logistical or systems move," they are sheerly outrageous and intolerable acts of erasure of Plaintiff's very identity and personhood. It goes beyond mere passive discrimination of failing to recognize someone's protected characteristics; it is an overt act of forcibly negating one's identity. The USOPC is the national entity that controls American Olympic sports and Mac Brown is an employee of said entity. The power imbalance they favorably possess against Plaintiff is staggering; they are the proverbial "gatekeeper" that governs who may and may not participate in sporting events. As evidenced by caselaw, courts disfavor when defendants with such a stark power imbalance use that imbalance to harm a plaintiff emotionally. Defendants' intentional conduct falls squarely within the New Jersey standard sufficient for a IIED claim. As in *Rivera*, Plaintiff has alleged sufficient facts to overcome a motion to dismiss under Rule 12(b)(6). It is, therefore, respectfully suggested, that Defendants' motion to dismiss Plaintiff's claim for intentional infliction of emotional distress must be denied.

### 2.    *Plaintiff Has Alleged Sufficient Facts To State A Claim For Civil Conspiracy*

Defendants claim that Plaintiff has failed to plead a claim for civil conspiracy because she has not pled a "cognizable tort." Defendant's Brief, Document 16, pp. 39-40. In New Jersey, the

elements of a civil conspiracy are: (1) a combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose or of a lawful purpose to be achieved by unlawful means; and (4) proof of special damages.[14]  *Gross-Quatrone v. Mizdol*, 811 Fed.Appx. 95, 100 (3d Cir. 2020) (citing *Morganroth & Morganroth v. Norris, McLaughlin & Marcus P.C.*, 331 F.3d 406, 414 (3d Cir. 2003).  New Jersey courts make it clear that any unlawful act is sufficient.  *Id.*  The "gist of the claim is not the unlawful agreement, 'but the underlying wrong which, absent the conspiracy, would give a right of action.'"  *Gonzalez v. City of Newark*, No. A-4524-17T3, 2020 WL 4811568, at *14 (N.J. Super. Ct. App. Div. Aug. 19, 2020)[15] (quoting *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 178, 876 A.2d 253, 263 (2005)); *K.J. v. J.P.D.*, 659 F. Supp. 3d 471, 482 (D.N.J. 2023) (holding same).

Plaintiff has sufficiently pled that Defendants' violations of the NYSHRL are sufficient underlying unlawful acts for her civil conspiracy claim.  New Jersey law does not strictly limit requisite unlawful acts for civil conspiracy to just intentional torts.  *Cf. Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 294, n.15 (3d Cir. 2018) (holding that the elements of a conspiracy claim under 42 U.S.C. § 1983 as well as New Jersey law to violate civil rights "are essentially the same.").  Indeed, Courts have stressed that broad *intentional and unlawful* conduct is sufficient for a civil conspiracy; they have not restricted that requirement to just *intentional and tortious* conduct. *See In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs., & Prods. Liab. Litig.*, 553 F. Supp. 3d 211, 233 (D.N.J. 2021) (("negligence cannot serve as a predicate for a conspiracy claim because conspiracy requires the commission of an unlawful act or a lawful act committed for an unlawful purpose.") (citing *Chen v. D.C.*, 256 F.R.D. 267, 273 n.5 (D.D.C. 2009)).

---

[14] Defendants rely on New York law for their civil conspiracy argument.  *See* Def. Mot. at 39-40.  However, New Jersey law is the applicable law to the civil conspiracy claim here.
[15] A copy of this unreported decision is attached as Exhibit "I" for the Court's convenience.

In the present matter, Plaintiff has alleged that Defendants conspired with USAF, Premier and the individual defendants to implement and enforce a transgender ban that violates the NYSHRL. Therefore, she has sufficiently alleged that Defendants committed an "unlawful act" and it is respectfully suggested that Defendants' motion to dismiss her claim for civil conspiracy must be denied.

## IV.   CONCLUSION

Defendants USOPC and Brown have sufficient involvement in the actions that took place in New Jersey and that gave rise to the instant claims to establish personal jurisdiction over them. In addition, Plaintiff's claims are not preempted by the Sports Act as the event from which Plaintiff was excluded was not part of the Olympic or Paralympic Games or trials for those games. Plaintiff's Complaint also sufficiently pleads facts regarding USOPC's and Brown's involvement in the discriminatory acts against Plaintiff to state a claim for aiding and abetting under the NYSHRL and state sufficient facts to state claims for intentional infliction of emotional distress and civil conspiracy.

For all of the reasons detailed above, it is respectfully suggested that Defendants USOPC's and Brown's motion to dismiss Plaintiff's Complaint must be denied.

**SPECTOR GADON ROSEN VINCI P.C.**

Dated:  March 5, 2026                    By: /s/ Susan M. Cirilli
                                           Susan M. Cirilli, Esquire
                                           Attorney I.D. No.: 017972012
                                           One Logan Square, 18th Floor
                                           130 N. 18th Street
                                           Philadelphia, PA 19103
                                           (215) 241-8887
                                           SCirilli@sgrvlaw.com
                                           *Attorney for Plaintiff Dinah Yukich*

41

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **DINAH YUKICH,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | **NO. 2:25-cv-18011-KSH-AME** |
| **PREMIER FENCING CLUB,** *et al.,* | |
| **Defendants.** | |

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 5th day of March, 2026, I electronically filed this

Response to Defendants' Motion to Dismiss on behalf of Dinah Yukich, with the Clerk of the Court

using CM/ECF filing system, which sent a notification filing to the following attorneys:

> Christopher S. Porrino, Esq.
> **LOWENSTEIN SANDLER LLP**
> 1251 Avenue of the Americas
> New York, NY 10020
> 212-419-5880
> *Attorneys for United States Olympic &*
> *Paralympic Committee and Mac Brown*
>
> Aimee S. Lin, Esq.
> Claudia A. Costa, Esq.
> **GOLDBERG SEGALLA LLP**
> Mailing address: PO Box 847, Buffalo, NY 14201
> 1037 Raymond Boulevard, Suite 1010
> Newark, NJ 07102-5423
> 973-681-7000
> alin@goldbergsegalla.com
> ccosta@goldbergsegalla.com
> *Attorneys for Defendants*
> *Abdel Aziz, USA Fencing Association,*
> *and Shannon Daugherty*

*Premier Fencing Club*[16]
215 Durham Avenue
Metuchen, NJ 08840

**SPECTOR GADON ROSEN VINCI P.C.**

By: /s/ Susan M. Cirilli

    Susan M. Cirilli, Esquire
    Attorney I.D. No.: 017972012
    One Logan Square, 18th Floor
    130 N. 18th Street
    Philadelphia, PA 19103
    (215) 241-8887
    scirilli@sgrvlaw.com
    *Attorney for Plaintiff Dinah Yukich*

---

[16] Defendant Premier Fencing Club has not answered or otherwise responded in this Matter. A copy of the Opposition has been sent to Premier Fencing Club via certified US mail.