# EXHIBIT D

Kwiatkowski v. Merrill Lynch, Not Reported in A.2d (2008)

104 Fair Empl.Prac.Cas. (BNA) 279

KeyCite Yellow Flag

Distinguished by Bird v. HomeGoods Inc., N.J.Super.L., December 21, 2012

2008 WL 3875417

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of New Jersey,
Appellate Division.

Darren KWIATKOWSKI, Plaintiff-Appellant,

v.

MERRILL LYNCH and Theresa
Wonder, Defendants-Respondents.

Argued April 30, 2008.
|
Decided Aug. 13, 2008.

On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Docket No. L-1031-04.

**Attorneys and Law Firms**

Charles Z. Schalk argued the cause for appellant (Mauro, Savo, Camerino & Grant, P.A., attorneys; Mr. Schalk, of counsel and on the brief).

J. Michael Riordan argued the cause for respondents (Greenberg Traurig, LLP, attorneys; Mr. Riordan and Melinda A. Minetto, on the brief).

Before Judges CUFF, LISA and LIHOTZ.

**Opinion**

PER CURIAM.

 **\*1** Plaintiff appeals from summary judgment dismissing his claims for wrongful termination of employment and harassment based on his sexual orientation, and for intentional infliction of emotional distress. The court dismissed the wrongful termination claim on the ground that plaintiff's direct supervisor, defendant Theresa Wonder, who demonstrated some evidence of bias, was not the person who made the termination decision. On appeal, plaintiff argues that his employer, defendant Merrill Lynch, cannot escape liability because it was Wonder who provided to the actual decisionmaker all of the information about him upon which the termination was based. The court dismissed plaintiff's

hostile work environment claim on the ground that the single offensive comment made by plaintiff's direct supervisor, although clearly derogatory, under all of the circumstances was insufficient to withstand summary judgment. On appeal, plaintiff disputes that determination and argues that he presented sufficient evidence to warrant a determination by a jury. The court also dismissed plaintiff's claim for intentional infliction of emotional distress, essentially on the same ground as the hostile work environment dismissal. Plaintiff's appeal argument is also similar, namely that a jury issue exists. Finally, based upon dismissal of plaintiff's claims under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, with respect to plaintiff's employer, the court also dismissed plaintiff's claims against Wonder for aiding and abetting discrimination and harassment. Plaintiff argues on appeal that the LAD claims against the employer should be reinstated and, accordingly, so should the aiding and abetting claims against Wonder. We agree with plaintiff and reverse.

I

Plaintiff was hired by Merrill Lynch on January 15, 2001 as an at-will employee. He worked in the Hopewell office as a client services representative. Plaintiff's primary duty was to answer incoming telephone inquiries from clients. Plaintiff was twenty-four years old when he was hired and a graduate of New York University. Plaintiff is homosexual. He believed that many people at Merrill Lynch knew he was gay, although he told very few people.

From the time of his hire until September 3, 2003, plaintiff was supervised by individuals other than Wonder. He received excellent performance evaluations, which noted that he was courteous, professional, extremely helpful to clients, had a positive attitude, was hardworking and dedicated, and was an invaluable resource to his peers and managers, taking the initiative to be a leader. The reports did contain some negative aspects, including that plaintiff should concentrate on reducing his call duration and on practicing better call management, and that he had excessive absences and tardiness.

On August 16, 2002, plaintiff was notified regarding his six absences during the prior twelve-month period and that a continued pattern might result in progressive disciplinary action. On November 15, 2002, he was notified of seven absences during the prior twelve-month period, and that additional absences might result in disciplinary action. On

January 10, 2003, he was issued a formal written warning for his eight absences in the prior twelve-month period. Overall, however, the record establishes that plaintiff was considered by supervisory personnel to be an exemplary employee. He received various awards for his outstanding work. He was routinely called upon by management to help resolve difficult client inquiries and was a recognized specialist in the financial software program known as Quicken. Because plaintiff was asked to deal with more complex client inquiries and Quicken issues, he was kept off the phones for extended periods.

**\*2** Wonder became plaintiff's direct supervisor on September 3, 2003. Her job responsibilities included monitoring her employees' phone calls and advising them on improving their performance. Plaintiff never told Wonder he was gay and was unaware whether anyone else told her so. Plaintiff himself told only two of his co-workers that he was gay, but discussed "the topic" with R. Michael Schwarz, another homosexual employed at the call center, and assumed that his homosexuality was common knowledge. Plaintiff joined Merrill Lynch's Rainbow Professional Network for gay and lesbian employees, although he did not participate in any of its activities.

In October 2003, plaintiff told Wonder he was unhappy with his job, did not like being micromanaged, and felt like he was always getting into trouble for something. He said his complaints were directed at the job, not at her, and Wonder said she would assist plaintiff with seeking a transfer.

On November 5, 2003, plaintiff was issued a final warning regarding his attendance. He was required to provide a doctor's note for any future absence and informed that his failure to correct the problem would result in his immediate termination.

Plaintiff alleged that from November 5 to December 21, 2003, Wonder began to create a record against him in an attempt to portray him as a poor performer. He alleged that Wonder began to take away his duties and specialties and that other employees perceived she was treating him unfairly. He claimed that she frequently screamed at him and criticized his work, and her criticism was delivered in an extremely accusatory manner. He claimed Wonder repeatedly asked him why he was working on a specific project, and she would berate him for spending too much time on an account that required research. Plaintiff began having panic attacks, for which he sought treatment. This was corroborated by his treating psychiatrist.

On December 21, 2003, Wonder reported to Human Resources (HR) that plaintiff's attitude was "horrible" and that his performance had been "very poor," specifically, that he failed to meet his adherence objectives for December. The next day, HR responded that Wonder should discuss plaintiff's problems with him, and if no improvement was shown, she should issue a verbal warning. On December 23, 2003, Wonder asked HR to issue a verbal warning immediately, claiming she had previously spoken to plaintiff about the issue.

During that month, Wonder gave holiday gifts to her staff. She gave each individual homemade cookies and candy, along with specialty calendars for the men and stationery for the women. She claims she attempted to pick calendars that suited each employee's interests, such as sports, crossword puzzle, and the like. For plaintiff, she chose what she thought was a "Joke-A-Day" calendar, because he liked jokes. As it turned out, however, the calendar contained many crude and obscene references to such things as penises, pubic hair, condoms, testicles, assholes, nipples, bowel movements, breasts, farts, and the like. Plaintiff initially displayed the calendar on his desk, but soon realized that the subject matter was offensive to him and his co-workers, and he put it in his drawer.

