# EXHIBIT E

2020 WL 4811568

2020 WL 4811568
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of New Jersey, Appellate Division.

Doris GONZALEZ, Plaintiff-Appellant,

v.

CITY OF NEWARK and Matthew
Spencer, Defendants-Respondents.

DOCKET NO. A-4524-17T3
|
Argued September 18, 2019
|
Decided August 19, 2020

On appeal from the Superior Court of New Jersey, Law
Division, Hudson County, Docket No. L-2777-17.

**Attorneys and Law Firms**

Patrick P. Toscano, Jr. argued the cause for appellant (The
Toscano Law Firm, LLC attorneys; Patrick P. Toscano, Jr., on
the briefs).

Cheyne R. Scott argued the cause for respondents (Chasan
Lamparello Mallon & Cappuzzo, PC, attorneys; Cheyne R.
Scott, of counsel and on the brief; Cindy Nan Vogelman, on
the brief).

Before Judges Whipple, Gooden Brown and Mawla.

**Opinion**

PER CURIAM

 **\*1**  Plaintiff Doris Gonzalez appeals from the May 18,
2018 Law Division order granting summary judgment
to defendants City of Newark (the City) and Lieutenant
Matthew Spencer, and dismissing her employment related
complaint with prejudice. The allegations in the complaint
are based upon interactions between plaintiff—a veteran
female Newark police officer of Puerto Rican descent and
a cancer survivor—and Spencer, her supervisor, and arose
after plaintiff refused Spencer's request for a hug. Plaintiff
alleged that after rejecting Spencer's hug request as well
as other unwelcome sexual suggestions and advances, she

was subjected to harassment, discrimination, retaliation and a
hostile work environment wherein Spencer harassed, verbally
abused, and demeaned her, causing her to negatively react and
incur several disciplinary charges.

In her multi-count complaint, plaintiff alleged violations of
the New Jersey Law Against Discrimination (LAD), N.J.S.A.
10:5-1 to -49, based on her "handicap/sickness (cancer) and
her gender"; violations of the New Jersey Conscientious
Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14,
based on her objections to defendants' "fraudulent and/or
illegal and/or unethical" activities; violations of the New
Jersey Civil Rights Act (CRA), N.J.S.A. 10:6-1 to -2,
based on the LAD and CEPA violations; and violations
of plaintiff's "substantive due process or equal protection
rights" under the New Jersey Constitution, Articles I
and II (1947). Plaintiff also alleged civil conspiracy as
well as various common law tort and breach of contract
claims, including intentional infliction of emotional distress,
intentional interference with contractual relations, intentional
interference with prospective economic advantage, breach of
the covenant of good faith and fair dealing, and negligent
training, supervision and retention.

In granting summary judgment, the motion judge determined
that plaintiff failed to demonstrate a prima facie case on any
of her claims as a matter of law. On appeal, plaintiff argues
there were disputes of material facts for each of her claims
that should have been submitted to a jury. Based on our review
of the record and the applicable legal principles, we disagree
and affirm.

Initially, we note that although plaintiff alleged a plethora
of counts in her complaint, in her merits brief, she presents
no legal argument or citation of law as to why the judge
erred in dismissing some causes of action. On some claims,
plaintiff simply makes cursory statements regarding the
judge's decision. As a consequence, plaintiff has effectively
abandoned these claims on appeal, and we will address only
the dismissed causes of action squarely advanced in her brief.
See N.J. Dep't of Envtl. Prot. v. Alloway Twp., 438 N.J.
Super. 501, 505-06 n. 2 (App. Div. 2015) ("An issue that
is not briefed is deemed waived upon appeal."); Telebright
Corp., Inc. v. Dir., N.J. Div. of Taxation, 424 N.J. Super.
384, 393 (App. Div. 2012) (finding that a party waived its
challenge on appeal based on the fact that "[a]part from
one sentence in the conclusion section, ... it present[ed] no
arguments in support of its contention"); Mid-Atlantic Solar
Energy Indus. Ass'n v. Christie, 418 N.J. Super. 499, 508

Case 2:25-cv-18011-KSH-AME    Document 27-5    Filed 03/23/26    Page 3 of 14 PageID: 1024

Gonzalez v. City of Newark, Not Reported in Atl. Rptr. (2020)

2020 WL 4811568

(App. Div. 2011) (declining to address issue on appeal where the party's "cursory discussion did not properly present the issue for our consideration or afford an adequate opportunity for the [agency] to respond").

## I.

**\*2** We derive the following facts from evidence submitted by the parties in support of, and in opposition to, the summary judgment motion, viewed in the light most favorable to plaintiff. Angland v. Mountain Creek Resort, Inc., 213 N.J. 573, 577 (2013) (citing Brill v. Guardian Life Ins. Co., 142 N.J. 520, 523 (1995)).

Plaintiff has served as a police officer in the Newark Police Department since 1998. During the course of her employment, plaintiff was diagnosed with thyroid cancer and received treatment in 2002 and 2009, a fact that was well known to other members of the Department. According to plaintiff, despite having had prior interactions with Spencer during which he made unwelcome sexual advances to her, including an interaction at a 2009 Christmas party in which he asked her for a hug while in a "drunk[en]" state, in March 2013, "Spencer was transferred to the midnight tour," and plaintiff was "forced to work directly for him." Plaintiff stated that once Spencer became her direct supervisor, his "sexually explicit and unwelcome behavior ... intensified greatly."

In particular, according to plaintiff, "if [Spencer] stay[ed] at [his] desk[,]" she could "easily" maneuver around him, but "if he [stood] there, it [was] hard" for her to "squeeze through," inferring that he "[i]ntentionally" positioned himself in that way to sexually harass her. Plaintiff also described incidents where attractive female inmates were brought before Spencer to sign release paperwork, providing him with an opportunity to gaze at their bodies. Additionally, sometime in March 2013, upon learning he was on "the promotional list" for the position of captain, after plaintiff congratulated him, Spencer stated to plaintiff, "don't I get a hug"? Plaintiff firmly denied the request, which she interpreted as sexual rather than friendly in nature "[b]ecause he [was] not normally friendly."

Plaintiff believed that her rebuff of Spencer's March 2013 hug request led him to "purposely single her out." Plaintiff identified several instances of alleged harassment and retaliation stemming from the hug request, including one that occurred the following month, in April 2013, when plaintiff was assigned to desk duty with Spencer serving as her supervising "desk lieutenant." On that occasion, Spencer ordered plaintiff to simultaneously conduct record checks and prepare front desk reports because the unit was understaffed. While "go[ing] back and forth" between both duties, plaintiff entered an incorrect password twice in a row. As a result, the record-checking computer system "locked [her] out."

