# EXHIBIT A

 Neutral

As of: April 13, 2026 8:33 PM Z

## *Jovanovic v. United States Olympic & Paralympic Comm.*

United States District Court for the District of New Jersey

April 28, 2025, Decided; April 28, 2025, Filed

Civil Action No. 22-2098 (ZNQ) (RLS)

**Reporter**

2025 U.S. Dist. LEXIS 79892 *; 2025 LX 43942; 2025 WL 1218155

NICHOLAS JOVANOVIC, Individually and as Administrator for the Estate of Pavle Jovanovic, Plaintiff, v. THE UNITED STATES OLYMPIC AND PARALYMPIC COMMITTEE., et al., Defendants.

**Notice:** NOT FOR PUBLICATION

**Prior History:** *Jovanovic v. United States Olympic & Paralympic Comm., 2023 U.S. Dist. LEXIS 56828, 2023 WL 7179298 (D.N.J., Mar. 31, 2023)*

**Counsel:** [*1] For NICHOLAS JOVANOVIC, Individually and as Administrator for the Estate of PAVLE JOVANOVIC, THE ESTATE OF PAVLE JOVANOVIC, by and through Nicholas Jovanovic, Plaintiffs: ANDREW J. D'ARCY, LEAD ATTORNEY, D'ARCY JOHNSON DAY, P.C.., Egg Harbor Twp, NJ.

For THE UNITED STATES OLYMPIC AND PARALYMPIC COMMITTEE, Defendant: WILLIAM C. BATON, LEAD ATTORNEY, ALEXANDER LEE CALLO, SAUL EWING LLP, NEWARK, NJ.

For THE UNITED STATES BOBSLED & SKELETON FEDERATION, Defendant: ROBERT C. NEFF, JR., LEAD ATTORNEY, WILSON ELSER, SUITES 100/110, MADISON, NJ.

**Judges:** ZAHID N. QURAISHI, UNITED STATES DISTRICT JUDGE.

**Opinion by:** ZAHID N. QURAISHI

# Opinion

## QURAISHI, District Judge

**THIS MATTER** comes before the Court upon two motions to dismiss filed by (1) Defendant the United States Olympic and Paralympic Committee ("USOPC") (ECF No. 126), and (2) Defendant the USA Bobsled/Skeleton, Inc. ("USABS") (ECF No. 127) (collectively, "Defendants") following this Court's previous denial of Defendants' motions to dismiss and the completion of jurisdictional discovery. (ECF Nos. 55, 56.)[1] Defendants individually submitted briefs in support of the motions. ("USOPC Br.," ECF No. 126-1; "USABS Br.," ECF No. 127-1.) Defendants also individually submitted various [*2] exhibits from jurisdictional discovery. (ECF Nos. 126-2; ECF Nos. 127-2 to 127-12.) Plaintiff Nicholas Jovanovic ("Plaintiff"), individually and as administrator of the estate of Pavle Javanovic, filed opposition briefs in response to both motions. ("Opp'n Br. I," ECF No. 132; "Opp'n Br. II," ECF No. 133.) Plaintiff also submitted various exhibits. (ECF Nos. 132-1 to 132-24; ECF Nos. 133-2 to 133-21). Defendants individually filed reply briefs, ("USOPC Reply," ECF No. 135; "USABS Reply," ECF No. 134), and Plaintiff filed a sur-reply to USOPC's reply. ("Sur-Reply," ECF No. 138.)[2] The Court has carefully considered the parties' submissions and decides the Motions without oral argument pursuant to *Federal Rule of Civil Procedure 78* and Local Civil Rule 78.1.[3] For the reasons set forth below, the Court will **GRANT** USOPC's Motion and **DENY** USABS's Motion.

## I. BACKGROUND AND PROCEDURAL HISTORY[4]

---

[1] *Jovanovic v. United States Olympic & Paralympic Comm., Civ. No. 22-2098, 2023 U.S. Dist. LEXIS 56828, 2023 WL 7179298, at *1 (D.N.J. Mar. 31, 2023)*.

[2] The USOPC submitted a letter asking for leave to file a sur-sur-reply in response to Plaintiff's Sur-Reply. (ECF No. 139.) Given the extensive briefing on the issue already and lack of prejudice to the USOPC, the Court denies that request and does not consider the USOPC's proposed sur-sur-reply.

[3] Hereinafter, all references to "Rule" or "Rules" refer to the Federal Rules of Civil Procedure unless otherwise noted.

[4] For the purposes of considering the Motion, the Court

The facts giving rise to Plaintiff's claims are known to the parties. Briefly, Pavle Jovanovic ("Pavle"), Plaintiff's late brother, was a former elite Olympic bobsled athlete. ("Am. Compl.," ¶¶ 89, 91, 92, ECF No. 61.) Pavle represented the United States in nine BMW IBSF World Cups, was a member of the United States Bobsled Team during **[*3]** the 2002, 2006, and 2010 Olympic cycles, and competed in the 2006 Olympics. (*Id.* ¶ 96.) In 2006, upon his return home from the Olympics, Pavle began to exhibit post-competition fatigue which later turned into cognitive impairment. (*Id.* ¶¶ 100-102.) Pavle was believed to have Chronic Traumatic Encephalopathy ("CTE") which appeared in the form of confusion and fatigue. (*Id.* ¶ 101.) That confusion later turned into frustration and anger. (*Id.*) In 2009 and 2010, a few years after first exhibiting signs of cognitive decline, Pavle developed a light sensitivity and later an alcohol abuse problem, emotional problems, and behavioral instability. (*Id.* ¶¶ 103, 104, 106.) Pavle was ultimately diagnosed with alcoholism, bi-polar disorder, and depression, all purportedly stemming from his CTE. (*Id.* ¶ 108.) In May 2020, Pavle tragically took his own life. (*Id.* ¶ 111.)

As to the parties involved in this action, the USOPC is a federally-chartered nonprofit corporation created by the federal Ted Stevens Olympic and the Amateur Sports Act, with a principal place of business in Colorado Springs, Colorado. (*Id.* ¶¶ 18, 19.)[5] The USOPC is responsible for the "development, safety, and training of athletes **[*4]** for their sports, as well as for the selection, organization, promotion, and support of American athletes for the Olympic Games and other domestic and international competitions." (*Id.* ¶ 21.) The USABS is a nonprofit corporation, with a principal place of business in Lake Placid, New York, and governs the Men's and Women's Bobsled National Teams, among others. (*Id.* ¶¶ 34, 35.) The USABS is a national governing body "responsible for the development, safety, and training of bobsled and skeleton athletes, as well as for the selection, organization, promotion, and support of American athletes for the USABS Olympic Teams, National Teams, and Development Teams."[6] (*Id.* ¶ 38.)

On February 23, 2022, Plaintiff initiated this action in New Jersey Superior Court. (*See generally* Compl., ECF No. 1-2.) Defendants timely removed the suit to this Court. (ECF No. 1.) Defendants then filed motions to dismiss arguing that the Court lacked personal jurisdiction over them. (ECF Nos. 29, 48.) On March 31, 2023, the Court denied the motions and granted Plaintiff's request for leave to conduct jurisdictional discovery. (ECF No. 55.) The Court found that "Plaintiff has raised enough jurisdictional contacts to **[*5]** persuade the Court, in its discretion, to [grant] Plaintiff's request for leave to conduct jurisdictional discovery as to both Defendants." (*Id.* at 17.) Plaintiff then filed an Amended Complaint (ECF No. 61)[7] and discovery took place over the next several months. Thereafter, Defendants filed the current motions to dismiss. (ECF Nos. 126, 127.)

## II. SUBJECT MATTER JURISDICTION

The Court has subject matter jurisdiction under *28 U.S.C. § 1332* because the parties are diverse and the amount in controversy exceeds $75,000.

## III. LEGAL STANDARD

Pursuant to *Rule 12(b)(2)*, a complaint is subject to dismissal for lack of personal jurisdiction. *See Fed. R.*

---

accepts all factual allegations in the Complaint as true. *See Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)*; *see also Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004)* ("[W]hen the court does not hold an evidentiary hearing on the motion to dismiss, the plaintiff need only establish a *prima facie* case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor.").

[5] Congress's goal in creating the USOPC was "to correct the disorganization and the serious factional disputes that seemed to plague amateur sports in the United States." *S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm., 483 U.S. 522, 544, 107 S. Ct. 2971, 97 L. Ed. 2d 427 (1987)*.

[6] The Court takes judicial notice of the fact that national governing bodies are organizations that govern and manage all aspects of their individual sports within the United States. They are responsible for training, competition, and development for their sports, as well as nominating athletes to the U.S. Olympic and Paralympic Teams.

[7] The Amended Complaint alleges three counts against the USOPC and the USABS for: (1) negligence; (2) negligent; misrepresentation; and (3) wrongful death. (Am. Compl. ¶¶ 400-437.) Plaintiff alleges that the USOPC and USABS breached their duty of care to Pavle by failing to research, study, and examine the dangers and risks of head injuries and in failing to inform athletes about their findings. (*Id.* ¶ 402.) Plaintiff also alleges that Defendants were careless and acted with intentional disregard for the safety of their athletes by failing to educate and warn athletes about the risks of bobsledding. (*Id.* ¶ 411.)

2025 U.S. Dist. LEXIS 79892, *5

*Civ. P. 12(b)(2)*. The plaintiff "bears the burden of demonstrating the facts that establish personal jurisdiction." *Pinker v. Roche Holdings Ltd., 292 F.3d 361, 368 (3d Cir. 2002)*. "If the district court does not hold an evidentiary hearing, the plaintiff[] need only establish a *prima facie* case of personal jurisdiction." *Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 330, 51 V.I. 1219 (3d Cir. 2009)* (internal quotations and citation omitted). "It is well established that in deciding a motion to dismiss for lack of jurisdiction, a court is required to accept the plaintiff's allegations as true, and is to construe disputed facts in favor of the plaintiff." *Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 457 (3d Cir. 2003)*. Still, "[w]hile disputed issues are construed in favor of the plaintiff, allegations **[*6]** may be contradicted by the defendant through opposing affidavits or other evidence, at which point the plaintiff must respond with 'actual proofs, not mere allegations.'" *Am. Bd. of Internal Med. v. Rushford, Civ. No. 14-6428, 2015 U.S. Dist. LEXIS 116861, 2015 WL 5164791, at *5 (D.N.J. Sept. 2, 2015)* (quoting *Patterson by Patterson v. FBI, 893 F.2d 595, 603 (3d Cir. 1990)*).

## IV. DISCUSSION

Defendants seek dismissal of Plaintiff's Amended Complaint pursuant to *Rule 12(b)(2)* and the USOPC seeks dismissal, in the alternative, under *Rule 12(b)(6)*. First, the Court will decide the portion of each Defendants' Motions seeking dismissal for lack of personal jurisdiction. If jurisdiction exists as to the USOPC, the Court will proceed to the merits of its *Rule 12(b)(6)* Motion. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 430-31, 127 S. Ct. 1184, 167 L. Ed. 2d 15 (2007)* (finding that generally a federal court may not rule on the merits of a case without first determining that it has subject matter jurisdiction and personal jurisdiction over a party).

"A federal court sitting in New Jersey has jurisdiction over parties to the extent provided under New Jersey state law." *Miller Yacht Sales, 384 F.3d at 96* (citing *Fed. R. Civ. P. 4(e)*). The New Jersey long-arm statute permits the exercise of personal jurisdiction to the fullest limits of due process. *IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 259 (3d Cir. 1998)* (citations omitted). "Personal jurisdiction under the Due Process Clause depends upon the relationship among the defendant, the forum, and the litigation." *Id.* (internal quotation marks and citation omitted). More precisely, "[t]he *Due Process Clause of the Fourteenth Amendment* requires **[*7]** that non-resident defendants have 'certain

minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Marten v. Godwin, 499 F.3d 290, 296 (3d Cir. 2007)* (quoting *Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)*).

