# EXHIBIT B

⚠️ Caution
As of: April 13, 2026 8:35 PM Z

# *McKenzie v. United States Tennis Ass'n Inc.*

⊖ On Appeal

United States District Court for the Middle District of Florida, Orlando Division

August 16, 2024, Decided; August 16, 2024, Filed

Case No: 6:22-cv-615-PGB-LHP

**Reporter**
2024 U.S. Dist. LEXIS 146453 *; 2024 WL 3849884

KYLIE MCKENZIE, Plaintiff, v. UNITED STATES TENNIS ASSOCIATION INCORPORATED and USTA PLAYER DEVELOPMENT INCORPORATED, Defendants.

**Subsequent History:** Appeal filed, 09/13/2024

**Prior History:** *McKenzie v. United States Tennis Ass'n Inc., 2022 U.S. Dist. LEXIS 240817, 2022 WL 19336464 (M.D. Fla., Aug. 18, 2022)*

**Counsel:** [*1] For Kylie McKenzie, Plaintiff: Robert Allard, LEAD ATTORNEY, PRO HAC VICE, Cerri, Boskovich & Allard, San Jose, CA; Amy Lynn Judkins, Maegen Peek Luka, Newsome Melton, Orlando, FL; Mark John Boskovich, PRO HAC VICE, Cerri, Boskovich & Allard, LLP, San Jose, CA; Nicholas Donald Seidule, McKeever & Seidule, Winter Park, FL; Edmund A. Normand, Normand Law PLLC, Orlando, FL.

For United States Tennis Association Incorporated, USTA Player Development Incorporated, Defendants: Kevin W. Shaughnessy, LEAD ATTORNEY, Erin Michelle Sales, Joyce Ackerbaum Cox, Meagan Leigh Martin, Baker & Hostetler, LLP, Orlando, FL; William Weber, Baker & Hostetler LLP, Labor and Employment, Orlando, FL.

**Judges:** PAUL G. BYRON, UNITED STATES DISTRICT JUDGE.

**Opinion by:** PAUL G. BYRON

# Opinion

**ORDER**

This cause is before the Court on Defendants' Renewed Motion for Judgment as a Matter of Law, or, Alternatively For a New Trial or Remittitur. (Doc. 236). The Plaintiff submitted a Response in Opposition. (Doc. 244). Upon consideration, the Defendants' Motions are denied.[1]

## I. BACKGROUND

Kylie McKenzie was a rising tennis player who was recruited by a United State Tennis Association ("**USTA**") national coach to train at the USTA National Training Center in Carson, [*2] California.[2] (Doc. 34, ¶ 18). Ms. McKenzie was ranked 33rd in the world junior ranking when she suffered a shoulder injury. After eight or nine months in rehabilitation, Ms. McKenzie returned to the Carson training center until July 2018. In August 2018, when Ms. McKenzie was 19, she moved back to Florida to train in Orlando at the USTA National Campus. (*Id.* ¶ 23). In September, after a month of periodic training sessions, Ms. McKenzie was assigned to train with USTA national coach Anibal Aranda, who was 34 years old. (*Id.* ¶ 24).

Ms. McKenzie testified that Aranda trained her on the

---

[1] Hereinafter, the Court will refer to Defendants United States Tennis Association Incorporated and USTA Player Development Incorporated collectively as either the "USTA" or "Defendants."

[2] While the parties cite to transcripts of trial testimony in their briefs, the transcripts were not filed with the Court. Accordingly, the Court will rely on its notes and recollection of the trial testimony. Ms. McKenzie testified at trial that she spent two years at the USTA facility in Carson. After Ms. McKenzie, at 16 years of age and playing in the 18-year-old division beat a player ranked 80th in the world, Mr. Ola Malmqvist invited her to train in Boca Raton, Florida.

clay tennis court, and he typically reserved courts 4 through 6. Unlike courts 1, 2, and 3, these courts are not visible from the administrative building. Soon after Coach Aranda started training Ms. McKenzie he began commenting on her appearance, telling Ms. McKenzie that she was beautiful. Aranda video-recorded practices on his cellphone and sat beside Ms. McKenzie on the courtside bench to review the video. Aranda sat with his thigh touching Ms. McKenzie's thigh or their shoulders touching. This grooming escalated, and Aranda would massage Ms. McKenzie's shoulder or rest his hand on her upper thigh and **[\*3]** move it up and down. Aranda also intertwined his arm with Ms. McKenzie's while holding his cell phone. Over time, the inappropriate physical contact escalated, and Aranda would adjust Ms. McKenzie's serve by resting his hand on her lower back, occasionally sliding his hand down to her buttocks. Aranda would also pull Ms. McKenzie's buttocks into his groin area while demonstrating proper tennis form.

Eventually, while seated on a tennis court bench, Aranda moved his hand under a towel covering Ms. McKenzie's legs and caressed her vagina without her consent. This testimony was uncontroverted. Aranda was not directly supervised while training Ms. McKenzie. This testimony was also uncontroverted. Ms. McKenzie reported these assaults to the police and Ms. Battaglia, the USTA manager of Player Development Events and Programming. Ms. Battaglia was a mandatory reporter under the SafeSport Code.[3] And Ms. Battaglia had been sexually assaulted by Coach Aranda in 2014 in the same manner that he later assaulted Ms. McKenzie. Ms. Battaglia never reported to the USTA that Coach Aranda had sexually abused her. After Ms. McKenzie told Ms. Battaglia she had been sexually assaulted by Coach Aranda, Ms. **[\*4]** Battaglia finally reported that

she was assaulted by him in 2014.

Ms. McKenzie filed this lawsuit alleging Negligent Supervision and Retention (Count I), Battery (Count II), Intentional Infliction of Emotional Distress (Count III), Negligence (Count IV), and Punitive Damages (Count V). (Doc. 34). The case proceeded to trial on negligence and negligent supervision and retention. Prior to trial, Ms. McKenzie moved for summary judgment on the first element of her negligence claim—whether Defendants owed a duty of care to her. (Doc. 98, pp. 12-14). The Court granted partial summary judgment, finding there is a "special relationship" that arises where, as here, the defendant has substantial control over the plaintiff so as to deprive the plaintiff of her normal opportunities for protection. (Doc. 164, p. 24 (quoting *Saunders v. Baseball Factory, Inc., 361 So. 3d 365, 370 (Fla. 4th DCA 2023)* (citing *Restatement (Second) of Torts § 314A* (1965)))). And at trial, after the close of the evidence, the Court granted Judgment as a Matter of Law on several elements of the Negligence and Negligent Supervision and Retention claims. The Defendants move to renew their Motion for Judgment as a Matter of Law and alternatively move for a New Trial or Remittitur.[4] (Doc. 236).

