**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

DINAH YUKICH,

*Plaintiff*,

v.

PREMIER FENCING CLUB; ABDEL AZIZ; USA FENCING; SHANNON DOUGHERTY; MAC BROWN; AND UNITED STATES OLYMPIC AND PARALYMPIC COMMITTEE,

*Defendants*.

Civil No.: 25-cv-18011 (KSH) (AME)

**OPINION**

**Katharine S. Hayden, U.S.D.J.**

## I. Introduction

On February 5, 2025, Executive Order No. 14201 (the "EO") was issued, stating, in part, that the United States "rescind[ed] support for and participation in people-to-people sports exchanges or other sports programs" that permit individuals to compete in women's events based on their gender identity rather than their biological sex, and would seek to amend the standards governing international Olympic sporting events accordingly. A few months later, the United States Olympic and Paralympic Committee ("USOPC"), which was created in 1978 through the Ted Stevens Olympic and Amateur Sports Act ("Sports Act"), 36 U.S.C. §§ 220501, *et seq.*, made a change in its eligibility requirements. USOPC established new athlete eligibility guidelines, via their Athlete Safety Policy, entitled "Transgender & Non-Binary Participation Policy," which disallows transgender women from competing in women's sporting events. (D.E.

16-2, Ex. B.) As a national governing body over the sport of fencing, USA Fencing Association ("USAF")[1] implemented the new requirement.

Plaintiff Dinah Yukich, a transgender woman, asserts that she was impermissibly excluded from competing in the women's events at a September 2025 fencing competition held in Suffern, New York. She has sued six defendants for their alleged roles in that exclusion: Premier Fencing Club ("Premier"), the event's organizer; Abdel Aziz, an "agent" of Premier; the USOPC; Mac Brown, a USOPC psychologist; USAF; and Shannon Daugherty,[2] who is described as a USAF employee.

Yukich brings statutory claims under the New York State Human Rights Law, N.Y. Exec. Law §§ 296-2a and 296-6, as well as common law claims for intentional infliction of emotional distress ("IIED") and civil conspiracy. All defendants have moved to dismiss the respective claims against them, which they argue are not cognizable because they are preempted, inadequately pleaded, or both. (*See* D.E. 10, 13 (USAF, Daugherty, and Aziz); D.E. 16, 25 (USOPC and Brown); D.E. 24, 31 (Premier).) They also assert that this case cannot proceed here in the first place because the Court lacks personal jurisdiction over them (USOPC, USAF, Daugherty, and Brown) or because the case must be arbitrated (USAF, Daugherty, Aziz, and Premier). Yukich opposes each motion. (D.E. 12, 17[3] (USAF, Daugherty, and Aziz); D.E. 21, 22 (USOPC and Brown); D.E. 27 (Premier).)

---

[1] USAF states that "USA Fencing" was incorrectly pleaded, and that its correct name is "USA Fencing Association." (D.E. 10-2, Lin Cert. ¶ 1.)

[2] The complaint interchanges "Dougherty" and "Daugherty" throughout. According to the filings on this defendant's behalf (*see, e.g.*, D.E. 10, Notice of Motion; D.E. 10-2, Lin Cert. ¶ 1), the correct spelling is "Daugherty," which the Court uses in this opinion.

[3] D.E. 17 is Yukich's motion for leave to file a sur-reply in view of arguments raised in USAF, Daugherty, and Aziz's reply brief. Having reviewed that reply brief, which raises arbitrability

## II. Background

The complaint alleges as follows. Yukich, a Maryland resident (D.E. 1-1, Compl. ¶ 18), describes herself as "a woman who loves to fence." (*Id.* ¶ 1.) She traces her affinity for the sport back to high school, when she and others revived a defunct fencing club. (*Id.* ¶ 2.) In her college years, which began in 2000, she fenced at the Baltimore Fencing Center after the college team's coach purportedly said he would not "accept 'girly men' on his team." (*Id.* ¶ 3.) In the winter of 2005 into 2006, Yukich came out as transgender. (*Id.* ¶ 4.) She began her physical transition in 2021 and later had gender affirming surgeries. (*Id.* ¶¶ 4, 8, 40, 42.)

The USOPC, incorporated in Washington, D.C. and maintaining its principal place of business in Colorado (*id.* ¶ 31), is charged by Congress in the Sports Act with coordinating amateur athletic activity in the United States relating to international competition, and exercises broad responsibilities, including certifying one national governing body ("NGB")[4] to oversee the administration of each sport. (D.E. 16-1, 1.) USAF is the NGB for fencing in the United States. (D.E. 1-1, ¶ 26.) According to the complaint, "[m]ost competitions are USAF Sanctioned events, and such events require a USA Fencing Membership." (*Id.* ¶ 7; *see also id.* ¶ 41.) Yukich "first became a USAF member on July 31, 2009." (*Id.* ¶ 39.) She then "took time off

---

for the first time, and Yukich's proposed sur-reply, which is an attachment to her motion, the Court will GRANT the motion for leave to file a sur-reply and deems the proposed brief filed.

