# EXHIBIT

# “B”

2026 WL 2969569
Only the Westlaw citation is currently available.
**Not for Publication**
United States District Court, D. New Jersey.

CHARLES SCHWAB & CO., INC., Plaintiff,
v.
ALEXIA KOEPPEL, H. ANDREW SCHWED, MEREDITH KOEPPEL SCHWED, AARON STERN, and LINDSAY SENTER, Defendants.

Civil Action No. 2:22-cv-02236 (ES) (ADS)
|
Filed 10/02/2026

**Attorneys and Law Firms**

Andrew Colman, Baritz & Colman LLP, New York, NY, Howard W. Burns Jr., Law Office of Howard W. Burns, Jr., New York, NY, for Plaintiff.

Gregg Philip Tabakin, Fein, Such, Kahn & Shepard P.C., Parsippany, NJ, for Defendants Alexia Koeppel, H. Andrew Schwed, Meredith Koeppel Schwed.

A. William Henkel, Elizabeth J. Hampton, Fox Rothschild LLP, Princeton, NJ, for Defendants Aaron Stern, Lindsay Senter.

**OPINION**

Esther Salas, U.S.D.J.

***1** Before the Court are four motions arising from this interpleader action filed by Plaintiff Charles Schwab & Co., Inc. ("Schwab"). Schwab commenced this action to resolve competing claims to the proceeds of a Roth Individual Retirement Account (the "Roth IRA") owned by the decedent, Mitchell Koeppel (the "Decedent"). (D.E. No. 1 ("Complaint" or "Compl.")). The competing claimants are Defendants Alexia Koeppel, H. Andrew Schwed, Meredith Koeppel Schwed, Aaron Stern, and Lindsay Senter, each of whom asserts entitlement to the account as a proper beneficiary.[1] Presently before the Court are: (i) a motion for summary judgment filed by Defendants Aaron Stern and Lindsay Senter (collectively, the "Stern Defendants"), (D.E. No. 130); (ii) a motion for summary judgment filed by Defendants Alexia Koeppel, H. Andrew Schwed, and Meredith Koeppel Schwed (collectively, the "Koeppel Defendants"), (D.E. No. 135); (iii) Schwab's cross-motion for summary judgment, (D.E. No. 136); and (iv) the Koeppel Defendants' motion *in limine* under Federal Rules of Evidence 702 and 704 to exclude the expert testimony of Daniele M. FitzPatrick, (D.E. No. 135-5).

The Court has carefully considered the parties' submissions in connection with the motions, as well as the balance of the record, and decides the motions without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons stated below, the Court will: (i) condition its exercise of subject-matter jurisdiction on Schwab's deposit of the disputed funds; (ii) **GRANT in part** and **DENY in part** the Koeppel Defendants' motion to exclude FitzPatrick's testimony; (iii) permit Schwab to invoke interpleader but **DENY** its request for discharge and dismissal of the counterclaims; (iv) **GRANT** the Koeppel Defendants summary judgment as to the undisputed fifty percent of the Roth IRA and **DENY** both the Koeppel Defendants and the Stern Defendants' motions for summary judgment as to the disputed fifty percent; and (v) **GRANT in part** and **DENY in part** the motions directed to the counterclaims asserted against Schwab.

## I. BACKGROUND

### A. Factual Background[2]

***2** The Decedent maintained several investment accounts with Schwab, including the Roth IRA at issue in this action, a traditional IRA, a joint account with his spouse, non-party Madelaine Senter, and a revocable trust account. (Koeppel SUMF ¶ 3).[3] Schwab provides securities brokerage, investment management, and financial advisory services and maintains a branch office in Manhasset, New York. (Koeppel SUMF ¶¶ 1–2). Between 2019 and 2022, John "Jack" Vogelzang ("Vogelzang"), a Schwab financial consultant, serviced the Decedent's accounts, including the Roth IRA. (*Id.* ¶ 4).

On January 9, 2009, the Decedent opened the Roth IRA. (Schwab SUMF ¶ 1). The account application provided that the Decedent could revoke or change his beneficiary designation at any time by completing a new IRA Beneficiary Form, with any change becoming effective upon Schwab's receipt of the completed form. (Koeppel SUMF ¶ 8). The application further incorporated the Schwab IRA and ESA

Account Agreement ("Account Agreement"), which provides that California law governs the account. (Stern SUMF ¶ 40).

Between 2013 and September 2019, the Decedent executed a series of beneficiary designation forms for the Roth IRA, successively naming, in varying combinations and percentages, Defendant Alexia Koeppel, Defendant Meredith Koeppel Schwed, Madelaine Senter, the Mitchell P. Koeppel Revocable Living Trust, the Alexia Koeppel Trust, and the Stern children. (Koeppel SUMF ¶¶ 21–25). Each designation form likewise specified that a beneficiary could be changed only "by completing a new Schwab Beneficiary Designation Form, listing all beneficiaries and their respective percentages." (*Id.* ¶ 28).

On September 27, 2019, the Decedent executed a Beneficiary Designation Form naming Defendant Alexia Koeppel as a fifty-percent beneficiary of the Roth IRA. (Stern SUMF ¶ 4). The Decedent also designated his two minor grandchildren from his first marriage—the Koeppel children—as twenty-five-percent beneficiaries each. (*Id.*). On or about October 1, 2020,[4] the Decedent met with Vogelzang at Schwab's Manhasset branch. (Schwab SUMF ¶¶ 3–4). According to Schwab, during that meeting, the Decedent instructed Vogelzang to remove Defendant Alexia Koeppel as a beneficiary and instead designate each of the Stern children as twenty-five-percent beneficiaries. (*Id.* ¶ 4). Vogelzang then entered those changes into Schwab's internal Client Central system while the Decedent was present. (*Id.* ¶ 5). Schwab frames this only as an oral request that Vogelzang entered into Client Central, expressly stating it is "unknown" whether the Decedent ever signed a supporting form. (Schwab SUMF ¶¶ 4–7). Vogelzang testified that he had the impression that the Decedent completed an updated beneficiary form with the front counter, and that he asked one of his colleagues to help the Decedent with completing it. (Stern SUMF ¶ 13; *see also* D.E. No. 130-8 ("Vogelzang Tr.") at 109:6-8 & 109:13-20). However, a signed form is currently not in Schwab's system and Schwab admits that it "has no documents in its custody, possession or control executed by Decedent and delivered to Schwab revoking or in any manner altering or changing the Designation." (Schwab SUMF ¶ 7; Koeppel SUMF ¶ 15). Consistent with this, Schwab employee Rachel Brown wrote Vogelzang on January 21, 2022, advising that she could not locate a supporting form, and Vogelzang responded on January 24, 2022, indicating that Schwab had "checked all of our files with no luck." (Stern SUMF ¶¶ 24–25). Schwab's policy as of August 2020 required a signed Beneficiary Designation Form or an online update, and prohibited accepting verbal instructions. (Koeppel SUMF ¶¶ 29–35).

***3** The parties dispute Vogelzang's authority to effect beneficiary changes through Client Central without a signed Beneficiary Designation Form. (*See, e.g.,* Koeppel SUMF ¶¶ 30, 32 & 34; Stern Resp. to Koeppel SUMF ¶¶ 30, 32 & 34; Schwab Resp. to Koeppel SUMF ¶¶ 30, 32 & 34). The Koeppel Defendants rely on Schwab's written policies, which, as of August 2020, required either a signed Beneficiary Designation Form or an online beneficiary update and prohibited verbal beneficiary change requests. (Koeppel SUMF ¶¶ 29–35). The Stern Defendants, by contrast, point to testimony indicating that branch employees nevertheless had the ability to make beneficiary changes through Client Central and characterize the written procedures as a "best practice" rather than an absolute requirement. (*Id.* ¶¶ 32 & 34). The record further reflects that in January 2019, after Vogelzang made a verbal beneficiary change to this same account, a Schwab operational manager advised him that verbal changes were invalid and that the client had to complete a form or make the change online. Schwab disputes the Stern Defendants' characterization of that communication as a "reprimand." (Stern SUMF ¶¶ 33–35; Schwab Resp. to Stern SUMF ¶¶ 33–35).

Following the October 2020 meeting, Schwab's system automatically generated an Account Verification Letter identifying the Stern children as beneficiaries of the Roth IRA, and the Decedent did not object to its contents. (Stern SUMF ¶ 14; Schwab SUMF ¶ 8). Schwab generated a second Account Verification Letter listing the same beneficiary information on November 18, 2021. (Stern SUMF ¶ 19). Thereafter, on March 21, 2022, and before this action was commenced, Schwab's counsel advised counsel for the Stern Defendants that Schwab's records identified the Stern children as beneficiaries of the Roth IRA. (Stern SUMF ¶ 20).

The Decedent died on October 15, 2021. (Koeppel SUMF ¶ 48). That same morning, Madelaine Senter telephoned Vogelzang to report the death. (*Id.* ¶ 49). Ms. Senter held a Full Power of Attorney over the Roth IRA that she acknowledged became "no longer viable" upon the Decedent's death.[5] (*Id.* ¶¶ 61–62).

Thereafter, competing claims arose regarding fifty percent of the Roth IRA. Alexia Koeppel relied on the September 2019 beneficiary designation, whereas the Stern Defendants relied on the October 2020 meeting and the changes entered

into Client Central. (Koeppel SUMF ¶ 51; Schwab SUMF ¶ 10). The Stern Defendants further demanded that Schwab halt distributions to any purported beneficiaries pending resolution of the dispute. (Schwab SUMF ¶ 11). On December 27 and 28, 2021, counsel for the Koeppel Defendants asserted that Alexia Koeppel remained a beneficiary of the Roth IRA and that the October 2020 beneficiary change was ineffective. (*Id.* ¶ 13). On January 26, 2022, Schwab responded that it had been unable to locate any beneficiary designation form naming the four grandchildren and advised that "a court order can override the beneficiary designation." (*Id.* ¶ 14). On February 17, 2022, the Koeppel Defendants further asserted that the October 2020 beneficiary change had been procured through "fraud, undue influence and coercion" and demanded that Schwab freeze the account. (*Id.* ¶ 16).

Schwab thereafter froze the Roth IRA pursuant to the dispute-resolution provisions of its Account Agreement and, on April 18, 2022, commenced this interpleader action. (Schwab SUMF ¶¶ 17–18). As of October 1, 2024, the Roth IRA held a market value of approximately $1.495 million. (Koeppel SUMF ¶ 50).

### B. Procedural History

On April 18, 2022, Schwab commenced this interpleader action, naming Alexia Koeppel, H. Andrew Schwed, Meredith Koeppel Schwed, Aaron Stern, and Lindsay Senter as Defendants. (Compl.). On June 29, 2022, the Stern Defendants answered the Complaint and asserted counterclaims against Schwab, including breach of fiduciary duty and negligence, (D.E. No. 10), and on July 20, 2022, Schwab answered those counterclaims, (D.E. No. 13). On September 16, 2022, the Koeppel Defendants likewise answered the Complaint and asserted counterclaims against Schwab, including breach of contract, breach of fiduciary duty, and negligence, (D.E. No. 23), and Schwab answered those counterclaims on October 7, 2022, (D.E. No. 26).

***4** During discovery, both sets of Defendants sought leave to amend their answers and counterclaims. (D.E. Nos. 48 & 63). The Court granted the Stern Defendants' unopposed motion to amend, and on September 22, 2023, the Stern Defendants filed an Amended Answer, Affirmative Defenses, and Counterclaim. (D.E. Nos. 66 & 67). The Court likewise granted the Koeppel Defendants' unopposed motion to amend, after which they filed an Amended Answer and Counterclaim. (D.E. Nos. 70 & 74). Schwab thereafter answered the amended counterclaims. (D.E. Nos. 72 & 77). The parties also moved to compel liquidation of the assets held in the Roth IRA. (D.E. Nos. 64 & 69). Following the parties' agreement, the Court entered a Stipulation and Order directing Schwab to liquidate the assets in the Roth IRA and invest the proceeds in the Schwab U.S. Treasury Money Fund. (D.E. No. 76). Discovery, including expert discovery, continued thereafter and was completed by August 20, 2024. (D.E. No. 101).

Thereafter, the Stern Defendants moved for summary judgment against Schwab. (D.E. No. 130). The Koeppel Defendants separately moved for summary judgment and, as part of their submission, moved *in limine* to exclude the expert testimony of Daniele M. FitzPatrick. (D.E. Nos. 135, 135-5 & 135-9). Schwab opposed both motions and cross-moved for summary judgment. (D.E. No. 136). The parties completed briefing on the pending motions. (*See* D.E. Nos. 132, 133, 134 & 136-5). Schwab subsequently filed a reply in further support of its cross-motion and in opposition to Defendants' motions. (D.E. No. 138).

The motions are ripe for adjudication.

## II. Subject Matter Jurisdiction

Schwab brings this action under the interpleader statute, 28 U.S.C. § 1335 ("Section 1335"). Before addressing the motions' merits, the Court will briefly assess Section 1335's jurisdictional requirements. *See* 28 U.S.C. § 1335. Section 1335 grants original jurisdiction to the district courts and sets forth certain requirements that must be met before an interpleader action may be maintained. *Prudential Ins. Co. of Am. v. Pinto*, No. 07-4166, 2010 WL 1752504, at *2 (D.N.J. Apr. 28, 2010); *CNA Ins. Cos. v. Waters*, 926 F.2d 247, 249 (3d Cir. 1991). Although the stakeholder's citizenship is irrelevant for jurisdictional purposes, the statute requires diversity of citizenship between two or more adverse claimants. *Reassure Am. Life Ins. Co. v. The Gennaro J. Perillo & Minnie Perillo Irrevocable Tr.*, No. 09-187, 2011 WL 832185, at *2 (D.N.J. Mar. 2, 2011). Section 1335 also requires that "the amount in controversy, which is measured by the value of the stake," be at least "$500, and compels the stakeholder to deposit the money or property at issue in the court's Registry or, in the alternative, to give a bond payable to the clerk of courts in the appropriate amount." *NYLife Distributors, Inc. v. Adherence Grp., Inc.*, 72 F.3d 371, 374 (3d Cir. 1995). "A proper deposit or bond is a jurisdictional prerequisite to bringing an [action in] interpleader." *U.S. Fire Ins. Co. v. Asbestospray, Inc.*, 182 F.3d 201, 210 (3d Cir. 1999).