**\*3** The event that purportedly formed the basis for plaintiff's termination occurred on Monday, December 29, 2003. The Merrill Lynch call center issued a "Code Red," which meant there was a high volume of client calls and all representatives were required to sit at their desks to take these calls in lieu of attending to other tasks. There were about fifty such Code Reds per year, often on Mondays, when call volume was typically high.

During the Code Red, plaintiff was in the process of helping a particular client, Ms. Bliss, with a problem. The call had been routed to him because he had done research for Bliss the previous week. Following protocol, plaintiff asked Wonder for permission to deviate from the Code Red to pull Bliss's client statements. Wonder told plaintiff that either the Correspondence Utility Team could pull these statements or plaintiff could get them the following day. Plaintiff chose the latter course. Wonder then put in a deviation request with the Workforce Management Team for plaintiff to be allowed off the phones for the following morning between 9:30 and 10 a.m. The request was granted and Wonder so notified plaintiff. Wonder authorized plaintiff to call Bliss back solely for the

purpose of telling her that he would be getting back to her the following morning to further discuss her problem.

According to plaintiff, before he could call the client back, it was necessary to find out from the Correspondence Utility Team whether any information had already been found regarding her account. He believed he had Wonder's permission to do that. On his way to check that information, plaintiff faxed a document regarding another client's request that he had put off doing earlier and which he regarded as urgent. He then called Bliss to advise her of the situation and what he found so far. All of this took about twenty-five minutes. Meanwhile, numerous incoming calls were backing up, and Wonder sent him this email:

> I asked you very nicely to take care of this tomorrow or give it to the CU [Correspondence Utility] and you just spend [sic] 25 minutes on this issue when there are 28 calls in queue. We made an agreement for you to do it tomorrow morning and I sent in a deviation for you. Can you please explain?

Plaintiff responded with this email:

> I first signed off to fax a DDS form to one client which I had delayed since this morning. The second issue where I called the client we spoke about was because client was reportedly upset and anxious regarding this issue. I just wanted to let her know of what was found and when I would call her.

> I apologize for again not being able to follow through correctly.

Plaintiff contended his apology was not because he believed he did anything wrong, but out of frustration.

Later that afternoon, Wonder went to the office of her supervisor, Sandra Givas, the Vice President and Manager of Financial Relationship Services, and reported the incident. Wonder felt hurt that an employee was insubordinate to her after she had tried to help him. Givas told Wonder that plaintiff should be terminated for his insubordination, and Wonder agreed.

 **\*4** Givas did not know whether plaintiff had ever previously breached a Code Red and that he had never before been insubordinate to either Givas or Wonder. She acknowledged that she did not have much interaction with plaintiff, except for an occasional passing in the hall, that she had limited firsthand knowledge of his job performance, and that any knowledge she had was essentially based on what Wonder,

or plaintiff's previous supervisors, had told her. Her decision to terminate plaintiff was based on Wonder's report of the Code Red incident and Givas's conclusion that plaintiff had been grossly insubordinate. Although Givas also noted that plaintiff had an ongoing attendance problem, she maintained that her decision to terminate him was based solely on his insubordination. Plaintiff does not dispute that Givas did not know he was gay.

Wonder agreed with and supported Givas's decision, and they never discussed any punishment other than termination, even though plaintiff had never before been insubordinate and even though Merrill Lynch used progressive discipline in certain situations. Givas then called HR for assistance. HR said they would speak to legal counsel first.

Two days later, on December 31, 2003, in response to Givas's request for a copy of plaintiff's latest performance review, Wonder furnished plaintiff's November 2003 evaluation. In it, Wonder reported that plaintiff was a core part of the team, was valued for being a subject matter expert, and was willing to take on any new challenge. However, she also reported that he needed to develop his time management skills and to realize that heavy call volume had to be his first priority. Although he was valued for his hard work and creativity, he had many areas that needed improvement, including his adherence scores, his attendance, and his lateness. Wonder believed plaintiff had great potential to succeed.

Also on December 31, 2003, plaintiff claimed he was in the office talking to a fellow employee when Wonder suddenly interrupted his conversation and said, "I can't believe you. was standing right there! How dare you be so unprofessional!" She then stormed into her office. Neither plaintiff nor his fellow employee had any idea what prompted Wonder's comments. A short time later, plaintiff said that as Wonder passed him in the hallway coming back from the conference room, he heard her call him a "stupid fag" under her breath. Although other people were in the area when the comment was made, plaintiff was not aware that anyone else heard it, and he never told anyone about it. However, one of his fellow employees observed his reaction of utter shock as he came back to his desk. Plaintiff claimed that after work that day, as he went out to his car, his knees buckled, he started to hyperventilate, and he no longer felt safe speaking to anyone at work.

Wonder denied ever making the comment, and also denied knowing whether plaintiff was gay. Her version of the events was different. She claimed that while plaintiff was talking to a

Kwiatkowski v. Merrill Lynch, Not Reported in A.2d (2008)

104 Fair Empl.Prac.Cas. (BNA) 279

fellow employee, she heard plaintiff refer to her as a "bitch." She told him this was inappropriate language, and he became irate and threw up his hands. She then asked to talk with him in the conference room, and at this meeting, she told plaintiff she was offended by his remark and that the department had zero tolerance for negativity. Plaintiff then returned to his desk.

**\*5** On January 2, 2004, the first work day after the incident, plaintiff called HR and spoke to Deb Droz, in Merrill Lynch's New York office. He told her he was being harassed by his supervisor, who did not like him, and that he was having panic attacks. He mentioned the calendar and that his supervisor was angry with him for being late to a meeting. He never said he was homosexual and never mentioned the "stupid fag" comment, even though Merrill Lynch's complaint procedure provided that anyone who was the victim of discrimination or harassment by their immediate supervisor should contact HR. The conversation ended with plaintiff telling Droz he wanted to try to handle the problem on his own and work it out with his supervisor.