According to plaintiff, Spencer "believed" she locked herself out on purpose and a verbal altercation ensued. During the altercation, in response to Spencer "talking down" to her and "raising his voice" at her, plaintiff stated, "you think I'm your wife. You are treating me as if I'm your wife. I'm not your wife. I'm an officer."[1] Spencer replied that plaintiff would "be so lucky to be his wife," which plaintiff interpreted as "an advance."

**\*3** Plaintiff advised three superior officers of the incident shortly after its occurrence, Lieutenant Anthony Costa, Lieutenant Gerardo Nieves, and Captain Eugene Venable, all of whom recommended she submit a written statement. Fearing retaliation if she "put it on paper," plaintiff declined to do so. However, on Venable's order, Spencer submitted a written statement to him about the "wife" comment. Spencer stated that plaintiff "was insolent and insubordinate" when he assigned her to two duties. He reported that he told plaintiff "as long as she[ was] a Newark police officer and [he] need[ed] her to do more than one job," she must follow his orders "or be charged." Spencer acknowledged that during the argument, when plaintiff told him "[they] argued like she was [his] wife," he "[off]handedly and sarcastically [stated] that [plaintiff] didn't want to marry [him,]" but explained that "[t]here was no intention to ... make [plaintiff] feel uncomfortable."

On April 10, 2013, after receiving Spencer's statement, to remedy the situation, Venable assigned plaintiff to "work the street [two] days and desk [two] days." To further avoid any interaction between the two, plaintiff was only assigned to desk duty when Nieves served as desk lieutenant. However, according to plaintiff, the respite only lasted until Nieves was promoted. Thereafter, once her interactions with Spencer resumed, Spencer further retaliated against her by ordering her on numerous "occasions to perform multiple tasks on the job at the same time."

In one instance in particular, when plaintiff confronted Spencer about her assignments, he replied that "as long as [he was her] boss, [she] w[ould] have to follow all of [his] orders with the exception of killing someone." Because he

Case 2:25-cv-18011-KSH-AME   Document 27-5   Filed 03/23/26   Page 4 of 14 PageID: 1025

Gonzalez v. City of Newark, Not Reported in Atl. Rptr. (2020)
2020 WL 4811568

had a "smirk on his face" when he said it, plaintiff interpreted this statement as Spencer's way of informing her that she must "succumb[ ] to his sexual advances or face his often times irrational wrath." Out of anger, plaintiff responded that "killing someone [could] always be arranged."

Plaintiff stated that another example of Spencer's harassing and retaliatory behavior occurred when he temporarily assigned her to partner with Officer Kiyata Derrick, a smoker. As a cancer survivor who also suffered from other medical conditions, plaintiff believed Spencer knew that working with Derrick "would have made [plaintiff] sick ... and caused [her] to go home and book off," giving him "more ammunition to [go] after [her]." When she advised Spencer of her inability to work with Derrick, Spencer refused to allow her to switch partners and told her to ask Derrick to "get out of the car to smoke." Plaintiff acknowledged that Derrick complied with her request to not smoke while in their patrol car.

According to plaintiff, yet another instance of Spencer's retaliatory conduct and harassing attitude toward her occurred on August 10, 2014. On that date, during her shift, plaintiff and her partner were "called back" to the precinct but were delayed because they responded to a motor vehicle accident. Plaintiff explained that because gathering victim statements is prioritized over responding to the precinct, plaintiff went to the hospital first to obtain the accident victim's statement. Thereafter, plaintiff and her partner reported to the precinct where plaintiff asked her partner to "find out what [Spencer] wanted" as a means of "avoiding [him]."

Plaintiff's partner advised that Spencer specifically wanted to speak to plaintiff. When plaintiff eventually responded, Spencer reportedly reprimanded her for not responding immediately to the precinct after being called twice. Spencer also told plaintiff that the tow reports she had submitted earlier required changes, and that none of his "people" were going to "put[ ] them in" the system. Plaintiff stated that Spencer's order was contrary to office protocol because, typically, desk personnel entered the reports so that an officer need not be taken from the field to do so.

**\*4** A few days later, on August 19, 2014, plaintiff filed a formal administrative complaint against Spencer. In her three-page submission, plaintiff described the March 2013 "hug request," the April 2013 "wife comment," and the "follow orders" except killing someone edict. Plaintiff wrote that "things escalated and continued to get worse" as Spencer would "incite confrontations, provoke a negative response

from [her], and instigate altercations to see how [Spencer] could be amused by [her] reaction." Plaintiff stated that, although she was advised by superiors to do so, she did not submit a written complaint at the time of the March or April 2013 incidents because she "was fearful of ... Spencer's political ties."

In her administrative complaint, plaintiff also wrote that Spencer would "overly scrutinize[ ]" her "patrol reports," causing her to feel like she was being "treated like an illiterate grade school child correcting [her] own homework." Plaintiff further recounted being partnered with a smoker as well as the August 10, 2014 tow report incident. Plaintiff explained that "[her] body ... react[ed] to the unnecessary stress[,] triggering chronic nose bleeds, migraine headaches, excessive hair loss[,] and acne," in addition to chronic "laryngitis." Plaintiff stated she was "no longer mentally or physically capable of working in those types of conditions."

Following the submission of plaintiff's written complaint, a formal investigation by the Newark Police Department's Office of Professional Standards (OPS) was launched. Spencer was transferred out of the fifth precinct prior to the completion of the investigation. The investigation was conducted by OPS's Lieutenant Anthony Rawa, Jr., who ultimately issued a report "exonerate[ing]" Spencer and recommending that the "investigation be closed."

During the investigation, Rawa conducted a recorded video interview of plaintiff on September 1, 2014, during which she reiterated the incidents and the effects of the work environment created by Spencer. Regarding the "tow reports" incident, plaintiff acknowledged that "her [tow] reports" contained "'many mistakes' and she had to 'redo them because of her state of mind that day.'" Further, while plaintiff acknowledged that Spencer never asked her for a date and that she had little interaction with him outside of work, plaintiff elaborated on her allegations of unwanted "sexual advances." Specifically, according to plaintiff, although she admitted telling Spencer that she did not "date black men" in an effort to stop his advances, Spencer turned her comment into "a joke," wherein on three or four occasions, Spencer said to other officers that plaintiff "don't do black."[2]

In the course of the investigation, Rawa reviewed plaintiff's medical records, which showed that the "physical ailments" plaintiff attributed "to the stress of her work environment" were also "side effects" from medications she took for unrelated medical conditions while under

Case 2:25-cv-18011-KSH-AME    Document 27-5    Filed 03/23/26    Page 5 of 14 PageID: 1026

Gonzalez v. City of Newark, Not Reported in Atl. Rptr. (2020)
2020 WL 4811568

Spencer's supervision. Rawa also reviewed both plaintiff's and Spencer's performance evaluations, which were unremarkable. Additionally, Rawa obtained statements from fellow officers, including Officer Glen Drinkard. Drinkard worked on desk duty under Spencer and reported that, in that capacity, he "handled multiple tasks" simultaneously. He also affirmed that "Spencer, like most supervisors, ... return[ed] reports to officers when corrections [were] needed."