"There are two distinct theories under which personal jurisdiction can arise: general and specific." *Allaham v. Naddaf, 635 F. App'x 32, 37-38 (3d Cir. 2015)* (citing *Grimes v. Vitalink Commc'ns Corp., 17 F.3d 1553, 1559 (3d Cir. 1994)*). "A court has general jurisdiction when a defendant has 'continuous and systematic' contacts with the forum state." *Id.* (quoting *O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 317 (3d Cir. 2007)*). Here, the Court only addresses specific personal jurisdiction because it has already found that Plaintiff has waived his argument as to general jurisdiction.[8] (ECF No. 55 at 6 n.3.)

The inquiry as to whether a court may exercise specific personal jurisdiction over a nonresident defendant is tripartite. *See O'Connor, 496 F.3d at 317*. First, "the defendant must have 'purposefully avail[ed] itself of the privilege of conducting activities within the forum.'" *Id.* (quoting *Hanson v. Denckla, 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958)*). "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson, 357 U.S. at 253*. The contacts must be the defendant's own choice and not "random, isolated, **[*8]** or fortuitous." *Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774, 104 S. Ct. 1473, 79 L. Ed. 2d 790 (1984)*; *see Ford Motor Co. v. Montana Eighth Jud. Dist. Ct., 592 U.S. 351, 359, 141 S. Ct. 1017, 209 L. Ed. 2d 225 (2021)* (stating that for specific personal jurisdiction, the defendant must have "deliberately 'reached out beyond' its home" (quoting *Walden v. Fiore, 571 U.S. 277, 285, 134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014)*)). The

---

[8] This determination is law of the case. *Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 815-16, 108 S. Ct. 2166, 100 L. Ed. 2d 811 (1988)* (noting that "the doctrine of law of the case posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case"); *Est. of DeRosa v. Murphy, Civ. No. 22-02301, 2025 U.S. Dist. LEXIS 10071, 2025 WL 249169, at *4 (D.N.J. Jan. 21, 2025)* (explaining that a prior judge's ruling on an issue earlier in the case precluded the losing party from reasserting the claim at a subsequent stage in the case).

unilateral activity of a third party cannot satisfy the requirement that the defendant have minimum contacts with the forum state. *See Hanson, 357 U.S. at 253* (noting that the mere "unilateral activity of those who claim some relationship with a non-resident defendant cannot satisfy the requirement of contact with the forum State").

Second, if there is purposeful availment by a non-resident defendant, a court may exercise personal jurisdiction over that defendant only when a plaintiff's claims "arise out of or relate to the defendant's contacts" with the forum state. *Bristol-Myers Squibb Co. v. Superior Ct., 582 U.S. 255, 262, 137 S. Ct. 1773, 198 L. Ed. 2d 395 (2017)*; *Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984)*.

Third, if the non-resident defendant purposefully avails itself, and the plaintiff's claims arise out of or relate to the defendant's contacts with the forum state, "due process requires . . . that the maintenance of the suit [against the defendant] does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe, 326 U.S. at 316* (quoting *Milliken v. Meyer, 311 U.S. 457, 463, 61 S. Ct. 339, 85 L. Ed. 278 (1940)*).

## A. SPECIFIC PERSONAL JURISDICTION OVER USOPC

For the reasons that follow, the Court finds that it lacks specific personal jurisdiction over the USOPC. **[*9]** Specifically, the USOPC did not purposefully direct activities towards the forum state. Because Plaintiff cannot show purposeful availment, the Court need not address the remaining two prongs of the specific personal jurisdiction analysis.

In its Motion, the USOPC denies purposefully directing activities towards New Jersey because it "did not recruit [Pavle] or any other bobsled athlete, did not host athletic competitions in New Jersey, did not operate training centers or training sites in New Jersey, did not control any assets in New Jersey, and also did not have any interactions with [Pavle]." (USOPC Br. at 3, 13.) In its opposition brief, Plaintiff argues that the evidence establishes that the USOPC purposefully availed itself of the privilege of conducting activities in New Jersey by (1) knowingly paying (through grant money) for the construction of a bobsled track in Pavle's backyard, (2) using the United States Olympic Paralympic Association to cultivate and grow relationships in New Jersey via

community building and outreach, (3) receiving major contributions from individuals and corporations in New Jersey, (4) targeting New Jersey by hosting special fundraising events like the **[*10]** "Night of Champions," and (5) continuously and deliberately cultivating relationships with New Jersey companies to obtain their support, including the support in "providing cutting-edge sports science and sports medicine facilities" to United States athletes like Pavle. (Opp'n Br. I at 12-14.)

As an initial matter, neither the allegations in the Amended Complaint nor the evidence from jurisdictional discovery sufficiently show that the USOPC specifically targeted New Jersey. For example, between 1997 and 2008, the USOPC did not own any training sites in New Jersey. ("USOPC Response to Interrogatory," ECF No. 126-2 at 6.)[9] The record reflects that the training sites in New Jersey were independently owned facilities and not owned by the USOPC. (*Id.*) Additionally, during the relevant time period, the USOPC's Sports Medicine Division, Sports Performance Division, and Sports Medicine Volunteer Program did not own, operate, control, or manage any buildings, facilities, clinics, lands, or leaseholds in New Jersey. (*Id.* at 9.) Moreover, discovery revealed that during the relevant time period, the USOPC did not host any conferences or symposia in New Jersey (*id.* at 15, 16; T1 191:15-19),[10] did **[*11]** not own any assets of real property in New Jersey (T1 192:4-15), did not host, promote, support, or oversee Olympic trials related to bobsledding in New Jersey (T1 191:3-6), did not host any athletic competitions related to bobsledding in New Jersey (T1 190:24-191:10; USOPC Responses to Interrogatories at 25), and did not provide any healthcare services to Pavle in New Jersey (T1 191:19-22). In fact, there are no bobsled tracks in New Jersey, and the USOPC does not recruit athletes for the USABS team. (T1 191:11-14.) To add, Lisa Carlock's deposition revealed that the USOPC likely did not receive any information about the USABS's recruiting events in New Jersey when they conducted their three recruiting events. (T2 97:18-25.)[11]

---

[9] The number indicates the page number of the interrogatory, not the interrogatory number.

[10] T1 refers to the transcript of the September 9, 2024 deposition of Katherine DeStefano, a *Rule 30(b)(6)* witness for the USOPC, attached to the USOPC's Motion at ECF No. 126-2 and Plaintiff's Opposition brief at ECF No. 132-15. Katherine DeStefano is the Associate General Counsel of Litigation & Dispute Resolution for the USOPC.

[11] T2 refers to Lisa Carlock's deposition transcript that was

Plaintiff's theory of personal jurisdiction is largely premised on the fact that Pavle received funds from the USOPC with the knowledge that Pavle intended to build a bobsled track in his backyard. The USOPC argues that it did not have knowledge that Pavle would build a bobsled track. (USOPC Br. at 20.)[12] In rebuttal, Plaintiff argues that Pavle's grant form shows that the money would be used for such a purpose. (USABS Br. at 17-18; ECF No. 127-12.) On this point, **[*12]** Plaintiff attests that he was "able to construct the track [in his backyard] through funding provided by the USOPC," which he argues is sufficient to exercise jurisdiction over the USOPC. (Jovanovic Declaration ¶ 10). The Amended Complaint moreover alleges that the grant money provided by the USOPC was used to purchase training equipment and to construct/refine a land push track in Pavle's backyard. (Am. Compl. ¶¶ 65, 77.) In a reply brief, the USOPC argues that Pavle's unilateral choice to build a bobsled track with the grant money does not show that the USOPC directly targeted New Jersey. (USOPC Reply Br. at 2.)

The Court finds that the allegations in the Amended Complaint related to the grant money are insufficient to show purposeful availment because contracting with a resident of the forum state, without more, is insufficient to confer specific personal jurisdiction. *Sovereign Consulting Inc. v. Cover Technologies Inc., Civ. No. 21-35, 2021 U.S. Dist. LEXIS 125077, 2021 WL 2802219 at *4 (D.N.J 2021)*. Additionally, the Court finds that the construction of the bobsled track was the direct actions of Pavle and Plaintiff and not the purposeful contacts of the USOPC with New Jersey. In other words, the intersection between the alleged building of the track and the use of the grant money for the track is a "random, **[*13]** fortuitous, or attenuated" contact with New Jersey. *See Walden, 571 U.S. at 286*. The application for the tuition grant did expressly state that Pavle would pursue a civil engineering degree *and* that the grant would assist in "[e]xtending and fine tuning a

___

attached to the USOPC's Motion. (ECF No. 126-2.) Lisa Carlock is a *Rule 30(b)(6)* witness and current Chief Financial Officer of the USABS.

[12] The USOPC concedes that "[a]t bottom, the only potentially relevant contact between the USOPC and New Jersey is [Pavle's] receipt of financial support from the USOPC while [Pavle] resided in the State." (USOPC Br. at 14.) The USOPC suggests that although it provided money to Plaintiff in New Jersey, it did not specifically target New Jersey in a way relevant to personal jurisdiction. (*Id.* at 18.) On this point, the USOPC argues that it was the USABS that set the criteria for distributing grants to Pavle, not the USOPC. (*Id.* at 19.)

push track [Pavle] built with [his] previous grant money[.]" (*See* ECF No. 132-3.) But even if the USOPC had knowledge that the grant money would be used for refining the bobsled track, it was not USOPC's decision to build it, much less refine it, in New Jersey. *See Asahi Metal Indus. Co. v. Superior Ct. of Cal., 480 U.S. 102, 109, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987)* ("[F]oreseeability is wholly irrelevant to personal jurisdiction."). The USOPC's knowledge only shows that it was engaged in transactions with a forum resident, which alone does not give rise to specific personal jurisdiction. *Sovereign Consulting Inc., 2021 U.S. Dist. LEXIS 125077, 2021 WL 2802219 at *4*.

In addition to the grant money used for the bobsled track, it is undisputed that (1) the USOPC gave money to Pavle in the form of tuition assistance and grants, and (2) the USOPC received funds and sponsorships from various corporate entities in New Jersey. First, as it relates to Pavle's receipt of funds, as briefly discussed regarding the bobsled track, giving Pavle funds is insufficient to confer specific personal jurisdiction in New Jersey because the payment of funds **[*14]** to a forum resident, without more, does not show a deliberate targeting of New Jersey. *See Traisman v. Khmelnitsky, Civ. No. 19-11045, 2020 U.S. Dist. LEXIS 95127, 2020 WL 2847751, at *9 (D.N.J. June 1, 2020)* (rejecting the plaintiff's argument that the receipt of funds from the defendant is sufficient to confer specific personal jurisdiction); *G&C Fab-Con, LLC v. M&S Civ. Consultants, Inc., Civ. No. 20-8425, 2021 U.S. Dist. LEXIS 15120, 2021 WL 268177, at *5 (D.N.J. Jan. 27, 2021)* ("[E]ven if the record clearly indicated that the plaintiff was processing pay applications or payments from the defendant, this is only one factor to consider among the totality of the circumstances.").