## II. LEGAL STANDARDS

### A. Motion [\*5] for Judgment as a Matter of Law

Judgment as a matter of law should be granted only if no objectively reasonable jury, based on the evidence and inferences adduced and through exercising impartial judgment, could reach the verdict rendered. *FED. R. CIV. P. 50*; *Brown v. Ala. Dep't of Transp., 597 F.3d 1160, 1173 (11th Cir. 2010)*; *Combs v. Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir. 1997)*. Put

---

[3] USTA Safe Play Policy, effective January 1, 2017, provided that covered individuals, such as Ms. Battaglia, must report prohibited conduct. (Joint Ex. 2, SP_001-002). Prohibited conduct includes "a. Sexual Conduct (or attempts to commit the same), without Consent." (*Id.* at SP_003). Other prohibited conduct includes sexual conduct with consent but where a Power Imbalance exists, and sexual misconduct involving minors. (*Id.*). When a coach is alleged to have violated the USTA policy prohibiting sexual assault or misconduct, for example, Coach Aranda's assault of Ms. McKenzie, an investigation is mandatory. (Joint Ex. 3). The SafeSport Code provides that covered adults **must** report conduct that could constitute sexual misconduct which includes sexual conduct without consent *and* sexual conduct involving a minor. (Joint Ex. 4, SSC_010, 016).

[4] Defendants appear to incorporate by reference arguments and briefing: "The USTA renews the arguments and objections made in open court on May 3 and May 6, 2024, along with arguments made in response to Plaintiff's Motion. Doc. 216." (Doc. 236, p. 1, n.1). The Local Rules of this Court limit memorandums to 25 pages to streamline litigation. The Court does not allow parties to incorporate by reference arguments made in Court or prior memorandums filed on the docket. To do so would nullify the rule limiting briefs to 25 pages and impose a duty on the Court to scour transcripts and memorandums in search of arguments that could be helpful to a party. The prejudice to opposing counsel is apparent. As such, the Court will only entertain arguments presented in the Defendants' instant Motion.

another way, the party moving for judgment as a matter of law must show that the trial evidence "is so overwhelmingly [in his favor] that a reasonable jury could not arrive at a contrary verdict." *Middlebrooks v. Hillcrest Foods, Inc., 256 F.3d 1241, 1246 (11th Cir. 2001)*. Yet, where substantial evidence in the trial record would allow reasonable minds to reach different conclusions, judgment as a matter of law is inappropriate. *Mee Indus. v. Dow Chem. Co., 608 F.3d 1202, 1211 (11th Cir. 2010)*. In considering a motion for judgment as a matter of law, the district court must review the record and draw all reasonable inferences derived therefrom in the light most favorable to the non-moving party. *Brown, 597 F.3d at 1173*. The district court must not make credibility determinations nor weigh evidence, as these are functions reserved for the jury. *Id.*

Finally, a *Rule 50(b)* motion "'may be used to renew consideration of issues initially raised in a pre-verdict motion [under *Rule 50(a)*],' but . . . the court cannot consider matters not raised in the initial motion." *King v. CVS Caremark Corp., 163 F.Supp.3d 1165, 1170 (N.D. Ala. 2016)* (quoting *Caban-Wheeler v. Elsea, 71 F.3d 837, 842 (11th Cir. 1996)*).[5]

**B. New Trial**

A district court may grant a new trial **[*6]** for a variety of reasons, including when the verdict is against the great weight of the evidence, the damages awarded by the jury are excessive, the court erred in admitting or excluding evidence or in instructing the jury on the law, or other circumstances led to a patently unfair trial. *FED. R. CIV. P. 59*; *Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251, 61 S. Ct. 189, 85 L. Ed. 147 (1940)*. Whatever its reason, "a district court may, in its discretion, grant a new trial 'if in [the court's] opinion, the verdict . . . will result in a miscarriage of justice, even though there may be substantial evidence'" which would preclude the entry of judgment as a matter of law. *McGinnis v. Am. Home Mortg. Servicing, Inc., 817 F.3d 1241, 1254 (11th Cir. 2016)* (quoting *Hewitt v. B.F. Goodrich Co., 732 F.2d 1554, 1556 (11th Cir. 1984)*).

Unlike a motion for judgment as a matter of law made under *Rule 50*, the court "is free to weigh the evidence" in assessing whether to grant a new trial under *Rule 59*. *Id.* (quoting *Rabun v. Kimberly-Clark Corp., 678 F.2d 1053, 1060 (11th Cir. 1982)*).

**C. Punitive Damages**

The decision whether to grant a new trial or remittitur on the grounds of excessive damages is within the district court's sound discretion. *Simon v. Shearson Lehman Bros., Inc., 895 F.2d 1304, 1310 (11th Cir. 1990)* (citation omitted). As here, where a claim arises under state law, we first look to state substantive law to determine whether the punitive damages award is excessive. *Roboserve, Ltd. v. Tom's Foods, Inc., 940 F.2d 1441, 1446 (11th Cir. 1991)* (citation omitted). Next, we determine if the award is excessive under federal law. *See Peer v. Lewis, No. 06-60146-CIV, 2008 U.S. Dist. LEXIS 38908, 2008 WL 2047978, at *13 (S.D. Fla. May 13, 2008)*.[6] Under Florida law, any punitive **[*7]** award in excess of three times the compensatory damages is presumed to be excessive, entitling the defendant to remittitur to that ratio. *FLA. STAT. § 768.73*. Where the ratio does not exceed the presumptive excess limit, the Court proceeds to analyze the reasonableness of the award under *§ 768.74(5)*.

*Section 768.74(5)* sets out criteria to assess the reasonableness of a punitive damages award. It requires a court to ask whether: (1) the amount awarded reflects prejudice, passion or corruption on the part of the trier of fact; (2) it appears that the trier of fact ignored the evidence in reaching a verdict or misconceived the merits of the case relating to the amounts of damages recoverable; (3) it appears the trier of fact considered improper elements or arrived at the amount of damages by speculation or conjecture; (4) the award bears a reasonable relation to the amount of damages proved and the injury suffered; and (5) the award is supported by the evidence and is one that could be adduced in a logical manner by reasonable persons. *FLA. STAT. § 768.74(5)*; *see also Myers v.*

---

[5] In their Motion for Judgment as a Matter of Law, Defendants failed to identify the grounds that were raised in their *Rule 50(a)* Motion at trial, and the Plaintiff has identified instances where the Defendant attempts to assert grounds not advanced at trial. The Court will not consider grounds or objections that have been waived by the Defendants.