[4] A "national governing body" is "an amateur sports organization, a high-performance management organization, or a paralympic sports organization that is certified" by USOPC pursuant to statutorily prescribed procedures. 36 U.S.C. § 220501(b)(9). USOPC can certify one NGB per sport. 36 U.S.C. § 220521(a)(2). The NGB has the authority to, among other things, "conduct amateur athletic competition, including national championships, and international amateur athletic competition in the United States, and establish procedures for determining eligibility standards for participation in competition," and "recommend to the [USOPC] individuals and teams to represent the United States" in the Olympic and Paralympic Games. *Id.* § 220523(a)(5)-(6). USAF's role as an NGB is discussed further *infra*.

from fencing from 2009 to 2024." (*Id.*)[5] In July 2023, Yukich "re-activated her USA Fencing . . . membership as she was ready to get back into fencing after her transition." (*Id.* ¶ 5.) Her gender marker was changed from "M" to "F" at her request, and she was marked eligible to compete in women's and mixed events. (*Id.* ¶¶ 6, 41.) She is an "Unclassified Fencer," or "U," the lowest rating a fencer can maintain with USAF. (*Id.* ¶ 9.)

In 2023 and 2024, Yukich "was training but did not compete in any competitions, as she was working to get back into physical shape after debilitating gender affirming surgeries, working full time and raising two children." (*Id.* ¶ 8.) She allowed her USAF membership to lapse again, albeit "briefly," and re-activated it again on April 9, 2025; she also notified USAF of her the legal change of her first name to "Dinah" and "increased her training with the intent of competing in 2025." (*Id.* ¶ 43.)

On July 22, 2025, USAF's CEO, Phil Andrews, advised USAF members that USAF was "forced" to apply USOPC's policy excluding transgender women from competing in women's events. (*Id.* ¶ 44.) He acknowledged, however, that states' laws and the "evolving federal legal landscape" could have "implications on the adherence to the proposed policy," and that it was up to event hosts and individuals to "make [USAF] aware" in such instances. (*Id.* ¶ 45.)

That same day, Yukich responded to Andrews and to defendant Mac Brown, a psychologist with the USOPC who lives and works in Colorado Springs, Colorado. (*Id.* ¶¶ 12, 33). She indicated that she did not consent to changing her gender marker from "F" to "M" and that doing so would be "demeaning and offensive." (*Id.* ¶ 46.) Brown's response acknowledged that the policy would cause distress. (*Id.* ¶ 47.)

---

[5] Elsewhere, the complaint states that Yukich began fencing again at the DC Fencers Club; from the context of that paragraph, the implication was that this happened in 2021. (*Id.* ¶ 40.)

On July 26, 2025, Yukich submitted a formal complaint to USAF. (*Id.* ¶ 49.) On July 28, 2025, an attorney with USAF wrote to Yukich that because the policy had been approved by USOPC, she had "not allege[d] a violation, and we must close [the complaint] with no finding." (*Id.* ¶ 50.)

On August 1, 2025, USAF "unilaterally changed [Yukich's] gender marker from "F" to "M" and blocked her from registering for any women's competitions." (*Id.* ¶ 11.) Yukich unsuccessfully sought to have USAF change her marker back; Andrews acknowledged the negative effects on her but stated that USAF "has no choice but to adhere to the requirements of the USOPC at this time." (*Id.* ¶¶ 52-53.)

Sometime in August 2025, Yukich attempted to register for a fencing competition, called the Premier Challenge ROC, that was scheduled to be held September 25-28, 2025, in Suffern, New York. (*Id.* ¶ 13.) Premier, a fencing club located in Metuchen, New Jersey, organized and hosted the event, which was sanctioned by USAF. (*Id.* ¶¶ 13, 19, 21, 27, 55.) This means the event was "authorized by a USA Fencing representative, and conducted in accordance with the [USAF] 'Rules of Competition' and the related 'USA Fencing Operations Manual.'" (*Id.* ¶ 27.) Registration was through the USAF website and registrants had to be USAF members. (*Id.* ¶ 56.)

Yukich was allowed to register only for the tournament's men's events, and was not permitted to register for or participate in her preferred event, the Veteran's Women's Epee ("VETWE") event, or in any other women's events. (*Id.* ¶¶ 13, 25, 28, 57.)

Yukich contacted USAF on August 15, 2025, about her inability to register for the VETWE and other women's events. (*Id.* ¶ 58.) Defendant Shannon Daugherty, the "Senior Regional Events Manager for USA Fencing" and a "USA Fencing employee" who works in

Colorado Springs, Colorado (*id.* ¶ 29), responded that USAF had been required to update their policy as a consequence of the USOPC's changes to its Athlete Safety Policy. (*Id.* ¶ 59.)

On August 22, 2025, Yukich contacted defendant Abdel Aziz, who Yukich alleges is "an agent of Premier Fencing" and "served as the organizer for the fencing competition at issue;" she again sought assistance to register for her chosen event. (*Id.*¶¶ 23, 60.) Aziz directed her back to Daugherty, explaining that he lacked the ability to register Yukich for women's events. (*Id.* ¶ 61.) Daugherty reiterated that USAF barred Yukich from women's events and said that USAF-sanctioned tournaments had to abide by USAF's policies. (*Id.* ¶ 62.) Aziz said the same thing when Yukich again asked him to register her, telling him that USAF's policy was discriminatory under New York and New Jersey law. (*Id.* ¶¶ 63-64.)