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

In the current case, the proceeds of the Roth IRA held a market value of approximately $1.495 million as of October 2024. (Koeppel SUMF ¶ 50). The Koeppel Defendants and the Stern Defendants are both claiming to be the rightful beneficiaries of the Roth IRA. Schwab also seems to make a sufficient showing that it legitimately fears multiple adverse claims. (*See* Section IV(B), *infra*). Indeed, both the Stern Defendants and Koeppel Defendants have asserted counterclaims against Schwab. Further, the Complaint alleges that Defendant Alexia Koeppel is a citizen of Utah; Defendants H. Andrew Schwed and Meredith Koeppel Schwed are citizens of New Jersey; and Defendants Aaron Stern and Lindsay Senter are citizens of Colorado. (Compl. ¶¶ 2– 4). Accordingly, because Defendants are "adverse claimants, of diverse citizenship," and the proceeds of the Roth IRA Account exceed $500, Schwab appears to have met the requirements for properly invoking the interpleader device, except for the proof of deposit of the disputed funds. Here, by Stipulation and Order dated October 13, 2023, Schwab liquidated all the assets in the Roth IRA Account and invested the proceeds in the Schwab US Treasury Money fund. (D.E. No. 76). It appears that Schwab has not deposited the funds to the Court's registry or posted a bond with the Court to date. However, it is within this Court's discretion to choose "not to dismiss an action for lack of subject matter jurisdiction[,] but instead ... permit Plaintiff an opportunity to perfect jurisdiction by depositing the funds at issue with the Court's Registry." *Wells Fargo Bank, N.A. v. Comments Sols., LLC*, No. 19-77, 2019 WL 6873257, at *1–3 (D.N.J. Dec. 17, 2019) (denying motion to dismiss, but conditioning decision on plaintiff first depositing the disputed funds into the Court's registry); *Nw. Mut. Life Ins. Co. v. Sonia*, No. 14-03787, 2014 WL 5392059, at *2 (D.N.J. Oct. 21, 2014) (determining "that the requirements of the interpleader statute will be met once Plaintiff deposits the employee death benefit with the Clerk of the Court."); *United States Life Ins. Co. in the City of New York v. Holtzman*, 723 F. App'x 141, 145 n.5 (3d Cir. Jan. 26, 2018) (noting that where the amount of funds at issue is undisputed district courts regularly provide "a stakeholder the opportunity to comply with the deposit requirement upon determining that the other two jurisdictional requirements have been met.").

***5** Here, the Court will exercise subject matter jurisdiction over the action and allow Schwab to cure the jurisdictional defect by depositing the disputed funds with the Clerk of the Court. *See* *Manhattan Life Ins. Co. v. Paciello*, No. 22-01949, 2022 WL 16631321, at *2 (D.N.J. Nov. 2, 2022) (permitting plaintiff to cure jurisdictional defect by depositing the disputed fund with the Court's Registry). Accordingly, the Court will order Schwab to submit an affidavit or declaration stating the current balance of the funds, and to thereafter deposit those funds with the Clerk of the Court. The Court conditions its exercise of subject matter jurisdiction in this action upon Schwab's compliance with these directives. *See* *Wells Fargo*, 2019 WL 6873257, at *4.

## III. MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY

### A. Legal Standard

"Under the Federal Rules of Evidence, a trial judge acts as a 'gatekeeper' to ensure that 'any and all expert testimony or evidence is not only relevant, but also reliable.' " *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)). However, this gatekeeping function is a "flexible" one. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594 (1993). "Rule 702, which governs the admissibility of expert testimony, has a liberal policy of admissibility." *Kannankeril*, 128 F.3d at 806. "Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80 (3d Cir. 2017) (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000)).

First, "[t]he qualification prong of Daubert refers to the requirement that the witness possess specialized expertise." *MD Retail Corp. v. Guard Ins. Grp.*, No. 14-6589, 2017 WL 1164499, at *5 (D.N.J. Mar. 28, 2017). The United States Court of Appeals for the Third Circuit has "interpreted Rule 702's qualification requirement liberally." *Pineda*, 520 F.3d at 244 (first citing *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003); and then citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994)). Second, with respect to "reliability", the Third Circuit has found that "an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." *Pineda*, 520 F.3d at 244 (citing *Kannankeril*, 128 F.3d at 806). Third, to satisfy the "fit" requirement, Rule 702 requires that an "expert's scientific, technical, or other specialized knowledge ... help the trier of fact to understand the evidence or to determine a fact in issue[.]" Fed. R. Evid. 702(a). To be helpful, expert testimony must be "sufficiently tied to the facts of the case [such] that it will aid the jury in resolving a factual dispute." *United States v. Schiff*, 602 F.3d 152, 173 (3d Cir. 2010) (quotation marks and citation omitted). Conversely, "expert evidence which

CHARLES SCHWAB & CO., INC., Plaintiff, v. ALEXIA KOEPPEL, H. ANDREW SCHWED, MEREDITH..., Slip Copy (2026)

does not relate to an issue in the case is not helpful." *United States v. Ford*, 481 F.3d 215, 219 n.6 (3d Cir. 2007) (quotation marks and citation omitted).

Relatedly, the court also "must ensure that an expert does not testify as to the governing law of the case." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006). "Although [Rule 704] permits an expert witness to give expert testimony that 'embraces an ultimate issue to be decided by the trier of fact,' an expert witness is prohibited from rendering a legal opinion." *Id.* (internal quotations and citations omitted).

**B. Analysis**

By way of background, the Stern Defendants retained Daniel FitzPatrick ("FitzPatrick") as an expert concerning Schwab's administration of the Decedent's Roth IRA and, specifically, whether Schwab acted reasonably and consistently with industry standards in implementing the Decedent's purported October 2020 beneficiary change. (D.E. No. 135-2 ("Gasperetti Decl.") Ex. 4 ("Report") ¶¶ 13–14). FitzPatrick has authored two expert reports in this action: (i) the FitzPatrick Expert Report dated November 30, 2023 (*See* Report); and (ii) the Responsive Expert Report dated February 28, 2024 (Gasperetti Decl. Ex. 5 ("Reps. Report")). On June 17, 2024, the Koeppel Defendants conducted FitzPatrick's expert deposition. Thereafter, the Koeppel Defendants moved *in limine* to exclude FitzPatrick's expert testimony ("*Daubert* motion"). (D.E. No. 135-5).

***6** According to the Report, FitzPatrick has more than thirty years of experience in private banking, wealth management, and fiduciary services. (Report ¶ 1). Although FitzPatrick holds a law degree and was previously admitted to practice law in New York, he states that his opinions are not offered as "legal interpretations of governing law," but instead concern standard practices in the fiduciary-services industry based on his professional experience. (*Id.* ¶ 3).

FitzPatrick issued his initial expert report dated November 30, 2023. In that Report, FitzPatrick opines that Schwab's administration of the Roth IRA fell below applicable industry standards in several respects. (*See generally* Report). Among other things, he states that Schwab failed to maintain adequate account records, failed to follow its own policies concerning beneficiary changes, failed to adequately supervise Vogelzang despite notice of a prior infraction, and failed to recognize and implement the Decedent's expressed wishes concerning the beneficiaries of the Roth IRA. (*Id.* ¶¶ 34–46). FitzPatrick further criticizes Schwab for commencing this interpleader action rather than attempting to resolve the consequences of its alleged administrative errors without litigation. (*Id.* ¶¶ 50–53). He ultimately identifies five respects in which, in his view, Schwab's conduct fell short of industry standards: "failure to maintain adequate account records"; "failure to follow policy"; failure to effectively supervise a client-facing employee despite notice of a prior infraction; failure to recognize and implement the client's express wishes; and initiating litigation rather than proactively addressing the consequences of its alleged error. (*Id.* ¶ 54).

Central to FitzPatrick's opinion is his treatment of the October 2020 meeting between the Decedent and Vogelzang. FitzPatrick assumes that the Decedent instructed Vogelzang to remove Defendant Alexia Koeppel as a beneficiary and divide the Roth IRA equally among his four grandchildren. (Report ¶ 22). He notes that Vogelzang entered those changes into Schwab's Client Central system and that Schwab subsequently sent the Decedent an Account Verification Letter identifying the four grandchildren as beneficiaries. (*Id.* ¶¶ 23–25). In FitzPatrick's view, the Client Central entry constituted an official memorialization of the requested beneficiary change, and the Verification Letter provided further confirmation upon which the Decedent could reasonably rely. (*Id.* ¶¶ 47–48). FitzPatrick therefore opines that, notwithstanding Schwab's inability to locate a signed Beneficiary Designation Form, a reasonable fiduciary would understand the four grandchildren to be the rightful beneficiaries of the Roth IRA and would have pursued a nonjudicial resolution of the competing claims. (*Id.* ¶ 55).

FitzPatrick subsequently issued a responsive expert report dated February 28, 2024, addressing opinions offered by another expert retained by the Koeppel Defendants—Mr. David Ranson. (Resp. Report ¶ 2). FitzPatrick agrees that Schwab failed to follow its internal procedures and adequately maintain its records, but disagrees that those failures rendered the October 2020 beneficiary change ineffective. (*Id.* ¶¶ 9–18). FitzPatrick maintains that the Decedent could reasonably have relied on the Verification Letter and that Schwab should honor the October 2020 beneficiary instructions notwithstanding the absence of a signed beneficiary designation form. (*Id.* ¶ 25). Both reports bear FitzPatrick's signature. (Report at 17; Resp. Report at 12). Neither report, however, contains an oath or declaration stating that its contents are made under penalty of perjury. (*See generally* Report & Resp. Report).

***7** The Koeppel Defendants first argue that FitzPatrick's proposed expert testimony should be precluded under Rule 702 because the contracts at issue are clear and unambiguous, and thus "interpretation of the contracts is within the exclusive province of the Court." (D.E. No. 135-9 ("MIL Br.") at 10). Additionally, the Koeppel Defendants contend that FitzPatrick's proposed testimony contains inadmissible legal opinions. (*Id.* at 12). According to the Koeppel Defendants, as a basis for his opinion, FitzPatrick cites, "*inter alia*, numerous purely legal quasi-authorities," including common law principles, the Uniform Trust Code, and the Restatement (Third) of Trust. (*Id.* at 13). The Koeppel Defendants further make a series of specific objections to FitzPatrick's Report. For example, they oppose FitzPatrick's opinion on the legal obligations of a custodian of a Roth IRA as improper testimony on the governing law of the case. (*Id.* at 14; Report ¶¶ 30–32). Additionally, in their Reply Brief in further support of their *Daubert* motion, the Koeppel Defendants argue that FitzPatrick's reports are not sworn and therefore "not competent to be considered on a motion for summary judgment." (D.E. No. 135-70 ("MIL Reply Br.") at 4–5).

The Stern Defendants oppose the *Daubert* motion on both procedural and substantive grounds. (D.E. No. 134 ("Opp'n Br. to MIL") at 33). They first contend that the motion is premature and exceeds the briefing limitations imposed by Local Civil Rule 7.1(h). (*Id.* at 34). On the merits, the Stern Defendants maintain that FitzPatrick does not offer impermissible legal conclusions, but instead provides admissible testimony concerning customs, practices, and standards in the financial-services industry and applies those standards to Schwab's conduct. (*Id.* at 35–38). They further argue that experts may testify concerning industry practices shaped by legal and regulatory requirements without thereby offering inadmissible legal opinions. (*Id.*). Finally, they contend that because this matter would proceed, if necessary, as a bench trial, the concerns underlying Rule 702 are diminished and the Court may defer any more refined admissibility determination until trial. (*Id.* at 37–38).

The Court first rejects the Stern Defendants' contention that the *Daubert* motion is premature. Although the Third Circuit has cautioned that challenges to expert testimony may require further factual development where admissibility turns on disputed issues concerning an expert's methodology, qualifications, or the factual foundation for the expert's opinions, an evidentiary hearing is not required whenever an objection to expert testimony is raised. *See Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 417–18 (3d Cir. 1999). Rather, whether to conduct such a hearing rests within the discretion of the Court, and the concern that the Third Circuit identified in *Padillas* arises principally where the admissibility determination turns on factual issues and exclusion of the expert testimony bears directly on the disposition of summary judgment. *Id.* at 418.

Here, the Stern Defendants rely on *Est. of Borroto v. CFG Health Sys., LLC* in support of their proposition that an evidentiary issue should not be resolved at the summary judgment stage. (Opp'n Br. to MIL at 34 (citing 751 F. Supp. 3d 443, 463–64 (D.N.J. 2024))). However, *Est. of Borroto* presents a different set of facts from this case. In *Est. of Borroto*, the parties had not filed motions to exclude the challenged experts pursuant to *Daubert* and instead attempted to litigate relevance and reliability objections through their summary-judgment briefs. *Est. of Borroto*, 751 F. Supp. 3d at 467–68. The *Est. of Borroto* court further found that the briefing on those issues was inadequate and therefore denied the challenges without prejudice to the parties' ability to file appropriate *Daubert* motions before trial. *Id.* at 468. Here, by contrast, the Koeppel Defendants filed a separate motion specifically identifying the portions of FitzPatrick's reports they contend are inadmissible, the Stern Defendants responded to those objections on the merits, and the Koeppel Defendants filed a reply. (*See generally*, MIL Br., MIL Reply Br., & Opp'n Br. to MIL). The admissibility issues are therefore fully presented to the Court.

***8** Moreover, the objections raised here do not require the type of fact-intensive reliability inquiry that concerned the Third Circuit in *Padillas*. (*Cf. Padillas*, 186 F.3d at 418 (holding that an *in-limine* hearing is required where admissibility turned on unresolved factual disputes concerning the expert's methodology and citing the factual foundation for his opinions)). The Koeppel Defendants principally contend that FitzPatrick's reports are not competent summary-judgment evidence because they are unsworn and that portions of his opinions impermissibly state governing law or offer legal conclusions reserved for the Court. (*See generally* MIL Br. & MIL Reply Br.). The Court may resolve those questions from the face of the reports and the existing record. Because the Court is presently considering the reports in conjunction with the pending motions for summary judgment, resolution of those threshold evidentiary issues is appropriate at this stage. *See, e.g. Boyce v. Eggers*, 513 F. Supp. 2d 139, 142–43 (D.N.J. 2007)

(resolving evidentiary issues before considering the motion for summary judgment). Finally, the Koeppel Defendants have not identified anything to be gained by reserving this fully-briefed issue for the eve of trial. The Court therefore declines to deny the motion as premature.