On January 6, 2004, Givas met with Wonder and plaintiff in her office and terminated plaintiff's employment. Givas maintained that the decision was based on her, not Wonder's, recommendation, and that she made her own recommendation after considering Wonder's input and evaluating the rest of what she herself knew about the situation. It was agreed with HR that the sole basis for termination was insubordination, even though Wonder made her aware of "other variables," such as plaintiff's attendance issues and schedule adherence. Givas was unaware of plaintiff's sexual orientation before terminating him, and she had not looked at his personnel file in the period between the instance of insubordination and the termination.

According to plaintiff, Givas told him at the termination meeting, "this has nothing to do with anything else," and it did not matter what his explanation was for his behavior on December 29, because the decision had already been made. Wonder claimed that plaintiff did not attempt to offer any explanation, did not dispute that he had been insubordinate, and did not allege any discrimination.

Plaintiff contended that, following his termination, he suffered from panic attacks, sleeplessness, nightmares, depression, upset stomach, loss of appetite, shortness of breath, chest pain, weakness, and emotional instability. His treating psychiatrist corroborated these complaints and added that plaintiff suffered flashbacks of the confrontations with his supervisor. The psychiatrist diagnosed plaintiff as suffering from post-traumatic stress disorder, and noted that a threat to plaintiff's integrity occurred when Wonder called him a "fag," when she yelled at him and embarrassed him in front of other people, and when she gave him the offensive calendar. Plaintiff also had to grapple with an issue he had not confronted since high school or college, when he "came out" as gay.

II

Plaintiff filed this action on July 16, 2004. In August 2006, defendants moved for summary judgment. On October 6, 2006, after hearing oral argument, the court granted defendants' motion. Plaintiff moved for reconsideration, which the court denied after hearing oral argument on December 1, 2006. This appeal followed.

**\*6** With respect to plaintiff's wrongful termination claim, the court found that he made out a prima facie case of discrimination, in that he was a member of a protected class who had been performing his job when terminated and that someone else was sought to perform the same job. The court further found that Merrill Lynch met its burden of articulating a nondiscriminatory reason for the discharge, namely plaintiff's insubordination on December 29, 2003. Thus the burden was on plaintiff to prove pretext, by presenting some evidence, direct or circumstantial, from which the factfinder could either disbelieve the employer's articulated reason for his termination or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

The court found that plaintiff could not meet this burden because he conceded that Givas, the decisionmaker, had no knowledge that he was gay. Although Schwarz assumed plaintiff was gay, there was no clear evidence from which the court could infer that plaintiff's homosexuality was well known within the company.

The court reasoned that plaintiff's hostile work environment claim was based solely on the "stupid fag" comment and the calendar. The court observed that the calendar, although very offensive, was not directed at homosexuals, and there was no basis upon which it could be found that the calendar would not have been given to plaintiff but for his sexual orientation. This left Wonder's comment, which the court accepted as having

**Kwiatkowski v. Merrill Lynch, Not Reported in A.2d (2008)**
104 Fair Empl.Prac.Cas. (BNA) 279

been made for summary judgment purposes, as the sole basis for the hostile work environment claim.

The court noted that no one was nearby when the comment was made and that plaintiff never mentioned the comment to anyone before he was fired. The court emphasized that the comment was extremely derogatory and offensive to gay men and that it would not have been uttered but for plaintiff's sexual orientation. Ultimately, the court concluded that the comment was not so severe or pervasive that a reasonable person would believe that the conditions of employment had been altered and that the working environment was hostile and abusive. Although a single comment could suffice, the court distinguished this incident from that in *Taylor v. Metzger,* 152 N.J. 490, 494-95 (1998), where the comment was made by the plaintiff's highest-ranking supervisor, not her immediate supervisor, and in the presence of another supervising officer. On the contrary, no one else was present in this case, and the court concluded that the comment under these circumstances was not sufficient to convert plaintiff's work environment into a hostile one.

The court applied a similar analysis to plaintiff's intentional infliction of emotional distress claim, concluding that the single comment by Wonder was not so extreme and outrageous as to go beyond all bounds of decency in a civilized society. Finally, plaintiff's claim against Wonder for aiding and abetting discrimination failed because there was no primary discrimination for her to aid and abet.

 **\*7** Plaintiff's reconsideration motion was based primarily on two grounds. He first urged the court to reconsider its decision that an employer could shield itself from liability for discrimination if the decisionmaker had no knowledge that the employee belonged to a protected class. Plaintiff relied upon a line of federal cases, which we will discuss, in support of this argument. The court analyzed the cases, but ultimately concluded that there was nothing in the record to suggest that Givas did not make an independent evaluation of the matter, and that she was aware generally of plaintiff, even though she had no prior interaction with him. Most importantly, although all of the information Givas relied on was furnished by Wonder, plaintiff never alleged that any of that information was incorrect.

The second ground for the reconsideration motion related to the hostile work environment claim. The court rejected plaintiff's argument that this claim was based on more than just the calendar and the "stupid fag" comment, and reiterated its previous ruling.

III

Plaintiff argues that the court erred in dismissing his wrongful termination claim because it mistakenly held that he failed to show sufficient evidence that his insubordination was a pretext for sexual orientation discrimination. In particular, he argues that an employer is liable for the discriminatory conduct of one of its supervisors irrespective of the knowledge of the ultimate decisionmaker. This presents a close question.

An employment discrimination case may be advanced on either a pretext or a mixed-motive theory. *Fleming v. Corr. Healthcare Solutions, Inc.,* 164 N.J. 90, 100 (2000). In a pretext case, an employee must show that he or she belonged to a protected class, was performing at a level that met the employer's expectations, was nevertheless terminated, and the employer then sought someone else to perform the same work. *Mogull v. CB Commercial Real Estate Group, Inc.,* 162 N.J. 449, 462 (2000); *DeWees v. RCN Corp.,* 380 N.J.Super. 511, 523 (App.Div.2005).

The burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the plaintiff's discharge. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L. Ed.2d 668, 678 (1973). That burden is met by the introduction of evidence which, if taken as true, permits the conclusion that unlawful discrimination was not the cause of the discharge. *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir.1994); *Greenberg v. Camden County Vocational & Technical Sch.,* 310 N.J.Super. 189, 199 (App.Div.1998).