Based on his investigation, relying on departmental procedures and policies, Rawa concluded that Spencer "acted within the realm of his duties as a [d]esk [l]ieutenant in ... reviewing reports for accuracy, ordering desk personnel to perform multiple tasks and adjusting patrol assignments when necessary." Regarding plaintiff's specific allegations of hostile work environment, Rawa concluded that plaintiff

 **\*5**  failed to specify any incident where the conduct of ... Spencer rose to the level of a [h]ostile [w]ork [e]nvironment or [h]arassment. There was no supporting documentation of these incidents when they occurred and ... [plaintiff] never advised ... Spencer that comments he made were unwelcome or unwarranted when they did happen. ... [Further,] Spencer was never found to have initiated any of these uncomfortable or humiliating conversations.

The first incident that resulted in disciplinary charges plaintiff attributed to Spencer's harassing conduct occurred on September 28, 2014. On that date, after missing a few days of work due to a sinus infection, plaintiff reported to patrol duty and began to feel "weird" and "swollen." Toward the end of her shift, Lieutenant Freddy Hill—a reported friend of Spencer—arrived at the precinct to relieve plaintiff's supervising sergeant. Plaintiff advised Hill that she was unable to work mandatory overtime to cover staffing shortages because she was "sick and ... [had] to go home to take [her] medication for the sinus infection and the pain." According to plaintiff, Hill said he did not care, and ordered her to report to the "West District" where Spencer worked. Plaintiff believed she would be working under "[Spencer's] command" and that Hill's order was a means of harassing her.[3] Thus, in direct violation of Hill's order, plaintiff went home at the end of her shift.

As a result, on October 2, 2014, Hill notified plaintiff that she was being investigated for "insubordination toward a superior officer" and for "book[ing] off sick" despite receiving "a direct lawful order that [she] was being held over

on overtime."[4] Plaintiff submitted an October 14, 2014 report providing her account of what transpired.

Following an investigation, on November 3, 2014, plaintiff was served with a preliminary notice of disciplinary action (PNDA), containing a total of six charges related to the September 28, 2014 "booking off" incident: (1) insubordination for failing to follow Hill's order to remain on duty and work mandatory overtime; (2) failure to obey Hill's order; (3) neglect of duty by failing to remain on duty when ordered; (4) malingering or feigning an illness; (5) absence without leave (AWOL), or leaving without consent of a superior officer; and (6) providing a false statement in her October 14, 2014 report that she made Hill aware of her health condition and his response was that he did not care.

On March 3, 2015, following a departmental hearing during which plaintiff was represented by counsel, plaintiff was found guilty of insubordination, failure to obey orders, neglect of duty, malingering, and being AWOL, and received a six-day suspension from March 16 until March 23, 2015. Plaintiff stated she was unsure when she was scheduled to return to duty after serving her suspension, and returned to work on March 25 instead of March 24, 2015.

Upon returning to duty on March 25, plaintiff was late, made a disrespectful remark directed at Hill that she was suspended "thanks to [him]," and "rudely snatched" a report from Hill's hand. As a result, following an investigation, on May 1, 2015, plaintiff was again served with a PNDA, charging her with insubordination, unprofessional use of language, neglect of duty, and failure to report for duty punctually. Plaintiff waived her right to a departmental hearing, and was found guilty on July 21, 2015, resulting in a forty-five-day suspension.

 **\*6**  Additionally, plaintiff was charged with being AWOL, and neglect of duty for failing to report to duty on March 24, 2015, as scheduled, after serving her suspension. Plaintiff waived her right to a departmental hearing on the AWOL charge, and was found guilty on August 7, 2015, resulting in a thirty-day suspension.

The final incident that resulted in disciplinary charges against plaintiff occurred on March 9, 2015, just prior to her serving her six-day suspension. On that day, plaintiff and her partner responded to a domestic violence (DV) call, but reported they were unable to gain entry because the door was locked. Because there was no timely police intervention, the victim was attacked by the assailant a second time. In addition,

2020 WL 4811568

despite receiving orders to "detain and conduct a field interrogation on the actor involved," plaintiff and her partner failed to do so and the assailant left the scene. When back-up officers arrived at the scene, they confirmed that the building was in fact "unsecured and the locks were inoperable," contrary to plaintiff's and her partner's prior representations.

After Lieutenant Mathew Milton received a citizen complaint from the DV victim in connection with the police response, an investigation ensued. As a result, on May 1, 2015, plaintiff was served with a PNDA charging her with neglect of duty, failure to obey orders, and providing false statements because plaintiff "neglected to provide service to [the DV victim]," and the "delay in service, coupled with the additional assault, caused the Newark Police Department to be viewed in an unprofessional manner." Plaintiff waived her right to a departmental hearing, and, on July 21, 2015, was found guilty and suspended for fifteen days.

Plaintiff's suspensions on the disciplinary actions totaled ninety-six days. Plaintiff appealed each decision to the Civil Service Commission (CSC), which transferred the matter to the Office of Administrative Law (OAL) as a contested matter. Plaintiff challenged the suspensions because she believed defendants were discriminating against her based on her gender, nationality, and perceived disability as a cancer survivor. Plaintiff testified in her deposition that she was treated differently from "black female[ officers]" because the Department "do[es not] even bring them up on charges when they go off on their supervisors." Plaintiff cited as an example an instance where two black female officers engaged in verbal arguments with Hill and were never brought up on charges. Plaintiff also referred to Spencer's "arrest[ in Jersey City] for [a DV] incident" during which he "hit his girlfriend." According to plaintiff, although the charges were "dismissed," unlike her, "no disciplin[ary] action was taken against [Spencer]."

On June 26, 2017, the Administrative Law Judge (ALJ) sustained plaintiff's suspensions arising out of the "booking off" incident, the disrespectful comment to Hill, and the DV call, but reduced the forty-five-day suspension to fifteen days. The ALJ dismissed the charge related to the AWOL incident and the attendant thirty-day suspension, finding "[t]here was substantial confusion as to whether the suspension days should be calculated on a work[-]day schedule or a calendar schedule." On July 28, 2017, the CSC adopted the ALJ's findings and recommendations, with the exception of the reduction of the forty-five-day suspension to fifteen days.