Similarly, it is well-settled law that merely entering into a contract—or in this case, a grant or agreement for funds—with a forum resident does not subject a non-resident to personal jurisdiction. *Mellon Bank (East) PSFS, Nat. Ass'n v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992)* ("The fact that a non-resident has contracted with a resident of the forum state is not, by itself, sufficient to justify personal jurisdiction over the nonresident."); *see also Walden, 571 U.S. at 285* (noting that the "minimum contacts analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there"); *O'Connor, 496 F.3d at 317* ("[C]ontacts with a state's citizens that take place outside the state are not purposeful contacts with the state itself."); *Drayage Express, LLC v. Int'l First Serv. United States, Civ. No.*

*15-3597, 2017 U.S. Dist. LEXIS 47999, at *15 (D.N.J. Mar. 29, 2017)* (defendant's contract with a New Jerseybased co-defendant was insufficient to establish the **[\*15]** requisite contacts with New Jersey to support specific jurisdiction). But payments to an in-state resident along with *additional contacts* could give rise to minimum contacts. *Sovereign Consulting Inc., 2021 U.S. Dist. LEXIS 125077, 2021 WL 2802219 at *4*. Here, even after discovery, Plaintiff has not shown the additional contacts that are required for the Court to exercise specific personal jurisdiction over the USOPC.

On this point, jurisdictional discovery revealed that the USOPC gave Pavle $182,432.37 in grants and other forms of financial assistance payments. (USOPC Responses to Interrogatories at 26-30.) The USOPC also provided tuition assistance to Pavle. (T1 176:18-25, 178:8-9.) The grants, however, were set by the USABS and not the USOPC. (T1 193:22-25.) In fact, discovery showed that the USOPC does not have any power over how national governing bodies, like the USABS, run their day-to-day operations, so any contacts that the USABS has with New Jersey are irrelevant to the USOPC. (T1 188:17-20.) Although the Amended Complaint alleges that the USOPC has the authority to prioritize the health and wellness of athletes and to disseminate information to its governing bodies (Am. Compl. ¶ 25), according to Katherine DeStefano's deposition, the USABS is an "independent **[\*16]** and autonomous" organization. (T1 189:20-22.) Accordingly, even after discovery, Plaintiff has not sufficiently alleged that there is something more, in addition to the receipt of funds or the issuance of grants, to subject the USOPC to the jurisdiction of New Jersey's courts.

As to whether the funds from corporate sponsors constitute purposeful availment, Plaintiff contends that there is specific personal jurisdiction over the USOPC because it received financial support from corporate sponsors, hosted fundraising events in New Jersey, and received contributions from corporate entities in New Jersey. (Opp'n Br. I at 13.) Specifically, jurisdictional discovery revealed that during the relevant time period, Global Sports Consultants, LLC, D/B/A Jet Set Sports ("Jet Set Sports") and Cooperative Sports, LLC D/B/A Cosport ("Cosport")—each with a principal place of business in New Jersey—entered into two separate licensing agreements authorizing Jet Set Sports and Cosport to use the Olympic trademark in exchange for royalty payments. (*Id.* at 12-13.) But merely receiving funds, entering into contracts, and interacting with New Jersey corporations does not mean there is purposeful availment **[\*17]** of the forum. *See Ford Motor Co., 592*

*U.S. at 359* (emphasizing that the inquiry is whether the *defendant* took "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State"); *G&C Fab-Con, LLC v. M&S Civil Consultants, Inc., Civ. No. 20-08425, 2021 U.S. Dist. LEXIS 15120, 2021 WL 268177, at *5 (D.N.J. Jan. 27, 2021)* ("The fact that a non-resident has contracted with a resident of the forum state is not, by itself, sufficient to justify personal jurisdiction over the nonresident.") (internal quotation marks and citations omitted); *Vetrotex CertainTeed Corp. v. Consolidated Fiber Glass Prods. Co., 75 F.3d 147, 152-53 (3d Cir. 1996)*; *see Grand Entm't Grp., Ltd. V. Star Media Sales, Inc., 988 F.2d 476, 482 (3d Cir. 1993)* ("[A] contract alone does not 'automatically establish sufficient minimum contacts in the other party's home forum'") (quoting *Burger King, 471 U.S. at 478*); *Mellon Bank (East) v. DiVeronica Bros., Inc., 983 F.2d 551, 557 (3d Cir. 1993)* ("Contracting with a resident of the forum state does not alone justify the exercise of personal jurisdiction over a non-resident defendant").

Furthermore, Plaintiff cites emails from the USOPC to New Jersey Olympians with an invitation to attend the Somerset Patriots minor league baseball game to honor Olympic night, (ECF No. 132-6), and an invitation by Jet Set Sports of a networking event in Morristown, (ECF No. 132-7) as a way to show that the USOPC targeted New Jersey. Plaintiff argues that the USOPC repeatedly communicated with Pavle in New Jersey to help with community initiatives, each time concealing that bobsledding can cause CTE **[\*18]** and other traumatic brain injuries. (Opp'n Br. I at 20-21.) In rebuttal, the USOPC argues that the email invitations to Olympic athlete alumni about events hosted by third parties are insufficient to show purposeful availment because the USOPC did not host the events in New Jersey; it merely acted as a facilitator of mass email invitations. (USOPC Reply Br. at 8 (citing *J.S. v. Dalton Sch., Inc., Civ. No. 18-10258, 2019 U.S. Dist. LEXIS 4447, 2019 WL 161507, at *3 (D.N.J. Jan. 9, 2019)*)).

The Court agrees with the USOPC. The email solicitations and invitations in this case are not purposeful contacts with New Jersey because an email solicitation about an event to former Olympians is not sufficient to show a deliberate targeting of the forum. *See Baanyan Software Servs., Inc. v. Kuncha, 433 N.J. Super. 466, 81 A.3d 672, 679 (N.J. App. Div. 2013)* ("[W]e have held that telephonic and electronic communications with individuals and entities located in New Jersey alone, are insufficient minimum contacts to establish personal jurisdiction over a defendant."); *Real*

*Est. Sols. Today LLC v. Scifo, Civ. No. 20-4512, 2021 U.S. Dist. LEXIS 25328, 2021 WL 486896, at \*5 (D.N.J. Feb. 10, 2021)* ("Informational communications in furtherance of [a contract between a resident and a nonresident] do[] not establish the purposeful activity necessary for a valid assertion of personal jurisdiction over [the nonresident defendant]") (first, second, and third alterations in original). Even more, to RSVP to the Morristown event, a New Jersey Olympian [*19] would need to email Jet Set Sport, not the USOPC, (*see* ECF No. 132-7), further showing that the USOPC's contacts with New Jersey via an email invitation are too attenuated.

In sum, the Court finds that even after jurisdictional discovery, the Amended Complaint lacks the necessary allegations to show that the USOPC purposefully availed itself of the New Jersey forum. Accordingly, Counts One, Two, and Three of the Amended Complaint will be dismissed against the USOPC without prejudice. Plaintiff will not be given further leave to amend against the USOPC.[13]

## B. SPECIFIC PERSONAL JURISDICTION OVER USABS

Turning next to the USABS, for the reasons that follow, the Court finds that there is specific personal jurisdiction over it.

1. Purposeful Availment

In the Motion, the USABS argues that there is no evidence that the USABS purposefully availed itself of the benefits and protections of the laws of New Jersey. (USABS Br. at 8.) The USABS contends that any injury arising from Pavle's backyard bobsled track was not the fault of USABS because the track was a personal workout device. (*Id.* at 12.) The USABS also argues that even though it sometimes reimbursed Pavle for travel to and from New Jersey or [*20] that he was treated by doctors in New Jersey which were paid by the USABS, there was no specific targeting of New Jersey. (*Id.* at 13, 16.)

In rebuttal, Plaintiff argues that there is specific personal jurisdiction over the USABS because the "USABS knowingly and intentionally targeted New Jersey

athletes and donors by hosting recruiting events (which the USABS refers to as 'BurliMan' events) in New Jersey, every year from 1995 to 1999." (Opp'n Br. II at 7-12.) More broadly, Plaintiff argues that "[e]very contact USABS ever had with [Pavle] in New Jersey is solely because of the USABS's efforts to cultivate a market and find athletes in New Jersey." (*Id.* at 9.) Next, Plaintiff argues that the USABS knowingly and intentionally assisted in the construction of and improvement to Pavle's backyard bobsled track. (*Id.* at 12.) Plaintiff adds that the USABS sourced some of the materials used to build the push-track. (*Id.* at 13.) Additionally, Plaintiff argues that the USABS knowingly and intentionally targeted companies and residents in New Jersey for its own financial gain via fundraising events and dinners. (*Id.* at 14-16.) Plaintiff further argues that the USABS paid Pavle approximately $75,000 [*21] during the course of his career excluding payment for Pavle's travel to and from New Jersey. (*Id.* at 17.)

The record reveals that Pavle was a USABS athlete between 1995 and 2008, as a result of recruiting events held in New Jersey. ("USABS Responses to Interrogatories," ECF No. 127-3.) The record also shows that the USABS conducted several BurliMan recruiting events in New Jersey. ("USABS First Supplemental Responses," ECF No. 127-6.) More specifically, Lisa Carlock's September 16, 2024 deposition confirmed that Pavle participated in two BurliMan events at Seaside Heights and then eventually joined the USABS team in 1997. (T4 111:20-25 to 112:1-10.)[14] On top of this, the USABS utilized newspapers and magazines to reach out to New Jersey residents, and targeted New Jersey politicians for more publicity at the BurliMan events. (T4 126:3-10.) Furthermore, the USABS sent money to Pavle on June 15, 2005, for an appearance at one of its New Jersey fundraisers. (*Id.* at 12.) As further evidence of purposeful availment, discovery showed that the USABS held many fundraising dinners in New Jersey targeted at New Jersey residents and corporate entities. (ECF Nos. 127-11; 133-19.) These facts, when [*22] taken together, show a deliberate targeting of New Jersey. (*See* Am. Compl. ¶¶ 70-87 (summarizing the allegations of purposeful availment as to USABS)).

More specifically as to the recruiting events, the USABS argues that its recruiting events are insufficient to confer specific personal jurisdiction because they were limited in scope and over twenty-seven years ago. (USABS Br.

---

[13] The Court does not reach whether Plaintiff's claims arise out of or relate to the USOPC's contacts or whether exercising jurisdiction would offend traditional notions of fair play and substantial justice.

[14] T4 refers to Lisa Carlock's deposition transcript attached to the USABS's moving brief at ECF No. 127-12.

at 14.) Plaintiff, however, argues that the USABS hosted at least seven separate BurliMan events in New Jersey and Pavle tried out at two of them and was successfully recruited in 1997. (Opp'n Br. II at 10.) The Court agrees with Plaintiff and finds that the USABS purposefully availed itself of New Jersey's benefit by conducting recruiting events in New Jersey in 1994, 1995, 1996, 1997, 1998, and 1999. (ECF No. 127-8.) By hosting at least seven recruiting events in New Jersey and directing activities towards New Jersey residents, the USABS knowingly and intentionally targeted New Jersey athletes and donors. In fact, the Amended Complaint alleges that at the 1997 BurliMan event, the USABS set up a portable push-track and "a recruiter convinced Pavle to take a break from his job and give the sled a try." (Am. Compl. **[*23]** ¶ 91.) It would simply not be fair if the USABS can come to New Jersey to advertise and recruit athletes—on multiple occasions—and then not be subject to this Court's jurisdiction. _Marten, 499 F.3d at 296_ ("The _Due Process Clause of the Fourteenth Amendment_ requires that non-resident defendants have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.").