[6] It is well-settled that a new trial may be warranted by an excessive jury award. *Johnson v. Clark, 484 F. Supp. 2d 1242, 1256 (M.D. Fla. 2007)*; *see also Simon, 895 F.2d at 1310*. A new trial based on excessive damages should only be ordered if the award shocks the court's conscience. *Christopher v. Florida, 449 F.3d 1360, 1368 (11th Cir. 2006)* (citing *Simon, 895 F.2d at 1310*).

*Central Fla. Invs., Inc., 592 F.3d 1201, 1215 (11th Cir. 2010)* (stating that a trial court must consider the factors set out in *§ 768.74(5)* when assessing the excessiveness of a punitive award).

*Section 768.74*, however, did not displace Florida's longstanding deference **[*8]** to a jury's damages assessment. *Johnson v. Clark, 484 F. Supp. 2d 1242, 1256-57 (M.D. Fla. 2007)* (citing *Aurbach v. Gallina, 721 So. 2d 756, 758 (Fla. 4th DCA 1998)*); *Slip-N-Slide Recs., Inc. v. TVT Recs., LLC, No. 05-21113-CIV, 2007 U.S. Dist. LEXIS 80788, 2007 WL 3232274, at *21 (S.D. Fla. Oct. 31, 2007)* (citation omitted). A court should not declare a jury verdict excessive simply because it is higher than the amount the court itself considers appropriate. *Clark, 484 F. Supp. 2d at 1257*. The award will not be disturbed "unless it is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." *Normius v. Eckerd Corp., 813 So. 2d 985, 988 (Fla. 2d DCA 2002)* (citation omitted).

## III. DISCUSSION

### A. Negligence

To succeed on a claim of negligence under Florida law, a plaintiff must establish: "(1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached said duty; (3) the breach was the proximate cause of the plaintiff's injury; and (4) the breach caused the plaintiff to suffer damages." *See Clay Elec. Coop, Inc. v. Johnson, 873 So. 2d 1182, 1185 (Fla. 2003)*. A duty is established when the acts of a defendant in a particular case "create a foreseeable zone of risk." *Pate v. Threlkel, 661 So. 2d 278, 280 (Fla. 1995)*. Additionally, "one who undertakes to act, even when under no obligation to do so, thereby becomes obligated to act with reasonable care." *Union Park Mem'l Chapel v. Hutt, 670 So. 2d 64, 66-67 (Fla. 1996)*.

Under the common law, a person or other entity generally has no duty to take precautions to protect another against criminal acts of third parties. *Boynton v. Burglass, 590 So. 2d 446, 448 (Fla. 3d DCA 1991)*. An exception exists when there is a "special relationship" between **[*9]** the defendant and the person whose behavior needs to be controlled or the person who is a foreseeable victim of that conduct. *Id.* "A special relationship typically arises in narrow circumstances where the relationship places the defendant in a superior position to control the risk, such as where the defendant has substantial control over the plaintiff so as to deprive the plaintiff of his or her normal opportunities for protection." *Saunders, 361 So. 3d at 370* (citing *Restatement (Second) of Torts § 314A* (1965)).

This special relationship arises when these programs voluntarily take custody of players under circumstances that deprive the players of normal opportunities for protection or that subject them to association with persons likely to harm them. *Special Olympics Fla., Inc. v. Showalter, 6 So. 3d 662, 665 (Fla. 5th DCA 2009)* (citing *Nazareth v. Herndon Ambulance Serv., Inc., 467 So. 2d 1076, 1078 (Fla. 5th DCA 1985)*). Florida law recognizes this sort of special relationship exists between a school and its students. *Rupp v. Bryant, 417 So. 2d 658, 666 (Fla. 1982)* (holding public schools owe a general duty of supervision to the minor students placed within their care). Applying similar principles, the Florida Supreme Court extends to universities a duty to use ordinary care to protect its adult students over whom it is exercising some degree of control from foreseeable harm in providing educational services and programs, like when assigning them to **[*10]** mandatory internship programs. *Nova Se. Univ., Inc. v. Gross, 758 So. 2d 86, 88 (Fla. 2000)*.

The Court granted summary judgment in favor of the Plaintiff on the first element of the negligence claim. (Doc. 164, pp. 23-28). The Court found that a special relationship exists between players and coaches. (*Id.* at pp. 25-28). The Court also found that the special relationship imposes on the USTA a duty of reasonable care to protect players in their training program from sexual abuse by their coaches, which is a foreseeable harm. (*Id.* at p. 27). The United States Olympic Committee's SafeSport publication entitled "*Recognizing, Reducing and Responding to Misconduct in Sport: Creating Your Strategy,*" teaches that staff members "should have a basic understanding of sexual abusers, as well as 'grooming,' the most common strategy offenders use to seduce their victims." (Pltf. Ex. 5, KM00205). It was undisputed at trial that Coach Aranda groomed Ms. McKenzie over two weeks with compliments, physical closeness, inappropriate touching, and ultimately sexual assault.

Ms. Lauren Tracy, senior director of strategic and business operations for the USTA, testified that Coach Aranda groomed Ms. McKenzie for two weeks, which corroborated Ms. McKenzie's testimony. **[*11]** The SafeSport Investigation Report reached the same conclusion:

Specifically, this investigation found that while acting as her tennis coach, [Aranda] engaged in an escalation of inappropriate conduct towards [Ms. McKenzie], including: (a) talking about how he wanted to be her coach; (b) commenting on and complimenting her physical appearance; (c) touching her body while they reviewed video or photographic footage from their practices, including leaning his body into hers while sitting next to her, putting his hand over hers while he held her phone, and intertwining his arm with her arm while she held her phone; (d) having her do mental affirmations that included stating she was "perfect;" (e) touching her bare waist and stomach on one occasion while joking about her being too skinny and resting his hand on her back and buttocks on one occasion; (f) touching her in a manner that made her uncomfortable while working on her serving technique, including pressing his body against hers, putting his hands on her hips moving them towards her crotch, and kneeling in front of her on one occasion; (g) touching and rubbing her vulva over her clothes on November 9, 2018; and (h) asking [Ms. McKenzie] [*12] what sort of relationship she wanted from him.