Yukich filed an eight-count complaint in New Jersey state court on October 10, 2025. (D.E. 1-1, Compl.) She asserts that Premier Fencing unlawfully discriminated against her on the basis of gender identity or expression, in violation of the New York State Human Rights Law, N.Y. Exec. L. § 296-2(a) (Count I), and that Aziz, USAF, Daugherty, USOPC, and Brown aided and abetted Premier Fencing's discriminatory conduct, in violation of N.Y. Exec. L. § 296-6 (Counts II through VI). She also asserts claims for IIED (Count VII) and civil conspiracy (Count VIII) against all six defendants.

The USOPC removed the action to this Court, invoking 36 U.S.C. § 220505(b)(9), which is part of the Sports Act. (D.E. 1, Notice of Removal.)[6]

---

[6] Under § 220505(b)(9), a civil action brought in state court against the USOPC "and solely relating to [its] responsibilities under this chapter shall be removed" at its request to the district court of the district in which the action was brought, and that district court "shall have original jurisdiction over the action without regard to the amount in controversy or citizenship of the parties involved."

Defendants' motions to dismiss followed. USAF and Daugherty (the "USAF Defendants") argue that this Court lacks personal jurisdiction over them and that the doctrine of *forum non conveniens* requires dismissal. (D.E. 10-1, USAF Moving Br.) They, along with Aziz, also argue that Yukich fails to state cognizable claims under Fed. R. Civ. P. 12(b)(6). (*Id.*) Yukich counters that she need only make out a prima facie case of personal jurisdiction and has done so, and that all of her claims are adequately pleaded. (D.E. 12, Pl.'s Opp. to USAF.)

In their reply, the USAF Defendants and Aziz add to their *forum non conveniens* argument that Yukich's claims should be dismissed because on June 1, 2025, she signed an agreement that included an arbitration provision and a Colorado forum selection and choice of law clause, and because the Sports Act purportedly requires arbitration in the circumstances presented here. (D.E. 13, USAF Reply 10.) Yukich's sur-reply contends that the arbitration provision in the written agreement is unconscionable and unenforceable, and that the Sports Act does not require arbitration here. (D.E. 17-1, USAF Sur-Reply Brief.)

As with the USAF Defendants and Aziz, the USOPC and Brown argue that this Court lacks personal jurisdiction over them. They also contend that Yukich's claims under New York state law are preempted by federal law, and that in any event, the complaint fails to state viable claim against them. (D.E. 16-1, USOPC Moving Br.)

Yukich, opposing, contends that this Court has general and specific personal jurisdiction over the USOPC and specific jurisdiction over Brown, and that her claims are not preempted and are adequately pleaded under New York statutory law and New Jersey common law. (D.E. 22-1, Pl.'s Opp. to USOPC). In their reply, the USOPC and Brown cite inconsistencies between what Yukich pleaded and what she now argues, but assert that dismissal remains warranted. (D.E. 25, USOPC Reply.)

Premier moves to dismiss on the basis that Yukich's claims must be arbitrated because she signed an agreement with an arbitration clause when she joined USAF, and because her claims are preempted by the Sports Act, which also requires arbitration. Premier also argues that the complaint fails to plead cognizable claims for relief. (D.E. 24-7, Premier Moving Br.) Yukich counters that the Sports Act does not require arbitration of her claims against Premier and that the arbitration provision in USAF's agreement, if even enforceable by Premier, is unenforceable. (D.E. 27, Pl.'s Opp. to Premier.)

## III. Standard of Review

To withstand dismissal under Fed. R. Civ. P. 12(b)(6), a complaint must plead a plausible claim for relief, which means the plaintiff has pleaded "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Kalu v. Spalding*, 113 F.4th 311, 324-25 (3d Cir. 2024) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In conducting that assessment, the well-pled factual allegations are assumed as true and reasonable inferences are drawn in plaintiffs' favor. *Id.* at 325; *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 426 (3d Cir. 2018). "[T]hreadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements" are disregarded in determining whether this standard is met. *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878-79 (3d Cir. 2018) (citation modified). At this stage, the Court accepts as true the factual allegations, considers them in the light most favorable to the plaintiff, and "disregard[s] legal conclusions and recitals of the elements of a cause of action supported by mere conclusory statements." *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016).

## IV. Discussion

### A. Personal Jurisdiction

The USOPC, USAF, Brown, and Daugherty have challenged the Court's personal jurisdiction over them; two, USAF and Daugherty also invoke *forum non conveniens*. The Court begins with these arguments. *Reading Health Sys. v. Bear Stearns*, 900 F.3d 87, 95 (3d Cir. 2018) (stating that "threshold disputes over venue and jurisdiction should be resolved before merits disputes," and concluding that the district court properly considered venue question before arbitrability issues); *see also In re Lipitor Antitrust Litig.*, 855 F.3d 126, 151 (3d Cir. 2017) ("[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction.") (quoting *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007)); *Lampe v. Xouth, Inc.*, 952 F.2d 697, 700 (3d Cir. 1991) ("It is an elementary requirement that personal jurisdiction must be established in every case before a court has power to render any judgment.").