The Koeppel Defendants further argue that the Court should disregard FitzPatrick's reports because they are unsworn. (MIL Reply Br. at 4–5). Although the Koeppel Defendants raised this argument for the first time in their reply submission, the Court must independently determine whether the materials before it constitute competent evidence for purposes of summary judgment.[6] *See* Fed. R. Civ. P. 56(c). The Third Circuit has held that an unsworn expert report offered for the truth of the opinions contained therein is not competent summary-judgment evidence. *See Fowle v. C & C Cola, a Div. of ITT-Cont'l Baking Co.*, 868 F.2d 59, 67 (3d Cir. 1989) ("The substance of this report was not sworn to by the alleged expert. Therefore, the purported expert's report is not competent to be considered on a motion for summary judgment."); *see also Travillion v. Wetzel*, No. 24-1763, 2025 WL 971669, at *2 (3d Cir. Apr. 1, 2025) (reaffirming that unsworn statements not made under penalty of perjury are not competent summary-judgment evidence and citing *Fowle* with respect to an unsworn expert report). Accordingly, the Court will not consider FitzPatrick's unsworn reports as evidence establishing or disputing facts in resolving the pending motions for summary judgment. This conclusion, however, does not resolve the *Daubert* motion.[7]

Turning to the merits of the *Daubert* challenge, the Koeppel Defendants contend that FitzPatrick impermissibly offers legal conclusions concerning the parties' respective rights and obligations. (MIL Br. at 12–14). An expert may testify concerning industry customs and practices, but may not instruct the Court as to the governing law or opine on whether a party complied with its legal obligations. *Berckeley Inv. Grp., Ltd.*, 455 F.3d at 217–18. The Third Circuit further explained that such testimony is prohibited because "it would usurp the District Court's pivotal role in explaining the law to the jury." *Id.* at 217 (citing *First National State Bank v. Reliance Elec. Co.*, 668 F.2d 725, 731 (3d Cir. 1981) (per curiam)). Thus, while an expert may explain "customs and business practices" within an industry, he may not offer an opinion concerning compliance with legal duties arising under the governing law. *Id.* at 218. The Third Circuit has recognized that distinction, finding that testimony concerning industry customs may be permissible even where those customs are shaped by legal requirements, but testimony concerning the governing law itself remains within the exclusive province of the Court. *See First National State Bank*, 668 F.2d at 731 (affirming the District Court's holding allowing the expert to testify on the customs in the banking industry but prohibiting him from giving his opinion as to the legal duties arising therefrom).

***9** Applying those principles, the Court agrees with the Koeppel Defendants that several of FitzPatrick's proposed opinions cross the line from permissible industry-practice testimony into impermissible legal conclusions. To be sure, the Stern Defendants correctly observe that an expert's testimony about industry customs does not become inadmissible merely because those customs are shaped by legal or regulatory requirements. *See United States v. Fumo*, 655 F.3d 288, 303 (3d Cir. 2011) ("These customs and practices will sometimes include applicable legal regulations[.]"). But that principle has limits.

In *United States v. Tartaglione*, for example, the Third Circuit permitted an expert to explain fiduciary duties imposed by Pennsylvania law because those duties were not the law governing the criminal charges in question, and provided relevant background concerning the defendant's intent. 815 F. App'x 648, 650 (3d Cir. 2020). Specifically, the Third Circuit held that, "qualified experts may testify about not only business customs and practices but also applicable legal duties, especially when those non-governing laws help explain fraudulent intent." *Id.* By contrast, an expert may not testify as to the governing law or whether a party violated legal duties arising under that law. *Id.*; *see also Berckeley*, 455 F.3d at 217–18.

The Court also finds *Berkelhammer v. ADP TotalSource Group, Inc.* instructive. No. 20-5696, 2026 WL 867136 (D.N.J. Mar. 30, 2026). There, in considering expert testimony concerning the administration of a retirement plan, the Court distinguished between opinions concerning what prudent fiduciaries in the retirement-plan industry ordinarily would do and opinions concerning whether the defendants satisfied their legal duties. *Id.* at *9. The former were permissible even when the experts employed terms such as "prudent," "reasonable," or "fiduciary" that also appeared in the governing legal standards; the latter were not. *Id*. The relevant inquiry, therefore, is not whether FitzPatrick employs terminology that also carries legal significance, but whether he applies his experience to explain industry standards or instead purports to determine the parties' legal rights and obligations.

*Krys v. Aaron* further illustrates that distinction. 112 F. Supp. 3d 181 (D.N.J. 2015). There, the Court permitted an expert to testify concerning generally accepted industry practices and what similarly situated industry participants should have known or done, but precluded him from taking the further step of concluding that the defendants had breached particular fiduciary or contractual duties. *Id.* at 192–94.

The Court finds that some of FitzPatrick's proposed testimony falls comfortably on the permissible side of that line. For example, his opinions concerning customary recordkeeping, the procedures ordinarily employed to implement beneficiary changes, and whether Schwab's conduct comported with those industry practices fall within the permissible side of the line drawn in *Berkelhammer* and *Krys*. Nor does FitzPatrick necessarily render an impermissible legal opinion merely by describing particular conduct as "prudent," "reasonable," or consistent with the standard of care prevailing in the financial-services industry. *See Berkelhammer*, 2026 WL 867136 at *9.

FitzPatrick crosses the line, however, when he expressly concludes that Schwab "fell short in meeting its fiduciary duty to maintain accurate records" and otherwise characterizes Schwab's conduct as a breach of its fiduciary obligations. (Report ¶ 39). Those statements do not merely compare Schwab's conduct to the practices of a prudent financial institution. They assume that Schwab owed a legally cognizable fiduciary duty, define the content of that duty, and determine that Schwab breached it. *Berkelhammer*, 2026 WL 867136, at *11 (explaining that although an expert may testify regarding industry standards, an opinion as to whether defendants complied with their legal obligations under ERISA would "constitute an improper legal opinion"). FitzPatrick's opinions regarding whether such a fiduciary relationship existed, the duties arising from that relationship, and whether Schwab breached those duties are all impermissible. *Krys*, 112 F. Supp. 3d at 193.

***10** The same reasoning applies to FitzPatrick's opinions concerning the beneficiary designation itself. FitzPatrick may explain, from an industry perspective, the practices a financial institution would ordinarily follow before confirming a beneficiary change. *United States v. Schiff*, 538 F. Supp. 2d 818, 846 (D.N.J. 2008) ("[C]ourts routinely admit testimony from industry experts related to the business practices in those industries."). But he may not assign legal effect to the underlying documents and conduct.

In *Krys*, for example, the Court held that the expert rendered an impermissible legal opinion by concluding that documentary evidence established that the relevant transactions had been "authorized" or "ratified." 112 F. Supp. 3d at 196. Similarly here, FitzPatrick relies on Schwab's Client Central records, the Verification Letter, and subsequent communications to conclude that the persons identified in the October 2020 Verification Letter were the "rightful beneficiaries," and that Schwab should honor the October 2020 instructions notwithstanding the absence of a signed Beneficiary Form. (Report ¶ 55; Resp. Report ¶ 25). Those opinions do not merely explain the significance of Schwab's records from an industry perspective; they provide a conclusion on whether Schwab's conduct legally effectuated or ratified a change in beneficiary, a question reserved for the Court. *See Holman Enters. v. Fid. & Guar. Ins. Co.*, 563 F. Supp. 2d 467, 472 (D.N.J. 2008) (holding that an expert report was partially inadmissible because the expert's principal opinion—that the defendants had not breached the implied covenant of good faith and fair dealing—was "an obvious conclusion of law" that necessarily required the expert to perform legal analysis rather than assist the factfinder with specialized knowledge). Accordingly, FitzPatrick may not opine on whether the October 2020 beneficiary change had any legal impact.

In conclusion, while the Court will bar FitzPatrick from offering certain opinions, it will not exclude his testimony in its entirety. Given his experience in the financial services industry, FitzPatrick may testify concerning relevant industry customs and practices. Such testimony may assist the factfinder in evaluating Schwab's conduct without dictating the legal consequences of that conduct. *See Berckeley*, 455 F.3d at 218; *First Nat'l State Bank of N.J.*, 668 F. 2d at 731; *Suter v. Gen. Acc. Ins. Co. of Am.*, 424 F. Supp. 2d 781, 792–93 (D.N.J. 2006). The Court will, however, bar FitzPatrick from offering any testimony providing legal conclusions or describing legal requirements (i.e., a fiduciary's obligations).

For the reasons explained above, the Court will therefore: (i) **GRANT** the Koeppel Defendants' *Daubert* motion to the extent FitzPatrick opines that Schwab breached a fiduciary duty or other legal duty, or that Schwab was legally obligated to honor the October 2020 instructions notwithstanding the absence of a signed Beneficiary Designation Form; and (ii) **DENY** the *Daubert* motion to the extent FitzPatrick proposes to testify concerning relevant customs and practices in the financial-services industry.

## IV. MOTIONS FOR SUMMARY JUDGMENT

### A. Legal Standard

Summary judgment is appropriate if the moving party shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if it is supported by evidence such that a reasonable jury could find the fact in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

***11** If the party seeking summary judgment makes this showing, the non-moving party must then "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.' " *Corliss v. Varner*, 247 F. App'x 353, 354 (3d Cir. 2007) (quoting *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002)). In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.

When parties submit cross-motions for summary judgment, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. § 2720, at 335–36 (3d ed. 1998); *accord Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (stating that "[e]ach motion must be considered on its own merits.").

### B. Schwab's Entitlement to Interpleader Relief

The Court next addresses whether Schwab is entitled to interpleader relief and, if so, whether it should be discharged from this case. Schwab brings this action under Section 1335. "[I]t has long been recognized that the interpleader statute is remedial, aimed at assisting a party who fears the vexation of defending multiple claims to a fund or property under his control by providing him the opportunity to satisfy his obligation in a single proceeding." *NYLife Distrib., Inc.*, 72 F.3d at 381 (citing *State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 533 (1967)). Consistent with that purpose, *Tashire* recognized interpleader as an appropriate means of resolving multiple claims directed to a single, identifiable fund. 386 U.S. at 533–34. In a typical interpleader action, " '[t]he competing claimants are left to litigate between themselves,' while the stakeholder is discharged from any further liability with respect to the subject of the dispute." *Prudential Ins. Co. of Am. v. Hovis*, 553 F.3d 258, 262 (3d Cir. 2009) (quoting *Metro Life Ins. Co. v. Price*, 501 F.3d 271, 275 (3d Cir.2007)). Interpleader actions typically proceed in two stages. *Id.* First, "the court determines whether the interpleader complaint was properly brought and whether to discharge the stakeholder from further liability to the claimants." *Id.* Second, "the court determines the respective rights of the claimants to the interpleaded funds." *Id.*

In the first stage, "[t]he key prerequisite to maintaining an action in interpleader presently is that there be two or more claimants to the fund who are 'adverse' to each other." *New Jersey Sports Productions, Inc. v. Don King Productions, Inc.*, 15 F. Supp. 2d 534, 539 (D.N.J. 1998) (quoting 7 Charles A. Wright & Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1705 at 507–09 (1986 & 1996 supp.)). Here, the parties do not dispute that, at the time Schwab commenced this action, it was facing adverse claims to the Roth IRA proceeds. Rather, the Stern Defendants assert that Schwab was ineligible for interpleader relief as it was not an innocent stakeholder. (*See, e.g.*, D.E. No. 130-3 ("Stern Mov. Br.") at 7). The Stern Defendants argue that "Schwab has come to the Court with unclean hands" and that its negligence and other misconduct caused the current dispute.[8] (Stern Mov. Br. at 7).

***12** "It is a general rule that a party seeking interpleader must be free from blame in causing the controversy, and where he stands as a wrongdoer with respect to the subject matter of the suit ... he cannot have relief by interpleader." *Farmers Irrigating Ditch & Reservoir Co. v. Kane*, 845 F.2d 229, 232 (10th Cir. 1988); *see also* 44B Am. Jur. 2d Interpleader § 7 ("The equitable doctrine of 'clean hands' applies to interpleader actions. The party seeking interpleader must do equity, not have caused the conflicting claims, and be free from blame in causing the controversy." (citation modified)); *Hovis*, 553 F.3d at 263 (quoting *Farmers*

*Irrigating Ditch & Reservoir Co.*, 845 F.2d at 232); *Lexington Ins. Co. v. Jacobs Indus. Maint. Co., LLC*, 435 F. App'x 144, 148 (3d Cir. 2011) (applying the same rule).

Schwab principally relies on *Hovis* for the proposition that it is entitled to interpleader relief. (*See* Schwab Mov. Br. at 9–11). Specifically, Schwab contends that it did not cause the present controversy, and that *Hovis* therefore supports the dismissal of counterclaims against it and entry of summary judgment in its favor. (*Id.* at 10–11). The Court is not persuaded that *Hovis* affords Schwab such broad protection.

*Hovis* involved competing claims to life-insurance proceeds after the insured sought, shortly before her death, to change the beneficiary from her son to her fiancé, Robert Hovis, who was also a Prudential employee. 553 F.3d at 259–60. Because Prudential generally prohibited its employees from holding beneficiary interests in clients' policies, Hovis needed internal approval for the change. *Id.* at 259. Prudential began investigating the request but had not completed its review when the insured died. *Id.* at 260. Both Hovis and the insured's son thereafter claimed the proceeds, and Prudential filed an interpleader action rather than determine which claimant was entitled to payment. *Id.* at 261. Hovis asserted counterclaims for, *inter alia*, negligence, bad faith, and breach of fiduciary duty, alleging that Prudential had failed to process the beneficiary change in a timely manner. *Id.* at 261–62. The Third Circuit reasoned that Prudential was not to blame for creating the competing claims because the ownership controversy arose from the circumstances surrounding the requested beneficiary change—not from Prudential's failure to complete the change before the insured's death or to pay Hovis before the competing claimant asserted his interest. *Id.* at 263. Because there was a genuine dispute over entitlement to the proceeds and Prudential was not responsible for creating that dispute, the Third Circuit held that the interpleader action was properly brought and that Prudential was entitled to "some measure of interpleader protection." *Id.* at 263–64. The Third Circuit further explained that a stakeholder's refusal to choose among existing adverse claimants, and its decision instead to invoke interpleader, cannot itself constitute a breach of legal duty. *Id.* at 264–65.

The Court reads *Hovis* as presenting two related but distinct inquiries: whether Schwab may properly invoke interpleader to resolve the competing claims to the Roth IRA, and, if so, whether Schwab is entitled to dismissal of the counterclaims asserted against it. Those questions are not coextensive. 553 F.3d at 263–65; *see also United of Omaha Life Ins. Co. v. Womack-Rodriguez*, 461 F. Supp. 3d 455, 470 (W.D. Tex. 2020) (permitting the insurer to interplead the disputed proceeds while holding that the interpleader did not shield it from an independent negligence claim based on its handling of beneficiary changes).