The burden then shifts back to the employee to show, by a preponderance of the evidence, that the proffered reason was a pretext. *McDonnell Douglas, supra,* 411 U.S. at 804, 93 S.Ct. at 1825, 36 L. Ed.2d at 679. This may be accomplished by showing that a discriminatory reason more likely motivated the employer than the employer's proffered reason, or that the proffered reason is not worthy of belief. *Beatty v. Farmer,* 366 N.J.Super. 69, 75 (App.Div.2004); *Greenberg, supra,* 310 N.J.Super. at 199-200. To avoid summary judgment, the plaintiff must submit "some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate

reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes, supra,* 32 *F.*3d at 764; *accord Zive v. Stanley Roberts, Inc.,* 182 *N.J.* 436, 455-56 (2005); *El-Sioufi v. St. Peter's Univ. Hosp.,* 382 *N.J.Super.* 145, 173 (App.Div.2005).

**\*8** All that is needed is "some" evidence from which a factfinder could infer that the proffered reason did not actually motivate the employer's decision to terminate. *Fuentes, supra,* 32 *F.*3d at 764; *Greenberg, supra,* 310 *N.J.Super.* at 200. However, more is required than "simple identification of an act or event that the plaintiff believes bespeaks discrimination." *El-Sioufi, supra,* 382 *N.J.Super.* at 173.

A plaintiff cannot defeat summary judgment just by showing that the employer's decision was wrong or mistaken, because the factual dispute is not whether the employer was wise or prudent, but only whether discriminatory animus motivated its decision. *Fuentes, supra,* 32 *F.*3d at 765. An employer is entitled to make its own policy and business judgments and may fire an at-will employee for a good or bad reason, or no reason at all, as long as the firing is not a pretext for intentional discrimination. *Maiorino v. Schering-Plough Corp.,* 302 *N.J.Super.* 323, 345-46 (App.Div.), *certif. denied,* 152 *N.J.* 189 (1997).

Under this pretext framework, the burden of proof remains at all times with the employee. *Fleming, supra,* 164 *N.J.* at 100. The framework was formulated to compensate for the fact that direct evidence of discrimination is often not available to the employee. *Zive, supra,* 182 *N.J.* at 446-47; *Myers v. AT & T,* 380 *N.J.Super.* 443, 452-53 (App.Div.2005), *certif. denied,* 186 *N.J.* 244 (2006).

By contrast, under the mixed-motive framework, the employee is able to produce "direct evidence" of discrimination. The burden then shifts to the employer to produce evidence sufficient to show that it would have made the same decision if illegal bias had played no role in the employment decision. *Price Waterhouse v. Hopkins,* 490 *U.S.* 228, 244-45, 109 *S.Ct.* 1775, 1787-88, 104 *L. Ed.*2d 268, 284 (1989). Direct proof of discrimination leaves the employer only an affirmative defense on the question of causation in fact. *Id.* at 244-46, 109 *S.Ct.* at 1787-88, 104 *L. Ed.*2d at 284-85; *Fleming, supra,* 164 *N.J.* at 100. Stray remarks unrelated to the decisional process are not considered sufficiently "direct evidence" of discrimination. *Bergen Commercial Bank v. Sisler,* 157 *N.J.* 188, 208 (1999)

(citing *Price Waterhouse, supra,* 490 *U.S.* at 277, 109 *S.Ct.* at 1804-05, 104 *L. Ed.*2d at 305 (O'Connor, J., concurring in judgment)).

"Unless there is evidence which can be fairly said to directly reflect unlawful bias, the case should be treated as a pretext case." *Jackson v. Georgia-Pacific Corp.,* 296 *N.J.Super.* 1, 19 (App.Div.1996), *certif. denied,* 149 *N.J.* 141 (1997). At the very least, the employee must present "circumstantial evidence 'of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude.' " *Ibid.* (citation omitted); *accord McDevitt v. Bill Good Builders, Inc.,* 175 *N.J.* 519, 528 (2003). "[A] court must consider whether a statement made by a decisionmaker associated with the decisionmaking process actually bore on the employment decision at issue and communicated proscribed animus." *McDevitt, supra,* 175 *N.J.* at 528.

**\*9** The theory of "subordinate bias" has been recognized in federal employment discrimination cases. This theory comes into play when an "allegedly biased subordinate accomplishes his discriminatory goals by misusing the authority granted to him by the employer-for example, the authority to monitor performance, report disciplinary infractions, and recommend employment actions." *EEOC v. BCI Coca-Cola Bottling Co.,* 450 *F.*3d 476, 485 (10th Cir.2006), *cert. dismissed, --- U.S.* 1931, 127 *S.Ct.* 1931, 167 *L. Ed.*2d 583 (2007). It recognizes that "a company's organizational chart does not always accurately reflect its decisionmaking process." *Id.* at 486.

That is, the theory recognizes that the "titular decisionmaker" may not be the "true decisionmaker." *Ibid.* (quoting *Russell v. McKinney Hosp. Venture,* 235 *F.*3d 219, 227 (5th Cir.2000)). "A biased low-level supervisor with no disciplinary authority might effectuate the termination of an employee from a protected class by recommending discharge or by selectively reporting or even fabricating information in communications with the formal decisionmaker." *Ibid.*

Various terms have been used to describe the theory of subordinate bias, including the "cat's-paw" or "rubber stamp." *Id.* at 484.

> In the employment discrimination context, "cat's paw" refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action. The "rubber stamp"

104 Fair Empl.Prac.Cas. (BNA) 279

doctrine ... refers to a situation in which a decisionmaker gives perfunctory approval for an adverse employment action explicitly recommended by a biased subordinate.

[*Ibid.* (citations omitted).]

The federal courts of appeal "overwhelmingly have endorsed some version of these doctrines." *Ibid.* But the circuits have

divided as to the level of control a biased subordinate must exert over the employment decision. Some courts ... formulat[e] the inquiry as whether the subordinate "possessed leverage, or exerted influence, over the titular decisionmaker." ... This standard apparently contemplates that any "influence," the reporting of any "factual information," or any form of "other input" by a biased subordinate renders the employer liable so long as the subordinate "may have affected" the employment action.

[*Id.* at 486 (citation omitted).]