Instead, the CSC imposed a thirty-day suspension. Plaintiff did not appeal the CSC's decision.

**\*7** On September 28, 2015, plaintiff filed her complaint. Following discovery, defendants moved for summary judgment. On May 14, 2018, following oral argument, finding no genuine issue of material fact and viewing the facts in the light most favorable to plaintiff, the judge granted defendants' motion.

First, the judge dismissed plaintiff's LAD claim based on hostile work environment sexual harassment. Relying on Lehmann v. Toys 'R' Us, 132 N.J. 587 (1993), the judge determined that "two requests for hugs unaccompanied by anything else," that occurred "at least four years apart"— one at the Christmas party in 2009 and the other when Spencer made the captain's list in 2013—were "not severe or pervasive." The judge explained that even considering Spencer's remark about following orders other than killing someone, the wife comment, and jokes about plaintiff not dating black men, "no reasonable juror could find [those comments] to be severe or pervasive enough to make a reasonable woman believe that the conditions of employment [were] altered and the working environment [was] hostile or abusive."

Turning to plaintiff's claim of hostile work environment based on her status as a person of Puerto Rican descent, the judge found "there [was] no evidence" to suggest that "[plaintiff] was targeted for internal affairs investigations" and subjected to "discipline" because of her nationality. The judge explained that plaintiff presented no viable evidence that the City failed to charge or "quashed" charges against non-Puerto Rican police officers for "similar" conduct. The judge rejected plaintiff's contention that the City's failure to administratively discipline Spencer, an African American, based on his involvement in a DV dispute with his girlfriend in Hudson County constituted proof of disparate treatment. According to the judge, unlike the DV call in which plaintiff responded in her official capacity as a police officer, Spencer's off-duty DV dispute occurred in his personal capacity and resulted in a dismissal of all related charges.

As to plaintiff's CEPA claim, the judge determined there was "no nexus" or "causal link" between the protected activity and adverse employment actions. According to the judge, the disciplinary charges, which were affirmed administratively, primarily involved Hill and had "nothing to do with ... Spencer," against whom plaintiff had engaged in protected

activity by lodging her objection and complaint. The judge explained that plaintiff's attempt to make a connection between the two was "just fanciful possibility."

Next, the judge dismissed plaintiff's intentional infliction of emotional distress claim. Acknowledging that under [Taylor v. Metzger, 152 N.J. 490 (1998)](#), "one word" could suffice, the judge found based on his review of the incidents catalogued by plaintiff that there was nothing said or done by Spencer "that [could] qualify as outrageous or beyond all possible bounds of decency in the eyes of any juror."

The judge also dismissed plaintiff's conspiracy claim because there was no evidence of an agreement between Spencer and Hill. The judge explained that Spencer's and Hill's friendship was not "enough to suggest" that "what Hill did was the result of a conspiracy," particularly since the disciplinary charges stemmed from plaintiff "booking out" and "leaving ... without authorization" and "grabbing [something] out of Hill's hand." According to the judge, to suggest that "somehow ... Hill was able to trick ... plaintiff into doing [what she did] because he [was] friends with Spencer" as part of a conspiracy was "just farfetched" and "silly."

 **\*8**  Additionally, the judge dismissed plaintiff's claim for intentional interference with contractual relations, explaining that the facts did not reveal any conduct that "would qualify as interference with [plaintiff's] right to economic advantage by Spencer." The judge determined that whatever loss of pay plaintiff incurred under her contract "while she was suspended ... had nothing to do with Spencer" since he did not initiate any of the disciplinary charges.

Regarding the CRA claim, the judge stated that in order for [N.J.S.A. 10:6-2(c)](#) to "provide[ ] redress for violation of substantive rights under the Constitution or laws of the United States o[r] New Jersey," plaintiff had to "identif[y] the right that was denied and ... show that her rights were denied by custom or policy." The judge determined that plaintiff failed to identify "a policy maker who denied plaintiff her substantive rights," and pointed to "no policy or custom" that violated her rights, noting that "[r]espondeat superior alone [was] not enough." Further, the judge considered but rejected plaintiff's claim that "Newark's anti[-]discrimination policy [was] illusionary." The judge added that "to the degree that CEPA and LAD are the substantive rights that ... plaintiff is alleging [are] covered by the [CRA claims,] then the [CRA count] has to be ... dismissed" based on the dismissal of the CEPA and LAD counts.

Finally, the judge dismissed plaintiff's negligence claim. The judge explained that despite City Personnel Director Kecia Daniels's deposition testimony admitting that she was unaware of "a lot of things that were going on," there was no evidence that the City was grossly negligent, nor was there any proximate cause between the City's alleged negligent supervision of the Newark Police Department and "damage[s] suffered by ... plaintiff." The judge's oral decision was memorialized in a May 18, 2018 order, and this appeal followed.

II.

We review a grant of summary judgment applying the same standard used by the trial court. [Steinberg v. Sahara Sam's Oasis, LLC, 226 N.J. 344, 366 (2016)](#). That standard is well-settled.

> [I]f the evidence of record—the pleadings, depositions, answers to interrogatories, and affidavits—"together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact," then the trial court must deny the motion. On the other hand, when no genuine issue of material fact is at issue and the moving party is entitled to a judgment as a matter of law, summary judgment must be granted.
>
> [[Ibid.](#) (quoting [R.](#) 4:46-2(c)).]

If there is no genuine issue of material fact, we must "decide whether the trial court correctly interpreted the law." [DepoLink Court Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013)](#) (quoting [Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007)](#)). We review issues of law de novo and accord no deference to the trial judge's legal conclusions. [Nicholas v. Mynster, 213 N.J. 463, 478 (2013)](#). "The practical effect of [[Rule](#) 4:46-2(c) ] is that neither the motion court nor an appellate court can ignore the elements of the cause of action or the evidential standard governing the cause of action." [Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)](#).

Applying these principles, we agree with the motion judge's ultimate conclusion that there are no "genuinely disputed issues of [material] fact" with respect to plaintiff's claims, and that defendants are entitled to summary judgment "as a matter of law." [Troupe v. Burlington Coat Factory Warehouse Corp., 443 N.J. Super. 596, 601 (App. Div. 2016)](#) (citing

Case 2:25-cv-18011-KSH-AME    Document 27-5    Filed 03/23/26    Page 8 of 14 PageID: 1029

Gonzalez v. City of Newark, Not Reported in Atl. Rptr. (2020)
2020 WL 4811568

Brill, 142 N.J. at 540). The crux of plaintiff's argument is that she was subjected to hostile work environment sexual harassment, discriminated against because of her ethnicity, and retaliated against after complaining about the discrimination in violation of CEPA, all of which formed the basis for the other causes of action alleged. In turn, we examine the elements of a prima facie case for each of plaintiff's claims.