The Court in its earlier decision found that one recruiting event in 1997 was insufficient and too attenuated to establish jurisdiction over the USABS. (ECF No. 55 at 13 ("The recruiting event occurred nearly 27 years ago, and accordingly the Court finds this is too "attenuated" for USABS to be haled into the forum state.") However, the benefit of jurisdictional discovery has revealed that the USABS conducted numerous recruiting events in New Jersey and purposefully availed itself of New Jersey's laws by aiming advertisements and recruiting events at New Jersey residents. (T4 111:20-25 to 112:1-10; ECF No. 127-8.) _See Dupell v. Franklin Towne Charter Sch., Civ. No. 16-278, 2016 U.S. Dist. LEXIS 166530, 2016 WL 7042068, at *5 (D.N.J. Dec. 2, 2016)_. The USABS's contacts with New Jersey were more than just the single recruiting event twenty-seven years ago that was previously represented to the Court prior to jurisdictional discovery. **[*24]** These contacts make it reasonable that the USABS could anticipate being haled into court in New Jersey. _See World—Wide Volkswagen Corp., 444 U.S. at 297_; _Lebel v. Everglades Marina, Inc., 115 N.J. 317, 558 A.2d 1252 (1989)_ (concluding that a seller was subject to specific personal jurisdiction in New Jersey because the seller telephoned the buyer in New Jersey and created contacts with the forum).

Moreover, jurisdictional discovery showed that the USABS held multiple fundraising events and dinners in New Jersey which are sufficient for the Court to exercise specific personal jurisdiction over the USABS when considering the totality of the contacts that the USABS has with New Jersey. (ECF Nos. 127-11; 133-19.) Although the Court reiterates that the receipt of funds alone are insufficient to satisfy the requisite minimum contacts needed, the record here shows that those fundraising events, donations, and receipt of funds were in addition to the USABS's recruiting events, which shows a deliberate and intentional targeting of New Jersey for the Court to exercise personal jurisdiction over the USABS. _See Traisman, 2020 U.S. Dist. LEXIS 95127, 2020 WL 2847751, at *9_.

In sum, the Court finds that the USABS has purposefully availed itself of the benefits and obligations of New Jersey's laws.

2. Arise Out of or Relate To

In addition to purposeful availment, for the **[*25]** reasons that follow, the Court finds that Plaintiff properly alleges that his claims "arise out of or relate to" the USABS's contacts with New Jersey. _See Daimler AG v. Bauman, 571 U.S. 117, 127, 134 S. Ct. 746, 187 L. Ed. 2d 624 (2014)_. This prong requires that "there [] be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulations.'" _Ford Motor Co., 592 U.S. at 360_ (quoting _Bristol-Myers Squibb Co., 582 U.S. at 262_) (alteration in original). In _Ford_, the Supreme Court held that the defendant's connections to the forum states via billboards, TV and radio spots, print ads, and direct mail were sufficient to show relatedness for purposes of specific personal jurisdiction, even if the specific defective product at issue was not sold in the forum. _Id. at 355, 365_ ("When a company like [defendant] serves a market for a product in a State and that product causes injury in the State to one of its residents, the State's courts may entertain the resulting suit."). Notably, the Court distinguished between the "arise out of" language, which denotes causation, and the "relates to" language, which contemplates that "some relationship will support jurisdiction without a causal showing." _Id. at 362_.

As the Court previously noted in its earlier **[*26]** decision, "the second prong is premised on the finding that USABS purposefully availed itself by hosting recruiting events in the forum." (ECF No. 55 at 14.) The USABS argues that Pavle's injuries (i.e. his CTE) arose from the 36 World Championships, two North American

Cups, and the 2006 Winter Olympics that he participated in which did not take place in New Jersey. (USABS Br. at 11.) The USABS argues that Plaintiff "can certainly not show that the claim of negligence and resultant injury in any way arose out of or is related to USABS's attenuated contact with New Jersey." (*Id.* at 20.)

Plaintiff argues that his claims directly arise out of or relate to the USABS's recruitment efforts because without them, Pavle would not have joined the bobsled team and gotten CTE from bobsledding. (Opp'n Br. II at 20.) Plaintiff further argues that the USABS actively misled and concealed from Pavle the risk of bobsledding, and Plaintiff's claims arose directly from that concealment. (*Id.* at 21.) Plaintiff also argues that his claims arise out of the USABS's financial relationships with New Jersey companies and the USABS's financial assistance of Pavle's backyard bobsled track. (*Id.* at 23.)

Given the **[\*27]** information from jurisdictional discovery, and having previously concluded that there has been purposeful targeting of New Jersey, the Court finds that there is a direct correlation between the USABS's recruiting events in New Jersey and Plaintiff's claims. (*See* Am. Compl. ¶¶ 84, 88, 91, 100-111, 114.) Notably, the Court agrees with Plaintiff that without the USABS's recruiting events in New Jersey, Pavle would not have joined the United States bobsled team.

Therefore, the Court finds that Plaintiff's claims arise out of or relate to the USABS's purposeful contacts with New Jersey.

3. Due Process

Lastly, maintenance of the suit against the USABS in New Jersey does not offend traditional notions of fair play and substantial justice. Plaintiff argues that maintenance of the suit against the USABS does not violate due process. (Opp'n Br. II at 26.) The USABS does not argue that the Court's exercise of jurisdiction is unreasonable.

In determining whether the requirement to comport with "fair play and substantial justice" is satisfied, the Court must consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief. *Asahi, 480 U.S. at 113*. It must also weigh **[\*28]** "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies." *Id.*

(quoting *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)*).

Here, although the USABS does not argue that the Court's exercise of jurisdiction is unreasonable, the Court finds that the factors to consider weigh in favor of jurisdiction. For example, the burden of having to defend this action in New Jersey is relatively low given that the USABS is headquartered in Lake Placid, New York, and not across the country. New Jersey also has a strong interest in protecting its citizens from injuries that arise from out-of-state actors, and Plaintiff has a strong interest in obtaining relief. As the Amended Complaint alleges, "New Jersey is central to this case." (Am. Compl. ¶ 88.) In sum, the Court finds that there is specific personal jurisdiction over the USABS.[15]

## V. **CONCLUSION**

For the reasons stated above, the Court will **GRANT** the USOPC's Motion (ECF No. 126). Counts One, Two, and Three of the Amended Complaint against the USOPC will be dismissed and Plaintiff will not be given leave to amend his Amended Complaint as to the USOPC. Additionally, **[\*29]** the Court will **DENY** the USABS's Motion (ECF No. 127). An appropriate Order will follow.

Date: April 28, 2025

/s/ Zahid N. Quraishi

**ZAHID N. QURAISHI**

**UNITED STATES DISTRICT JUDGE**

**ORDER**

**QURAISHI, District Judge**

**THIS MATTER** comes before the Court upon two motions to dismiss filed by (1) Defendant the United States Olympic and Paralympic Committee ("USOPC") (ECF No. 126), and (2) Defendant the USA Bobsled/Skeleton, Inc. ("USABS") (ECF No. 127). For the reasons set forth in the accompanying Opinion,

**IT IS** on this **28th** day of **April 2025**,

---

[15] The USABS does not argue that Plaintiff fails to state a claim under *Rule 12(b)(6)*. Accordingly, the Court does not address whether Plaintiff adequately alleged his claims.

**ORDERED** that the USOPC's Motion (ECF No. 126) is hereby **GRANTED**; it is further

**ORDERED** that Counts One, Two, and Three of the Amended Complaint against the USOPC are hereby dismissed without prejudice and Plaintiff is not given leave to further amend his Amended Complaint; and it is further

**ORDERED** that the USABS's Motion (ECF No. 127) is hereby **DENIED**.

/s/ Zahid N. Quraishi

**ZAHID N. QURAISHI**

**UNITED STATES DISTRICT JUDGE**

---

**End of Document**

# EXHIBIT B

⚠️ Caution
As of: April 13, 2026 8:35 PM Z

## *McKenzie v. United States Tennis Ass'n Inc.*

⊖ On Appeal

United States District Court for the Middle District of Florida, Orlando Division

August 16, 2024, Decided; August 16, 2024, Filed

Case No: 6:22-cv-615-PGB-LHP

**Reporter**
2024 U.S. Dist. LEXIS 146453 *; 2024 WL 3849884

KYLIE MCKENZIE, Plaintiff, v. UNITED STATES TENNIS ASSOCIATION INCORPORATED and USTA PLAYER DEVELOPMENT INCORPORATED, Defendants.

**Subsequent History:** Appeal filed, 09/13/2024

**Prior History:** *McKenzie v. United States Tennis Ass'n Inc., 2022 U.S. Dist. LEXIS 240817, 2022 WL 19336464 (M.D. Fla., Aug. 18, 2022)*

**Counsel:** [*1] For Kylie McKenzie, Plaintiff: Robert Allard, LEAD ATTORNEY, PRO HAC VICE, Cerri, Boskovich & Allard, San Jose, CA; Amy Lynn Judkins, Maegen Peek Luka, Newsome Melton, Orlando, FL; Mark John Boskovich, PRO HAC VICE, Cerri, Boskovich & Allard, LLP, San Jose, CA; Nicholas Donald Seidule, McKeever & Seidule, Winter Park, FL; Edmund A. Normand, Normand Law PLLC, Orlando, FL.

For United States Tennis Association Incorporated, USTA Player Development Incorporated, Defendants: Kevin W. Shaughnessy, LEAD ATTORNEY, Erin Michelle Sales, Joyce Ackerbaum Cox, Meagan Leigh Martin, Baker & Hostetler, LLP, Orlando, FL; William Weber, Baker & Hostetler LLP, Labor and Employment, Orlando, FL.

**Judges:** PAUL G. BYRON, UNITED STATES DISTRICT JUDGE.

**Opinion by:** PAUL G. BYRON

## Opinion

### ORDER

This cause is before the Court on Defendants' Renewed Motion for Judgment as a Matter of Law, or, Alternatively For a New Trial or Remittitur. (Doc. 236). The Plaintiff submitted a Response in Opposition. (Doc. 244). Upon consideration, the Defendants' Motions are denied.[1]

### I. BACKGROUND

Kylie McKenzie was a rising tennis player who was recruited by a United State Tennis Association ("**USTA**") national coach to train at the USTA National Training Center in Carson, [*2] California.[2] (Doc. 34, ¶ 18). Ms. McKenzie was ranked 33rd in the world junior ranking when she suffered a shoulder injury. After eight or nine months in rehabilitation, Ms. McKenzie returned to the Carson training center until July 2018. In August 2018, when Ms. McKenzie was 19, she moved back to Florida to train in Orlando at the USTA National Campus. (*Id.* ¶ 23). In September, after a month of periodic training sessions, Ms. McKenzie was assigned to train with USTA national coach Anibal Aranda, who was 34 years old. (*Id.* ¶ 24).

Ms. McKenzie testified that Aranda trained her on the

---

[1] Hereinafter, the Court will refer to Defendants United States Tennis Association Incorporated and USTA Player Development Incorporated collectively as either the "USTA" or "Defendants."

[2] While the parties cite to transcripts of trial testimony in their briefs, the transcripts were not filed with the Court. Accordingly, the Court will rely on its notes and recollection of the trial testimony. Ms. McKenzie testified at trial that she spent two years at the USTA facility in Carson. After Ms. McKenzie, at 16 years of age and playing in the 18-year-old division beat a player ranked 80th in the world, Mr. Ola Malmqvist invited her to train in Boca Raton, Florida.

clay tennis court, and he typically reserved courts 4 through 6. Unlike courts 1, 2, and 3, these courts are not visible from the administrative building. Soon after Coach Aranda started training Ms. McKenzie he began commenting on her appearance, telling Ms. McKenzie that she was beautiful. Aranda video-recorded practices on his cellphone and sat beside Ms. McKenzie on the courtside bench to review the video. Aranda sat with his thigh touching Ms. McKenzie's thigh or their shoulders touching. This grooming escalated, and Aranda would massage Ms. McKenzie's shoulder or rest his hand on her upper thigh and **[*3]** move it up and down. Aranda also intertwined his arm with Ms. McKenzie's while holding his cell phone. Over time, the inappropriate physical contact escalated, and Aranda would adjust Ms. McKenzie's serve by resting his hand on her lower back, occasionally sliding his hand down to her buttocks. Aranda would also pull Ms. McKenzie's buttocks into his groin area while demonstrating proper tennis form.