(Pltf. Ex. 1, PRIV000382).

Ms. Tracy testified that she requested camera footage for the clay courts where Coach Aranda assaulted Ms. McKenzie. She learned that the camera had not been turned on for the court where the assault occurred, and the only video Ms. Tracy located was from a neighboring court on November 9, 2018. Ms. Tracy related this information to the SafeSport investigator. (Pltf. Ex. 1, PRIV000384). The SafeSport investigation found Coach Aranda, as a USTA Player Development Coach, held a position of authority over athletes and is a Covered Individual subject to the disciplinary jurisdiction of the SafeSport Code. (*Id.* at PRIV000385). The Code prohibits sexual conduct without consent. (*Id.*). That is, "any intentional bodily contact of a sexual nature, however slight, whether clothed or unclothed, of a person's intimate body parts with any object or body part up to and including a completed or attempted penetration."[7]  (*Id.*). Therefore, the Code prohibits

precisely what Coach Aranda did to Ms. McKenzie.

Notwithstanding that the potential for sexual abuse of athletes by coaches is foreseeable and historically rampant, the **[*13]** USTA vehemently opposed the imposition of minimum standards of conduct. (Pltf. Ex. 6). The USTA wrote to the United States Olympic Committee in December 2012 and complained that minimum standards while "likely made with good intentions . . . is **misguided at best**." (*Id.* at USOPC-USTA-00001822 (emphasis added)). The USTA opined that "to mandate 'minimum' SafeSport standards with significant penalties crosses the line, falls outside the scope of the Ted Stevens Act, **and is simply wrong**." (*Id.* (emphasis added)).

In March of 2015, Ms. Rachel Booth, counsel for the USTA, wrote to Malia Arrington, with the U.S. Olympic Committee, and enclosed a marked-up version of the draft SafeSport Policies and Disciplinary Procedures. (Pltf. Ex. 9). The section titled "Imbalance of power" states:

> An imbalance of power exists where one person in a relationship holds a superior position of power over the other. Consent is not possible if the relationship involves an imbalance of power. For example, a young person can never consent to conduct with an adult as an adult always holds a position of power over a young person. Factors relevant to determining whether there is an imbalance of power include but are **[*14]** not limited to the:
>
> • nature and extent of a person's supervisory, evaluative or other authority over another
>
> • actual relationship between the parties and their respective roles
>
> • age of the parties involved and their intellectual capabilities.

(*Id.* at USTA0000416).

In the edits, the USTA writes: "This is not realistic in tennis — at the highest levels MANY female players date their own or other coaches—f (sic) imbalance could go either way — e.g. hugely successful player." (*Id.*).

---

[7] The U.S. Center for SafeSport's Decision of April 12, 2019, found Coach Aranda inappropriately touched Ms. McKenzie for two weeks and that the USTA suspended him from his employment and barred him from entering the National Campus. (Pltf. Ex. 2, PRIV000371). SafeSport sanctioned Coach Aranda by suspending him for two years from

participating in any capacity in any activity organized under the auspices of the United States Olympic Committee, and/or a Local Affiliated Organization of a national governing body. (*Id.* at PRIV000377). Upon his return to the sport, Coach Aranda was required to be placed on probation for two years. (*Id.*).

The SafeSport code in effect in 2018 provides that "[o]nce a coach-Athlete relationship is established, a Power Imbalance is presumed to exist throughout the coach-Athlete relationship (regardless of age)." (Joint Ex. 4, SCC_009). Thus, the SafeSport code makes clear that a power imbalance always exists between a coach and an athlete, and the USTA was aware that sexual relationships are common between coaches and athletes. And yet, the USTA continued to resist implementing minimum standards, because in its opinion such standards are "not realistic" in tennis. The USTA placed the interests of "hugely successful player[s]" over the well-being of young women training at their National Campus because in rare instances **[\*15]** the power imbalance may favor the athlete. The USTA's cavalier attitude explains why they paid lip service to the need to adhere to minimum standards designed to protect young athletes training at their National Campus.

The evidence at trial established that Coach Aranda inappropriately touched Ms. McKenzie for over two weeks without detection. The absence of security or supervision was partially explained by Ms. Tracy who testified that the cameras for the tennis court reserved by Coach Aranda were not turned on. Additionally, Mr. Ola Malmqvist, the Director of Women's Tennis, testified that he was unfamiliar with the "Rule of Three." The USTA Safe Play Conduct, Policies & Guidelines (effective January 1, 2017), provides:

> Interaction with participants should be in an open and observable environment. Adults should strive to avoid being alone with a single child or teen where he or she cannot be observed by others. The "Rule of Three" offers a reminder that a minimum of three persons (two adults and one teen or child; or one adult and two teens or children) should be present at all times during USTA events, programs, tournaments, and activities.

(Joint Ex. 2, SP_009-010). Once Mr. Malmqvist **[\*16]** was shown the Rule of Three, he agreed it applies to Ms. McKenzie since she was 19 years old when Coach Aranda assaulted her.[8] Mr. Malmqvist also testified that

it is nearly impossible to comply with the Rule of Three. And he admitted that Coach Aranda was in a position to train Ms. McKenzie without supervision.

Mr. Malmqvist's testimony underscores that it was foreseeable that a coach would be alone with a teenager, as occurred here.[9] Even so, the USTA argues that Coach Aranda's sexual assault of Ms. McKenzie was not foreseeable. (Doc. 236, p. 11). The USTA fails to cite any testimony or evidence in support of this assertion. The USTA relies on the argument that Coach Aranda's sexual assault of Ms. Battaglia in 2014 did not make his 2018 assault of Ms. McKenzie reasonably foreseeable. (*Id.*). Setting aside Aranda's sexual assault of Ms. Battaglia, the USTA conveniently ignores the other evidence showing that it was reasonably foreseeable that a coach could sexually assault an athlete. For example, in March of 2015, Ms. Rachel Booth complained to the U.S. Olympic Committee that preventing sexual relations between coaches and athletes is not "realistic" because sexual relationships between **[\*17]** coaches and female athletes is so common. The USTA also fails to account for the imbalance of power between coaches and athletes which has given rise to sexual abuse and which prompted Congress to create SafeSport as part of the Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017.