A federal court may exercise personal jurisdiction over nonresident defendants to the extent authorized by the law of the state in which it sits; in New Jersey, the long-arm statute provides for jurisdiction co-extensive with the limits of due process under the Fourteenth Amendment. *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 144-45 (3d Cir. 1992). Due process requires that the defendant have sufficient minimum contacts with New Jersey such that maintaining the suit "does not offend traditional notions of fair play and substantial justice." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The focus is on the "nature and extent of 'the defendant's relationship to the forum State.'" *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021) (quoting *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.*, 582 U.S. 255, 262 (2017)).

Whether sufficient contacts exist is viewed through the lens of either general jurisdiction, meaning the defendant is subject to suit in the forum state with respect to all causes of action, or specific jurisdiction, meaning that the defendant is subject to suit in the forum state because a sufficient connection exists between her contacts with the forum and the asserted cause of action. *O'Connor*, 496 F.3d at 317. General jurisdiction requires continuous and systematic contacts with the forum state, while "[s]pecific jurisdiction permits the exercise of personal jurisdiction over [a] non-resident defendant only if the plaintiff's claims 'arise out of or relate to' the defendant's forum contacts." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 101 (3d Cir. 2004) (Scirica, J., concurring) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

**1. USOPC and USAF**

The USOPC and USAF are not subject to general jurisdiction in New Jersey; they are not "at home" in New Jersey. *See Ford*, 592 U.S. at 358. While in the "'paradigm' case, an individual is subject to general jurisdiction in [their] place of domicile . . . the 'equivalent' forums for a corporation are its place of incorporation and principal place of business." *Id.* at 358-59. "It is incredibly difficult to establish general jurisdiction over a corporation in a forum *other* than the place of incorporation or principal place of business." *Chavez v. Dole Food Co.*, 836 F.3d 205, 223 (3d Cir. 2016) (citation modified). Even a "substantial, continuous, and systematic course of business" will not confer general jurisdiction. *Daimler AG v. Bauman*, 571 U.S. 117, 138 (2014) (citation modified). Only when a corporation's operations are "so substantial and of such a nature as to render the corporation at home in that State" is the corporation subject to general jurisdiction in the forum state. *Id.* at 139 n.19.

The complaint fails to allege facts sufficient to meet this standard. The USOPC is a federally chartered corporation that is incorporated in Washington, D.C. and maintains its

principal place of business in Colorado. (D.E. 1-1, ¶ 31.) Yukich advances the novel argument that the USOPC has thirteen different "nerve centers" in thirteen different states because there are NGB locations in each of those states. (D.E. 22-1, 7.) Two of these NGB locations are in New Jersey, United States Rowing and the United States Golf Association (*id.* at 7), and neither is implicated in this action.[7] This Court finds Yukich's argument implausible. "A corporation's 'nerve center,' usually its main headquarters, is a single place . . . within a State." *Hertz Corp. v. Friend*, 559 U.S. 77, 93 (2010); *see Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 347 (3d Cir. 2013) (a nerve center is the "single place that is the corporation's 'brain'"). That "nerve center" is where a corporation's "high level officers direct, control, and coordinate the corporation's activities." *Hertz*, 559 U.S. at 80. The USOPC's headquarters is in Colorado (D.E. 1-1, ¶ 31); its "nerve center" would be Colorado.

Similarly, USAF is a Colorado not-for-profit corporation and maintains its principal place of business in Colorado. (D.E. 10-1, 6). Yukich alleges that USAF's status as the national governing body for the sport of fencing is enough to render it "at home" in New Jersey. (D.E. 12, 4-5.) However, as established, a corporation's "nerve center" is usually its headquarters; USAF's headquarters is in Colorado. Yukich has not alleged sufficient facts to establish that USAF directs, controls, or coordinates USAF activities in New Jersey. Since USAF is not "at home" in New Jersey, this Court has no general jurisdiction over them.

---

[7] Yukich alleges that NGB's are "tightly controlled" by the USOPC (D.E. 22-1, 8), which defendants rebut by reference to the Sports Act. (D.E. 25, 6 ("NGBs are distinct legal entities that operate independently, with their own boards and corporate governance structures.")) Either way, the two NGB's headquartered in New Jersey are irrelevant to this action, and do not provide sufficient minimum contacts with the state so as to confer personal jurisdiction upon the USOPC.

For specific jurisdiction, Yukich has not sufficiently alleged that the USOPC or USAF have "meaningful contacts, ties, or relations" with New Jersey, *Burger King*, 471 U.S. at 471-72 (citation modified); have "purposefully avail[ed]" themselves of the privilege of conducting activities within the New Jersey, *see J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 880 (2011); nor has she properly claimed[8] that New Jersey is the forum where either corporation committed their alleged tortious conduct, or where plaintiff felt the brunt of that alleged conduct, *see Calder v. Jones*, 465 U.S. 783, 788-89 (1984). Yukich is a Maryland resident who alleges that Colorado defendants prevented her from registering for a women's fencing event in New York, in violation of New York law.