***13** As to the first inquiry, the Court finds that the Stern Defendants' allegation that Schwab contributed to the dispute does not render interpleader unavailable. The Third Circuit expressly cautioned that the traditional rule barring a wrongdoer from obtaining interpleader relief is "not geared toward" a situation in which "the stakeholder's own errors are responsible for the ownership dispute." *Hovis,* 553 F.3d at 263 n.4. Rather, that rule is principally aimed at preventing a tortfeasor facing claims from multiple parties from using interpleader to deposit a limited fund and thereby cap its potential liability. *Id.* (citing *Farmers Irrigating Ditch & Reservoir Co.*, 845 F.2d at 232). Additionally, "unclean hands will not prevent the maintenance of an interpleader action where it does not appear that the plaintiff has sought to abuse court process but was simply a victim of circumstances beyond his or her own control." 44B Am. Jur. 2d Interpleader § 7; *see also Womack-Rodriguez*, 461 F. Supp. 3d at 470 ("To withdraw the availability of interpleader requires more than a finding that the insurer 'can plausibly be blamed for the existence of the underlying ownership controversy.' ") (quoting *Hovis*, 553 F.3d at 265–66)); *Royal School Laboratories, Inc. v. Town of Watertown*, 358 F.2d 813, 817 (2d Cir. 1966) (holding that a town's negligent failure to obtain a statutory bond from a contractor does not give the town such unclean hands as to prevent it from invoking interpleader).

Here, Schwab is not attempting to use interpleader in the manner condemned in *Farmers Irrigating Ditch*. 845 F.2d at 232. It is not a tortfeasor seeking to "tender into court a minimal amount of money with the representation that such is all he has, force the claimants to prorate the amount deposited, and then obtain an order discharging him from any further liability for his tort." *Id.* Rather, Schwab invokes interpleader for its traditional purpose—to obtain a judicial determination between adverse claimants asserting entitlement to the same identifiable fund. *See Tashire*, 386 U.S. at 533–34. The record further supports Schwab's good faith attempt to resolve a dispute between the parties and demonstrates that Schwab sought the remedy of interpleader once it became clear the parties would not be able to find a mutually acceptable resolution. *See Lexington Ins. Co.*, 435 F. App'x. at 148 (rejecting clean-hands challenge where the stakeholder made a good-faith effort to resolve the dispute

and sought interpleader only after the competing claimants were unable to reach a mutually acceptable resolution). The Court therefore concludes that Schwab properly invoked interpleader to resolve the competing claims to the disputed Roth IRA proceeds.

That conclusion, however, does not resolve the second inquiry. The Supreme Court has cautioned against extending interpleader protection beyond the controversy that the device is intended to resolve. *Tashire*, 386 U.S. at 533. In *Tashire*, although the insurer properly invoked interpleader with respect to competing claims against the insurance proceeds, the Supreme Court rejected an effort to use the interpleader proceeding to control claims extending beyond that limited fund. *Id.* at 533–37. The Supreme Court explained that, where the claimants' controversy concerns entitlement to the stake, the fund "marks the outer limits of the controversy," and cautioned against transforming interpleader into an all-purpose "bill of peace." *Id.* at 534–35.

*Hovis* is consistent with that limitation. Although *Hovis* permits Schwab to invoke interpleader, it does not necessarily immunize Schwab from liability arising from antecedent conduct that allegedly created the ownership dispute. *See* 553 F.3d at 265–66; *see also* Wright, Miller & Kane, Federal Practice & Procedure: Civil 2d § 1715 (1986) ("Certainly when the stakeholder is an interested party and when one of the claimants asserts that the stakeholder is independently liable to that claimant, the interposition of a counterclaim is appropriate. Indeed, in most instances of this type, the counterclaim will be compulsory and the court will exercise supplemental jurisdiction over it ..."); 44B Am. Jur. 2d Interpleader § 4 ("Interpleader is a procedural device not intended to alter substantive rights. It is not the function of an interpleader rule to bestow upon the stakeholder immunity from liability for damages that are unrelated to the act of interpleading, such as negligence in preserving the fund."). Indeed, the Third Circuit expressly left open that possibility, explaining that its holding was "potentially consistent with holding a stakeholder liable for its investigation of ownership of the stake, at least where defects in its investigation can plausibly be blamed for the existence of the underlying ownership controversy."[9] *Hovis,* 553 F.3d at 265–66.

***14** That distinction is critical here. The Stern Defendants do not merely contend that Schwab should have selected them as beneficiaries after competing claims arose. Rather, they contend that Schwab's own conduct before the Decedent's death created the uncertainty that ultimately produced those competing claims. (Stern Mov. Br. at 7). Schwab's internal procedures require a beneficiary change to be completed through a signed Beneficiary Form or an authorized online change. (Stern SUMF ¶¶ 27 & 29; Schwab Resp. to Stern SUMF ¶¶ 27 & 29). Yet, after the Decedent allegedly instructed Vogelzang to alter the beneficiaries of the Roth IRA, Schwab entered the purported change into its Client Central system and thereafter sent the Decedent communications reflecting the revised beneficiary information, notwithstanding the absence of a signed Beneficiary Designation Form. (Stern SUMF ¶¶ 11, 14, 19 & 24–25; Schwab Resp. to Stern SUMF ¶¶ 11, 14, 19 & 24–25). Schwab responds that, "Vogelzang directed the Decedent to[,] and had reason to believe that the Decedent did [ ] stop by the front desk to execute the form." (Schwab Mov. Br. at 9). From that premise, Schwab contends that "there is no evidence of wrongdoing or negligence by Schwab, nor is there any evidence that Schwab in any way mishandled the October 2020 Designation Form." (*Id.*). But that argument misses the point. Rather, the Court finds that the pertinent question is whether Schwab's administration of the purported change—including recording the change in Client Central, generating subsequent communications reflecting the revised designation, and failing to obtain or retain the documentation that Schwab now contends was necessary to effectuate that change prior to the Decedent's death nearly a year later—contributed to the very ownership controversy now before the Court.

The Ninth Circuit's decision in *Lee v. West Coast Life Insurance Co.*, although not binding, is particularly instructive because its facts closely resemble those presented here. 688 F.3d 1004 (9th Cir. 2012). In *Lee*, an employee of the insurer gave erroneous instructions about who needed to sign the relevant forms when assisting with beneficiary-change documents. *Id.* at 1007. The insurer nevertheless recorded the changes and treated them as effective, only to conclude after the insured's death that the earlier changes had been improperly executed. *Id.* The resulting uncertainty forced competing claimants to litigate entitlement to the policy proceeds. *Id.* As here, the counterclaimants in *Lee* brought negligence claims against the insurer. The Ninth Circuit held that, although interpleader protected the insurer from having to determine the proper recipient of the proceeds at its peril, it did not shield the insurer from tort liability arising from its alleged role in creating the dispute. *Id.* at 1011 (citing *Tashire,* 386 U.S. at 533). As the Ninth Circuit explained, the claimants' damages arose not from the insurer's decision to file an interpleader action, but from the earlier negligent

conduct that forced the ownership dispute to occur in the first place. *Id.* at 1012–13.

*Hovis* involved a stakeholder that was "blameless with respect to the existence of the ownership controversy"; the counterclaims there challenged the stakeholder's failure to resolve an already-existing dispute in the claimant's favor. 553 F.3d at 265. *Lee*, by contrast, involved allegations that the stakeholder itself caused the dispute through its mishandling of a beneficiary change. 688 F.3d at 1013–14. Other courts applying *Hovis* have recognized the same distinction. *See, e.g., Womack-Rodriguez*, 461 F. Supp. 3d at 470 (explaining that, although interpleader may absolve a stakeholder from liability arising from "how to distribute" the disputed funds, it does not protect the stakeholder from independent claims —including negligence surrounding a beneficiary change— where the stakeholder's alleged conduct "created the dispute itself.").

The circumstances here more closely resemble those in *Lee* rather than those in *Hovis*. *Compare Lee*, 688 F.3d at 1012–14 *with Hovis*, 553 F.3d at 264–65. Schwab's potential liability does not arise merely because it declined, after the Decedent's death, to choose between the Stern Defendants and the Koeppel Defendants. Rather, the Stern Defendants' counterclaims involve conduct that predated (and allegedly caused) the competing claims. (*See, e.g.,* Stern SUMF ¶¶ 11, 14 & 24–25; Schwab Resp. to Stern SUMF ¶¶ 11, 14 & 24–25). If a factfinder determines that Schwab failed either to obtain and retain documentation it considered necessary or to refrain from recording and confirming an incomplete change, it could reasonably conclude that Schwab's own administration of the account produced the present controversy. *Hovis* therefore does not immunize Schwab from the counterclaims.

***15** Accordingly, the Court cannot regard Schwab as blameless with respect to the existence of the ownership controversy between the Stern Defendants and Koeppel Defendants. The Court therefore GRANTS Schwab's request to proceed in interpleader but finds that Schwab is not entitled to summary judgment regarding its request for discharge and dismissal of the counterclaims asserted against it.

### C. Choice of Law

Before turning to the merits of the pending motions for summary judgment regarding the proper beneficiaries of the Roth IRA, the Court must first determine whether New York or California's substantive law governs that issue. The Stern Defendants contend that the Court should enforce the California choice-of-law provision contained in the Account Agreement because, under New Jersey's choice-of-law rules, the provision is valid and does not contravene a fundamental policy of New York. (D.E. No. 132 ("Stern Opp'n Br. against Koeppel") at 4). Schwab likewise contends that "upholding the governing law provision would not violate New York or New Jersey public policy," and "there is no reason for the Court to invalidate the parties agreed-on governing law provision."[10] (D.E. No. 136-5 ("Schwab Mov. Br.") at 34). The Koeppel Defendants, by contrast, argue that New York law governs because, although the Account Agreement selects California law, New York has a materially greater interest in the dispute and application of California law would contravene a fundamental policy of New York. (D.E. No. 135-1 ("Koeppel Mov. Br.") at 9–12).

Under the familiar doctrine of *Erie Railroad v. Tompkins*, federal courts sitting in diversity jurisdiction apply state law to substantive issues and federal law to procedural issues. 304 U.S. 64, 78 (1938); *see also Collins ex rel. Collins v. Mary Kay, Inc.*, 874 F.3d 176, 181 (3d Cir. 2017) (applying the *Erie* doctrine). Here, the Account Agreement between Schwab and the Decedent contains the following choice-of-law provision:

> This Agreement, and all future agreements you shall enter into with Schwab, unless otherwise indicated on such other agreements shall be governed by the law (but not the choice of law doctrines) of the state of California. This is the case regardless of whether you reside or transact business with Schwab in California or elsewhere, except that the section entitled ["]Arbitration["] shall be governed by the Federal Arbitration Act.

(Koeppel SUMF ¶ 11). "In evaluating whether a contractual choice-of-law clause is enforceable, federal courts sitting in diversity apply the choice-of-law rules of the forum state, which in this case is New Jersey." *Homa v. Am. Express Co.*, 558 F.3d 225, 227 (3d Cir. 2009) (citing *Gibbs v. Carnival Cruise Lines*, 314 F.3d 125, 131 (3d Cir.2002) (citation omitted)).[11] Under New Jersey's rules, "[o]rdinarily, when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts will uphold the contractual choice if it does not violate New Jersey's public policy." *Instructional Sys., Inc. v. Comput. Curriculum Corp.*, 614 A.2d 124, 133 (N.J. 1992) (first collecting cases, then adopting Restatement (Second) of Conflicts of Laws § 187 ("Restatement")). Restatement Section 187(2) further provides that the law of the parties' chosen state will apply unless either:

> ***16** (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement § 187(2); *see also* *Homa*, 558 F.3d at 227–28 (quoting the same language).

The Third Circuit has explained that enforcing contractual choice-of-law provisions advances the "[p]rime objectives of contract law ... to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities under the contract." *Collins*, 874 F.3d at 183–84 (quoting Restatement § 187 cmt. e (quotation marks omitted)). Accordingly, "[a] court should not depart from this rule and refrain from applying the [parties'] chosen law merely because this would lead to a different result than would be obtained under the ... law of the forum state." *Id.* (quoting Restatement § 187 cmt. g (quotation marks omitted)).

Here, the "no substantial relationship" exception set forth in Section 187(2)(a) does not apply because Schwab has its principal place of business in California. (Compl. ¶ 1). As the New Jersey Supreme Court has recognized, where a contracting party is headquartered in the chosen state, that state bears a "substantial relationship to the parties," and Section 187(2)(a) does not preclude enforcement of the parties' contractual choice of law. *Instructional Sys., Inc.*, 614 A.2d at 342; Restatement § 187(2)(a).

The dispute therefore centers on the second exception set forth in Section 187(2)(b). Under that section, the Court would only refrain from enforcing the Account Agreement's contractual choice-of-law clause if: (i) New York has a "materially greater interest" in the "determination of the particular issue" in dispute; (ii) application of California law would conflict with a fundamental New York policy; and (iii) New York law would apply in the absence of an effective choice of law by the parties. Restatement § 187(b); *see also* *Adler v. Gruma Corp.*, 135 F.4th 55, 71–74 (3d Cir. 2025) (applying the Restatement § 187 framework under New Jersey's choice-of-law principles). Here, the parties do not dispute that New York law would apply absent the choice-of-law provision.[12] (*See, e.g.*, Koeppel Mov. Br. at 11–12; Stern Opp'n Br. against Koeppel at 3–11 (arguing only that New York lacks a materially greater interest than California and that application of California law would not contravene a fundamental policy of New York)).

***17** With respect to the "materially greater interest" element, the Third Circuit has explained that, "[t]o determine which state has a materially greater interest in the application of its law to the issue in question, New Jersey's choice-of-law rules ask for more than counting contacts: they call for an examination into whether [New York] has expressed a policy interest in enforcing the protections of its own law regarding an issue over a contrary agreement by the parties." *Adler*, 135 F.4th at 74 (3d Cir. 2025) (quoting *Instructional Sys.*, 614 A.2d at 342–43 (quotation marks omitted)); *see also* Restatement § 187 cmt. g ("The more closely this state is related to the contract and to the parties, the more likely it is that the choice-of-law provision will be given effect. The more closely the state of the chosen law is related to the contract and the parties, the more fundamental must be the policy of the state of the otherwise applicable law to justify denying effect to the choice-of-law provision."). Furthermore, in determining which state has the materially greater interest, the Court must " 'identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties.' " *Homa*, 558 F.3d at 232 (quoting *Veazey v. Doremus*, 510 A.2d 1187, 1189 (N.J. 1986)); *see also* *Adler*, 135 F.4th at 74–75 (3d Cir. 2025) (reaffirming that, under Restatement § 187, courts compare the governmental policies underlying each state's law and evaluate how those policies are affected by each state's contacts to the litigation and the parties). Thus, the Court considers not only each state's contacts with the parties and the transactions, but also the policy interests underlying the competing laws.