The Third Circuit has endorsed such a lenient approach and has predicted that the New Jersey Supreme Court would "hold an employer liable for the discriminatory conduct of its supervisors irrespective of the knowledge of intent of the ultimate decision-makers." *Delli Santi v. CNA Ins. Cos.,* 88 F.3d 192, 200 n. 11 (3d Cir.1996); *see also Abrams v. Lightolier, Inc.,* 50 F.3d 1204, 1214 (3d Cir.1995) (if evidence shows that immediate supervisor "played a role" in employer's decision to fire plaintiff, and that supervisor harbored discriminatory animus, jury could reasonably conclude that supervisor was decisionmaker).

 **\*10**  This lenient approach has also been endorsed by the Seventh Circuit. In fact, it was Judge Posner's decision in *Shager v. Upjohn Co.,* 913 F.2d 398 (7th Cir.1990), that originally coined the term "cat's-paw." In that case, the plaintiff had not been fired by his supervisor, but by a "Career Path Committee" of the employer. *Id.* at 405. The plaintiff alleged that the committee's decision had been tainted by the supervisor's prejudice, the supervisor had portrayed the plaintiff's performance to the committee in the worst possible light, and the committee's deliberations on the question whether to fire him had been brief and perfunctory. *Ibid.* In ruling in favor of the plaintiff, Judge Posner held that if the committee "acted as the conduit of [the supervisor's] prejudice-his cat's-paw-the innocence of its members would not spare the company from liability." *Ibid.*

The Fifth Circuit has also adopted this more lenient approach. In *Russell, supra,* 235 F.3d at 226, the court held that a jury could consider evidence of discriminatory remarks made by someone who was "principally responsible" for the employee's termination. "If the employee can demonstrate that others had influence or leverage over the official decisionmaker, and thus were not ordinary coworkers, it is proper to impute their discriminatory attitudes to the formal decisionmaker." *Ibid.* The court held that such a lenient approach was justified because otherwise "employers could easily insulate themselves from liability by ensuring that the one who performed the employment action was isolated from the employee, thus eviscerating the spirit of the 'actual decisionmaker' guideline." *Id.* at 227 n. 13.

The Fourth Circuit has taken a much stricter approach. In *Hill v. Lockheed Martin Logistics Management, Inc.,* 354 F.3d 277, 291 (2004) (en banc), *cert. dismissed,* 543 U.S. 1132, 125 S.Ct. 1115, 160 L. Ed.2d 1090 (2005), the court

decline[d] to endorse a construction of the [federal] discrimination statutes that would allow a biased subordinate who has no supervisory or disciplinary authority and who does not make the final or formal employment decision to become a decisionmaker simply because he had a substantial influence on the ultimate decision or because he has played a role, even a significant one, in the adverse employment decision.

... Regarding adverse employment actions, an employer will be liable not for the improperly motivated person who merely influences the decision, but for the person who in reality makes the decision. This encompasses individuals who may be deemed actual decisionmakers even though they are not formal decisionmakers.... [T]o survive summary judgment, an aggrieved employee who rests a discrimination claim under [the federal statutes] upon the discriminatory motivations of a subordinate employee must come forward with sufficient evidence that the subordinate employee possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer.

 **\*11**  More recently, an intermediary approach appears to have been adopted by some of the federal courts. In *BCI, supra,* 450 F.3d at 486-87, the Tenth Circuit rejected the lenient approach as improperly eliminating the requirement of causation, and rejected the strict approach as improperly placing too much reliance on who is a "decisionmaker" when that term appears nowhere in the federal statutes. Instead, the

court held that the proper focus in a subordinate bias claim should be on "whether the biased subordinate's discriminatory reports, recommendation, or other actions caused the adverse employment action." *Id.* at 487.

Under this approach, an employer can avoid liability by showing that it conducted an independent investigation of the allegations against an employee. *Id.* at 488; *see also Richardson v. Sugg,* 448 *F.*3d 1046, 1060 (8th Cir.2006) (where decisionmaker makes independent determination as to whether employee should be terminated and does not serve as mere conduit for another's discriminatory motives, subordinate bias theory fails); *English v. Colo. Dep't of Corr.,* 248 *F.*3d 1002, 1011 (10th Cir.2001) ("A plaintiff cannot claim that a firing authority relied uncritically upon a subordinate's prejudiced recommendation where the plaintiff had an opportunity to respond to and rebut the evidence supporting the recommendation.").

Even the Seventh Circuit appears to be moving toward this intermediary approach. In *Brewer v. Board of Trustees of University of Illinois,* 479 *F.*3d 908, 918 (7th Cir.), *cert. denied,* --- *U.S.* 357, 128 *S.Ct.* 357, 169 *L. Ed.*2d 36 (2007), the court held that where a decisionmaker is not wholly dependent on a single source of information, but instead conducts its own investigation into the facts relevant to the decision to terminate, the employer will not be liable for misinformation supplied to the decisionmaker by a subordinate employee. The court specifically rejected the more lenient "lesser degree of influence" approach in the context of an employee being disciplined for particular misconduct. *Id.* at 920. Even where a biased employee levels false charges of misconduct against a plaintiff, the employer can avoid liability if it shows that the decisionmaker independently investigated the charges. *Ibid.*

New Jersey courts have not directly addressed the subordinate bias theory or the "cat's-paw" doctrine in any reported case. However, as previously stated, our Supreme Court, in the context of distinguishing between a direct evidence case and a pretext case, has recognized that a court should consider whether "a statement made by a decisionmaker associated with the decisionmaking process actually bore on the employment decision at issue." *McDevitt, supra,* 175 *N.J.* at 528. Also, in *Grasso v. West New York Board of Education,* 364 *N.J.Super.* 109 (App.Div.2003), *certif. denied,* 179 *N.J.* 312 (2004), we cited with approval the Third Circuit's formulation that " 'it is sufficient if those exhibiting discriminatory animus influenced or participated

in the decision.' " *Id.* at 118 (quoting *Abramson v. William Paterson Coll. of N.J.,* 260 *F.*3d 265, 286 (3d Cir.2001)). These authorities seem to suggest that our courts tend toward a more lenient approach regarding this issue.