A. Plaintiff's LAD Claims

**\*9** To prove a hostile work environment sexual harassment claim under the LAD, the plaintiff must "demonstrate that 'the complained-of conduct (1) would not have occurred but for the employee's gender; and it was (2) severe or pervasive enough to make a (3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive.'" Griffin v. City of E. Orange, 225 N.J. 400, 413-14 (2016) (emphasis omitted) (quoting Lehmann, 132 N.J. at 603-04). In order to determine whether the conduct was "severe or pervasive," courts must consider "whether a reasonable person would believe that the conditions of employment have been altered and that the working environment is hostile." Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 24 (2002). Thus, although plaintiff only challenges the judge's evaluation of the second prong, we must also examine the third and fourth prongs because "the second, third, and fourth prongs are, to some degree, interdependent." Ibid.

Under the second prong,

[w]hether conduct is "severe or pervasive" requires an assessment of the totality of the relevant circumstances, which involves examination of (1) "the frequency of all the discriminatory conduct"; (2) "its severity"; (3) "whether it is physically threatening or humiliating, or a mere offensive utterance"; and (4) "whether it unreasonably interferes with an employee's work performance."

[Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 196 (2008) (quoting Green v. Jersey City Bd. of Educ, 177 N.J. 434, 447 (2003)).]

While "a single act of ... offensive conduct could, under certain conditions, create a hostile work environment," such cases are "'rare and extreme.'" Oakley v. Wianecki, 345 N.J. Super. 194, 202 (App. Div. 2001) (quoting Lehmann, 132 N.J. at 606-07). Thus, we must consider "the cumulative effect of the various incidents." Godfrey, 196 N.J. at 196 (quoting Lehmann, 132 N.J. at 607). Additionally, "when determining whether conduct has created a hostile work environment, the harassing conduct itself must be evaluated, 'not its effect on the plaintiff,'" id. at 197 (quoting Lehmann, 132 N.J. at 606), and the conduct must be assessed "by use of a reasonable-person standard, which was adopted to keep the test for harassing conduct tied to reasonable community standards and yet allow for its evolution as societal norms mature." Ibid. (citing Lehmann, 132 N.J. at 603-04, 612).

Here, under the totality of the circumstances, we agree with the judge that Spencer's actions do not amount to severe or pervasive conduct under the case law. See Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998) (holding that merely offensive rudeness, teasing, offhand comments, and isolated incidents do not amount to harassment); see also Heitzman v. Monmouth Cty., 321 N.J. Super. 133, 147 (App. Div. 1999) ("An employment discrimination law such as the LAD is not intended to be 'a "general civility" code' for conduct in the workplace.").

Although Spencer's 2009 and 2013 hug requests were inappropriate and undoubtedly made plaintiff feel uncomfortable, the judge correctly evaluated the frequency as well as the conduct itself and "not its effect on ... plaintiff." Godfrey, 196 N.J. at 196-97 (quoting Lehmann, 132 N.J. at 606). Further, Spencer's wife comment, while offensive and insulting, resulted from a verbal confrontation in which plaintiff introduced the word "wife." Likewise, Spencer's comment that plaintiff should follow his orders emanated from a verbal altercation when plaintiff objected to an assignment. Additionally, Spencer's comment regarding plaintiff's dating preference, while crude, arose from plaintiff's own account of her preference.

Under the LAD, insults, rudeness, and even severe personality conflicts as evident here are generally insufficient to establish a hostile work environment. Taylor, 152 N.J. at 500-02; see Herman v. Coastal Corp., 348 N.J. Super. 1, 20-21 (App. Div. 2002) ("Personality conflicts, albeit severe, do not equate to hostile work environment claims simply because the conflict is between a male and female employee."); Flizack v. Good News Home for Women, Inc., 346 N.J. Super. 150, 160 (App. Div. 2001) ("[W]e recognize that offensive, crude or inappropriate comments are not automatically discriminatory because the words used are tinged with ... sexual connotations."); Heitzman, 321 N.J. Super. at 147

2020 WL 4811568

(characterizing "merely offensive" comments as insufficient to sustain hostile work environment claim).

 **\*10** Similarly, plaintiff's account of incidents where she had to squeeze by Spencer at his desk and witness him gazing at attractive female inmates do not satisfy the elements of a prima facie LAD claim. Although "plaintiff's work environment is affected not only by conduct directed at herself but also by the treatment of others," Baliko v. Stecker, 275 N.J. Super. 182, 190 (App. Div. 1994), plaintiff provided insufficient details about Spencer's purported gazing at female inmates to determine whether the conduct occurred because of plaintiff's gender or indiscriminately in the presence of other employees, including males. See ibid. (explaining that "[e]vidence of sexual harassment directed at other women is relevant to both the character of the work environment and its effects on the complainant." (quoting Lehmann, 132 N.J. at 611)); Herman, 348 N.J. Super. at 20 (finding that "[t]he defining element in hostile work environment cases is not that the conduct was sexual in nature, but that the harassment occur[red] because of the employee's gender."). Further, plaintiff's account of Spencer positioning himself at his own desk "was devoid of facts and based on unsubstantiated inferences and feelings." Oakley, 345 N.J. Super. at 201.

Turning to plaintiff's ethnic discrimination claim under the LAD, to prove disparate treatment discrimination,[5] a plaintiff must establish by a preponderance of the evidence that: (1) plaintiff is a member of a protected class; (2) plaintiff was performing the job consistent with the employer's expectations; (3) plaintiff suffered an adverse employment action; and (4) others not within the protected class did not suffer adverse employment actions. Maher v. N.J. Transit Rail Operations, Inc., 125 N.J. 455, 480-81 (1991). "A disparate treatment claim with regard to discipline requires comparison between the defendant's conduct toward plaintiff and other members of the protected class on one hand, and similarly situated employees not within the protected class on the other." Jason v. Showboat Hotel & Casino, 329 N.J. Super. 295, 305 (App. Div. 2000).

Once the prima facie case is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Zive v. Stanley Roberts, Inc., 182 N.J. 436, 449 (2005). If the employer overcomes the presumption of discrimination, the burden shifts back to plaintiff to prove that the employer's proffered reason for the adverse employment action was merely a

pretext for discrimination. Bergen Commer. Bank v. Sisler, 157 N.J. 188, 211 (1999).