Eventually, while seated on a tennis court bench, Aranda moved his hand under a towel covering Ms. McKenzie's legs and caressed her vagina without her consent. This testimony was uncontroverted. Aranda was not directly supervised while training Ms. McKenzie. This testimony was also uncontroverted. Ms. McKenzie reported these assaults to the police and Ms. Battaglia, the USTA manager of Player Development Events and Programming. Ms. Battaglia was a mandatory reporter under the SafeSport Code.[3] And Ms. Battaglia had been sexually assaulted by Coach Aranda in 2014 in the same manner that he later assaulted Ms. McKenzie. Ms. Battaglia never reported to the USTA that Coach Aranda had sexually abused her. After Ms. McKenzie told Ms. Battaglia she had been sexually assaulted by Coach Aranda, Ms. **[*4]** Battaglia finally reported that she was assaulted by him in 2014.

Ms. McKenzie filed this lawsuit alleging Negligent Supervision and Retention (Count I), Battery (Count II), Intentional Infliction of Emotional Distress (Count III), Negligence (Count IV), and Punitive Damages (Count V). (Doc. 34). The case proceeded to trial on negligence and negligent supervision and retention. Prior to trial, Ms. McKenzie moved for summary judgment on the first element of her negligence claim—whether Defendants owed a duty of care to her. (Doc. 98, pp. 12-14). The Court granted partial summary judgment, finding there is a "special relationship" that arises where, as here, the defendant has substantial control over the plaintiff so as to deprive the plaintiff of her normal opportunities for protection. (Doc. 164, p. 24 (quoting *Saunders v. Baseball Factory, Inc., 361 So. 3d 365, 370 (Fla. 4th DCA 2023)* (citing *Restatement (Second) of Torts § 314A* (1965)))). And at trial, after the close of the evidence, the Court granted Judgment as a Matter of Law on several elements of the Negligence and Negligent Supervision and Retention claims. The Defendants move to renew their Motion for Judgment as a Matter of Law and alternatively move for a New Trial or Remittitur.[4] (Doc. 236).

## II. LEGAL STANDARDS

### A. Motion **[*5]** for Judgment as a Matter of Law

Judgment as a matter of law should be granted only if no objectively reasonable jury, based on the evidence and inferences adduced and through exercising impartial judgment, could reach the verdict rendered. *FED. R. CIV. P. 50*; *Brown v. Ala. Dep't of Transp., 597 F.3d 1160, 1173 (11th Cir. 2010)*; *Combs v. Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir. 1997)*. Put

---

[3] USTA Safe Play Policy, effective January 1, 2017, provided that covered individuals, such as Ms. Battaglia, must report prohibited conduct. (Joint Ex. 2, SP_001-002). Prohibited conduct includes "a. Sexual Conduct (or attempts to commit the same), without Consent." (*Id.* at SP_003). Other prohibited conduct includes sexual conduct with consent but where a Power Imbalance exists, and sexual misconduct involving minors. (*Id.*). When a coach is alleged to have violated the USTA policy prohibiting sexual assault or misconduct, for example, Coach Aranda's assault of Ms. McKenzie, an investigation is mandatory. (Joint Ex. 3). The SafeSport Code provides that covered adults ***must*** report conduct that could constitute sexual misconduct which includes sexual conduct without consent *and* sexual conduct involving a minor. (Joint Ex. 4, SSC_010, 016).

[4] Defendants appear to incorporate by reference arguments and briefing: "The USTA renews the arguments and objections made in open court on May 3 and May 6, 2024, along with arguments made in response to Plaintiff's Motion. Doc. 216." (Doc. 236, p. 1, n.1). The Local Rules of this Court limit memorandums to 25 pages to streamline litigation. The Court does not allow parties to incorporate by reference arguments made in Court or prior memorandums filed on the docket. To do so would nullify the rule limiting briefs to 25 pages and impose a duty on the Court to scour transcripts and memorandums in search of arguments that could be helpful to a party. The prejudice to opposing counsel is apparent. As such, the Court will only entertain arguments presented in the Defendants' instant Motion.

another way, the party moving for judgment as a matter of law must show that the trial evidence "is so overwhelmingly [in his favor] that a reasonable jury could not arrive at a contrary verdict." *Middlebrooks v. Hillcrest Foods, Inc., 256 F.3d 1241, 1246 (11th Cir. 2001)*. Yet, where substantial evidence in the trial record would allow reasonable minds to reach different conclusions, judgment as a matter of law is inappropriate. *Mee Indus. v. Dow Chem. Co., 608 F.3d 1202, 1211 (11th Cir. 2010)*. In considering a motion for judgment as a matter of law, the district court must review the record and draw all reasonable inferences derived therefrom in the light most favorable to the non-moving party. *Brown, 597 F.3d at 1173*. The district court must not make credibility determinations nor weigh evidence, as these are functions reserved for the jury. *Id.*

Finally, a *Rule 50(b)* motion "'may be used to renew consideration of issues initially raised in a pre-verdict motion [under *Rule 50(a)*]',' but . . . the court cannot consider matters not raised in the initial motion." *King v. CVS Caremark Corp., 163 F.Supp.3d 1165, 1170 (N.D. Ala. 2016)* (quoting *Caban-Wheeler v. Elsea, 71 F.3d 837, 842 (11th Cir. 1996)*).[5]

**B. New Trial**

A district court may grant a new trial **[*6]** for a variety of reasons, including when the verdict is against the great weight of the evidence, the damages awarded by the jury are excessive, the court erred in admitting or excluding evidence or in instructing the jury on the law, or other circumstances led to a patently unfair trial. *FED. R. CIV. P. 59*; *Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251, 61 S. Ct. 189, 85 L. Ed. 147 (1940)*. Whatever its reason, "a district court may, in its discretion, grant a new trial 'if in [the court's] opinion, the verdict . . . will result in a miscarriage of justice, even though there may be substantial evidence'" which would preclude the entry of judgment as a matter of law. *McGinnis v. Am. Home Mortg. Servicing, Inc., 817 F.3d 1241, 1254 (11th Cir. 2016)* (quoting *Hewitt v. B.F. Goodrich Co., 732 F.2d 1554, 1556 (11th Cir. 1984)*).

Unlike a motion for judgment as a matter of law made under *Rule 50*, the court "is free to weigh the evidence" in assessing whether to grant a new trial under *Rule 59*. *Id.* (quoting *Rabun v. Kimberly-Clark Corp., 678 F.2d 1053, 1060 (11th Cir. 1982)*).

**C. Punitive Damages**

The decision whether to grant a new trial or remittitur on the grounds of excessive damages is within the district court's sound discretion. *Simon v. Shearson Lehman Bros., Inc., 895 F.2d 1304, 1310 (11th Cir. 1990)* (citation omitted). As here, where a claim arises under state law, we first look to state substantive law to determine whether the punitive damages award is excessive. *Roboserve, Ltd. v. Tom's Foods, Inc., 940 F.2d 1441, 1446 (11th Cir. 1991)* (citation omitted). Next, we determine if the award is excessive under federal law. *See Peer v. Lewis, No. 06-60146-CIV, 2008 U.S. Dist. LEXIS 38908, 2008 WL 2047978, at *13 (S.D. Fla. May 13, 2008)*.[6] Under Florida law, any punitive **[*7]** award in excess of three times the compensatory damages is presumed to be excessive, entitling the defendant to remittitur to that ratio. *FLA. STAT. § 768.73*. Where the ratio does not exceed the presumptive excess limit, the Court proceeds to analyze the reasonableness of the award under *§ 768.74(5)*.

*Section 768.74(5)* sets out criteria to assess the reasonableness of a punitive damages award. It requires a court to ask whether: (1) the amount awarded reflects prejudice, passion or corruption on the part of the trier of fact; (2) it appears that the trier of fact ignored the evidence in reaching a verdict or misconceived the merits of the case relating to the amounts of damages recoverable; (3) it appears the trier of fact considered improper elements or arrived at the amount of damages by speculation or conjecture; (4) the award bears a reasonable relation to the amount of damages proved and the injury suffered; and (5) the award is supported by the evidence and is one that could be adduced in a logical manner by reasonable persons. *FLA. STAT. § 768.74(5)*; *see also Myers v.*

---

[5] In their Motion for Judgment as a Matter of Law, Defendants failed to identify the grounds that were raised in their *Rule 50(a)* Motion at trial, and the Plaintiff has identified instances where the Defendant attempts to assert grounds not advanced at trial. The Court will not consider grounds or objections that have been waived by the Defendants.

---

[6] It is well-settled that a new trial may be warranted by an excessive jury award. *Johnson v. Clark, 484 F. Supp. 2d 1242, 1256 (M.D. Fla. 2007)*; *see also Simon, 895 F.2d at 1310*. A new trial based on excessive damages should only be ordered if the award shocks the court's conscience. *Christopher v. Florida, 449 F.3d 1360, 1368 (11th Cir. 2006)* (citing *Simon, 895 F.2d at 1310*).

*Central Fla. Invs., Inc., 592 F.3d 1201, 1215 (11th Cir. 2010)* (stating that a trial court must consider the factors set out in *§ 768.74(5)* when assessing the excessiveness of a punitive award).

*Section 768.74*, however, did not displace Florida's longstanding deference **[*8]** to a jury's damages assessment. *Johnson v. Clark, 484 F. Supp. 2d 1242, 1256-57 (M.D. Fla. 2007)* (citing *Aurbach v. Gallina, 721 So. 2d 756, 758 (Fla. 4th DCA 1998)*); *Slip-N-Slide Recs., Inc. v. TVT Recs., LLC, No. 05-21113-CIV, 2007 U.S. Dist. LEXIS 80788, 2007 WL 3232274, at *21 (S.D. Fla. Oct. 31, 2007)* (citation omitted). A court should not declare a jury verdict excessive simply because it is higher than the amount the court itself considers appropriate. *Clark, 484 F. Supp. 2d at 1257*. The award will not be disturbed "unless it is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." *Normius v. Eckerd Corp., 813 So. 2d 985, 988 (Fla. 2d DCA 2002)* (citation omitted).

## III. DISCUSSION

### A. Negligence

To succeed on a claim of negligence under Florida law, a plaintiff must establish: "(1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached said duty; (3) the breach was the proximate cause of the plaintiff's injury; and (4) the breach caused the plaintiff to suffer damages." *See Clay Elec. Coop, Inc. v. Johnson, 873 So. 2d 1182, 1185 (Fla. 2003)*. A duty is established when the acts of a defendant in a particular case "create a foreseeable zone of risk." *Pate v. Threlkel, 661 So. 2d 278, 280 (Fla. 1995)*. Additionally, "one who undertakes to act, even when under no obligation to do so, thereby becomes obligated to act with reasonable care." *Union Park Mem'l Chapel v. Hutt, 670 So. 2d 64, 66-67 (Fla. 1996)*.

Under the common law, a person or other entity generally has no duty to take precautions to protect another against criminal acts of third parties. *Boynton v. Burglass, 590 So. 2d 446, 448 (Fla. 3d DCA 1991)*. An exception exists when there is a "special relationship" between **[*9]** the defendant and the person whose behavior needs to be controlled or the person who is a foreseeable victim of that conduct. *Id.* "A special relationship typically arises in narrow circumstances where the relationship places the defendant in a

superior position to control the risk, such as where the defendant has substantial control over the plaintiff so as to deprive the plaintiff of his or her normal opportunities for protection." *Saunders, 361 So. 3d at 370* (citing *Restatement (Second) of Torts § 314A* (1965)).