Coach Aranda's grooming and subsequent sexual assault of Ms. McKenzie were reasonably foreseeable. The U.S. Olympic Committee issued a publication which provides that staff members "should have a basic understanding of sexual abusers, as well as 'grooming,' the most common strategy offenders use to seduce their victims." (Pltf. Ex. 5, KM00205). The Rule of Three is designed to combat the foreseeable risk of sexual abuse by coaches, and USTA was cautioned about the risks inherent where an imbalance of power exists. In

---

[8] Mr. Martin Blackman, the USTA General Manager of Player Development, testified in response to a question posed by USTA's counsel that the Rule of Three applied to "minors." Mr. Blackman is wrong. The Rule of Three applies to children and teens; a 19-year-old is a teen, as Mr. Malmqvist acknowledged. The Court notes that throughout the trial the USTA attempted, albeit unsuccessfully, to rewrite the

SafeSport code to limit its reach to minors.

[9] On March 7, 2018, the Congressional Committee on Energy and Commerce wrote to the Executive Director and Chief Executive Officer of the USTA and stated that "[b]ased on information received to date, the Committee is concerned that a pervasive and systemic problem exists in Olympic sports," involving sexual abuse. (Pltf. Ex. 17, USTA0000249). In response, the USTA reported to the Committee that it received 3 reports of sexual abuse in 2013, 8 reports of sexual abuse in 2014, 4 reports of sexual abuse in 2015, 1 report of sexual abuse in 2016, 6 reports of sexual abuse in 2017, and as of May 7, 2018, the USTA had received 5 reports of sexual abuse. (Pltf. Ex. 19).

addition, the USTA was aware of 27 reported instances of sexual abuse by coaches. The evidence established a relationship or nexus existed between Ms. McKenzie and Aranda's employment from which a legal duty would flow from the defendant-employer to Ms. McKenzie. *See Magill v. Bartlett Towing, Inc., 35 So. 3d 1017, 1020 (Fla. 5th DCA 2010)*. That nexus created a foreseeable zone of risk.

The USTA also argues there is no substantial evidence that the USTA breached its duty of care. (*Id.* at **[*18]** p. 13). The USTA focuses on generalities rather than discussing the specific facts of this case. For example, the USTA submits that Mr. Malmqvist testified he would walk the tennis courts several hours a day. (Doc. 236, p. 14). The USTA disregards that Mr. Malmqvist qualified this statement by adding that he walks the tennis courts *when in town*. The USTA also ignores that Mr. Malmqvist never testified that he observed Coach Aranda interacting with Ms. McKenzie. Mr. Malmqvist also testified to the extent that employees visited the tennis court, they did so randomly. No policy or procedure required regular observation of coaches interacting with players. Moreover, while Mr. Blackman and Ms. Tracy claimed the tennis courts were observable, the photographic evidence established that the court reserved by Coach Aranda could not be seen from the administrative building.

Turning to the facts of this case, Ms. Kathy Rinaldi, USTA's lead national coach, testified that when she went to Prague for a tournament, she did not tell Mr. Malmqvist that she would be gone or arrange for another supervisor to observe Coach Aranda in her absence. Nor did Ms. Rinaldi recall how often she visited the tennis **[*19]** courts to watch Coach Aranda train young athletes or whether she watched videos of him training athletes. Mr. Malmqvist did not know until the SafeSport investigation was conducted that there was no video footage during the week that Coach Aranda assaulted Ms. McKenzie. The duty to protect young athletes who are held in a special relationship with the USTA is not satisfied by the mere possibility that a USTA employee in the administrative building could by sheer happenstance observe a practice in progress, or that an employee may randomly walk by a tennis court when a coach is interacting with a player. Mr. Blackman, USTA's general manager, summed it up when he testified that they do not supervise practices.

Against this backdrop, Coach Aranda groomed and inappropriately touched Ms. McKenzie over the course of two weeks, culminating in her being sexually assaulted. Coach Aranda got away with this conduct because the USTA failed to implement measures to protect Ms. McKenzie from a predatory coach. The USTA knew sexual relations between coaches and athletes were common, and the USTA resisted attempts by the U.S. Olympic Committee to regulate coach-athlete relationships. Senior management, **[*20]** including Mr. Malmqvist and Mr. Blackman, either did not know about the Rule of Three or misunderstood its application. And most shockingly, the USTA had no standardized policies or procedures for monitoring coach-athlete interaction. The USTA could have monitored CCTV and recorded all coach-athlete interactions but chose not to. The USTA left to chance its legal duty to protect young athletes from the foreseeable risk of sexual abuse created by the power imbalance coaches enjoy over aspiring athletes. Accordingly, there was no issue for the jury's consideration on the breach of the duty owed to Ms. McKenzie.[10] Defendants' Renewed Motion for Judgment as a Matter of Law, or, Alternatively For a New Trial is denied.

## B. Negligent Supervision and Retention

Florida law recognizes a cause of action for negligent retention and supervision. *Mallory v. O'Neil, 69 So. 2d 313, 315 (Fla. 1954)*. Negligent retention or supervision "occurs when during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further actions such as investigation, discharge, or reassignment." *Dep't of Env't Prot. v. Hardy, 907 So. 2d 655, 660 (Fla. 5th DCA 2005)*. A plaintiff must show that "once an employer received active **[*21]** or constructive notice of problems with an employee's fitness, it was unreasonable for the employer not to investigate or take corrective action." *Garcia v. Duffy, 492 So. 2d 435, 441 (Fla. 2d DCA 1986)*. Liability attaches only if the plaintiff is "within the zone of foreseeable risks created by the employment" and the failure to take reasonable action is the proximate cause of the plaintiff's harm. *Watson v. City of Hialeah, 552 So. 2d 1146, 1149 (Fla. 3d DCA 1989)*.

---

[10] The jury awarded $3,000,000 in compensatory damages to Ms. McKenzie for the USTA's negligence. The finding of negligence and the award of damages stands independent of whether Ms. Jessica Battaglia's knowledge of Coach Aranda's sexually aggressive propensity is imputed to the USTA.