Yukich alleges that the USOPC "purposefully availed" itself of New Jersey when it "directed" USAF and other USOPC NGBs to update their policies relating to transgender athletes. (D.E. 22-1, 9.) She also alleges that USAF "disseminated the Trans Ban to all USAF members and USAF clubs." (D.E. 12, 5.) The Supreme Court has rejected the proposition that a nationwide policy creates jurisdiction in every state where it might have consequences. *See J. McIntyre Mach.*, 564 U.S. at 882 (stating that nationwide conduct "permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum"). USOPC and USAF's nationwide policy does not create a relevant forum in New Jersey such as to confer specific jurisdiction upon the USOPC or USAF.

Yukich further alleges that USAF's active website is a mechanism to confer specific jurisdiction upon USAF, because "it targets individuals to sign up for events held across the

[8] In her opposition briefs, Yukich, for the first time, adds the claim that she "felt the harm in New Jersey because that is where the acts were committed." (D.E. 12, 13; D.E. 22-1, 22.) However, the facts pled in the complaint do not sufficiently support this contention; there are not sufficient facts alleged to suggest that *any* actions took place in New Jersey.

country," and it advertised the New York event of Premier, a company headquartered in New Jersey. (D.E. 12, 5-6.) However, "the mere operation of a commercially interactive website should not subject the operator to jurisdiction anywhere in the world." *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 454 (3d Cir. 2003) (referencing *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997)). "In cases where the defendant is clearly doing business through its web site in the forum state, and where the claim relates to or arises out of use of the web site, the *Zippo* court held that personal jurisdiction exists." *Id.* at 452. Here, even if USAF was "doing business" through its website by advertising fencing events, it was not advertising an event in New Jersey; USAF was in no way "doing business" in New Jersey. Yukich has failed to sufficiently allege USAF's intentional interaction with New Jersey via their website.

This Court does not have personal jurisdiction over these corporate entities. All claims against the USOPC and USAF must accordingly be dismissed with prejudice.

**2. Mac Brown and Shannon Daugherty**

Brown and Daugherty are not subject to general jurisdiction in New Jersey; they are not "at home" in New Jersey. *See Ford*, 592 U.S. at 358. For individuals, the "paradigm case" for general jurisdiction is their domicile. *Id.* at 358-59. Brown lives and works in Colorado. (D.E. 1-1, ¶ 33.) Daugherty is also domiciled in Colorado. (*Id.* ¶ 29.) Yukich has not sufficiently alleged that either defendant has ties or contacts in New Jersey that would render them "at home" in the state.

For specific jurisdiction, Yukich has not sufficiently alleged that Brown or Daugherty have "meaningful contacts, ties, or relations" with New Jersey, *see Burger King*, 471 U.S. at 471-72 (citation modified), nor has she claimed that New Jersey is the forum where Brown or Daugherty committed their alleged tortious conduct, or where plaintiff felt the brunt of that

alleged conduct, *see Calder*, 465 U.S. at 788-89.

Yukich alleges that Brown's actions "took place in New Jersey when he controlled USAF to implement the ban in New Jersey." (D.E. 22-1, 18.) However, the alleged facts do not support this assertion. Brown is employed by USOPC as a psychologist. (D.E. 1-1, ¶ 12.) Yukich contacted him to protest the sex marker change from "F" to "M" on her USAF record. (*Id.* ¶ 46.) Brown told Yukich it "is painful and distressing to be labeled in a manner that does not align with our held identities." (*Id.* ¶ 47.) This was the extent of Brown's conduct; it does not support the allegation that he had any control over, nor even contact with, USAF, and reveals no conduct on his part tied to New Jersey.

Yukich alleges that Daugherty's actions "violate New York Law, and the actions took place in New Jersey." (D.E. 12, 10.) "The actions" are alleged as follows: Daugherty, an employee of USAF, told Yukich that USAF "was required to update their transgender policy due to the USOPC's update to their Athlete Safety Policy" (D.E. 1-1, ¶ 59) and "all sanctioned USA Fencing tournaments, local, regional, and nationals are required to abide by our policies. It is a condition of being a sanctioned event." (*Id.* ¶ 62.) Daugherty, in Colorado, replied to Yukich, in Maryland, regarding the actions of a Colorado corporation as it affected Yukich's registration for an event in New York. Yukich does not allege facts through which a plausible inference can be drawn that that Daugherty was "very much emmeshed in planning, promoting, and operating the public accommodation (Premier ROC Challenge), with [Premier] (located in New Jersey)." (D.E. 12, 7.) The alleged facts make clear that there is no way to infer or confer jurisdiction when no harm is pled as having taken place in New Jersey, let alone harm caused by Daugherty.

This Court therefore does not have personal jurisdiction over Brown or Daugherty, and the alleged facts show that any amendment would be futile. All claims against Brown and Daugherty must accordingly be dismissed with prejudice.