The Koeppel Defendants assert that "none of the actions and transactions at issue in this case took place in California[,]" and that Restatement Section 187(b) "requires this Court to apply New York law[.]" (Koeppel Mov. Br. at 10). The Koeppel Defendants further contend that New York has expressed a policy interest through N.Y. Estate Powers and Trust Law § 13-3.2(e) ("EPTL 13-3.2(e)"), which provides that "the designation of a beneficiary for an IRA pension plan must be (a) effected in writing and signed by the person making the designation and (b) the designation must comply with the requirements of the pension plan." (*Id.* at 11 (citing EPTL 13-3.2(e))). According to the

Koeppel Defendants, the statute reflects New York's policy of protecting against fraudulent or unauthorized changes to beneficiary designations, and therefore demonstrates that New York has a materially greater interest in the issues presented by the dispute. (*Id.*).

The Stern Defendants counter that "New York's interest is not materially greater than that of California because California maintains contacts with the parties and the underlying dispute." (Stern Opp'n Br. against Koeppel at 10). Specifically, the Stern Defendants argue that Schwab is a California corporation and "California has an interest in seeing its in-state companies enjoy contractual freedom and have their contracts enforced according to their terms." (*Id.* at 11).

The Court agrees with the Stern Defendants. While New York undoubtedly has significant contacts with this dispute—including the Decedent's domicile, the location of Schwab's Manhasset branch, and the meeting during which the disputed beneficiary change allegedly occurred—California likewise has substantial contacts with the Account Agreement and the parties. *See Rosenberg v. Hotel Connections, Inc.*, No. 21-4876, 2022 WL 7534445, at *5 (D.N.J. Oct. 13, 2022) (upholding a New York choice-of-law provision because, *inter alia*, "Defendant Hotel was incorporated in New York at the time of the execution of the Employment Agreement."); *Chemetall US Inc. v. Laflamme*, No. 16-780, 2016 WL 885309 at *7–8 (D.N.J. Mar. 8, 2016) (upholding the parties' New Jersey choice-of-law provision notwithstanding that the employee's work, execution of the agreement, customer relationships, and alleged competitive conduct occurred in Indiana); *Collins*, 874 F.3d at 184 (rejecting argument that New Jersey had a materially greater interest where the other contracting party was headquartered in the contractually chosen state). Indeed, courts in this District have enforced contractual choice-of-law provisions even where many of the operative events occurred in the competing state. *See Chemetall US Inc. v. LaFlamme*, No. 16-780, 2016 WL 885309, at *7–8 (D.N.J. Mar. 8, 2016) (concluding that Indiana lacked a materially greater interest despite the employee's residence, work, customer relationships, and execution of the agreement occurring there); *Diversant, LLC v. Carino*, No. 18-3155, 2018 WL 1610957, at *3–4 (D.N.J. Apr. 2, 2018) (concluding that California lacked a materially greater interest even though the employee resided there and the agreement was formed, signed, performed, and allegedly breached there).

***18** The states' competing policies likewise do not establish that New York's interest is materially greater. The Court acknowledges that New York has expressed a legitimate interest through EPTL 13-3.2(e), which reflects the State's interest in protecting the integrity of beneficiary designations. New York courts have explained that requirements governing beneficiary changes serve, among other purposes, to ensure that benefits are distributed consistently with the account holder's expressed intent and to prevent courts from speculating about a decedent's wishes. *See McCarthy v. Aetna Life Ins. Co.,* 704 N.E.2d 557, 560 (N.Y. 1998); *see also In re Durcan*, 87 N.Y.S.3d 26, 27 (N.Y. App. Div. 1st Dep't 2018) (applying EPTL § 13-3.2(e) to an IRA and declining to recognize a beneficiary designation in the absence of a signed form notwithstanding evidence of the decedent's intent). California, however, has a countervailing interest in respecting voluntarily negotiated contractual choices, an interest concretely implicated here because Schwab is a California corporation headquartered in that State. *See Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 471 (1992) (recognizing California's policy of respecting choices made in voluntarily negotiated agreements). Indeed, New York itself recognizes the same public policy interest in enforcing contractual agreements. *See, e.g., Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*, 754 F. Supp. 2d 616, 626 (S.D.N.Y. 2010) (" 'In general, public policy holds competent contracting parties to bargains made by them freely and voluntarily, and requires the courts to enforce such agreements.' " (quoting *Cuciniello v. Cuciniello,* 378 N.Y.S.2d 976, 977 (N.Y.Sup.Ct.1976)).

New Jersey's own choice-of-law rules similarly recognize that honoring the parties' selected law protects their justified expectations and permits them to predict their contractual rights and liabilities. *See Collins*, 874 F.3d at 184 ("[H]onoring the parties' selected law serves the prime objectives of contract law ... to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities under the contract. Eliminating uncertainties about which law governs may be particularly critical where, as here, the parties reside in and perform their contractual obligations in different jurisdictions." (quoting Restatement § 187 cmt. e) (quotation marks omitted)); *see also La Quinta Fran. LLC v. Alsbury Hosp., Inc.*, No. 22-05184, 2025 WL 1837667, at *7 (D.N.J. July 3, 2025) (upholding a New Jersey choice-of-law provision despite Minnesota "doubtlessly" has a policy interest in protecting franchisees).

Considering those policies together with the contacts that implicate them, the Court concludes that New York does not have a materially greater interest than California in the parties' disputes. Although New York may have more contacts with the events surrounding the disputed beneficiary change, that alone is insufficient. *Actega Kelstar, Inc. v. Musselwhite*, No. 09-1255, 2010 WL 744126, at *3 (D.N.J. Mar. 2, 2010) (concluding that, although Georgia appeared to have more contacts with the dispute and "perhaps *some* greater interest," its interest was not "materially greater" than New Jersey's because the agreement involved a New Jersey business and New Jersey had an interest in the enforcement of its residents' contracts); *Chemetall US Inc.*, 2016 WL 885309, at *7–8; *Diversant*, 2018 WL 1610957, at *3–4. Accordingly, the Court finds that the Koeppel Defendants have not established that New York possesses the materially greater interest required by § 187(2)(b).

In the alternative, the Court finds that application of California law would not contravene a fundamental policy of New York. In determining whether a competing state's policy is "fundamental" within the meaning of Restatement § 187, "the nature of the policy itself and its relative importance must be considered." *Adler*, 135 F.4th at 76. The Restatement further explains that, "[t]o be 'fundamental,' a policy must in any event be a substantial one." Restatement § 187 cmt. g. It cautions that, "[e]xcept perhaps in the case of contracts relating to wills, a policy of this sort will rarely be found in a requirement, such as the statute of frauds, that relates to formalities." *Id.* The Koeppel Defendants contend that EPTL § 13-3.2(e) embodies such a fundamental policy. (Koeppel Mov. Br. at 11). In support, they rely principally on *Matter of Durcan*, in which the New York County Surrogate's Court observed that, "EPTL 13-3.2 (e) represents the legislative choice of protecting an insured or retirement plan participant from the possibility of fraud after her death by forgoing even persuasive testimonial evidence in favor of a formal requirement that has the virtue of objectivity and can be easily satisfied." (*Id.* (citing 2018 NY Slip Op 30629(U), 8 (Sur. Ct.)).

***19** The Stern Defendants respond that EPTL 13-3.2(e) "does not represent a policy properly classified as fundamental." (Stern Opp'n Br. against Koeppel at 7). First, they argue that while acknowledging the statute, New York courts do not require strict compliance with the formal requirements. (*Id.*). And "the statute can hardly represent a fundamental policy" if courts are willing to bypass it. (*Id.*). Second, the Stern Defendants contend that EPTL 13-3.2(e) is "merely a contractual formality, which the Restatement says rarely qualifies as a substantial public policy warranting non-enforcement of a choice of law provision." (*Id.* at 8). The Stern Defendants further assert that the statute is "akin to the Statute of Frauds," and that formal requirements such as these do not constitute a fundamental policy. (*Id.* (quoting *Finnish Fur Sales Co. v. Juliette Shulof Furs, Inc.*, 770 F. Supp 139, 146 (S.D.N.Y. 1991) (citation and quotation marks omitted))). Finally, the Stern Defendants argue that the Koeppel Defendants fail to show that "application of California law is offensive, truly obnoxious or violative of some fundamental principle of justice." (*Id.* at 9).

The Court agrees with the Stern Defendants. Although EPTL 13-3.2(e) undoubtedly reflects an important legislative judgment concerning the manner in which beneficiary designations should be effectuated, the statute principally prescribes the formalities by which such designations must be made. *See* EPTL § 13-3.2(e). That is the type of requirement the Restatement cautions will "rarely" constitute a fundamental policy sufficient to override the parties' contractual choice of law. Restatement § 187 cmt. g. Nor does *Matter of Durcan* persuade the Court otherwise. While *Durcan* recognizes that the statute serves an anti-fraud purpose, it does not establish that the policy is "fundamental" in the distinct sense contemplated by Restatement § 187. Indeed, courts applying New York law have reached the same conclusion with respect to analogous formal requirements. In *Nakhleh v. Chemical Construction Corp.*, for example, the court recognized that New York's Statute of Frauds served the important purpose of preventing perjury and erroneous verdicts, but nevertheless concluded that this anti-fraud interest was not so fundamental as to displace the parties' contractual choice of law. 359 F. Supp. 357, 360–61 (S.D.N.Y. 1973). Likewise, *Finnish Fur Sales Co.* held that "formal requirements such as the Statute of Frauds do not constitute a fundamental policy for the purpose of choice of law analysis, except in the case of contracts relating to wills."[13] 770 F. Supp. at 146 (quoting Restatement § 187 cmt. g (quotation marks omitted)).

Accordingly, the Court is not persuaded by the Koeppel Defendants' argument that EPTL 13-3.2(e) rises to the level of a "fundamental policy" within the meaning of Restatement § 187(2)(b). The Court therefore concludes that the Account Agreement's California choice-of-law provision is enforceable and applies California substantive law in deciding the pending motions for summary judgment.

**D. The Lawful Beneficiaries of the Roth IRA**

The Court next turns to the parties' competing motions for summary judgment regarding the lawful beneficiaries of the Roth IRA. The parties agree that the Koeppel children are entitled to fifty percent of the account proceeds under both the September 2019 Beneficiary Designation Form and the designation reflected in Schwab's October 2020 records. (*See* D.E. No. 67; Koeppel Mov. Br. at 13; Schwab Mov. Br. at 24). No adverse claim exists as to that portion of the account. The Court therefore grants the Koeppel Defendants' motion for summary judgment with respect to the undisputed fifty percent and directs that those funds be distributed to Defendants H. Andrew Schwed and Meredith Koeppel Schwed, as custodians for the Koeppel children. The competing motions concerning the remaining fifty percent, however, present factual questions that cannot be resolved under Rule 56.

***20** As to the disputed half, the Stern Defendants contend that Decedent effectively removed Alexia Koeppel and designated the Stern children as beneficiaries during his meeting with Vogelzang. They invoke the substantial compliance doctrine and also rely on modification through conduct and subsequent writing, reformation, and equitable estoppel. (Stern Mov. Br. at 9–12). The Koeppel Defendants respond that the governing account documents required Decedent to complete a new Beneficiary Designation Form during his lifetime and that, in the absence of an effective later designation, the September 2019 Form controls. (Koeppel SUMF ¶¶ 8 & 12–15; see also Koeppel Mov. Br. at 14–16). The Court begins with substantial compliance because that doctrine most directly addresses the legal effect of the Decedent's undisputed instructions notwithstanding Schwab's inability to produce the form.

California law has adopted the substantial compliance doctrine. The doctrine is "commonly understood to mean compliance with the substantial or essential requirements of something (as a statute or contract) that satisfies its purpose or objective even though its formal requirements are not complied with." *Manderson-Saleh v. Regents of the University of California*, 274 Cal. Rptr. 3d 838, 860 (Cal. App. 4th Dist. 2021) (internal quotation marks and citation omitted). It reflects the principle that, where the substantive requirements have been met, "technical deviations" should not be treated as noncompliance and "substance controls over form." *Id*. (citation omitted). Thus, unless the governing provision's purpose can be achieved only through strict compliance, substantial compliance may suffice. *Id.*

California courts articulate different applications of that principle depending on the nature of the benefit at issue. For public retirement systems, a beneficiary change may be effective where the member intended to make the change and took "*some* affirmative action evidencing the exercise of the right to change." *Watenpaugh v. State Teachers' Retirement System*, 336 P.2d 165, 169 (Cal. 1959) (emphasis added). *Watenpaugh* represents a more relaxed application of the doctrine as the court emphasized that the benefits at issue were statutory, participation was compulsory, and the governing requirements were not negotiated. *Id.* The Supreme Court of California articulated a stricter standard in *Pimentel v. Conselho Supremo de Uniao Portugueza do Estado da California*:

> where the insured *makes every reasonable effort* under the circumstances, complying as far as he is able with the rules, and there is a clear manifestation of intent to make the change, which the insured has put into execution as best he can, equity should regard the change as effected.

57 P.2d 131, 134 (Cal. 1936) (emphasis added); *see also BankAmerica Pension Plan v. McMath*, 206 F.3d 821, 830–31 (9th Cir. 2000) (recognizing the two different iterations of the substantial compliance doctrine).

In *McMath*, the Ninth Circuit applied the stricter standard to a 401(k) Plan because "[t]he 401(k) Plan beneficiary designation provisions are not statutory and membership in the 401(k) Plan is not compulsory. Although the requirements for change of beneficiary were not negotiable, neither are they in insurance contracts." 206 F.3d at 830. The same reasoning applies here. The Account Agreement's provisions are not prescribed by statute, and the Decedent voluntarily opened the Account. Therefore, the Court applies the more demanding formulation set forth in *Pimentel*, under which the owner must clearly manifest the intended change and make "every reasonable effort under the circumstances," complying with the governing requirements as far as the owner is able and putting the intended change into execution as best the owner can. 57 P.2d at 134.

In *Pimentel*, while hospitalized, the insured signed and acknowledged an endorsement changing his beneficiary, instructed his attorney and others to take the steps necessary to complete the change, and later received assurances that the matter had been completed. 57 P.2d at 132. However, those intermediaries failed to follow the required procedure. *Id.* The California Supreme Court nevertheless held that the change was effective because the insured had complied as far as he

reasonably could and had entrusted the remaining ministerial acts to others, whose failure was outside his control. *Id.* at 134. The Ninth Circuit reached the opposite result in *McMath*. There, the participant submitted a beneficiary form that was unsigned, and the plan accepted it without noticing the omission. 206 F.3d at 823–24. Because signing the form remained within the participant's power and nothing excused his failure to do so, the court held that he had not made every reasonable effort to effectuate the change. *Id.* at 830–31.