**\*12** At the motion for reconsideration, the trial judge properly formulated and recognized the various approaches taken by the federal courts. For the purpose of summary judgment, the court accepted as true that Wonder's use of the term "stupid fag" constituted direct evidence of discriminatory animus. However, the court was persuaded that nothing else in the record supported plaintiff's claim that Wonder treated him differently than she treated others. Plaintiff admitted that his prior supervisors also monitored his performance, albeit with a less accusing managerial style. The court thus concluded that plaintiff failed to come forward with sufficient evidence of pretext to survive summary judgment.

The court also found that there was nothing in the record to suggest that Givas did not make her own independent evaluation. Givas was "aware generally" of plaintiff, even though she had had no prior interaction with him and even though all of the information she was provided came through Wonder. Ultimately, however, plaintiff's claim failed because plaintiff did not allege that Wonder gave Givas "incorrect" information.

At first blush, it appears that the trial court conflated the two different theories of proving an employment discrimination case. That is, although the court recognized that plaintiff had come forward with direct evidence of discrimination-the comment made by Wonder-it did not apply the mixed-motive analysis of *Price Waterhouse.* However, it could be argued that this was because the court found Wonder's comment to be a "stray remark" unrelated to the decisional process. In such a case, discriminatory comments made by someone with input into the decisionmaking process, such as where the discriminatory person makes recommendations to the decisionmaker, may be considered as evidence of pretext under the *McDonnell Douglas* analysis. *Abramson, supra,* 260 *F.*3d at 286; *Grasso, supra,* 364 *N.J.Super.* at 118.

The difficult issue is thus whether the court was correct that Merrill Lynch can escape liability here because Wonder was not the actual decisionmaker and because, although she provided information to the actual decisionmaker, that information was ultimately true. Application of the Third Circuit's more lenient approach leads to the conclusion that the court erred in failing to recognize the extent of Wonder's

104 Fair Empl.Prac.Cas. (BNA) 279

influence on the actual decision made by Givas. In our view, the record showed that Givas had no actual knowledge of plaintiff at all-either his prior work history or his conduct on the day in question. All of that information was supplied by Wonder. Moreover, because Wonder agreed with the decision to terminate, Wonder's influence on the whole process here may have been quite substantial.

Although the court was correct that plaintiff was unable to show that Wonder treated him differently on account of his sexual orientation, this overlooks the fact that she called him a "stupid fag" only two days after reporting him to Givas. That comment belied Wonder's claim not only that she was unaware of plaintiff's sexual orientation but also that she was not biased against gays.

 **\*13**  Moreover, even application of the so-called intermediary approach, which allows an employer to avoid liability by showing that the actual decisionmaker undertook an independent investigation, would militate against summary judgment for defendants. Givas never said that she undertook an independent investigation of the events of December 29. Although she deferred terminating plaintiff until she got clearance from HR, there was nothing in the record to suggest that HR made an independent investigation either.

What makes the question here so close, however, is the fact that, as properly noted by the trial court, the facts upon which Givas relied to terminate plaintiff were really not in dispute. That is, plaintiff did not dispute that he disobeyed Wonder's order and was away from his desk for twenty-five minutes during a Code Red. Rather, he disputed only the severity of his punishment. The court properly noted that employers are entitled to make their own judgments in this regard and that courts should not second-guess such decisions. However, this immunity does not apply where the action taken is a pretext for intentional discrimination. *Maiorino, supra,* 302 *N.J.Super.* at 345-46.

The court apparently did not believe that Wonder had intentionally discriminated against plaintiff because there was nothing in the record to suggest that her discriminatory animus was exercised on this particular occasion. That is, she merely supplied correct factual information to Givas, and Givas made the decision that such behavior warranted termination. Viewed in this light, the grant of summary judgment in defendants' favor would be appropriate.

However, the flaw with this analysis is that if, in fact, Wonder had a bias against gays, that may have colored her decision to report plaintiff to Givas in the first place. That is, as the federal courts have recognized, even if just the "reporting" function is tainted by bias, that may be enough to hold the employer liable. *E.g., BCI, supra,* 450 *F.*3d at 485-87. Here, where plaintiff had never before been reported for violating a Code Red or for being insubordinate, a reasonable factfinder could conclude that Wonder's decision to report him to Givas on this occasion was motivated by her discrimination against homosexuals. Merrill Lynch cannot avoid liability for that discrimination by assigning the ultimate decision to terminate plaintiff to someone who had no knowledge of the discrimination, where that ultimate decisionmaker failed to undertake her own independent investigation.

We therefore reverse the grant of summary judgment in defendants' favor on plaintiff's wrongful termination claim.

IV

Plaintiff claims that the court erred in dismissing his hostile work environment claim. We agree.

A cause of action for a hostile work environment based on harassment of an employee because of a trait or condition protected by the LAD requires the employee to allege conduct that (1) would not have occurred but for the employee's protected status that is (2) severe or pervasive enough (3) to make a reasonable person with that trait believe that (4) the conditions of employment have been altered and the working environment is hostile or abusive. *Shepherd v. Hunterdon Dev. Ctr.,* 174 *N.J.* 1, 24 (2002); *Lehmann v. Toys 'R' Us, Inc.,* 132 *N.J.* 587, 603-04 (1993). It is the harassing conduct that must be severe or pervasive, not its effect on the employee or the work environment. *Lehmann, supra,* 132 *N.J.* at 606. That is, it is the harasser's conduct, not the alterations to the conditions of employment, that must be severe or pervasive. *Taylor, supra,* 152 *N.J.* at 507. "[E]vidence of specific, tangible adverse changes in the work environment is not required." *Ibid.*

 **\*14**  The objective reasonableness standard focuses on the nature of the conduct rather than the reaction of an individual plaintiff. *Lehmann, supra,* 132 *N.J.* at 612. If a "hypersensitive" employee has a "wholly idiosyncratic" response to conduct that, objectively viewed, is not harassing, such conduct will not support a claim for harassment even

if the plaintiff perceives the workplace to be hostile. *Id.* at 612-13.

It is the "rare and extreme" case in which a single incident is so severe that it can be considered, from the perspective of a reasonable employee, to make the working environment hostile. *Id.* at 606-07. However, harm should not go unremedied merely because it is brought about by a single severe incident. *Id.* at 607. This is especially true when the conduct consists of the single utterance of a racial epithet or a patently racist slur that has an "opprobrious connotation" capable of "contaminating the workplace." *Taylor, supra,* 152 *N.J.* at 501-03.