Here, plaintiff's unsupported conclusory statement that "[o]ther officers of different backgrounds were not treated the same way for similar conduct" could not lead a jury to reasonably conclude that defendants imposed no or lesser discipline on non-Puerto Ricans for comparable infractions. See Horizon Blue Cross Blue Shield of N.J. v. State, 425 N.J. Super. 1, 32 (App. Div. 2012) ("Bare conclusory assertions, without factual support in the record, will not defeat a meritorious application for summary judgment." (citing Brae Asset Fund, L.P. v. Newman, 327 N.J. Super. 129, 134 (App. Div. 1999)); accord Puder v. Buechel, 183 N.J. 428, 440-41 (2005) ("[C]onclusory and self-serving assertions by one of the parties are insufficient to overcome the [summary judgment] motion.").

Plaintiff relies on the fact that "Spencer, an African-American male[,] was arrested in Hudson County on a [DV] charge for beating up his girlfriend" but was never administratively charged or suspended by the Department. However, "[a]n 'inference of discrimination' does not arise 'anytime a single member of a non-protected group was allegedly treated more favorably than one member of the protected group, regardless of how many other members of the non-protected group were treated equally or less favorably.'" Jason, 329 N.J. Super. at 307 (quoting Simpson v. Kay Jewelers, 142 F.3d 639, 646 (3d Cir. 1998)).

 **\*11** Further, as the judge noted, Spencer's off-duty DV incident was not comparable misconduct to plaintiff's because Spencer was not acting in an official capacity. In contrast, the disciplinary charge that arose from plaintiff's malfeasance in responding to the DV call occurred in her official capacity. Our Supreme Court has held that "[a]nti-discrimination laws do not permit courts to make personnel decisions for employers," and instead "simply require that an employer's personnel decisions be based on criteria other than those proscribed by law." Peper, 77 N.J. at 87. Inasmuch as the City's decision regarding whether or not to file disciplinary charges against Spencer for the DV incident was a personnel decision, and there is no evidence in the record to indicate that it improperly considered plaintiff's or Spencer's race or ethnicity in making its decision, there is no legal proscription.

Moreover, plaintiff offered no other evidence that defendants' legitimate, nondiscriminatory reasons for filing disciplinary charges against her, charges that were largely affirmed by the

ALJ and adopted by the CSC, were pretextual. See Viscik v. Fowler Equip. Co., 173 N.J. 1, 14 (2002) ("To prove pretext, ... a plaintiff must do more than simply show that the employer's reason was false; he or she must also demonstrate that the employer was motivated by discriminatory intent."). Indeed, there is no evidence in the record that "an invidious discriminatory reason was more likely than not" the cause of plaintiff's disciplinary charges to withstand summary judgment. Zive, 182 N.J. at 456 (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).

B. Plaintiff's CEPA Claim

Turning to plaintiff's CEPA claim, "[t]he purpose of CEPA ... is to protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431 (1994). To establish a prima facie case under CEPA, a plaintiff must demonstrate that:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy;
>
> (2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3(c);
>
> (3) an adverse employment action was taken against him or her; and
>
> (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.
>
> [Lippman v. Ethicon, Inc., 222 N.J. 362, 380 (2015) (quoting Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003)).]

Pertinent to this appeal, N.J.S.A. 34:19-3(c) provides that an employer shall not take retaliatory action against an employee because the employee:

> [o]bjects to, or refuses to participate in any activity, policy[,] or practice which the employee reasonably believes:
>
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law, ... ;
>
> (2) is fraudulent or criminal, ... ; or

> (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.
>
> [N.J.S.A. 34:19-3(c).]

A plaintiff who brings a claim pursuant to N.J.S.A. 34:19-3(c) need not show that the employer actually violated the law or a clear mandate of public policy. Dzwonar, 117 N.J. at 462; Gerard v. Camden Cty. Health Servs. Ctr., 348 N.J. Super. 516, 522 (App. Div. 2002). Instead, a plaintiff need only show that he or she "reasonably believed" that to be the case. Estate of Roach v. TRW, Inc., 164 N.J. 598, 613 (2000).

"CEPA does not require any magic words in communicating an employee's reasonable belief of illegal activity." Beasley v. Passaic Cty., 377 N.J. Super. 585, 605 (App. Div. 2005). "The object of CEPA is not to make lawyers out of conscientious employees but rather to prevent retaliation against those employees who object to employer conduct that they reasonably believe to be unlawful." Mehlman, 153 N.J. at 193-94. "CEPA is designed to protect employees who 'blow the whistle' on illegal or unethical activity committed by their employers or co-employees, and as such, is remedial legislation that should be construed liberally to achieve its purpose." Beasley, 377 N.J. Super. at 605 (quoting Estate of Roach, 164 N.J. at 609-10).

**\*12** Here, plaintiff failed to satisfy the third and fourth prongs to establish a prima facie CEPA claim. Regarding the third prong, the substantiated disciplinary charges that resulted in plaintiff's suspensions cannot establish retaliation for plaintiff engaging in protected activity by objecting to and reporting Spencer's conduct because the disciplinary charges arose from reasons unrelated to plaintiff's complaint. See Higgins v. Pascack Valley Hosp., 158 N.J. 404, 424 (1999) ("Filing a complaint ... does not insulate the complaining employee from discharge or other disciplinary action for reasons unrelated to the complaint.").

Moreover, while plaintiff disputed the legal ramifications, she acknowledged that she did in fact engage in the conduct that ultimately led to her disciplinary charges. Beasley, 377 N.J. Super. at 607 ("Where the affected party does not deny committing an infraction that resulted in discipline, the discipline cannot be considered 'proscribed reprisal.'"); see also Hancock v. Borough of Oaklyn, 347 N.J. Super. 350, 361 (App. Div. 2002) (holding that when a plaintiff is "afforded a hearing" and "represented by counsel," he or she "cannot

Case 2:25-cv-18011-KSH-AME    Document 27-5    Filed 03/23/26    Page 11 of 14 PageID: 1032

Gonzalez v. City of Newark, Not Reported in Atl. Rptr. (2020)

2020 WL 4811568

claim that ... substantiated disciplinary charges and resulting brief suspensions from work [are] retaliatory."). Further, notwithstanding the timing, because the disciplinary charges were filed against plaintiff by superiors other than Spencer, and none of the incidents for which plaintiff was disciplined involved Spencer, there is no causal connection between the whistle-blowing activity and the adverse employment action to establish the fourth prong.

### C. Plaintiff's CRA Claim

The CRA was adopted in 2004 "for the broad purpose of assuring a state law cause of action for violations of state and federal constitutional rights and to fill any gaps in state statutory anti-discrimination protection." Ramos v. Flowers, 429 N.J. Super. 13, 21 (App. Div. 2012) (quoting Owens v. Feigin, 194 N.J. 607, 611 (2008)). N.J.S.A. 10:6-2(c) provides an individual a remedy in the form of a civil action for damages against private and public defendants if the individual can demonstrate that he or she

> has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law ....