This special relationship arises when these programs voluntarily take custody of players under circumstances that deprive the players of normal opportunities for protection or that subject them to association with persons likely to harm them. *Special Olympics Fla., Inc. v. Showalter, 6 So. 3d 662, 665 (Fla. 5th DCA 2009)* (citing *Nazareth v. Herndon Ambulance Serv., Inc., 467 So. 2d 1076, 1078 (Fla. 5th DCA 1985)*). Florida law recognizes this sort of special relationship exists between a school and its students. *Rupp v. Bryant, 417 So. 2d 658, 666 (Fla. 1982)* (holding public schools owe a general duty of supervision to the minor students placed within their care). Applying similar principles, the Florida Supreme Court extends to universities a duty to use ordinary care to protect its adult students over whom it is exercising some degree of control from foreseeable harm in providing educational services and programs, like when assigning them to **[*10]** mandatory internship programs. *Nova Se. Univ., Inc. v. Gross, 758 So. 2d 86, 88 (Fla. 2000)*.

The Court granted summary judgment in favor of the Plaintiff on the first element of the negligence claim. (Doc. 164, pp. 23-28). The Court found that a special relationship exists between players and coaches. (*Id.* at pp. 25-28). The Court also found that the special relationship imposes on the USTA a duty of reasonable care to protect players in their training program from sexual abuse by their coaches, which is a foreseeable harm. (*Id.* at p. 27). The United States Olympic Committee's SafeSport publication entitled "*Recognizing, Reducing and Responding to Misconduct in Sport: Creating Your Strategy,*" teaches that staff members "should have a basic understanding of sexual abusers, as well as 'grooming,' the most common strategy offenders use to seduce their victims." (Pltf. Ex. 5, KM00205). It was undisputed at trial that Coach Aranda groomed Ms. McKenzie over two weeks with compliments, physical closeness, inappropriate touching, and ultimately sexual assault.

Ms. Lauren Tracy, senior director of strategic and business operations for the USTA, testified that Coach Aranda groomed Ms. McKenzie for two weeks, which corroborated Ms. McKenzie's testimony. **[*11]** The SafeSport Investigation Report reached the same conclusion:

Specifically, this investigation found that while acting as her tennis coach, [Aranda] engaged in an escalation of inappropriate conduct towards [Ms. McKenzie], including: (a) talking about how he wanted to be her coach; (b) commenting on and complimenting her physical appearance; (c) touching her body while they reviewed video or photographic footage from their practices, including leaning his body into hers while sitting next to her, putting his hand over hers while he held her phone, and intertwining his arm with her arm while she held her phone; (d) having her do mental affirmations that included stating she was "perfect;" (e) touching her bare waist and stomach on one occasion while joking about her being too skinny and resting his hand on her back and buttocks on one occasion; (f) touching her in a manner that made her uncomfortable while working on her serving technique, including pressing his body against hers, putting his hands on her hips moving them towards her crotch, and kneeling in front of her on one occasion; (g) touching and rubbing her vulva over her clothes on November 9, 2018; and (h) asking [Ms. McKenzie] **[\*12]** what sort of relationship she wanted from him.

(Pltf. Ex. 1, PRIV000382).

Ms. Tracy testified that she requested camera footage for the clay courts where Coach Aranda assaulted Ms. McKenzie. She learned that the camera had not been turned on for the court where the assault occurred, and the only video Ms. Tracy located was from a neighboring court on November 9, 2018. Ms. Tracy related this information to the SafeSport investigator. (Pltf. Ex. 1, PRIV000384). The SafeSport investigation found Coach Aranda, as a USTA Player Development Coach, held a position of authority over athletes and is a Covered Individual subject to the disciplinary jurisdiction of the SafeSport Code. (*Id.* at PRIV000385). The Code prohibits sexual conduct without consent. (*Id.*). That is, "any intentional bodily contact of a sexual nature, however slight, whether clothed or unclothed, of a person's intimate body parts with any object or body part up to and including a completed or attempted penetration."[7]   (*Id.*).   Therefore,   the   Code   prohibits

precisely what Coach Aranda did to Ms. McKenzie.

Notwithstanding that the potential for sexual abuse of athletes by coaches is foreseeable and historically rampant, the **[\*13]** USTA vehemently opposed the imposition of minimum standards of conduct. (Pltf. Ex. 6). The USTA wrote to the United States Olympic Committee in December 2012 and complained that minimum standards while "likely made with good intentions . . . is **misguided at best**." (*Id.* at USOPC-USTA-00001822 (emphasis added)). The USTA opined that "to mandate 'minimum' SafeSport standards with significant penalties crosses the line, falls outside the scope of the Ted Stevens Act, **and is simply wrong**." (*Id.* (emphasis added)).

In March of 2015, Ms. Rachel Booth, counsel for the USTA, wrote to Malia Arrington, with the U.S. Olympic Committee, and enclosed a marked-up version of the draft SafeSport Policies and Disciplinary Procedures. (Pltf. Ex. 9). The section titled "Imbalance of power" states:

> An imbalance of power exists where one person in a relationship holds a superior position of power over the other. Consent is not possible if the relationship involves an imbalance of power. For example, a young person can never consent to conduct with an adult as an adult always holds a position of power over a young person. Factors relevant to determining whether there is an imbalance of power include but are **[\*14]** not limited to the:
>
> • nature and extent of a person's supervisory, evaluative or other authority over another
>
> • actual relationship between the parties and their respective roles
>
> • age of the parties involved and their intellectual capabilities.

(*Id.* at USTA0000416).

In the edits, the USTA writes: "This is not realistic in tennis — at the highest levels MANY female players date their own or other coaches—f (sic) imbalance could go either way — e.g. hugely successful player." (*Id.*).

---

[7] The U.S. Center for SafeSport's Decision of April 12, 2019, found Coach Aranda inappropriately touched Ms. McKenzie for two weeks and that the USTA suspended him from his employment and barred him from entering the National Campus. (Pltf. Ex. 2, PRIV000371). SafeSport sanctioned Coach Aranda by suspending him for two years from

participating in any capacity in any activity organized under the auspices of the United States Olympic Committee, and/or a Local Affiliated Organization of a national governing body. (*Id.* at PRIV000377). Upon his return to the sport, Coach Aranda was required to be placed on probation for two years. (*Id.*).

The SafeSport code in effect in 2018 provides that "[o]nce a coach-Athlete relationship is established, a Power Imbalance is presumed to exist throughout the coach-Athlete relationship (regardless of age)." (Joint Ex. 4, SCC_009). Thus, the SafeSport code makes clear that a power imbalance always exists between a coach and an athlete, and the USTA was aware that sexual relationships are common between coaches and athletes. And yet, the USTA continued to resist implementing minimum standards, because in its opinion such standards are "not realistic" in tennis. The USTA placed the interests of "hugely successful player[s]" over the well-being of young women training at their National Campus because in rare instances **[*15]** the power imbalance may favor the athlete. The USTA's cavalier attitude explains why they paid lip service to the need to adhere to minimum standards designed to protect young athletes training at their National Campus.

The evidence at trial established that Coach Aranda inappropriately touched Ms. McKenzie for over two weeks without detection. The absence of security or supervision was partially explained by Ms. Tracy who testified that the cameras for the tennis court reserved by Coach Aranda were not turned on. Additionally, Mr. Ola Malmqvist, the Director of Women's Tennis, testified that he was unfamiliar with the "Rule of Three." The USTA Safe Play Conduct, Policies & Guidelines (effective January 1, 2017), provides:

> Interaction with participants should be in an open and observable environment. Adults should strive to avoid being alone with a single child or teen where he or she cannot be observed by others. The "Rule of Three" offers a reminder that a minimum of three persons (two adults and one teen or child; or one adult and two teens or children) should be present at all times during USTA events, programs, tournaments, and activities.

(Joint Ex. 2, SP_009-010). Once Mr. Malmqvist **[*16]** was shown the Rule of Three, he agreed it applies to Ms. McKenzie since she was 19 years old when Coach Aranda assaulted her.[8] Mr. Malmqvist also testified that

it is nearly impossible to comply with the Rule of Three. And he admitted that Coach Aranda was in a position to train Ms. McKenzie without supervision.

Mr. Malmqvist's testimony underscores that it was foreseeable that a coach would be alone with a teenager, as occurred here.[9] Even so, the USTA argues that Coach Aranda's sexual assault of Ms. McKenzie was not foreseeable. (Doc. 236, p. 11). The USTA fails to cite any testimony or evidence in support of this assertion. The USTA relies on the argument that Coach Aranda's sexual assault of Ms. Battaglia in 2014 did not make his 2018 assault of Ms. McKenzie reasonably foreseeable. (*Id.*). Setting aside Aranda's sexual assault of Ms. Battaglia, the USTA conveniently ignores the other evidence showing that it was reasonably foreseeable that a coach could sexually assault an athlete. For example, in March of 2015, Ms. Rachel Booth complained to the U.S. Olympic Committee that preventing sexual relations between coaches and athletes is not "realistic" because sexual relationships between **[*17]** coaches and female athletes is so common. The USTA also fails to account for the imbalance of power between coaches and athletes which has given rise to sexual abuse and which prompted Congress to create SafeSport as part of the Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017.

Coach Aranda's grooming and subsequent sexual assault of Ms. McKenzie were reasonably foreseeable. The U.S. Olympic Committee issued a publication which provides that staff members "should have a basic understanding of sexual abusers, as well as 'grooming,' the most common strategy offenders use to seduce their victims." (Pltf. Ex. 5, KM00205). The Rule of Three is designed to combat the foreseeable risk of sexual abuse by coaches, and USTA was cautioned about the risks inherent where an imbalance of power exists. In

---

[8] Mr. Martin Blackman, the USTA General Manager of Player Development, testified in response to a question posed by USTA's counsel that the Rule of Three applied to "minors." Mr. Blackman is wrong. The Rule of Three applies to children and teens; a 19-year-old is a teen, as Mr. Malmqvist acknowledged. The Court notes that throughout the trial the USTA attempted, albeit unsuccessfully, to rewrite the

SafeSport code to limit its reach to minors.

[9] On March 7, 2018, the Congressional Committee on Energy and Commerce wrote to the Executive Director and Chief Executive Officer of the USTA and stated that "[b]ased on information received to date, the Committee is concerned that a pervasive and systemic problem exists in Olympic sports," involving sexual abuse. (Pltf. Ex. 17, USTA0000249). In response, the USTA reported to the Committee that it received 3 reports of sexual abuse in 2013, 8 reports of sexual abuse in 2014, 4 reports of sexual abuse in 2015, 1 report of sexual abuse in 2016, 6 reports of sexual abuse in 2017, and as of May 7, 2018, the USTA had received 5 reports of sexual abuse. (Pltf. Ex. 19).

addition, the USTA was aware of 27 reported instances of sexual abuse by coaches. The evidence established a relationship or nexus existed between Ms. McKenzie and Aranda's employment from which a legal duty would flow from the defendant-employer to Ms. McKenzie. *See Magill v. Bartlett Towing, Inc., 35 So. 3d 1017, 1020 (Fla. 5th DCA 2010).* That nexus created a foreseeable zone of risk.