For purposes of negligent retention and supervision, an employer is not considered separately from its managers—since a corporation cannot act on its own and only management can receive notice of an employee's unfitness or take corrective action. *See Tallahassee Furniture Co., Inc. v. Harrison, 583 So. 2d 744, 754 (Fla. 1st DCA 1991)* (declining summary judgment based on facts "known to management" and subsequent inaction); *McArthur Jersey Farm Dairy, Inc. v. Burke, 240 So. 2d 198, 201 (Fla. 4th DCA 1970)* (finding dairy farm had notice of the employee's reckless driving because dairy superintendent was aware of it and previously told the employee to stop). "The factors constituting notice, employee fitness, and the type of action reasonably required of the employer" center in part on what exactly managers knew and when they knew it, the role and duties of any managers with knowledge, and the expected actions that knowledge should impel for someone in that role. *Garcia, 492 So. 2d at 441; see also McArthur Jersey Farm Dairy, 240 So. 2d at 201*; *Iglesia Cristiana La Casa Del Senor, Inc. v. L.M., 783 So. 2d 353, 359 (Fla. 3d DCA 2001)*.

*1. Facts Not in Dispute*

Jessica **[*22]** Battaglia has worked for the USTA since 2006. In 2014, Ms. Battaglia was the coordinator for coaching and performance and by 2017 Ms. Battaglia was promoted to Manager of Player Development Events and Programming. Her duties included pairing coaches with athletes interested in becoming coaches. (Pltf. Ex. 32). On February 12, 2018, Ms. Battaglia completed SafeSport training. (Joint Ex. 10(d)). Ms. Battaglia testified that she knew she was a mandatory reporter under the SafeSport Code and agreed that the obligation to report violations is ongoing.

In 2014, Ms. Battaglia attended the U.S. Open tennis tournament in her capacity with the USTA. While at the U.S. Open, Ms. Battaglia went to dinner with other USTA members and then went to a nightclub with some of her colleagues. While on the dancefloor Coach Aranda began grinding on her from behind and then placed his hand on her vagina. Ms. Battaglia did not consent to Aranda's sexual advances and did not encourage him to touch her. Ms. Battaglia immediately exited the club, and Aranda followed and tried to get into a taxi with her. Ms. Battaglia was 28 years old when Aranda sexually assaulted her. Ms. Battaglia knew Coach Aranda had access **[*23]** to teenage female athletes, and she did not report the sexual assault to the USTA until 2017 when Ms. McKenzie told her that

Coach Aranda sexually assaulted her.

*2. Whether Ms. Battaglia's Knowledge Is Imputed to the USTA* [11]

The USTA contends that they are entitled to judgment as a matter of law because the evidence was insufficient to support Ms. McKenzie's negligent supervision and retention claim.[12] (Doc. 236, pp. 1-11). As Ms. McKenzie correctly notes, the Defendants' argument centers on "an unsupported distinction between managing people and managing 'projects and events.'" (Doc. 255, p. 2 (citing Doc. 236, p. 6)). Even if the distinction made a difference, since October 2017, Ms. Battaglia managed Katelyn Stokes, her administrative assistant. (Pltf. Ex. 37). Setting aside that fact, the USTA mistakenly relies on the treatise *American Jurisprudence of Corporations*, *18B Am. Jur. 2d Corp. § 1415*. The treatise is not binding on this Court and offers little guidance, as Ms. McKenzie correctly observes in her response. (Doc. 244, p. 3).

It is undisputed that Ms. Battaglia was entrusted by the USTA to manage programs in the "mentoring space," including pairing coaches with athletes. "The best test for determining whether **[*24]** notice to or knowledge of an agent . . . is imputed to his or her principal [] is whether the condition and facts known by the agent were within the sphere of authority of that particular agent." *Gutter v. E.I. Dupont De Nemours, 124 F. Supp. 2d 1291, 1310 (S.D. Fla. 2000)*. In Florida, knowledge that an agent has a duty to communicate is chargeable to the principal. *See, e.g.*, *First Bond & Mortg. Co. v. Yancey, 104 Fla. 229, 139 So. 597, 599 (Fla. 1932)*; *Restatement 2d Agency § 275*; *Beck v. Deloitte & Touche, 144 F.3d 732, 736 (11th Cir. 1998)* (recognizing that under Florida law knowledge of an officer generally

---

[11] "Circumstances involving the imputation of knowledge from an agent to principal typically involve questions of law rather than fact." *LanChile Airlines v. Conn. Gen. Life Ins., 759 F. Supp. 811, 814 (S.D. Fla. 1991)*.

[12] Defendants rely in part on the Court's Order denying their Motion for Summary Judgment where the Court noted that "the extent of Jane Doe's [Ms. Battaglia's] managerial role and duties" are disputed. (Doc. 236, p. 11). Whether an issue of material fact existed at the summary judgment stage, however, is irrelevant to a renewed motion for judgment as a matter of law. The Court should not have to point out that the record at trial is what matters and not pronouncements made on an incomplete record.

is imputed to the corporation).

Ms. Battaglia was under a duty imposed by the Safe Sport Code to report sexual misconduct. *36 U.S.C. § 220541*. The Safe Sport Code is incorporated into the *Safe Sport Act. § 220541(b)*. Ms. Battaglia admitted at trial that she is a covered adult under the Safe Sport Code and nothing in the Safe Sport Code limits the mandatory reporting requirement to the abuse of minors or athletes. Congress created the Center for Safe Sport to "prevent the abuse of any amateur athlete." *§ 220542(a)(1)*. The Code includes within the scope of prohibited behavior sexual conduct (consensual and also where a power imbalance exists), *as well as* sexual misconduct involving minors. (Joint Ex. 4, SSC_010). The plain language of the Code makes it clear that the prohibition against sexual conduct is not limited to minors. Moreover, "[c]onduct by a Covered Individual **[*25]** that could constitute sexual misconduct should be reported." (*Id.* at SSC_011).

Coach Aranda was a covered individual because he was within the governance or disciplinary jurisdiction of the USTA when he sexually assaulted Ms. Battaglia. (*Id.* at SSC_005). As a result, Ms. Battaglia was obligated to report Coach Aranda's violation of the Code. Ms. Battaglia's knowledge of Coach Aranda's prohibited sexual abuse was imputed to the USTA once Ms. Battaglia was promoted to a managerial position.[13] Furthermore, the Court agrees with Ms. McKenzie that Ms. Battaglia's other duties support the imputation of her knowledge to the USTA. Ms. Battaglia was responsible for organizing and creating continuing education programs for coaches held at major USTA tournaments. Ms. Battaglia also planned and managed the mentoring program that paired players who aspired to become coaches with USTA coaches for mentoring. Thus, Ms. Battaglia's knowledge of Coach Aranda's violation of the Code is material to her duties to the employer. *Dye v. Tamko Bldg. Prods. Inc., 908 F.3d 675, 686 (11th Cir. 2018)* (quoting *Restatement 3d Agency § 5.03*).