**3. Premier and Aziz**

As stated *supra*, individuals are subject to general jurisdiction in their place of domicile, and a corporation is subject to general jurisdiction in its place of incorporation and principal place of business. *Ford*, 592 U.S at 358-59. Premier is therefore subject to the general jurisdiction of New Jersey; its principal place of business is Metuchen, New Jersey. (D.E. 1-1, ¶ 19.)

Nowhere in the briefing, however, is Aziz's domicile alleged. He is referred to as an "agent" of Premier and as the "organizer for the fencing competition" at issue here. (*Id.* ¶ 23.) The exact nature of his relationship to Premier is unknown to this Court, but he does not dispute his status as "agent." (*See generally* D.E. 10-1; D.E. 13.) Therefore, this Court has specific jurisdiction over Aziz, as his presumed employment at a New Jersey company creates a meaningful tie, contact, or relationship with New Jersey. *See Burger King*, 471 U.S. at 471-72.

This Court therefore has personal jurisdiction over Premier and Aziz.

**B. Arbitrability**

Premier argues that Yukich's claims against them are barred by the arbitration provision. (D.E. 24-7, 6.) Under the arbitration provision, governed by the Federal Arbitration Act, 9 U.S. §§ 1-16 (the "FAA"), Premier argues that Yukich agreed to arbitrate her claims regarding participation in fencing events sponsored by USAF in Colorado and pursuant to Colorado law. (D.E. 24-7, 6.) Yukich argues that the arbitration clause is unenforceable. (D.E. 27, 7-12.)

Whether parties have agreed to arbitrate a particular dispute is typically an "issue for

judicial determination." *Granite Rock Co. v. Int'l Broth. of Teamsters*, 561 U.S. 287, 296 (2010) (citation modified). It is similarly well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to decide. *Id.* (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (stating that when deciding whether the parties have agreed to arbitrate a certain matter, courts should apply ordinary principles that govern the formation of contracts)). Accordingly, the FAA reflects the fundamental principle that arbitration is a matter of contract, and places arbitration agreements on equal footing with other contracts, requiring courts to enforce them according to contract terms. *See Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010).

**1. Scope**

A court may order arbitration of a particular dispute "only where the court is satisfied that the parties agreed to arbitrate *that dispute*." *Granite Rock*, 561 U.S. at 297 (citing *First Options*, 514 U.S. at 943). For such an agreement to exist, the court must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce. *Id.* Typically, these issues concern the "scope of the arbitration clause and its enforceability." *Id.* And where parties concede that they have agreed to arbitrate some matters pursuant to an arbitration clause, the law's permissive policies on arbitration provide that "any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration." *Id.* at 298 (quoting *First Options*, 514 U.S. at 945).

On June 1, 2025, Yukich signed the USAF 2025-26 Individual Membership waiver (D.E. 24-3, 3); it contains an arbitration provision stating in part:

> any controversy or claim arising from or relating to . . . membership or participation . . . in USA Fencing, Including but not limited to any matter arising from or relating to (i) qualification or selection for, or competition in, any fencing event, whether staged under the auspices of USA Fencing, the FIE, the IWAS, the

> USOPC, the IOC or some other fencing administrative body . . . shall to the fullest extent permitted by law be settled by arbitration.

(D.E. 24-3, 2.)

Premier argues that because Yukich signed the waiver, she agreed to arbitrate her claims, and that looking at Yukich's own allegations, the waiver applies to this action. (D.E. 24-7, 8.) Premier points to her acknowledgement that the event was sanctioned by USAF (D.E. 1-1, ¶ 55), that she attempted to register for the event through the USAF website (*id.* ¶¶ 56-57), and that to attempt to register for the event she had to be a USAF member (*id.* ¶ 56), for support. (D.E. 24-7, 8.) Yukich's opposition is not persuasive. She argues that "Premier Fencing had no obligation under any law to host an event that *had to be sanctioned*" by USAF. (D.E. 27, 5.) Whether or not Premier's event *had to* be sanctioned by USAF is irrelevant; before the Court is the alleged fact that the event was, in fact, sanctioned by USAF.

Yukich also takes issue with the applicability of the arbitration clause to this dispute because of the language: "qualification or selection for, or competition in, any fencing event." (D.E. 24-3, 2.) She argues that the competition was open to the public. (D.E. 27, 13.) Contract jurisprudence instructs this Court to look to the plain meaning of a term; where language has a generally prevailing meaning, a term is interpreted with that meaning. By ordinary definition, "qualification" can refer to "a condition or standard that must be complied with." *See Qualification*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/qualification (last visited Sept. 30, 2026). This dispute directly involves the gender-based conditions set forth by the EO, interpreted by the USOPC, and applied by USAF. The EO's biological sex condition denied Yukich the ability to compete in the women's fencing event. The dispute undoubtedly concerns Yukich's qualification for or competition in a fencing event. Pursuant to the arbitration agreement, this dispute must be submitted to arbitration.