***21** *Cahn v. Molinari*, while unpublished and nonbinding, is also instructive because it applied the substantial compliance test to Roth IRAs and concluded that the owner satisfied even *Pimentel*'s stricter standard. No. 140329, 2015 WL 4035239, at *4–5 (Cal. Ct. App. June 30, 2015). The owner, whose rapidly progressing illness prevented him from writing, dictated and signed a witnessed document identifying the intended IRA beneficiary, received incorrect advice concerning the required form, and continued attempting to complete his estate arrangements until his death. *Id.* at *1–2 & *4–5. Distinguishing *McMath*, the court emphasized that the owner's failure to complete the custodian's process resulted from his deteriorating health and the misleading assistance he received, rather than carelessness. *Id.* at *5.

Under these authorities, in order to determine whether the Decedent made "every reasonable effort" to effectuate the beneficiary change, the Court must undertake a close examination of what remained within the Decedent's power and why he failed to complete the prescribed process. *Pimentel*, 57 P.2d at 134. Here, several facts material to that inquiry are undisputed. The Decedent personally instructed Vogelzang to remove Alexia Koeppel and designate the four grandchildren as twenty-five-percent beneficiaries. (Schwab SUMF ¶ 4; Koeppel Resp. to Schwab SUMF ¶ 4). At the Decedent's request, Vogelzang entered those designations in Client Central while the Decedent was present. (Schwab SUMF ¶ 5; Koeppel Resp. to Schwab SUMF ¶ 5). Vogelzang then directed Decedent to the front service desk to sign the corresponding Beneficiary Designation Form. (Schwab SUMF ¶ 6; Koeppel Resp. to Schwab SUMF ¶ 6). And Schwab thereafter delivered an Account Verification Letter listing the four grandchildren as beneficiaries, requested that Decedent notify Schwab if the information was incorrect, and received no response. (Schwab SUMF ¶ 8; Koeppel Resp. to Schwab SUMF ¶ 8). Those facts establish the Decedent's precise intent to make a present beneficiary change. The parties' dispute, therefore, concerns whether he sufficiently executed that intent in accordance with *Pimentel*.

The Court first considers the Stern Defendants' motion. Because they are the movants, the evidence and reasonable inferences must be viewed in favor of the Koeppel Defendants. *Scott v. Harris*, 550 U.S. 372, 378 (2007). According to the record, no signed form corresponding to the October 2020 change has been located, and no witness testified that he or she observed the Decedent execute one. (Schwab SUMF ¶ 7; Stern SUMF ¶¶ 24–25). Although Vogelzang testified that he was "under the impression" that the Decedent completed the form with the front-counter staff, he did not observe what occurred there. (Schwab SUMF ¶ 6; Koeppel Resp. to Schwab SUMF ¶ 6). He also testified that he did not know why "the forms did not get signed" while the Decedent was present and that he assumed another employee would handle the matter. (Stern SUMF ¶¶ 13 & 35). Additional evidence reinforces that inference. The Decedent had previously completed several Beneficiary Designation Forms for this Roth IRA. (Koeppel SUMF ¶¶ 21–25). And Vogelzang previously had been advised, after making a verbal change to the same account, that beneficiary changes could not be accepted verbally and required either a completed form or an online change. (Stern SUMF ¶ 34). Although Vogelzang's knowledge cannot automatically be imputed to the Decedent, the Decedent's prior course of completing beneficiary forms and Vogelzang's express direction to the front desk would permit a reasonable factfinder to conclude that the Decedent failed to complete an essential step within his control. *See McMath*, 206 F.3d at 830–31; *see also West Coast Life Insurance Co. v. Clark*, 24 F. Supp. 3d 933, 939–40 (C.D. Cal. 2014) (finding no substantial compliance where the insured remained able to take additional steps required to effectuate the intended change but did not do so).

***22** The Court next considers the Koeppel Defendants' motion. On that motion, the Stern Defendants receive the benefit of all reasonable inferences. *Scott v. Harris*, 550 U.S. at 378. First, the Decedent did more than express an uncommunicated intention. He personally conveyed the precise change to the Schwab representative responsible for his accounts, Vogelzang entered that change into Schwab's system in the Decedent's presence, and Schwab sent the Decedent an Account Verification Letter reflecting the requested designation that same day. (Stern SUMF ¶¶ 8, 11–12 & 14; Koeppel Resp. to Stern SUMF ¶¶ 8, 11–12 & 14).[14] Approximately one year later, Schwab sent a second Account Verification Letter identifying the same beneficiaries. (Stern SUMF ¶ 19; Koeppel Resp. to Stern SUMF ¶ 19). The record also contains testimony that Decedent had lost four

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

fingers and experienced substantial difficulty writing and using a computer. (Stern SUMF ¶ 9; Koeppel Resp. to Stern SUMF ¶ 9). Viewed in the Stern Defendants' favor, this evidence would permit a reasonable factfinder to conclude that the Decedent completed the steps Schwab asked him to perform or reasonably understood from Schwab's assistance and written confirmation that the change had been completed. Under that account, any remaining omission would resemble the administrative failure attributed to intermediaries in *Pimentel* rather than the participant's unexplained omission in *McMath*. *See Pimentel*, 57 P.2d at 134; *McMath*, 206 F.3d at 830–31.

Accordingly, a reasonable factfinder could conclude either (i) that an essential act remained within the Decedent's control or (ii) that the Decedent completed everything Schwab required or reasonably led him to believe was required. *See National Electrical Annuity Plan v. Roybal*, No. 15-3213, 2017 WL 10316152, at *4–5 (E.D. Wash. Dec. 1, 2017) (denying competing claimants' cross-motions where the evidence concerning an unsigned beneficiary form supported conflicting inferences as to substantial compliance); *Blansfield v. Alumni Association of Arizona State University*, No. 9435, 2015 WL 4600802, at *5–6 & *4 n.23 (Del. Ch. July 31, 2015) (concluding that factual disputes concerning an unsigned IRA beneficiary form precluded summary judgment for either claimant). Resolving those competing inferences would require the Court to weigh evidence and determine what most likely occurred at the front desk of the Schwab branch in October 2020, which it may not do under Rule 56. *See Anderson*, 477 U.S. at 249, 255. Neither the Stern Defendants nor the Koeppel Defendants have therefore established any entitlement to the disputed fifty percent as a matter of law. *See Roybal*, 2017 WL 10316152, at *5; *Celotex*, 477 U.S. at 323. Accordingly, both motions for summary judgment are denied to that extent.

Alternatively, the Stern Defendants invoke several contractual and equitable doctrines including modification, reformation, waiver, equitable estoppel, and ratification, as grounds for treating the October 2020 beneficiary designation as effective. (Stern Mov. Br. at 9–12). The authorities they cite, however, principally concern the modification or enforcement of ordinary commercial agreements. None holds that an oral request, together with the custodian's internal entry and subsequent confirmation, independently effectuates a change of beneficiary, notwithstanding the prescribed beneficiary-change procedure. (*See generally id.*). California courts instead evaluate imperfect beneficiary changes through the more specific doctrines discussed above, asking whether the account holder intended to make the change and took sufficient affirmative action to place that intention into effect. *See Molinari*, 2015 WL 4035239, at *4–5; *Watenpaugh*, 336 P.2d at 169. The Stern Defendants' alternative theories do not eliminate the disputed questions concerning what occurred at the front desk and what the Decedent understood remained to be done. For example, reformation depends on proof of an antecedent agreement and mistake. *See Hess v. Ford Motor Co.*, 41 P.3d 46, 52 (Cal. 2002). Although it is undisputed that the Decedent requested the beneficiary change in question, the record does not establish whether the absence of a signed form resulted from mutual mistake or from the Decedent's conscious failure to complete a step that remained in his power. *See Pimentel*, 57 P.2d at 134 (requiring "every reasonable effort under the circumstances" to effectuate the change); *McMath*, 206 F.3d at 830–31. Because these questions of material fact persist despite the legal theory at issue, these alternative legal theories cannot provide an independent basis for summary judgment. *Anderson*, 477 U.S. at 248–49.

***23** Accordingly, the Court concludes that genuine disputes of material fact preclude it from determining whether the Decedent effectively changed the beneficiary designation as to the disputed fifty percent of the Roth IRA. *Anderson*, 477 U.S. at 249. The Court therefore DENIES both the Stern Defendants and the Koeppel Defendants' motions for summary judgment as to the disputed fifty percent of the Roth IRA; and GRANTS the Koeppel Defendants' motion for summary judgment as to the undisputed fifty percent.

### E. Counterclaims Asserted Against Schwab

Lastly, the Court addresses the counterclaims asserted against Schwab. Both the Stern Defendants and the Koeppel Defendants assert counterclaims arising from Schwab's administration of the Decedent's accounts. (D.E. Nos. 67 & 74). The Koeppel Defendants assert claims for breach of contract, breach of fiduciary duty, and negligence. (D.E. No. 74 at 4–13). They further allege that Schwab failed to safeguard the assets of the Decedent by "knowingly" permitting Ms. Senter to withdraw funds from the Decedent's Roth IRA and a separate traditional IRA account after the Decedent's death, when her authority under the power of attorney had allegedly terminated. (Koeppel Mov. Br. at 25–27). They therefore seek summary judgment on their negligence counterclaim and an order requiring Schwab to restore the funds Ms. Senter withdrew. (*Id.* at 27–28). The Stern Defendants likewise assert claims for negligence,

breach of fiduciary duty, breach of contract, and negligent supervision. (*See* D.E. No. 67, ¶¶ 18–44; *see also* Stern Mov. Br. at 13 & 26). Schwab cross-moves for summary judgment dismissing all counterclaims asserted against it. (Schwab Mov. Br. at 8–26).

As explained above, Schwab's use of the interpleader procedure does not categorically insulate it from liability for its own conduct. Although a stakeholder generally cannot be held liable merely for declining to choose among competing claimants and seeking interpleader relief, *Hovis*, 553 F.3d at 264–65, that protection does not extend to independent negligent conduct by the stakeholder that created the controversy over entitlement to the disputed funds, *Lee*, 688 F.3d at 1012–14. The Court therefore turns to the merits of the counterclaims.

As a threshold matter, the Court notes that the counterclaims require a claim-specific choice-of-law analysis. California law would govern the breach-of-contract counterclaims because those claims seek to enforce duties allegedly arising from the Account Agreement, which expressly selects California law. The Court's earlier conclusion that California law governs the beneficiary-designation dispute therefore applies equally to those claims. The Account Agreement's choice-of-law provision, however, does not purport to govern tort claims based on duties imposed independently of the Agreement. *See Black Box Corp. v. Markham*, 127 F. App'x 22, 25–26 (3d Cir. 2005) (construing a provision stating that an agreement would be "governed by" the law of a particular state as limited to the agreement itself and not related noncontractual claims). The Court must therefore determine which law governs the remaining claims.

Under New Jersey's choice-of-law framework, the Court first determines whether the laws of the interested states present an actual conflict. *P.V. ex rel. T.V. v. Camp Jaycee*, 962 A.2d 453, 459–60 (N.J. 2008); *Maniscalco v. Brother International (USA) Corp.*, 709 F.3d 202, 206 (3d Cir. 2013). If no actual conflict exists, the Court applies the law of the forum; if the competing laws could produce different outcomes, the Court determines which state has the most significant relationship to the particular claim or issue. *Camp Jaycee*, 962 A.2d at 460–61. Here, an actual conflict exists concerning when a financial institution owes a duty of care to a noncustomer.

***24** Under New York law, such a duty generally requires contractual privity or a relationship sufficiently close to constitute its functional equivalent. *See Sykes v. RFD Third Ave. 1 Assocs., LLC*, 938 N.E.2d 325, 326 (N.Y. 2010); *Credit Alliance Corp. v. Arthur Andersen & Co.*, 483 N.E.2d 110, 118 (N.Y. 1985). New Jersey applies a different formulation, asking whether an agreement, undertaking, or contact created a "special relationship" from which a duty may arise. *City Check Cashing, Inc. v. Manufacturers Hanover Trust Co.*, 764 A.2d 411, 417 (N.J. 2001); *ADS Associates Group, Inc. v. Oritani Savings Bank*, 99 A.3d 345, 360 (N.J. 2014). That distinction is material here because the Stern Defendants rely on Schwab's alleged undertaking to complete the beneficiary change and its subsequent communications, whereas New York's near-privity doctrine additionally requires reliance by the allegedly known party and conduct demonstrating Schwab's understanding of that reliance. *See Credit Alliance Corp.*, 483 N.E.2d at 118. The two states' standards therefore could produce different results on the asserted duty.

The Court accordingly applies New Jersey's most-significant-relationship test to the counterclaims for negligence, breach of fiduciary duty, and negligent supervision. *Camp Jaycee*, 962 A.2d at 460. Under that test, the Court considers the place of the alleged injury, the place of the conduct causing that injury, the parties' residences and places of business, and the place where their relationship was centered, assigning each contact weight according to its relevance to the particular issue. *Id.* at 461–63. Those considerations favor New York. The Decedent resided there, his relationship with Schwab was centered at its Manhasset branch, and the alleged tortious conduct —including Vogelzang's handling of the beneficiary-change request—occurred principally there. New York therefore has the strongest interest in defining the duties governing that conduct and regulating financial institutions operating through branches within its borders. *See id.*; *see also Fu v. Fu*, 733 A.2d 1133, 1142 (N.J. 1999) (recognizing a state's interest in regulating conduct occurring within its territory). Accordingly, California law governs the breach-of-contract counterclaims, while New York law governs the remaining tort counterclaims.

#### i. The Stern Defendants' Counterclaims against Schwab

***Negligence.*** "To establish a prima facie case of negligence, a plaintiff must establish '(1) a duty of care owed to plaintiff by defendant, (2) a breach of that duty by defendant, (3) proximate cause, and (4) actual damages.' " *Grund v. Delaware Charter Guarantee & Tr. Co.*, 788 F. Supp. 2d 226, 247 (S.D.N.Y. 2011), *on reconsideration*, No. 09-8025, 2011 WL 3837146 (S.D.N.Y. Aug. 30, 2011) (quoting *Brunson v.*

*Affinity Fed. Cred. Union,* 972 A.2d 1112 (N.J. 2009)). The existence and scope of the asserted duty present questions of law for the Court. *532 Madison Avenue Gourmet Foods, Inc. v. Finlandia Center, Inc.*, 750 N.E.2d 1097, 1101 (N.Y. 2001).