However, the LAD is not a general civility code for workplace conduct and neither rudeness nor lack of sensitivity alone constitutes harassment. *Heitzman v. Monmouth County,* 321 *N.J.Super.* 133, 147 (App.Div.1999). Thus, simple offhand comments and isolated incidents cannot be deemed to constitute discriminatory changes in the terms and conditions of one's employment. *Ibid.* Moreover, a plaintiff is not entitled to a work environment free of annoyances and disagreeable colleagues. *Herman v. Coastal Corp.,* 348 *N.J.Super.* 1, 23 (App.Div.), *certif. denied,* 174 *N.J.* 363 (2002). *But see Cutler v. Dorn,* --- *N.J.* ----, --------- (2008) (slip op. at 18-24) (noting that inappropriate "workplace cultures," involving repeated derogatory comments, can give rise to liability under the LAD).

The court here found that plaintiff's claim was based on only two alleged instances of harassing conduct, i.e., Wonder's gift to him of the calendar and her calling him a "stupid fag." The court found that the calendar, though offensive, was not given to plaintiff because of his protected trait, because its insults were not targeted at or intended for gay individuals. On his motion for reconsideration, plaintiff argued that, because Wonder had a bias against gay individuals, as evidenced by the "stupid fag" comment and the way she treated plaintiff, she chose to give him a calendar that was generally insulting and offensive, whereas all the other employees in Wonder's department received appropriate calendars or other gifts.

We agree that plaintiff failed to show how this particular calendar would not have been given to him but for his homosexuality. Moreover, even if he could show this, we do not believe that the calendar's offensiveness rose to the necessary level of severity to make a reasonable homosexual person believe that the terms and conditions of the workplace had been altered. Rather, it appears to fall into the category of general incivility and rudeness that the LAD was not designed to correct.

**\*15** The same, however, cannot necessarily be said of the "stupid fag" comment. Plaintiff argues that this comment, made to him as a gay man, was the equivalent of the "jungle bunny" comment made to the African-American plaintiff in *Taylor, supra,* which the Supreme Court found sufficient to form the basis for a hostile work environment claim.

In *Taylor,* the plaintiff was an African-American sheriff's officer and the defendant was her employer, the county sheriff. One day, the defendant said to another supervisor, in the plaintiff's presence, "There's the jungle bunny." 152 *N.J.* at 495. The defendant originally denied having used the phrase with any derogatory connotation but later attempted to apologize to the plaintiff. He then "hassled her" for refusing his apology. *Id.* at 496-97.

In concluding that the plaintiff's hostile work environment claim should not have been dismissed as a matter of law, our Supreme Court held that "a single utterance of an epithet can, under particular circumstances, create a hostile work environment." *Id.* at 501. It is often the connotation of the epithet that can materially contribute to the severity of the remark. *Id.* at 502.

In the case of the "jungle bunny" comment, the Court held that it was "patently a racist slur, ... ugly, stark and raw in its opprobrious connotation" and capable of contaminating the workplace. *Id.* at 502-03. The severity of the remark was exacerbated by the fact that it was uttered by a superior officer, who should have been responsible for preventing, avoiding, and rectifying such harassment in the workplace. *Id.* at 503. Thus, the comment carried with it the power and authority of the sheriff's office. *Id.* at 504-05.

In addition, after the incident, the plaintiff in *Taylor* became the target of racial epithets at work. Her co-workers mocked her and labeled her a troublemaker and the defendant himself badgered her and was reluctant to apologize. *Id.* at 507-08. All these factors led the Court to conclude that the plaintiff's allegations raised a question for the jury.

The court here distinguished *Taylor* on the ground that no one else heard the comment allegedly uttered by Wonder and plaintiff never mentioned it to anyone before he was fired. In addition, the comment was uttered by plaintiff's immediate supervisor, as opposed to the highest-ranking officer of the

104 Fair Empl.Prac.Cas. (BNA) 279

department. The court, however, did agree with plaintiff that the remark was offensive and derogatory to a gay man. The court ultimately concluded that the single comment uttered under these circumstances was not sufficient to convert plaintiff's work environment into a hostile one.

In our view, the patent offensiveness of the "stupid fag" comment renders it quite similar to the comment made to the plaintiff in *Taylor.* As plaintiff's treating psychiatrist noted, the effect of such a comment was to make him question his identity and his decision to identify himself as a gay man in a straight world. Thus, as in *Taylor,* we believe the comment made to plaintiff was the equivalent of "receiving a slap in the face" because the injury was "instantaneous." *Id.* at 503 (citation omitted).

 **\*16**  We disagree with the trial court that this case is distinguishable from *Taylor* because the comment was not made by the highest-ranking officer in plaintiff's department. The fact that it was made by plaintiff's immediate supervisor should be enough because, as *Taylor* itself noted, a supervisor is someone who should be protecting the employee from such conduct in the workplace. Moreover, plaintiff was having difficulty dealing with Wonder's managerial style even before this comment was made, and he already believed she was treating him more harshly than his prior supervisors had and that she did not like him. Given that environment, hearing his supervisor refer to him in a patently offensive way could have reasonably led him to believe that the terms and conditions of his employment had indeed changed. At the very least, plaintiff would have had genuine reason to question Wonder every time she criticized his work and evaluated his performance, and to wonder whether the criticism was valid or instead was generated by her bias against gay men.

That plaintiff did not mention the comment to anyone before he was fired should not be held against him for purposes of summary judgment. First, plaintiff was fired very shortly after the comment was made and did not have that much time to discuss it with others. Second, whether plaintiff mentioned this comment to Droz or anyone else before he was fired goes to the credibility of his claims that the comment was made and that it severely affected him. That credibility must be assessed by a jury. We are not persuaded that, as a matter of law, plaintiff's failure to mention the comment before he was terminated shows that the comment had no effect upon him.

Accordingly, we reverse the grant of summary judgment in defendants' favor on plaintiff's hostile work environment claim.

V

We next address plaintiff's claim for intentional infliction of emotional distress. In addition to claiming that plaintiff's emotional distress claim was properly dismissed on its merits, defendants respond that there are two procedural bases for rejecting plaintiff's claim. First, they argue that his appeal from the dismissal of this claim was untimely because this claim was not included in his reconsideration motion. We reject this argument out of hand. The time for filing an appeal is tolled by the timely filing of a motion for "reconsideration seeking to alter or amend the judgment." *R.* 2:4-3(e). That is what occurred here, and the time to appeal was tolled as to all components of the judgment.