Thus, there are "two types of private claims ... under this statute: (1) a claim when one is 'deprived of a right,' and (2) a claim when one's rights have been 'interfered with by threats, intimidation, coercion or force.'" Lapolla v. Cty. of Union, 449 N.J. Super. 288, 306 (App. Div. 2017) (quoting Felicioni v. Admin. Office of Courts, 404 N.J. Super. 382, 400 (App. Div. 2008)).

A cause of action brought under the CRA has the same elements as the analogous federal Civil Rights Act, 42 U.S.C. § 1983 (Section 1983), after which New Jersey's CRA was modeled. Rezem Family Assocs., LP v. Borough of Millstone, 423 N.J. Super. 103, 115 (App. Div. 2011); see also Filgueiras v. Newark Pub. Sch., 426 N.J. Super. 449, 468 (App. Div. 2012). Similar to a cause of action under Section 1983, in order to prevail under the CRA, a plaintiff must first identify "'the person acting under color of law[ ]' that has caused the alleged deprivation," and then "identify a 'right, privilege or

immunity' secured to the claimant" by the state or federal constitution or state or federal laws. Rezem, 423 N.J. Super. at 114-15 (quoting Rivkin v. Dover Twp. Rent Leveling Bd., 143 N.J. 352, 363 (1996)).

**\*13** "Although local governments are 'persons' for purposes of [Section] 1983, a municipality generally cannot be held liable in a [Section] 1983 action for the acts of employees under the principle of respondeat superior." Stomel v. City of Camden, 192 N.J. 137, 145 (2007). "An exception exists when an official municipal 'policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy,' is the cause of the constitutional deprivation." Ibid. (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)).

> Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.

> [Loigman v. Twp. Comm., 185 N.J. 566, 591 (2006) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481-82 (1986)).]

Here, to support her CRA claim, plaintiff relies heavily on Daniels's deposition testimony. As the City's personnel director, Daniels was "responsible for on-boarding ... employees [meaning the] hiring, discipline, [and] termination[ of employees]." She also implemented employee benefits and was "in charge of the training unit," among other things. However, Daniels acknowledged that the Chief of Police did not report to her. Daniels testified that because the police department is a paramilitary organization, most of plaintiff's complaints and allegations of harassment, discrimination, and retaliation were handled "internally" through the chain of command. Thus, Daniels never learned about the allegations until the litigation was filed. Daniels confirmed, however, that the City had an anti-discrimination, anti-harassment, and anti-retaliation policy in place during the relevant time period, which allowed plaintiff to circumvent the chain of command.[6]

Based on this testimony, plaintiff asserts that "Newark's long-established custom of promoting woefully deficient

Case 2:25-cv-18011-KSH-AME   Document 27-5   Filed 03/23/26   Page 12 of 14 PageID: 1033

Gonzalez v. City of Newark, Not Reported in Atl. Rptr. (2020)
2020 WL 4811568

workplace policies and practices" regarding sexual discrimination, harassment, and retaliation "compromised the safety and well-being of ... employees who are victims of illegal conduct in the workplace." However, Daniels is not the official responsible for establishing final government policy respecting these activities in the police department for the municipality to be held liable. Further, other than the LAD and CEPA, plaintiff failed to specify the constitutional rights allegedly infringed. Thus, because plaintiff's CRA claim is dependent upon the success of her CEPA and LAD claims, both of which have been rejected, plaintiff's CRA claim must also fail.

D. Plaintiff's Intentional Infliction of Emotional Distress Claim

To prove intentional infliction of emotional distress, a plaintiff must show:

> (1) defendant acted intentionally; (2) defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community;" (3) defendant's actions proximately caused him [or her] emotional distress; and (4) the emotional distress was "so severe that no reasonable [person] could be expected to endure it."

> **\*14** [Segal v. Lynch, 413 N.J. Super. 171, 191 (App. Div. 2010) (second alteration in original) (quoting Buckley v. Trenton Sav. Fund Soc'y, 111 N.J. 355, 366 (1988)).]

We have described the second required element "as an 'elevated threshold' that is satisfied only in extreme cases." Ingraham v. Ortho-McNeil Pharm., 422 N.J. Super. 12, 21 (App. Div. 2011) (Griffin v. Tops Appliance City, Inc., 337 N.J. Super. 15, 23 (App. Div. 2001)). "A court determines whether outrageous conduct could possibly be found as a matter of law based on the facts, while a jury determines if in fact that conduct was outrageous." G.D. v. Kenny, 411 N.J. Super. 176, 194 (App. Div. 2009) (citing Taylor, 152 N.J. at 509-10); see also Buckley, 111 N.J. at 367.

Here, we conclude, as did the judge, that Spencer's conduct, while troubling, did not rise to the level of extreme and outrageous conduct necessary to support a cause of action for intentional infliction of emotional distress. "Indeed, the workplace has too many personal conflicts and too much behavior that might be perceived as uncivil for the courts to

be used as the umpire for all but the most extreme workplace disputes." Ingraham, 422 N.J. Super. at 23; see Taylor, 152 N.J. at 509 (finding a superior's single use of a racial slur towards the plaintiff to be extreme and outrageous); Flizack, 346 N.J. Super. at 162 (explaining that "[m]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" are insufficient to meet the outrageous standard); see also Ingraham, 422 N.J. Super. at 21 (cataloguing cases in which courts have found extreme and outrageous conduct and cases in which it did not).

E. Plaintiff's Civil Conspiracy Claim

Our Supreme Court described a civil conspiracy as

> a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.

> [Banco Popular N. Am. v. Gandi, 184 N.J. 161, 177 (2005) (quoting Morgan v. Union Cty. Bd. of Chosen Freeholders, 268 N.J. Super. 337, 364 (App. Div. 1993)).]

"To establish a conspiracy, 'it simply must be shown that there was "a single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences."'" Morgan, 268 N.J. Super. at 365 (alteration in original) (quoting Hampton v. Hanrahan, 600 F.2d 600, 621 (7th Cir. 1979), rev'd in part on other grounds, Hanrahan v. Hampton, 446 U.S. 754 (1980)). Accordingly, a civil conspiracy exists where the purported conspirator understood "the general objectives of the scheme, accept[ed] them, and agree[d], either explicitly or implicitly, to do [their] part to further them." Gandi, 184 N.J. at 177 (quoting Jones v. City of Chicago, 856 F.2d 985, 992 (7th Cir. 1988)). Notably, the "gist of the claim is not the unlawful agreement, 'but the underlying wrong which, absent the conspiracy, would give a right of action.'" Id. at 177-78 (quoting Morgan, 268 N.J. Super. at 364).