The USTA also argues there is no substantial evidence that the USTA breached its duty of care. (*Id.* at **[\*18]** p. 13). The USTA focuses on generalities rather than discussing the specific facts of this case. For example, the USTA submits that Mr. Malmqvist testified he would walk the tennis courts several hours a day. (Doc. 236, p. 14). The USTA disregards that Mr. Malmqvist qualified this statement by adding that he walks the tennis courts *when in town*. The USTA also ignores that Mr. Malmqvist never testified that he observed Coach Aranda interacting with Ms. McKenzie. Mr. Malmqvist also testified to the extent that employees visited the tennis court, they did so randomly. No policy or procedure required regular observation of coaches interacting with players. Moreover, while Mr. Blackman and Ms. Tracy claimed the tennis courts were observable, the photographic evidence established that the court reserved by Coach Aranda could not be seen from the administrative building.

Turning to the facts of this case, Ms. Kathy Rinaldi, USTA's lead national coach, testified that when she went to Prague for a tournament, she did not tell Mr. Malmqvist that she would be gone or arrange for another supervisor to observe Coach Aranda in her absence. Nor did Ms. Rinaldi recall how often she visited the tennis **[\*19]** courts to watch Coach Aranda train young athletes or whether she watched videos of him training athletes. Mr. Malmqvist did not know until the SafeSport investigation was conducted that there was no video footage during the week that Coach Aranda assaulted Ms. McKenzie. The duty to protect young athletes who are held in a special relationship with the USTA is not satisfied by the mere possibility that a USTA employee in the administrative building could by sheer happenstance observe a practice in progress, or that an employee may randomly walk by a tennis court when a coach is interacting with a player. Mr. Blackman, USTA's general manager, summed it up when he testified that they do not supervise practices.

Against this backdrop, Coach Aranda groomed and inappropriately touched Ms. McKenzie over the course of two weeks, culminating in her being sexually assaulted. Coach Aranda got away with this conduct because the USTA failed to implement measures to protect Ms. McKenzie from a predatory coach. The USTA knew sexual relations between coaches and athletes were common, and the USTA resisted attempts by the U.S. Olympic Committee to regulate coach-athlete relationships. Senior management, **[\*20]** including Mr. Malmqvist and Mr. Blackman, either did not know about the Rule of Three or misunderstood its application. And most shockingly, the USTA had no standardized policies or procedures for monitoring coach-athlete interaction. The USTA could have monitored CCTV and recorded all coach-athlete interactions but chose not to. The USTA left to chance its legal duty to protect young athletes from the foreseeable risk of sexual abuse created by the power imbalance coaches enjoy over aspiring athletes. Accordingly, there was no issue for the jury's consideration on the breach of the duty owed to Ms. McKenzie.[10] Defendants' Renewed Motion for Judgment as a Matter of Law, or, Alternatively For a New Trial is denied.

## B. Negligent Supervision and Retention

Florida law recognizes a cause of action for negligent retention and supervision. *Mallory v. O'Neil, 69 So. 2d 313, 315 (Fla. 1954)*. Negligent retention or supervision "occurs when during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further actions such as investigation, discharge, or reassignment." *Dep't of Env't Prot. v. Hardy, 907 So. 2d 655, 660 (Fla. 5th DCA 2005)*. A plaintiff must show that "once an employer received active **[\*21]** or constructive notice of problems with an employee's fitness, it was unreasonable for the employer not to investigate or take corrective action." *Garcia v. Duffy, 492 So. 2d 435, 441 (Fla. 2d DCA 1986)*. Liability attaches only if the plaintiff is "within the zone of foreseeable risks created by the employment" and the failure to take reasonable action is the proximate cause of the plaintiff's harm. *Watson v. City of Hialeah, 552 So. 2d 1146, 1149 (Fla. 3d DCA 1989)*.

---

[10] The jury awarded $3,000,000 in compensatory damages to Ms. McKenzie for the USTA's negligence. The finding of negligence and the award of damages stands independent of whether Ms. Jessica Battaglia's knowledge of Coach Aranda's sexually aggressive propensity is imputed to the USTA.

2024 U.S. Dist. LEXIS 146453, *21

For purposes of negligent retention and supervision, an employer is not considered separately from its managers—since a corporation cannot act on its own and only management can receive notice of an employee's unfitness or take corrective action. *See Tallahassee Furniture Co., Inc. v. Harrison, 583 So. 2d 744, 754 (Fla. 1st DCA 1991)* (declining summary judgment based on facts "known to management" and subsequent inaction); *McArthur Jersey Farm Dairy, Inc. v. Burke, 240 So. 2d 198, 201 (Fla. 4th DCA 1970)* (finding dairy farm had notice of the employee's reckless driving because dairy superintendent was aware of it and previously told the employee to stop). "The factors constituting notice, employee fitness, and the type of action reasonably required of the employer" center in part on what exactly managers knew and when they knew it, the role and duties of any managers with knowledge, and the expected actions that knowledge should impel for someone in that role. *Garcia, 492 So. 2d at 441; see also McArthur Jersey Farm Dairy, 240 So. 2d at 201*; *Iglesia Cristiana La Casa Del Senor, Inc. v. L.M., 783 So. 2d 353, 359 (Fla. 3d DCA 2001)*.

### 1. Facts Not in Dispute

Jessica **[*22]** Battaglia has worked for the USTA since 2006. In 2014, Ms. Battaglia was the coordinator for coaching and performance and by 2017 Ms. Battaglia was promoted to Manager of Player Development Events and Programming. Her duties included pairing coaches with athletes interested in becoming coaches. (Pltf. Ex. 32). On February 12, 2018, Ms. Battaglia completed SafeSport training. (Joint Ex. 10(d)). Ms. Battaglia testified that she knew she was a mandatory reporter under the SafeSport Code and agreed that the obligation to report violations is ongoing.

In 2014, Ms. Battaglia attended the U.S. Open tennis tournament in her capacity with the USTA. While at the U.S. Open, Ms. Battaglia went to dinner with other USTA members and then went to a nightclub with some of her colleagues. While on the dancefloor Coach Aranda began grinding on her from behind and then placed his hand on her vagina. Ms. Battaglia did not consent to Aranda's sexual advances and did not encourage him to touch her. Ms. Battaglia immediately exited the club, and Aranda followed and tried to get into a taxi with her. Ms. Battaglia was 28 years old when Aranda sexually assaulted her. Ms. Battaglia knew Coach Aranda had access **[*23]** to teenage female athletes, and she did not report the sexual assault to the USTA until 2017 when Ms. McKenzie told her that

Coach Aranda sexually assaulted her.

### 2. Whether Ms. Battaglia's Knowledge Is Imputed to the USTA [11]

The USTA contends that they are entitled to judgment as a matter of law because the evidence was insufficient to support Ms. McKenzie's negligent supervision and retention claim.[12] (Doc. 236, pp. 1-11). As Ms. McKenzie correctly notes, the Defendants' argument centers on "an unsupported distinction between managing people and managing 'projects and events.'" (Doc. 255, p. 2 (citing Doc. 236, p. 6)). Even if the distinction made a difference, since October 2017, Ms. Battaglia managed Katelyn Stokes, her administrative assistant. (Pltf. Ex. 37). Setting aside that fact, the USTA mistakenly relies on the treatise *American Jurisprudence of Corporations*, *18B Am. Jur. 2d Corp. § 1415*. The treatise is not binding on this Court and offers little guidance, as Ms. McKenzie correctly observes in her response. (Doc. 244, p. 3).

It is undisputed that Ms. Battaglia was entrusted by the USTA to manage programs in the "mentoring space," including pairing coaches with athletes. "The best test for determining whether **[*24]** notice to or knowledge of an agent . . . is imputed to his or her principal [] is whether the condition and facts known by the agent were within the sphere of authority of that particular agent." *Gutter v. E.I. Dupont De Nemours, 124 F. Supp. 2d 1291, 1310 (S.D. Fla. 2000)*. In Florida, knowledge that an agent has a duty to communicate is chargeable to the principal. *See, e.g.*, *First Bond & Mortg. Co. v. Yancey, 104 Fla. 229, 139 So. 597, 599 (Fla. 1932)*; *Restatement 2d Agency § 275*; *Beck v. Deloitte & Touche, 144 F.3d 732, 736 (11th Cir. 1998)* (recognizing that under Florida law knowledge of an officer generally

---

[11] "Circumstances involving the imputation of knowledge from an agent to principal typically involve questions of law rather than fact." *LanChile Airlines v. Conn. Gen. Life Ins., 759 F. Supp. 811, 814 (S.D. Fla. 1991)*.

[12] Defendants rely in part on the Court's Order denying their Motion for Summary Judgment where the Court noted that "the extent of Jane Doe's [Ms. Battaglia's] managerial role and duties" are disputed. (Doc. 236, p. 11). Whether an issue of material fact existed at the summary judgment stage, however, is irrelevant to a renewed motion for judgment as a matter of law. The Court should not have to point out that the record at trial is what matters and not pronouncements made on an incomplete record.

is imputed to the corporation).

Ms. Battaglia was under a duty imposed by the Safe Sport Code to report sexual misconduct. *36 U.S.C. § 220541*. The Safe Sport Code is incorporated into the *Safe Sport Act. § 220541(b)*. Ms. Battaglia admitted at trial that she is a covered adult under the Safe Sport Code and nothing in the Safe Sport Code limits the mandatory reporting requirement to the abuse of minors or athletes. Congress created the Center for Safe Sport to "prevent the abuse of any amateur athlete." *§ 220542(a)(1)*. The Code includes within the scope of prohibited behavior sexual conduct (consensual and also where a power imbalance exists), *as well as* sexual misconduct involving minors. (Joint Ex. 4, SSC_010). The plain language of the Code makes it clear that the prohibition against sexual conduct is not limited to minors. Moreover, "[c]onduct by a Covered Individual **[*25]** that could constitute sexual misconduct should be reported." (*Id.* at SSC_011).

Coach Aranda was a covered individual because he was within the governance or disciplinary jurisdiction of the USTA when he sexually assaulted Ms. Battaglia. (*Id.* at SSC_005). As a result, Ms. Battaglia was obligated to report Coach Aranda's violation of the Code. Ms. Battaglia's knowledge of Coach Aranda's prohibited sexual abuse was imputed to the USTA once Ms. Battaglia was promoted to a managerial position.[13] Furthermore, the Court agrees with Ms. McKenzie that Ms. Battaglia's other duties support the imputation of her knowledge to the USTA. Ms. Battaglia was responsible for organizing and creating continuing education programs for coaches held at major USTA tournaments. Ms. Battaglia also planned and managed the mentoring program that paired players who aspired to become coaches with USTA coaches for mentoring. Thus, Ms. Battaglia's knowledge of Coach Aranda's violation of the Code is material to her duties to the employer. *Dye v. Tamko Bldg. Prods. Inc., 908 F.3d 675, 686 (11th Cir. 2018)* (quoting *Restatement 3d Agency § 5.03*).

---

[13] Defendants' argument that Ms. Battaglia was not required to report being sexually assaulted by Coach Aranda because it happened at a nightclub is inconsistent with the SafeSport Code, and allowing a loophole to the duty to report sexual abuse by a Coach undermines the purpose of the Safe Sport Act and defies commonsense. *See United States v. Planes, No. 8:18-CV-2726-T-23TGW, 2019 U.S. Dist. LEXIS 115314, 2019 WL 3024895, at *9 (M.D. Fla. July 11, 2019)* (finding that knowledge learned "in a casual circumstance" was imputed to principal).