---

[13] Defendants' argument that Ms. Battaglia was not required to report being sexually assaulted by Coach Aranda because it happened at a nightclub is inconsistent with the SafeSport Code, and allowing a loophole to the duty to report sexual abuse by a Coach undermines the purpose of the Safe Sport Act and defies commonsense. *See United States v. Planes, No. 8:18-CV-2726-T-23TGW, 2019 U.S. Dist. LEXIS 115314, 2019 WL 3024895, at *9 (M.D. Fla. July 11, 2019)* (finding that knowledge learned "in a casual circumstance" was imputed to principal).

### 3. Aranda's Abuse of Ms. McKenzie Was Foreseeable

Ms. McKenzie correctly points out that the Court ruled that sexual abuse by a coach was reasonably foreseeable by the **[*26]** USTA. As the Court explained in discussing the negligence claim, before Coach Aranda sexually assaulted Ms. McKenzie, Congress voiced its concern over the prevalence of sexual abuse in amateur tennis. A Congressional Committee directed the USTA to share data on reported instances of sexual assault, and the USTA disclosed 27 reported sexual assaults occurring between 2013 and May 2018. Furthermore, in March of 2015, Ms. Rachel Booth, counsel for the USTA, told the U.S. Olympic Committee that proposed rules regarding the imbalance of power between coaches and athletes are not "realistic" because "MANY" female players date their coaches. Coach Aranda's willingness to exploit the imbalance of power over Ms. McKenzie was foreseeable to the USTA when coupled with Ms. Battaglia's knowledge of his sexually predatory tendencies.

### 4. Scope-of-Employment

Finally, the USTA claims Ms. McKenzie failed to present evidence that Coach Aranda was acting outside the scope of his employment at the time of the assaults. (Doc. 236, p. 12). Ms. McKenzie is correct that this argument was not raised during trial. *Doe v. Celebrity Cruises, Inc., 394 F.3d 891, 902 (11th Cir. 2004)* ("[A]ny renewal of a motion for judgment as a matter of law under *Rule 50(b)* must be based upon the same grounds **[*27]** as the original request . . . ."). And as Ms. McKenzie notes, the USTA argued in its Motion for Summary Judgment that Coach Aranda was not acting within the scope of his employment. (Doc. 244, p. 12). The USTA staked out the following position at summary judgment:

> Aranda did not have the authority to touch Plaintiff in the manner that he did; in fact, it was explicitly prohibited by Defendants. (Deposition of Def. Corp. Rep. (CR Dep.) at Ex. 23). Plaintiff does not even pretend that is the case. Plaintiff cannot demonstrate, therefore, that Aranda was acting within the scope of his employment when he touched her inappropriately. *See Mason v. Fla. Sheriffs' Self-Ins. Fund, 699 So. 2d 268, 270 (Fla. 5th DCA 1997)* ("Even though [employee] was on duty, in uniform, and charged with the responsibility of serving a warrant, in no way did he have the

authority to use his power to coerce sex. Because there was not even the pretense of lawful right in [employee's] performance of this act, it was not within the scope of his employment."). . . . Because Aranda was not working within the course and scope of his employment and for the benefit of the Defendants, final judgment should be entered in favor of Defendants as to Count II.

(Doc. 96, pp. 23-24).

Under the doctrine of **[*28]** judicial estoppel, "where a party assumes a certain position in a legal proceeding and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the [opposing] party." *Allapattah Servs. Inc. v. Exxon Corp., 372 F. Supp. 2d 1344, 1367 (S.D. Fla. 2005)* (citing *New Hampshire v. Maine, 532 U.S. 742, 749, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001)*). The doctrine is used to prevent "a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Id.* Thus, "judicial estoppel is an equitable doctrine invoked at a court's discretion, designed to protect the integrity of the judicial process." *Stephens v. Tolbert, 471 F.3d 1173, 1177 (11th Cir. 2006)*.

In *Anderson v. Brown Industries, 614 F. App'x 415, 417-18 (11th Cir. 2015)*, the Court noted that the Supreme Court has identified three factors for determining when judicial estoppel may be invoked: "(1) whether the present position is clearly inconsistent with the prior positions; (2) whether the party persuaded the court to accept the earlier position, such that acceptance of the inconsistent position would create the perception that the court was misled; and (3) whether the party advancing the inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party."[14] *Id.* (citing *New Hampshire, 532 U.S. at 749-51*); *see also Burnes v. Pemco Aeroplex, Inc., 291 F.3d 1282 (11th Cir. 2002)*. "Pleadings, as well as **[*29]** statements by parties and counsel in open court, are equivalent to sworn statements for purposes of judicial estoppel." *In re Cummings, 381 B.R. 810, 827 (S.D. Fla. 2007)*; *see Allapattah, 372 F. Supp. 2d at 1368, n.12*.

The USTA cannot raise an argument that was not

preserved at trial, and the USTA is estopped from reversing its previous position that Coach Aranda was operating outside the scope of his employment. Besides, the USTA cannot seriously argue that a perk of coaching at its National Campus is the opportunity to groom and sexually assault young athletes entrusted to a coach's care. To be clear, the Court does not believe the USTA endorses sexual violence and employs sarcasm to underscore the absurdity of the USTA's most recent argument. Even though the USTA has forfeited the right to present this argument, the Court will summarize the overwhelming evidence presented by the Plaintiff establishing that Coach Aranda was acting outside the scope of his employment.

Ms. Tracy, the senior director of strategic and business operations for the USTA, testified that once Ms. McKenzie reported she had been sexually abused by Coach Aranda, the USTA suspended Aranda and gave his photograph to security with instructions to deny him access to the campus. The USTA later fired Coach **[*30]** Aranda which would not have occurred had he been acting within the scope of his employment. Mr. Malmqvist testified that there was no "professional purpose" for Coach Aranda to touch Ms. McKenzie's stomach, or inner thigh, or to press his body against her body during training. Mr. Malmqvist stated that such conduct would result in suspension. Mr. Blackman testified it is never permissible for a coach to engage in a sexual relationship with an athlete. This begs the question of how the USTA can now claim that Ms. McKenzie failed to present evidence that Coach Aranda was acting outside the scope of his employment. This argument is frivolous.

As such, the USTA's Motion for Judgment as a Matter of Law, or, Alternatively For a New Trial is denied.