### 2. Enforceability

Yukich further argues that the Individual Membership Waiver, which contains the arbitration provision, is an unenforceable contract

Yukich first claims that "it is a legal impossibility for an individual to assent to arbitrate something that was not contemplated at the time of execution," relying on the fact that Yukich signed the agreement on June 1, 2025, but the change of her gender marker from "F" to "M," occurred in July 2025. (D.E. 27, 7.) As Premier indicates, however, the point of an arbitration agreement is to designate the procedure by which the parties have their future grievances heard. (D.E. 31, 7.) The membership waiver even contains the language:

> I agree to abide by the current rules and policies of USA Fencing . . . all as now constituted and as may be amended from time to time . . . USA Fencing has the right to adjust, modify, add to, or otherwise amend its Bylaws, rules, policies, and procedures, the current versions of which will be available on the USA Fencing website.

(D.E. 24-3, 1.) Yukich was on notice, at the time of signing the waiver, that the existing rules agreed to were subject to change.

Yukich argues that the arbitration clause constituted an unconscionable agreement and therefore is not valid under Colorado law.[9] (D.E. 27, 8.) Since, under the FAA, arbitration agreements are treated like any other contract, a party may challenge whether they are unconscionable. *Rent-A-Center*, 561 U.S. at 67-68. An unconscionable contract or term is unenforceable. In determining whether a contract was unconscionable at the time the contract was made this Court must address both substantive unconscionability and procedural unconscionability. *Bailey v. Lincoln Gen. Ins. Co.*, 255 P.3d 1039, 1055 (Colo. 2011) (en banc).

---

[9] This court applies Colorado law to this analysis, as the arbitration clause states: "The arbitration shall be governed by the laws of the State of Colorado and the United States" (D.E. 24-3, 3) and both parties apply Colorado law.

Colorado law provides the following seven factor test, encompassing factors of both substantive and procedural unconscionability: (1) whether the agreement is standardized and between parties of unequal bargaining position; (2) lack of opportunity to read or become familiar with the document before signing it; (3) use of fine print in the portion of the contract containing the provision; (4) absence of evidence that the provision was commercially reasonable or should reasonably have been anticipated; (5) whether the contract contains terms that are substantively unfair; (6) the relationship of the parties, including factors of assent, unfair surprise and notice; and (7) all the circumstances surrounding the formation of the contract, including its commercial setting, purpose and effect. *Davis v. M.L.G. Corp.*, 712 P.2d 985, 991 (Colo. 1986) (en banc).

*i. Unequal Bargaining*

The arbitration clause was agreed to as a part of the process of joining USAF though its website. (D.E. 31, 5.) Yukich argues that there is an "inequality of bargaining strength" between Premier and herself since the clause was presented on a "take-it-or-leave-it basis." (D.E. 27, 9-10.) Yet, as Premier points out, Yukich does not allege that she attempted to negotiate the terms of the arbitration provision and that such a request was denied. (D.E. 31, 5.) As a practical matter, "take-it-or-leave-it" is not an actionable condition under the circumstances here, where Yukich wanted to be a member and was free not to be a member. This argument is rejected.

*ii. Lack of Opportunity*

Yukich argues that she was "not given an adequate opportunity to become familiar with the arbitration provision." (D.E. 27, 10.) She argues that there was "no opportunity to ask questions, seek counsel, or opt out of arbitration without forfeiting membership." (*Id.*) However, as Premier points out, there is no reason why she could not have printed out the

agreement, considered it, or presented it to counsel, if she so chose; she was under no time constraint. (D.E. 31, 6.) This Court finds this argument unpersuasive.

*iii. Use of Fine Print*

Yukich argues that "the arbitration clause was shelved between voluminous waivers within one document." (D.E. 27, 10.) This is not the case. The arbitration clause is found within the 2025-26 Individual Membership Waiver, which is two pages long. (D.E. 24-3.) Within that document, the clause is offset with the capitalized word "ARBITRATION." (*Id.* at 2.) The arbitration clause therefore appears "reasonably conspicuous" and Yukich's "assent was unambiguous," as evidenced by her electronic signature. *Vernon v. Qwest Communs. Int'l, Inc.*, 925 F. Supp. 2d 1185, 1191 (D. Colo. 2013).

*iv. Commercially Reasonable*

Yukich advances no arguments relating to this factor.

*v. Substantively Unfair Terms*

The arbitration clause states that "[t]he arbitrator(s) will have no authority or jurisdiction to award consequential, punitive, or exemplary damages, and any demand for such damages shall be a nullity." (D.E. 24-3, 3.) Yukich argues that this language is substantively unfair, because it "completely disallows all monetary damages for civil rights claims." (D.E. 27, 11.) This is inaccurate. Pursuant to the arbitration clause, the cases that could be referred for arbitration concern:

> (i) qualification or selection for, or competition in, any fencing event, whether staged under the auspices of USA Fencing, the FIE, the IWAS, the USOPC, the IOC or some other fencing administrative body, (ii) qualification or selection for, or activities as, a coach, referee or other official at any such fencing event; or (iii) compliance with or violation of any rule, regulation, policy, practice, bylaw, statute or common law, of USA Fencing, FIE, IWAS, USOPC or IOC, or of any national, state, provincial or local governing or administrative body, including any issue concerning compliance by USA Fencing or by any officer, director,

> employee, agent, attorney, referee, official, club member, individual member, committee member or volunteer of USA Fencing, including but not limited to any matter arising from or relating to allegations of damage to property or injury to person.