As an initial matter, the Court notes that Schwab owed a transaction-specific duty of reasonable care to the Decedent. Although the holder of a nondiscretionary account generally cannot impose upon a broker a continuing duty to monitor the account or provide unsolicited advice, the broker must exercise diligence and competence in performing the transactions entrusted to it. *de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1302, 1305–06 (2d Cir. 2002); *Bissell v. Merrill Lynch & Co.*, 937 F. Supp. 237, 246 (S.D.N.Y. 1996). Once Schwab undertook to process the Decedent's request to change his beneficiaries, it therefore owed him a duty to exercise reasonable care in completing that transaction and in communicating whether additional action remained necessary.

***25** The existence of a duty to the Decedent, however, does not necessarily establish that the Stern Defendants may recover for its breach. A cause of action belonging to a decedent ordinarily survives in favor of the decedent's personal representative. *See* N.Y. Est. Powers & Trusts Law § 11-3.2(b). The Stern Defendants assert their counterclaims on behalf of the Stern children, rather than as representatives of the Decedent's estate. Thus, even if a factfinder ultimately determines that the Stern children became the lawful beneficiaries, that determination would not, without more, establish that they succeeded to the Decedent's personal negligence claim. The Stern Defendants must therefore identify a duty running to the Stern children themselves.

The Stern Defendants alternatively invoke a near-privity theory. (D.E. No. 133 ("Stern Opp'n Br. against Schwab") at 11–14). Strict privity and near-privity are distinct. Under New York's strict-privity rule, a professional duty arising from a contractual relationship ordinarily runs only to the client for whom the services were performed. *Wainwright v. Matrix Asset Advisors, Inc.*, No. 05-227, 2004 WL 3418933, at *2 (S.D.N.Y. July 27, 2005). A nonclient may nevertheless establish a relationship approaching privity by showing "(1) an awareness by the maker of the statement that it is to be used for a particular purpose; (2) reliance by a known party on the statement in furtherance of that purpose; and (3) some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance." *Id.* at *3 (internal quotation marks and citation omitted); *see also Credit Alliance Corp.*, 483 N.E.2d at 118–20; *Ossining Union Free School District v. Anderson LaRocca Anderson*, 539 N.E.2d 91, 94–95 (N.Y. 1989). Near-privity therefore provides an exception to strict privity, but requires more than foreseeability or identification of the claimant as an intended beneficiary. *See Wainwright*, 2004 WL 3418933, at *2–4.

The Stern Defendants contend that all three requirements are satisfied because Schwab understood the purpose of its confirmations, knew the identities of the Stern children, and communicated directly with their representatives after the Decedent's death. (Stern Opp'n Br. against Schwab at 11–14). Schwab, on the other hand, argues that Stern Defendants "did not have a relationship with Schwab 'so close as to touch the bounds of privity' nor did the Stern Defendants reasonably rely on any Schwab's representations to their detriment." (Schwab Mov. Br. at 14–15 (citing *Wainwright*, 2004 WL 3418933, at *2)).

Here, the Court finds that the Stern Defendants have not established near-privity with Schwab. The Decedent requested the October 2020 beneficiary change, communicated with Vogelzang, and received the Account Verification Letter. Although Schwab knew the identities of the proposed beneficiaries, the present record does not establish that Schwab understood that the letter, which was sent to the Decedent, would be used by the Stern children for a particular purpose. *See Parrott v. Coopers & Lybrand, L.L.P.*, 741 N.E.2d 506, 509 (N.Y. 2000). Nor can the Decedent's alleged reliance upon Vogelzang be imputed to the Stern children. *See Wainwright*, 2004 WL 3418933, at *3 (dismissing intended IRA beneficiaries' negligence claim where they did not allege their own reliance upon the adviser's statements). The Stern Defendants additionally rely upon a January 24, 2022 telephone call during which Vogelzang identified the Stern children as beneficiaries reflected in Schwab's records. (Stern Opp'n Br. against Schwab at 13–14; Stern SUMF ¶ 17). Schwab responds that Vogelzang also advised them during the same call that the identity of the lawful beneficiaries was disputed and that the account had been restricted pending resolution. (Schwab Mov. Br. at 15). Regardless of the parties' differing descriptions of the call, the Stern Defendants identify no undisputed evidence that they acted or refrained from acting based upon Vogelzang's statement. Accordingly, the Court concludes that the Stern Defendants fail to independently establish a duty of care through near-privity and are not entitled to summary judgment on that theory.

***26** The Stern Defendants' assumption-of-duty theory fares no better. A party that undertakes to perform services for another may owe a duty to a third party where its conduct increases the risk of harm or the third party suffers harm in reliance upon the undertaking. *Tavarez v. Lelakis*, 143 F.3d 744, 746–47 (2d Cir. 1998). The Stern Defendants argue that Vogelzang undertook to assist the Decedent in making changes to his account, knowing that the Decedent was "disabled" and "fragile." (Stern Opp'n Br. against Schwab at 14–15). The evidence may support a finding that Vogelzang undertook to assist the Decedent in changing his beneficiaries and therefore assumed a duty to perform that undertaking with reasonable care. The Stern Defendants, however, identify no authority establishing that a duty assumed toward an account holder extends to the intended beneficiaries of the transaction. (*See generally id.*). Their reliance on *Matter of Estate of Praczkajlo* is misplaced, because that decision concerned the vesting of title in a validly designated IRA beneficiary, not the extension of a tort duty assumed toward the account holder. *See* 542 N.Y.S.2d at 133–35. Accordingly, because the Stern Defendants fail to establish that Schwab owed them a duty of care, their negligence counterclaim fails as a matter of law. The Court therefore DENIES the Stern Defendants' motion and GRANTS Schwab's cross-motion for summary judgment on that counterclaim.

***Negligent Supervision.*** The Stern Defendants separately allege that Schwab negligently supervised Vogelzang. Under New York law, to state a claim for negligent supervision, "in addition to the standard elements of negligence, a plaintiff must show: (1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (internal quotation marks and citations omitted). Unlike the near-privity theory discussed above, negligent supervision does not require a special relationship or contractual privity between the Stern Defendants and Schwab. *Moore Charitable Found. v. PJT Partners, Inc.*, 217 N.E.3d 8, 17 (N.Y. 2023) ("Thus, to the extent defendants argue that a special relationship or privity between plaintiff and employer is a necessary element of a negligent supervision claim, we expressly reject any such requirement.").

The Stern Defendants principally rely upon a prior incident involving a Roth IRA. (Stern Opp'n Br. against Schwab at 17–18). They argue that, indisputably, Vogelzang previously entered a beneficiary change in Schwab's Client Central system based upon oral instructions and was thereafter advised that Schwab required either a signed form or an online change. (*See id.*; Stern SUMF ¶¶ 29, 33–34). They contend that this incident placed Schwab on notice that Vogelzang was likely to enter beneficiary changes without obtaining the required documentation. (Stern Opp'n Br. against Schwab at 17–18). The Court observes, however, that a negligent-supervision claim requires an underlying tortious act that caused the plaintiff's injury. *See Ehrens*, 385 F.3d at 235. Whether Vogelzang's action was tortious remains disputed because the record does not establish whether the Decedent signed the October 2020 form, whether Schwab failed to preserve it, or whether the Decedent understood that a signature remained required but decided to not take that step. Furthermore, Schwab's failure to sufficiently address the claim for negligent supervision in its briefing does not warrant judgment for the Stern Defendants by default. A summary-judgment movant retains the burden of demonstrating entitlement to judgment as a matter of law even when the opposing party does not separately address every argument. *See Big Apple BMW v. BMW of North America, Inc.,* 974 F.2d 1358, 1362–63 (3d Cir.1992). At the same time, Schwab has not established the absence of a triable claim merely by asserting that neither it nor Vogelzang acted negligently. The same disputed facts concerning the October 2020 transaction bear upon Vogelzang's conduct, Schwab's notice, causation, and injury. Accordingly, the Court DENIES both the Stern Defendants' motion and Schwab's cross-motion for summary judgment on the negligent-supervision counterclaim.

***27** ***Breach of Fiduciary Duty.*** The Stern Defendants also contend that Schwab owed fiduciary duties to the Decedent and the Stern children. They rely upon the Decedent's history of seeking Vogelzang's assistance, his physical limitations, and Schwab's subsequent confirmations of the designation. (Stern Opp'n Br. against Schwab at 18–22). Schwab responds that the Roth IRA was self-directed and nondiscretionary and that neither the Account Agreement nor the parties' relationship gave Schwab control over the account. (Schwab Mov. Br. at 16–18).

Under New York law, when the parties' relationship is governed by a contract, courts begin with that agreement to "discover the nexus of [the parties'] relationship and the particular contractual expression establishing the parties' interdependency." *EBC I, Inc. v. Goldman, Sachs & Co.,*

832 N.E.2d 26, 31 (N.Y. 2005) (internal quotation marks and citation omitted); *see also De Leon v. DraftKings, Inc.*, No. 25-644, 2025 WL 3551627, at *10 (S.D.N.Y. Dec. 11, 2025) (quoting the same language). "If the parties ... do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them." *EBC I*, 832 N.E.2d at 31 (citation omitted). The existence of a fiduciary relationship therefore turns on the parties' actual relationship, not merely the existence of an agreement between them. *Id.*

Consistent with that principle, "[t]he fiduciary obligation between a broker and customer under New York law is limited to affairs entrusted to the broker." *Bissell*, 937 F. Supp. at 246. Thus, absent discretionary authority delegated by the customer, a broker does not owe a general fiduciary duty over the customer's account. *Id.*; *see also Celle v. Barclays Bank P.L.C.*, 851 N.Y.S.2d 500, 501 (N.Y. App. Div. 1st Dep't 2008) ("Indeed, brokers for non-discretionary accounts do not owe clients a fiduciary duty[.]"). New York courts have applied that rule specifically to self-directed IRAs, holding that an account custodian does not owe a fiduciary duty when it neither provides investment advice nor exercises discretionary control over the account. *Barrett v. Grenda*, 62 N.Y.S.3d 673, 676 (N.Y. App. Div. 4th Dep't 2017). Moreover, a fiduciary-duty claim cannot survive when it merely duplicates a claim for breach of the parties' agreement. *Grund*, 788 F. Supp. 2d at 249.

A broader fiduciary duty may arise in the "rare" case involving exceptional circumstances that place the relationship outside the ordinary model of a self-directed account. *Stewart v. J.P. Morgan Chase & Co.*, No. 02-1936, 2004 WL 1823902, at *13 (S.D.N.Y. Aug. 16, 2004). Such circumstances may exist where a client's impaired faculties or extreme lack of sophistication leave the client unable to understand or manage the account, or where the broker and client maintain a relationship closer than an arm's-length commercial relationship. *Id.*; *see also de Kwiatkowski*, 306 F.3d at 1308–09 (stating the same rule).

Here, the Stern Defendants have not identified evidence placing the Decedent's relationship with Schwab within that narrow exception. The Stern Defendants emphasize the Decedent's physical limitations, his preference for conducting business in person, and his practice of seeking Vogelzang's assistance with account-maintenance matters. (*See* Stern Mov. Br. at 18–22; Stern Opp'n Br. against Schwab at 18–22). But the evidence cited shows only that the Decedent had difficulty writing and preferred to obtain administrative assistance in person; it does not show that he suffered from impaired cognitive faculties or lacked financial sophistication. (Stern SUMF ¶¶ 9–10). Nor does reliance on administrative assistance, without evidence that Schwab possessed discretionary authority or exercised de facto control over the account, establish the "exceptional circumstances" necessary to impose a broader fiduciary duty. *de Kwiatkowski*, 306 F.3d at 1308.

***28** It follows that Schwab did not owe a fiduciary duty to the Stern children. Their asserted relationship with Schwab arose solely from their status as intended beneficiaries of the Decedent's self-directed account and therefore could not confer greater rights than the Decedent himself possessed. *Saska v. Metropolitan Museum of Art*, 975 N.Y.S.2d 605, 615 (N.Y. Sup. Ct. 2013) ("[A] third-party beneficiary has no greater rights or remedies than the direct parties to [the] contract." (internal quotation marks and citation omitted)). Accordingly, the Court DENIES the Stern Defendants' motion and GRANTS Schwab's cross-motion for summary judgment on the breach-of-fiduciary-duty counterclaim.

***Breach of Contract.*** The Stern Defendants also contend that the Decedent and Schwab entered into an enforceable agreement changing the Roth IRA beneficiaries, that the Stern children were intended beneficiaries of that agreement, and that Schwab breached by refusing to distribute the proceeds to them. (Stern Mov. Br. at 9–12). Those arguments substantially duplicate their claim to the interpleaded funds. Whether the Stern children possess contractual rights to the proceeds depends upon whether the October 2020 designation was effective—an issue the Court has determined cannot be resolved on summary judgment. Moreover, Schwab's decision to restrict the account and seek interpleader after receiving competing claims cannot independently constitute breach. The Account Agreement expressly authorized Schwab to restrict the account and pursue interpleader when the identity of the proper beneficiaries was disputed. (Schwab Mov. Br. at 8–12). A counterclaim based solely upon Schwab's refusal to select one claimant and distribute the disputed funds is not independent of the interpleader controversy. *See Hovis*, 553 F.3d at 264–65. Therefore, the Court DENIES the Stern Defendants' motion for summary judgment on their breach-of-contract counterclaim. To the extent that counterclaim rests solely upon Schwab's failure to distribute the disputed proceeds, the Court GRANTS Schwab's cross-motion. This ruling, however, does not determine whether the Stern children are entitled to the

proceeds under the October 2020 designation—that question remains for trial.

**ii. The Koeppel Defendants' Counterclaims Against Schwab**

The Koeppel Defendants' counterclaims overlap only partially with those asserted by the Stern Defendants. Their breach-of-contract claim rests principally on Alexia Koeppel's asserted rights under the September 2019 beneficiary designation, while their negligence claim concerns Schwab's alleged failure to safeguard the Decedent's accounts after his death. (D.E. No. 74 ¶¶ 22–47; Koeppel Mov. Br. at 14 & 25–27). The Court addresses each theory in turn.[15]

***29** ***Breach of Contract.*** Under California law, a claim for breach of contract requires "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages." *Oasis W. Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011) (citation omitted). The Koeppel Defendants contend that the September 2019 designation remained effective and that Schwab breached the Account Agreement by failing to recognize Alexia Koeppel as a beneficiary and distribute the corresponding portion of the Roth IRA to her. (Koeppel Mov. Br. at 14–25). That theory depends upon the premise that the September 2019 designation remained controlling. As explained above, however, whether the Decedent effectively changed that designation in October 2020 presents disputed questions of material fact. Alexia Koeppel therefore has not established as a matter of law that she possessed a contractual right to fifty percent of the account when the Decedent died.