Second, defendants argue that the claim is preempted by plaintiff's filing of a LAD claim. They assert that "where an employee asserts an NJLAD claim, any common law claims based upon the same allegations are preempted and should be dismissed." However, the case law cited by defendants support the argument only that "supplementary common law causes of action [for wrongful discharge based on discrimination] may not go to the jury when a statutory remedy under the LAD exists." *Catalane v. Gilian Instrument Corp.,* 271 *N.J.Super.* 476, 491-92 (App.Div.), *certif. denied,* 136 *N.J.* 298 (1994).

 **\*17**  Contrary to defendants' argument, the LAD does not "preempt" supplementary common law causes of action. By its very terms, the LAD does not exclude any independent right or action which may exist to provide relief from any unlawful discrimination, *N.J.S.A.* 10:5-27, and should be construed in combination with other protections available under the laws of our State, *N.J.S.A.* 10:5-3. In *Dale v. Boy Scouts of America,* 160 *N.J.* 562, 604 (1999), *rev'd on other grounds,* 530 *U.S.* 640, 120 *S.Ct.* 2446, 147 *L. Ed.*2d 554 (2000), our Supreme Court recognized that "[i]n many cases, ... a common law claim is merely duplicative of a LAD claim." However, where the common law claim would "protect an interest 'in addition to or aside from those' protected by [the] statutory action," it should not be deemed duplicative. *Id.* at 604-05 (quoting *Shaner v. Horizon Bancorp .,* 116 *N.J.* 433, 454 (1989), *superseded by statute on other grounds, L.* 1990, *c.* 12, § 1 (codified at *N.J.S.A.* 10:53)).

A claim for intentional infliction of emotional distress is not duplicative of a statutory claim for wrongful discharge based on unlawful discrimination, even though both claims may rely on the same set of facts. Therefore, we reject defendants' argument that plaintiff was barred from bringing such a claim.

Turning to the merits, to prevail on a claim for intentional infliction of emotional distress, a plaintiff must show that: (1) the defendant acted intentionally or recklessly, both in doing the act and in producing emotional distress; (2) the conduct was so outrageous in character and extreme in degree as to go beyond all bounds of decency; (3) the defendant's actions were the proximate cause of the emotional distress; and (4) the distress was so severe that no reasonable person could be expected to endure it. *Tarr v. Ciasulli,* 181 *N.J.* 70, 77 (2004); *Buckley v. Trenton Sav. Fund Soc'y,* 111 *N.J.* 355, 366 (1988).

Here, the court essentially found that plaintiff failed to satisfy the second element because the conduct in question was not so extreme and outrageous as to go beyond all bounds of decency in a civilized society. We do not agree.

For conduct to be extreme and outrageous, it must be " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Buckley, supra,* 111 *N.J.* at 366 (quoting *Restatement (Second) of Torts* § 46 comment d (1965)); *accord Flizack v. Good News Home for Women, Inc.,* 346 *N.J.Super.* 150, 162 (App.Div.2001). " '[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities' are insufficient." *Flizack, supra,* 346 *N.J.Super.* at 162 (quoting *Restatement (Second) of Torts, supra,* § 46 comment d).

It has been recognized that employees are entitled to greater protection than strangers from insults and that employers have a greater duty than strangers to avoid inflicting emotional distress. Thus, an employer's position of authority and the abuse of the employer/employee relationship can contribute to a finding of extreme and outrageous conduct. *Taylor, supra,* 152 *N.J.* at 512; *Wigginton v. Servidio,* 324 *N.J.Super.* 114, 131 (App.Div.1999), *certif. denied,* 163 *N.J.* 11 (2000). "A comment that might otherwise be regarded as a part of everyday living, no matter how vulgar or rude, can take on entirely different connotations when uttered by a supervisor or co-employee in the workplace." *Wigginton, supra,* 324 *N.J.Super.* at 131.

**\*18** Nevertheless, "[e]xcept for the kind of aggravated discriminatory conduct involved in *Taylor,* 'it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress.' " *Griffin v. Tops Appliance City, Inc.,* 337 *N.J.Super.* 15, 23-24 (App.Div.2001) (quoting *Cox v. Keystone Carbon Co.,* 861 *F.*2d 390, 395 (3d Cir.1988)).

In *Taylor, supra,* 152 *N.J.* at 512-13, based on the supervisor's use of a single racial epithet, the Court found that, "[i]n light of the potency of racial slurs," it was for the jury to determine whether the defendant's conduct was extreme and outrageous. In *Wigginton, supra,* 324 *N.J.Super.* at 120, 130-32, we found that it was for the jury to determine whether an employee had a cause of action for intentional infliction of emotional distress where one of her co-workers, in the presence of her supervisor and another co-worker, said to her, "Your boss said you'd give him a blow job," and the other co-worker added, "Yeah, and he said we can watch."

We believe the same result should be reached here. Although admittedly the comment was made under plaintiff's supervisor's breath, and not in the presence of anyone else, it was said in anger and was entirely offensive. Moreover, plaintiff's psychiatrist stated the effects that such a comment had on plaintiff as a gay man and the severe stress it caused him.

We therefore reverse the dismissal of plaintiff's claim for intentional infliction of emotional distress.

VI

Finally, because of our determination that plaintiff's LAD claims for wrongful termination and hostile work environment should not have been dismissed, it follows that plaintiff may proceed against Wonder as an aider and abettor. *N.J.S.A.* 10:512e; *see also Tarr, supra,* 181 *N.J.* at 83 (active and purposeful conduct that aids or abets unlawful discrimination prohibited by the LAD may result in personal liability); *Herman, supra,* 348 *N.J.Super.* at 27-28 (for individuals to be liable for acts of discrimination or harassment, they must hold position of supervisor).

Reversed and remanded.

**Kwiatkowski v. Merrill Lynch, Not Reported in A.2d (2008)**
104 Fair Empl.Prac.Cas. (BNA) 279

**All Citations**

Not Reported in A.2d, 2008 WL 3875417, 104 Fair
Empl.Prac.Cas. (BNA) 279

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S.
Government Works.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.