 **\*15** Here, other than "unsubstantiated inferences and feelings," Oakley, 345 N.J. Super. at 201, the record is devoid of any evidence that Spencer and Hill composed a "single plan" to file disciplinary charges against plaintiff, that they "accept[ed]" those objectives, and that they agreed to carry out the plan. Morgan, 268 N.J. Super. at 365; Gandi, 184 N.J. at 177. Thus, this claim was properly dismissed.

Case 2:25-cv-18011-KSH-AME   Document 27-5   Filed 03/23/26   Page 13 of 14 PageID: 1034

Gonzalez v. City of Newark, Not Reported in Atl. Rptr. (2020)

2020 WL 4811568

F. Plaintiff's Tortious Interference with Contractual Relations Claim

A claim of tortious interference with contractual relations requires plaintiff to demonstrate: "(1) actual interference with a contract; (2) that the interference was inflicted intentionally by a defendant who is not a party to the contract; (3) that the interference was without justification; and (4) that the interference caused damage." Russo v. Nagel, 358 N.J. Super. 254, 268 (App. Div. 2003). A claim must be based on facts showing that the interference was done intentionally and with malice. Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 751 (1989). "For purposes of this tort, '[t]he term malice is not used in the literal sense requiring ill will toward the plaintiff,'" but rather meaning that the harm was inflicted intentionally and without justification or excuse. Ibid. (alteration in original).

"[E]mployees and agents of a corporation can be charged with the tort of intentional interference with a plaintiff's contract with the corporation." Vosough v. Kierce, 437 N.J. Super. 218, 234 (App. Div. 2014). "However, 'if an employee or agent is acting on behalf of his or her employer or principal, then no action for tortious interference will lie.'" Ibid. (quoting DiMaria Const., Inc. v. Interarch, 351 N.J. Super. 558, 568 (App. Div. 2001)). "[A]n action for tortious interference will lie" only if "the employee or agent is acting outside the scope of his or her employment or agency." Ibid. (quoting DiMaria Const., 351 N.J. Super. at 568).

Here, plaintiff cannot establish that Spencer actually interfered with her contract with the City because none of the disciplinary charges that resulted in plaintiff's suspensions and loss of pay were filed by Spencer. Moreover, as a party to the contract, the City cannot be liable for this tort. Kopp, Inc. v. United Techs., 223 N.J. Super. 548, 559 (App. Div. 1988). Thus, the claim was properly dismissed.

G. Plaintiff's Negligence Claim

Under the Torts Claims Act, "[e]xcept as otherwise provided by th[e] act, a public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." N.J.S.A. 59:2-1(a). N.J.S.A. 59:2-3(d) provides the following exception:

A public entity is not liable for the exercise of discretion when, in the face of competing demands, it determines whether and how to utilize or apply existing resources, including those allocated for equipment, facilities and personnel unless a court concludes that the determination of the public entity was palpably unreasonable.

Thus, to establish liability against a public entity, a plaintiff must demonstrate a prima facie case that the action or inaction of the public entity was "palpably unreasonable." Coyne v. Dep't of Transp., 182 N.J. 481, 493 (2005).

The term "palpably unreasonable" implies "behavior that is patently unacceptable under any given circumstance." Muhammad v. N.J. Transit, 176 N.J. 185, 195 (2003) (quoting Kolitch v. Lindedahl, 100 N.J. 485, 494 (1985)); see also Ogborne v. Mercer Cemetery Corp., 197 N.J. 448, 459 (2009) (explaining that to constitute "palpably unreasonable" conduct, "it must be manifest and obvious that no prudent person would approve of [the entity's] course of action or inaction." (quoting Kolitch, 100 N.J. at 493)). Further, whether the public entity's behavior was palpably unreasonable is generally a question of fact for the jury. See Vincitore v. N.J. Sports & Exposition Auth., 169 N.J. 119, 130 (2001).

 *16 However, a determination of palpable unreasonableness, "like any other fact question before a jury, is subject to the court's assessment whether it can reasonably be made under the circumstances presented." Maslo v. City of Jersey City, 346 N.J. Super. 346, 351 (App. Div. 2002) (quoting Black v. Atlantic Highlands, 263 N.J. Super. 445, 452 (App. Div. 1993)). Accordingly, "the question of unreasonableness may be decided by the court as a matter of law in appropriate cases." Id. at 350 (citing Garrison v. Twp. of Middletown, 154 N.J. 282, 311 (1998)).

Palpably unreasonable conduct "implies a more obvious and manifest breach of duty" than negligence, "and imposes a more onerous burden on the plaintiff." Williams v. Phillipsburg, 171 N.J. Super. 278, 286 (App. Div. 1979). Here, a review of the undisputed material facts reveals that plaintiff failed to meet this burden, and that no rational factfinder could find that the City acted in a "palpably unreasonable" manner in its decision-making process as it pertained to its handling of plaintiff's complaints, its training on discrimination and harassment issues, and its supervision of Spencer. Thus, plaintiff's claim fails as a matter of law.

In sum, plaintiff failed to establish the prima facie elements of her claims, and the judge's decision granting defendants summary judgment and dismissing the complaint with prejudice is legally supportable. To the extent we have not addressed a particular argument, it is because either our disposition makes it unnecessary or the argument was without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

**All Citations**

Not Reported in Atl. Rptr., 2020 WL 4811568

Footnotes

1    Plaintiff clarified that when she made this statement, she meant that Spencer was treating her "[i]n a demeaning way," and not the way a superior officer should address a subordinate. Plaintiff also acknowledged that the wife remark was preceded by her accusing Spencer of being "bipolar" based on changes in his demeanor towards her.

2    Plaintiff acknowledged that other officers made the same comment to her, prompting her to "curse them out."

3    Plaintiff acknowledged in her deposition that she did not know whether Spencer was, in fact, on duty in the West District at that specific time.

4    In her deposition, plaintiff acknowledged that while she had "no [supporting] facts," she "believed ... in [her] heart" that Spencer told Hill "to bring [her] up on disciplinary charges" because "supervisors stick together."

5    Disparate treatment occurs when "[t]he employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." Gerety v. Atl. City Hilton Casino Resort, 184 N.J. 391, 398 (2005) (quoting Peper v. Princeton Univ. Bd. of Trs., 77 N.J. 55, 81 (1978)).

6    Plaintiff acknowledged that the Department required each member to undergo mandatory in-service sexual harassment training two times per year.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.