### 3. Aranda's Abuse of Ms. McKenzie Was Foreseeable

Ms. McKenzie correctly points out that the Court ruled that sexual abuse by a coach was reasonably foreseeable by the **[*26]** USTA. As the Court explained in discussing the negligence claim, before Coach Aranda sexually assaulted Ms. McKenzie, Congress voiced its concern over the prevalence of sexual abuse in amateur tennis. A Congressional Committee directed the USTA to share data on reported instances of sexual assault, and the USTA disclosed 27 reported sexual assaults occurring between 2013 and May 2018. Furthermore, in March of 2015, Ms. Rachel Booth, counsel for the USTA, told the U.S. Olympic Committee that proposed rules regarding the imbalance of power between coaches and athletes are not "realistic" because "MANY" female players date their coaches. Coach Aranda's willingness to exploit the imbalance of power over Ms. McKenzie was foreseeable to the USTA when coupled with Ms. Battaglia's knowledge of his sexually predatory tendencies.

### 4. Scope-of-Employment

Finally, the USTA claims Ms. McKenzie failed to present evidence that Coach Aranda was acting outside the scope of his employment at the time of the assaults. (Doc. 236, p. 12). Ms. McKenzie is correct that this argument was not raised during trial. *Doe v. Celebrity Cruises, Inc., 394 F.3d 891, 902 (11th Cir. 2004)* ("[A]ny renewal of a motion for judgment as a matter of law under *Rule 50(b)* must be based upon the same grounds **[*27]** as the original request . . . ."). And as Ms. McKenzie notes, the USTA argued in its Motion for Summary Judgment that Coach Aranda was not acting within the scope of his employment. (Doc. 244, p. 12). The USTA staked out the following position at summary judgment:

> Aranda did not have the authority to touch Plaintiff in the manner that he did; in fact, it was explicitly prohibited by Defendants. (Deposition of Def. Corp. Rep. (CR Dep.) at Ex. 23). Plaintiff does not even pretend that is the case. Plaintiff cannot demonstrate, therefore, that Aranda was acting within the scope of his employment when he touched her inappropriately. *See Mason v. Fla. Sheriffs' Self-Ins. Fund, 699 So. 2d 268, 270 (Fla. 5th DCA 1997)* ("Even though [employee] was on duty, in uniform, and charged with the responsibility of serving a warrant, in no way did he have the

authority to use his power to coerce sex. Because there was not even the pretense of lawful right in [employee's] performance of this act, it was not within the scope of his employment."). . . . Because Aranda was not working within the course and scope of his employment and for the benefit of the Defendants, final judgment should be entered in favor of Defendants as to Count II.

(Doc. 96, pp. 23-24).

Under the doctrine of **[*28]** judicial estoppel, "where a party assumes a certain position in a legal proceeding and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the [opposing] party." *Allapattah Servs. Inc. v. Exxon Corp., 372 F. Supp. 2d 1344, 1367 (S.D. Fla. 2005)* (citing *New Hampshire v. Maine, 532 U.S. 742, 749, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001)*). The doctrine is used to prevent "a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Id.* Thus, "judicial estoppel is an equitable doctrine invoked at a court's discretion, designed to protect the integrity of the judicial process." *Stephens v. Tolbert, 471 F.3d 1173, 1177 (11th Cir. 2006)*.

In *Anderson v. Brown Industries, 614 F. App'x 415, 417-18 (11th Cir. 2015)*, the Court noted that the Supreme Court has identified three factors for determining when judicial estoppel may be invoked: "(1) whether the present position is clearly inconsistent with the prior positions; (2) whether the party persuaded the court to accept the earlier position, such that acceptance of the inconsistent position would create the perception that the court was misled; and (3) whether the party advancing the inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party."[14] *Id.* (citing *New Hampshire, 532 U.S. at 749-51*); *see also Burnes v. Pemco Aeroplex, Inc., 291 F.3d 1282 (11th Cir. 2002)*. "Pleadings, as well as **[*29]** statements by parties and counsel in open court, are equivalent to sworn statements for purposes of judicial estoppel." *In re Cummings, 381 B.R. 810, 827 (S.D. Fla. 2007)*; *see Allapattah, 372 F. Supp. 2d at 1368, n.12*.

The USTA cannot raise an argument that was not

---

[14] The Plaintiff abandoned her claim for battery and infliction of emotional distress after the USTA argued they are not vicariously liable for Coach Aranda's assault because he was acting outside the scope of his employment.

preserved at trial, and the USTA is estopped from reversing its previous position that Coach Aranda was operating outside the scope of his employment. Besides, the USTA cannot seriously argue that a perk of coaching at its National Campus is the opportunity to groom and sexually assault young athletes entrusted to a coach's care. To be clear, the Court does not believe the USTA endorses sexual violence and employs sarcasm to underscore the absurdity of the USTA's most recent argument. Even though the USTA has forfeited the right to present this argument, the Court will summarize the overwhelming evidence presented by the Plaintiff establishing that Coach Aranda was acting outside the scope of his employment.

Ms. Tracy, the senior director of strategic and business operations for the USTA, testified that once Ms. McKenzie reported she had been sexually abused by Coach Aranda, the USTA suspended Aranda and gave his photograph to security with instructions to deny him access to the campus. The USTA later fired Coach **[*30]** Aranda which would not have occurred had he been acting within the scope of his employment. Mr. Malmqvist testified that there was no "professional purpose" for Coach Aranda to touch Ms. McKenzie's stomach, or inner thigh, or to press his body against her body during training. Mr. Malmqvist stated that such conduct would result in suspension. Mr. Blackman testified it is never permissible for a coach to engage in a sexual relationship with an athlete. This begs the question of how the USTA can now claim that Ms. McKenzie failed to present evidence that Coach Aranda was acting outside the scope of his employment. This argument is frivolous.

As such, the USTA's Motion for Judgment as a Matter of Law, or, Alternatively For a New Trial is denied.

## C. Punitive Damages

The USTA argues that they are entitled to judgment as a matter of law because Ms. McKenzie failed to prove culpable conduct at both the employee and corporate level. (Doc. 236, p. 19 (citing *Napleton's North Palm Auto Park, Inc. v. Agosto, 364 So. 3d 1103, 1106 (Fla. 4th DCA 2023)*)). They further contend that while a corporation may be directly liable through the conduct of its managing agent, Ms. Battaglia occupied a position too low to qualify. (*Id.* at pp. 19-20 (citing *Wells Fargo Bank, N.A. v. Elec. Funds Transfer Corp., 326 So. 3d 753, 757 (Fla. 5th DCA 2021)* ("A 'managing agent' is an individual such **[*31]** as a president, primary owner, or

other individual who holds 'a position with the corporation which might result in his acts being deemed the acts of the corporation."))). The USTA also avers that its failure to implement the Rule of Three does not support an award of punitive damages because it only applies to minors. (Doc. 236, p. 21). Finally, the USTA asserts that while a coverup may justify punitive damages it must take place before the Plaintiff sustains injury. (*Id.* (quoting *L.E. Myers Co. v. Young, 165 So. 3d 1, 8 (Fla. 2d DCA 2015)*)).

The award of punitive damages is supported by competent evidence. The Plaintiff argues, and the Court agrees, that the evidence showed the USTA had a "culture" of conscious indifference to the safety of the young women who trained at their campus. (Doc. 244, p. 16). In December 2012, the USTA complained that minimum standards while "likely made with good intentions . . . is **misguided at best**." (Pltf. Ex. 6, USOPC-USTA-00001822 (emphasis added)). The USTA argued that "to mandate 'minimum' SafeSport standards with significant penalties crosses the line, falls outside the scope of the Ted Stevens Act, **and is simply wrong**." (*Id.* (emphasis added)). In March of 2015, Ms. Booth, counsel for the USTA, wrote to **[*32]** the U.S. Olympic Committee and resisted implementing minimum standards regarding the imbalance of power between coaches and players, because in its opinion such standards are "not realistic" in tennis. (Pltf. Ex. 9). The USTA complained that "MANY" players date their coaches or other coaches, acknowledging the problem while advocating that a prohibition against such conduct due to the power coaches exert over players is not realistic. (*Id.*).

This culture of gross indifference and even open hostility to protecting vulnerable players explains why the USTA failed to institute basic safety procedures at its National Campus. The USTA's failure to use CCTV to monitor coach-athlete interaction, the absence of systematic and mandatory supervision of coaches interacting with players, and the failure to implement the Rule of Three are the direct product of the USTA's gross indifference to player safety. Mr. Malmqvist knew nothing about the Rule of Three and when confronted with the rule at trial, he testified it was nearly impossible to enforce.

The Plaintiff is correct that Ms. Battaglia's failure to report Coach Aranda's sexual assault is not the basis for punitive damages; it was, however, **[*33]** relevant to demonstrate the USTA's culture of silence and gross negligence. Similarly, the evidence concerning the USTA's attempt to cover up Ms. McKenzie's assault was relevant to the USTA's culture of silence and was not offered as a basis for punitive damages.[15] And, as was previously discussed, the USTA's contention that the Rule of Three applies only to minors is wrong. The Rule of Three applies to children and teens. Ms. McKenzie was 19 when she was sexually assaulted by Coach Aranda. Had the USTA wanted to say "minor" instead of "teen" it would have done so. Mr. Malmqvist, as the Director of Women's Tennis, testified that "teen" includes Ms. McKenzie. He was correct, and the USTA cannot simply choose to ignore the plain and unambiguous language of the Rule of Three.

Notwithstanding this rule, Mr. Blackman testified the USTA does not supervise its practices. This statement is dumbfounding since the USTA was warned to be on the lookout for grooming by coaches and had direct reports of 27 sexual assaults by coaches before Ms. McKenzie was assaulted. The USTA simply ignored the danger presented by coaches who wield considerable power over young female players. This is exactly what **[*34]** Congress legislated to prevent and is precisely what the USTA pushed back against. The punitive damages award was twice the compensatory damages and is justified by the facts. The USTA's Motion for Remittitur is denied.

### D. Motion for New Trial

The USTA argues the verdict was against the weight of the evidence, and so a new trial is warranted. (Doc. 236, p. 22). For the reasons stated in the preceding sections, the Court rejects the USTA's argument, and the Motion for New Trial is denied. The USTA also raises a new argument and submits that the Court's admonishment to defense counsel during closing necessitates a new trial. Two points: first, the USTA failed to object when the Court sustained the Plaintiff's objections and instructed defense counsel to comply with its judgment under *Rule 50* and waived the issue. *See United States v. Calderon, 127 F.3d 1314, 1334 (11th Cir. 1997)* ("[A]

---

[15] The Plaintiff presented evidence that USTA International Tennis Hall of Fame member Pam Shriver was told by the USTA's general counsel to "be careful" after Ms. Shriver began discussing sexual abuse within the USTA with Ms. McKenzie. USTA's general manager, Mr. Malmqvist, advised Ms. McKenzie not to discuss what happened to her but Mr. Malmqvist also directed her to report it. And Ms. McKenzie's former close friend, CiCi Bellis, broke off all contact with her after speaking with the USTA's general manager, Mr. Blackman.

contemporaneous objection was required to allow the district court the opportunity to correct any error that may have existed."). Second, the defense counsel's refusal to abide by the Court's rulings prompted the Court to sustain the Plaintiff's objections to the defense counsel's improper argument. The Plaintiff objected five times and the Court sustained the objections each **[*35]** time and instructed defense counsel to limit his arguments to the issues in dispute. That a criminal contempt citation was not issued is a testament to the Court's patience. The balance of the USTA's vague argument concerning the exclusion of evidence is unpersuasive. Accordingly, the USTA's Motion for New Trial is denied.

## IV. CONCLUSION

For these reasons, the USTA's Renewed Motion for Judgment as a Matter of Law, or, Alternatively for a New Trial or Remittitur (Doc. 236) is **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on August 16, 2024.

/s/ Paul G. Byron

PAUL G. BYRON

UNITED STATES DISTRICT JUDGE

**End of Document**

# EXHIBIT C