### C. Punitive Damages

The USTA argues that they are entitled to judgment as a matter of law because Ms. McKenzie failed to prove culpable conduct at both the employee and corporate level. (Doc. 236, p. 19 (citing *Napleton's North Palm Auto Park, Inc. v. Agosto, 364 So. 3d 1103, 1106 (Fla. 4th DCA 2023)*)). They further contend that while a corporation may be directly liable through the conduct of its managing agent, Ms. Battaglia occupied a position too low to qualify. (*Id.* at pp. 19-20 (citing *Wells Fargo Bank, N.A. v. Elec. Funds Transfer Corp., 326 So. 3d 753, 757 (Fla. 5th DCA 2021)* ("A 'managing agent' is an individual such **[*31]** as a president, primary owner, or

---

[14] The Plaintiff abandoned her claim for battery and infliction of emotional distress after the USTA argued they are not vicariously liable for Coach Aranda's assault because he was acting outside the scope of his employment.

other individual who holds 'a position with the corporation which might result in his acts being deemed the acts of the corporation."))). The USTA also avers that its failure to implement the Rule of Three does not support an award of punitive damages because it only applies to minors. (Doc. 236, p. 21). Finally, the USTA asserts that while a coverup may justify punitive damages it must take place before the Plaintiff sustains injury. (*Id.* (quoting *L.E. Myers Co. v. Young, 165 So. 3d 1, 8 (Fla. 2d DCA 2015)*)).

The award of punitive damages is supported by competent evidence. The Plaintiff argues, and the Court agrees, that the evidence showed the USTA had a "culture" of conscious indifference to the safety of the young women who trained at their campus. (Doc. 244, p. 16). In December 2012, the USTA complained that minimum standards while "likely made with good intentions . . . is **misguided at best**." (Pltf. Ex. 6, USOPC-USTA-00001822 (emphasis added)). The USTA argued that "to mandate 'minimum' SafeSport standards with significant penalties crosses the line, falls outside the scope of the Ted Stevens Act, **and is simply wrong**." (*Id.* (emphasis added)). In March of 2015, Ms. Booth, counsel for the USTA, wrote to **[*32]** the U.S. Olympic Committee and resisted implementing minimum standards regarding the imbalance of power between coaches and players, because in its opinion such standards are "not realistic" in tennis. (Pltf. Ex. 9). The USTA complained that "MANY" players date their coaches or other coaches, acknowledging the problem while advocating that a prohibition against such conduct due to the power coaches exert over players is not realistic. (*Id.*).

This culture of gross indifference and even open hostility to protecting vulnerable players explains why the USTA failed to institute basic safety procedures at its National Campus. The USTA's failure to use CCTV to monitor coach-athlete interaction, the absence of systematic and mandatory supervision of coaches interacting with players, and the failure to implement the Rule of Three are the direct product of the USTA's gross indifference to player safety. Mr. Malmqvist knew nothing about the Rule of Three and when confronted with the rule at trial, he testified it was nearly impossible to enforce.

The Plaintiff is correct that Ms. Battaglia's failure to report Coach Aranda's sexual assault is not the basis for punitive damages; it was, however, **[*33]** relevant to demonstrate the USTA's culture of silence and gross negligence. Similarly, the evidence concerning the USTA's attempt to cover up Ms. McKenzie's assault was

relevant to the USTA's culture of silence and was not offered as a basis for punitive damages.[15] And, as was previously discussed, the USTA's contention that the Rule of Three applies only to minors is wrong. The Rule of Three applies to children and teens. Ms. McKenzie was 19 when she was sexually assaulted by Coach Aranda. Had the USTA wanted to say "minor" instead of "teen" it would have done so. Mr. Malmqvist, as the Director of Women's Tennis, testified that "teen" includes Ms. McKenzie. He was correct, and the USTA cannot simply choose to ignore the plain and unambiguous language of the Rule of Three.

Notwithstanding this rule, Mr. Blackman testified the USTA does not supervise its practices. This statement is dumbfounding since the USTA was warned to be on the lookout for grooming by coaches and had direct reports of 27 sexual assaults by coaches before Ms. McKenzie was assaulted. The USTA simply ignored the danger presented by coaches who wield considerable power over young female players. This is exactly what **[*34]** Congress legislated to prevent and is precisely what the USTA pushed back against. The punitive damages award was twice the compensatory damages and is justified by the facts. The USTA's Motion for Remittitur is denied.

### D. Motion for New Trial

The USTA argues the verdict was against the weight of the evidence, and so a new trial is warranted. (Doc. 236, p. 22). For the reasons stated in the preceding sections, the Court rejects the USTA's argument, and the Motion for New Trial is denied. The USTA also raises a new argument and submits that the Court's admonishment to defense counsel during closing necessitates a new trial. Two points: first, the USTA failed to object when the Court sustained the Plaintiff's objections and instructed defense counsel to comply with its judgment under *Rule 50* and waived the issue. *See United States v. Calderon, 127 F.3d 1314, 1334 (11th Cir. 1997)* ("[A]

---

[15] The Plaintiff presented evidence that USTA International Tennis Hall of Fame member Pam Shriver was told by the USTA's general counsel to "be careful" after Ms. Shriver began discussing sexual abuse within the USTA with Ms. McKenzie. USTA's general manager, Mr. Malmqvist, advised Ms. McKenzie not to discuss what happened to her but Mr. Malmqvist also directed her to report it. And Ms. McKenzie's former close friend, CiCi Bellis, broke off all contact with her after speaking with the USTA's general manager, Mr. Blackman.

contemporaneous objection was required to allow the district court the opportunity to correct any error that may have existed."). Second, the defense counsel's refusal to abide by the Court's rulings prompted the Court to sustain the Plaintiff's objections to the defense counsel's improper argument. The Plaintiff objected five times and the Court sustained the objections each **[*35]** time and instructed defense counsel to limit his arguments to the issues in dispute. That a criminal contempt citation was not issued is a testament to the Court's patience. The balance of the USTA's vague argument concerning the exclusion of evidence is unpersuasive. Accordingly, the USTA's Motion for New Trial is denied.

## IV. CONCLUSION

For these reasons, the USTA's Renewed Motion for Judgment as a Matter of Law, or, Alternatively for a New Trial or Remittitur (Doc. 236) is **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on August 16, 2024.

/s/ Paul G. Byron

PAUL G. BYRON

UNITED STATES DISTRICT JUDGE

**End of Document**