(D.E. 24-3, 3.) The above does not sweep in "all civil rights claims" and Yukich leaves out the availability under the clause to seek injunctive relief.

*vi. Relationship of the Parties*

Yukich argues that the 2025-26 Individual Membership Waiver is "voluminous" and that it is an "unfair surprise" for claims against Premier, "a private fencing club in New Jersey," to be encompassed by the arbitration clause. (D.E. 27, 11.) As discussed *supra*, the waiver is not voluminous; it is two pages long, and the arbitration clause is conspicuous. (D.E. 24-3.) And, as discussed above, the waiver states that it applies to "qualification or selection for, or competition in, any fencing event, whether staged under the auspices of USA Fencing, the FIE, the IWAS, the USOPC, the IOC or some other fencing administrative body." (*Id.*) This includes a USAF sanctioned fencing event in New York organized by a New Jersey club. Yukich has therefore not sufficiently alleged unfair assent, surprise, or notice.

*vii. Circumstances Relating to Formation*

Both the opposition and the case law treat this factor as a catch-all. *See Bailey*, 255 P.3d at 1055 n.9 (indicating that the last factor combines both substantive and procedural accountability, weighing all the circumstances surrounding the formation of the contract, including its setting, purpose, and effect). None of the foregoing factors favor Yukich.

The claims against Premier are therefore not appropriately before this court and are dismissed.

**C. Aiding and Abetting, IIED, and Civil Conspiracy**

The Court now turns to Aziz. Yukich alleges that, under N.Y. Exec. L. § 296(6), Aziz

aided and abetted Premier in its alleged unlawful discrimination against her. New York law requires that "a precondition to a valid aiding and abetting claim . . . is a demonstration of a valid primary claim for discrimination . . . against the corporate employer." *Samuels v. Urb Assembly Charter Sch. for Comput. Sci.*, No 23-1379, 2024 WL 4008165, *12 (S.D.N.Y. Aug. 30, 2024). Here, as established above, the "primary claim for discrimination" against Premier, the corporate employer, is not validly before this Court. This claim must be dismissed.

Yukich also alleges claims against Aziz for IIED and civil conspiracy under New York law. (D.E. 1-1, ¶¶ 117-126.) However, in her opposition brief, she argues that New Jersey law should apply. (D.E. 12, 18-19.) The Court need not spend resources on cleaning up this discrepancy; fortunately, New York and New Jersey law agree.

To survive a motion to dismiss with respect to a claim of IIED, the "pleading must allege conduct that [is] so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Ferdous v. Hasan*, 236 A.D.3d 992, 994 (N.Y. App. Div. 2025) (citation modified); *see also Ingraham v. Ortho-McNeil Pharm.*, 422 N.J. Super. 12, 21 (App. Div. 2011) (IIED must be "extreme and outrageous . . . as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community"). This is a high standard, and one that Yukich does not reach. She alleges that she contacted Aziz regarding her inability to register for the women's competition (D.E. 1-1, ¶ 60), and he told her to contact Daugherty, explaining that he did not have the option to register Yukich for any women's events due to constraints in the online system. (*Id.* ¶ 61.) Daugherty told her that "[a]ll sanctioned USA Fencing tournaments . . . are required to abide by our policies." (*Id.* ¶ 62.) She went back to Aziz, requesting that Premier violate the USAF policy. (*Id.* ¶ 63.) Aziz reiterated that "Premier

Fencing Club, as the organizing Club, is required to comply with USA Fencing policies." (*Id.* ¶ 64.) As alleged, this conduct hardly rises to extreme or outrageous conduct that goes beyond all possible bounds of decency. Aziz and Daugherty were doing their jobs.

Finally, this Court turns to the civil conspiracy claim against Aziz. To plead a cause of action for civil conspiracy, the plaintiff "must allege a cognizable tort, coupled with an agreement between the conspirators regarding the tort, and an overt action in furtherance of the agreement." *McSpedon v. Levine*, 158 A.D.3d 618, 621 (N.Y. App. Div. 2018) (citation modified); *see also Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 177 (2005) (explaining that the gist of the claim is not the unlawful agreement, but the underlying wrong, which, absent the conspiracy, would give a right of action). Here, since Yukich's claim for IIED as to Aziz must be dismissed, so too must the claim for civil conspiracy. Absent IIED, there is not a properly pled underlying wrong or tort. Therefore, Yukich's civil conspiracy claim against Aziz is dismissed with prejudice.

## V. Conclusion

The motions to dismiss (D.E. 10, D.E. 16, D.E. 24) are GRANTED. The dismissals are with prejudice. The Court has determined the jurisdictional issues based on pleaded facts that cannot be unpleaded. Further, the Court has exercised its authority to decide whether an agreement to arbitrate Yukich's qualifications to enter the women's competition exists (it does) and whether the agreement to arbitrate is enforceable (it is). Amendment would be futile. An appropriate order will be entered reflecting the Court's ruling.

s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.

Date: September 30, 2026