***Negligence.*** The Koeppel Defendants separately contend that Schwab failed to safeguard the assets of the Decedent and knowingly permitted Ms. Senter to transfer funds from the Decedent's Roth IRA and traditional IRA after his death pursuant to powers of attorney that had terminated upon the Decedent's death. (Koeppel Mov. Br. at 25–27). The relevant events are largely undisputed. The Decedent died on October 15, 2021, and Ms. Senter orally informed Vogelzang of his death that morning. (Koeppel SUMF ¶¶ 59–60; Schwab Resp. to Koeppel SUMF ¶¶ 59–60). Schwab thereafter permitted transfers of $60,000 from the Roth IRA and $31,000 from the traditional IRA before receiving written notification of the Decedent's death on November 18, 2021.[16] (Koeppel SUMF ¶¶ 66–70; Schwab SUMF ¶ 9). Schwab responds that it was not required to restrict the accounts because the governing Power of Attorney and Authorization Agreement ("POA Agreement") provided that the power would remain effective until Schwab received written notification of the Decedent's death, which did not occur until November 18, 2021. (Schwab Mov. Br. at 25–26; D.E. No. 138 ("Schwab Reply Br.") at 9–10).

New York law provides that a power of attorney terminates when the principal dies. N.Y. Gen. Oblig. Law § 5-1511(1)(a); *see also Bryan v. Moor*, 109 N.Y.S.3d 861, 863 (N.Y. Sup. Ct. 2019) (quoting the same language). Thus, Ms. Senter's authority to act for the Decedent terminated on October 15, 2021. That conclusion, however, does not establish Schwab's liability by itself. Section 5-1511(5)(a) further provides that termination is ineffective against a third party that "has not received actual notice of the termination and acts in good faith under the power of attorney," and that a financial institution is deemed to have actual notice after it has received written notice and had a reasonable opportunity to act upon it. N.Y. Gen. Oblig. Law § 5-1511(5)(a).

The POA Agreement is therefore significant, although not dispositive. The Decedent agreed that "[t]his Power of Attorney, authorization and indemnification will remain in effect until Schwab is notified in writing of my death." (Schwab Mov. Br. at 25; *see also* D.E. No. 136-27 & 136-28 (Exhibits 21 & 22 to Colman Decl.)). That provision could not preserve Ms. Senter's authority to act for the Decedent after his death because Section 5-1511(1)(a) terminated that authority by operation of law. N.Y. Gen. Oblig. Law § 5-1511(1)(a); *see also Bryan*, 109 N.Y.S.3d at 863 (holding that the power of attorney was revoked by operation of law upon the death of the principal). The provision nevertheless bears directly on Schwab's authority to rely upon the instrument, the scope of the obligations Schwab contractually undertook, and whether Schwab acted reasonably and "in good faith." *See* N.Y. Gen. Oblig. Law § 5-1511(5)(a). By expressly requiring written notification, the agreement supports Schwab's position that it was entitled to continue processing transactions until it received written notice of the Decedent's death. The provision therefore prevents the Koeppel Defendants from establishing breach merely by showing that Ms. Senter's authority had terminated.

***30** The closest authority is *Matter of Hill,* in which the New York Queen County Surrogate's Court denied a bank summary judgment and indemnification under Section 5-1511(5) because it received written subpoena papers before

the challenged transaction informing it of the principal's death. 938 N.Y.S.2d 226, 226 (N.Y. Sur. Ct. Aug. 10, 2011). Although *Hill* involved written rather than oral notice, it demonstrates that reliance and indemnification provisions do not conclusively protect a financial institution when actual notice and good faith remain in question. *See id.* Furthermore, Section 5-1511(5)(a) refers generally to "actual notice" and states that written notice will cause a financial institution to be "deemed" to possess such notice; it does not expressly state that written notice is the exclusive means of proving actual notice. N.Y. Gen. Oblig. Law § 5-1511(5)(a). Section 5-1504 also provides that an institution acting through employees lacks actual knowledge if "the employee conducting the transaction" lacked actual knowledge after making reasonable inquiry. *Id.* § 5-1504(1)(f). Here, the record does not establish which employees conducted the respective transfers, what information was available to them, or whether they made reasonable inquiry. The Koeppel Defendants and Schwab further dispute whether Schwab's procedures required Vogelzang to notify Schwab's estate services department upon learning of the death or only after Schwab received written notification. (Koeppel SUMF ¶ 63; Schwab Resp. to Koeppel SUMF ¶ 63). Those disputes bear directly on actual notice and good faith.

Further still, questions concerning injury and damages remain. The challenged transfers originated from two different accounts, and the Koeppel Defendants have not established that they were entitled at all to assets transferred from the traditional IRA. (*See generally* Koeppel Mov. Br. & Koeppel Opp'n Br. against Schwab). The Court therefore cannot determine on the present motions whether the transfers caused the Koeppel Defendants a compensable loss or the amount of any such loss.

Accordingly, the automatic termination of Ms. Senter's authority does not entitle the Koeppel Defendants to summary judgment in light of the POA Agreement's written-notice provision and the unresolved questions concerning actual notice, reasonable inquiry, causation, and damages. Conversely, the POA Agreement and the absence of written notice do not entitle Schwab to summary judgment because the record does not conclusively establish that Schwab lacked actual notice and acted in good faith when it processed the challenged transfers. The Court therefore DENIES the Koeppel Defendants' motion for summary judgment on their negligence counterclaim and DENIES Schwab's cross-motion insofar as it seeks dismissal of the claim arising from the post-death transfers.

## V. CONCLUSION

For the foregoing reasons, the Court will condition its exercise of subject matter jurisdiction on Schwab's deposit of the disputed funds with the Clerk of the Court. The Court will: (i) condition its exercise of subject-matter jurisdiction on Schwab's deposit of the disputed funds; (ii) **GRANT in part** and **DENY in part** the Koeppel Defendants' motion to exclude FitzPatrick's testimony; (iii) permit Schwab to invoke interpleader but deny its request for discharge and dismissal of the counterclaims; (iv) **GRANT** the Koeppel Defendants summary judgment as to the undisputed fifty percent of the Roth IRA and **DENY** both the Koeppel Defendants and the Stern Defendants' motions for summary judgment as to the disputed fifty percent; and (v) **GRANT in part** and **DENY in part** the motions directed to the counterclaims asserted against Schwab. An appropriate Order accompanies this Opinion.

### All Citations

Slip Copy, 2026 WL 2969569

Footnotes

1 Mitchell Koeppel was the father of Defendants Alexia Koeppel. (Compl. ¶ 2). Defendants H. Andrew Schwed and Meredith Koeppel Schwed are the parents and legal guardians of minors N-S. and A-S (the "Koeppel children"). (*Id.* ¶ 3). Defendants Aaron Stern and Lindsay Senter are the parents and legal guardians of minors R.S. and A.S. (the "Stern children"). (*Id.* ¶ 4).

2 The following facts are drawn from the parties' statements of material facts, responses thereto, and, where appropriate, other portions of the underlying record. (*See* the Stern Defendants' Statement of Undisputed Material Facts (D.E. No. 130-2 ("Stern SUMF")); the Koeppel Defendants' Statement of Undisputed Material Facts (D.E. No. 135-3 ("Koeppel SUMF")); Schwab's Statement of Undisputed Material Facts (D.E. No. 136-2 ("Schwab SUMF")); the Stern Defendants' response to the Koeppel SUMF (D.E. No. 132-1 ("Stern Resp. to Koeppel SUMF")); the Stern Defendants' response to

the Schwab SUMF (D.E. No. 133-1 ("Stern Resp. to Schwab SUMF")); the Koeppel Defendants' response to the Stern SUMF (D.E. No. 135-8 ("Koeppel Resp. to Stern SUMF")); the Koeppel Defendants' response to the Schwab SUMF (D.E. No. 135-67 ("Koeppel Resp. to Schwab SUMF")); and Schwab's responses to the Koeppel SUMF and the Stern SUMF (D.E. Nos. 136-3 & 136-4 ("Schwab Resp. to Koeppel SUMF" and "Schwab Resp. to Stern SUMF"))). The Court also considered the declarations and accompanying exhibits the parties submitted in support of their motions.

Unless otherwise indicated, the facts are undisputed. Where a party purports to dispute an asserted (and properly supported) fact but fails to cite record evidence contradicting it, the Court treats the fact as undisputed for purposes of the pending motions. *See Grant v. Revera Inc.*, Civ. No. 12-5857, 2014 WL 7341198, at *2 (D.N.J. Dec. 23, 2014) ("Where ... a party fails to respond to the movant's statement of undisputed material facts ... with a precise citation to the factual record where contrary evidence exists, then the Court assumes that the opponent has no evidence raising a genuine dispute with the movant's stated fact."). Where the parties have identified conflicting record evidence, the Court notes the dispute and, in considering each motion, draws all reasonable inferences in favor of the non-moving party. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, (2000) ("[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.") (citing *Lytle v. Household Mfg., Inc.,* 494 U.S. 545, 554–55 (1990)).

3 The Court notes that the parties submitted several statements of fact pursuant to Local Civil Rule 56.1. For efficiency, where the parties agree on a fact, the Court cites only one party's statement.

4 Though not pertinent to the Court's analysis, the exact date is disputed by the Koeppel Defendants. (Koeppel Resp. to Schwab SUMF ¶ 2).

5 Schwab states its Power of Attorney and Authorization Agreement required written notification, which it did not receive until November 18, 2021. (Schwab SUMF ¶ 9).

6 However, the Court notes that a party may not ordinarily raise a new argument for the first time in reply. *See Ballas v. Tedesco*, 41 F.Supp.2d 531, 533 (D.N.J. 1999) ("A moving party may not raise new issues and present new factual materials in a reply brief that it should have raised in its initial brief."); *see also United States v. Concepcion*, 679 F. App'x 230, 232 n. 1 (3d Cir. 2017) (refusing to consider arguments raised for the first time in a reply brief); *Stern v. Halligan*, 158 F.3d 729, 731 n. 3 (3d Cir. 1998) ("A party cannot raise issues for the first time in a reply brief."); *United States v. Boggi*, 74 F.3d 470, 478 (3d Cir. 1996) (declining to consider arguments raised in a reply brief to avoid prejudice to appellees).

7 Although the Court does not rely on FitzPatrick's unsworn reports as evidence in resolving the pending motions for summary judgment, it considers them to determine their admissibility under Rule 702.

8 The Koeppel Defendants do not challenge Schwab's resort to interpleader to resolve the competing claims to the Roth IRA. Instead, they contend that Schwab is independently liable because it permitted non-party Madelaine Senter to withdraw funds from the Decedent's accounts after his death, when her authority under the relevant powers of attorney had terminated. (*See* Koeppel Mov. Br. at 25–27).

9 The Third Circuit further noted that under the "modern approach" regarding interpleader practice, where "a claimant brings an independent counterclaim against the stakeholder, the stakeholder is kept in the litigation to defend against the counterclaim, rather than being dismissed after depositing the disputed funds with the court." *Hovis*, 553 F.3d at 264.

10 The Court notes that Schwab does not separately brief the choice-of-law issue in connection with its cross-motion for summary judgment. (*See generally* Schwab Mov. Br.). Although Schwab argues that California law applies in opposing the Koeppel Defendants' motion for summary judgment, its legal analysis of the counterclaims principally relies on New York law. (*Id.*).

11 *Homa* was later abrogated on other grounds by *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011).

12 Restatement § 188(2) provides that, "[i]n the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue." Here, the Decedent was "a life-long New York resident who opened the Roth IRA ... with Schwab in New York." (Koeppel SUMF ¶ 3). Moreover, the acts and transactions giving rise to this current dispute took place in New York. (*Id.* ¶ 38). Accordingly, the Court concludes that New York law would apply to this dispute in the absence of the choice-of-law provision.

13 The Restatement's comment concerning "contracts relating to wills" does not alter the Court's conclusion. EPTL § 13-3.2 itself distinguishes the beneficiary designations governed by that provision from testamentary transfers, providing that rights arising from pension, retirement, and similar beneficiary designations "shall not be impaired or defeated by any statute or rule of law governing the transfer of property by will, gift or intestacy." EPTL § 13-3.2(a). Thus, although the designation operates upon death, New York law itself does not treat the disposition as an ordinary testamentary transfer.

14 The Court notes that the Koeppel Defendants dispute the legal effect of these events, principally whether Vogelzang had authority to effectuate the change without a signed form, but not that the information was entered into Client Central and reflected in the Account Verification Letter. (Koeppel Resp. to Stern SUMF ¶¶ 11–12 & 14).

15 The Court further notes that although the Koeppel Defendants plead counterclaims for breach of contract, breach of fiduciary duty, and negligence, their summary-judgment submissions do not brief nor defend the fiduciary-duty claim against Schwab's cross-motion. (*See generally* D.E. No. 74 ¶¶ 22–47; D.E. No. 135-68 ("Koeppel Opp'n Br. against Schwab"); D.E. No 135-7 ("Koeppel Opp'n Br. against Stern")). Where a party fails to defend a claim in opposition to a motion for summary judgment, courts in this District ordinarily treat the claim as abandoned. *See Greene v. Elizabeth Police Department*, No. 18-8972, 2023 WL 6233124, at *5 (D.N.J. Sept. 26, 2023); *Bernard v. Webb-McRae*, No. 17-7030, 2020 WL 1329934, at *2 (D.N.J. Mar. 23, 2020); *see also DLJ Mortgage Capital, Inc. v. Stevens*, 167 F.4th 632, 635 (3d Cir. 2026) (holding that a matter raised in a pleading but not asserted in opposition to summary judgment is forfeited). The Court therefore treats the Koeppel Defendants' breach-of-fiduciary-duty counterclaim as abandoned. Their breach-of-contract counterclaim is not similarly abandoned because their opening brief expressly seeks judgment on that claim and develops the asserted contractual rights arising from the September 2019 designation. (Koeppel Mov. Br. at 14). Nor have they abandoned their negligence counterclaim insofar as it concerns Schwab's alleged failure to safeguard the accounts after the Decedent's death. (*Id.* at 25–27; Koeppel Opp'n Br. against Schwab at 23–26). The Court therefore addresses those two counterclaims on their merits.

16 The Koeppel Defendants in their moving brief state that the challenged transfers totaled $91,000 but identify the aggregate amount as $90,500 in their opposition brief. (*Compare* Koeppel Mov. Br. at 27, *with* Koeppel Opp'n Br. against Schwab at 23). The record reflects transfers totaling $91,000. (*See* Koeppel SUMF ¶¶ 66–70; D.E. Nos. 135-60, 135-62, 135-63, 135-64 & 135-65). The Court therefore adopts the $91,000 figure.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.